UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CHRISTOPHER HART, JEFFREY BEYER, MARIA
SARGENT, TAYLOR RAMSEY, ANDREA
RANDLETT and SHELLY CARRERA,
*on behalf of themselves and all other employees similarly
situated,*

Plaintiffs,

v.

CRAB ADDISON, INC. d/b/a JOE'S CRAB SHACK,
IGNITE RESTAURANT GROUP, INC., RAYMOND
A. BLANCHETTE III, KEVIN COTTINGIM and
RODNEY MORRIS,

*Defendants.*

CLASS AND COLLECTIVE ACTION
COMPLAINT
AND DEMAND FOR JURY TRIAL

Civil Action
No. 13-cv-6458

Plaintiffs Christopher Hart, Jeffrey Beyer, Maria Sargent, Taylor Ramsey, Andrea

Randlett and Shelly Carrera ("Named Plaintiffs"), on behalf of themselves and all other

persons similarly situated (collectively, "Plaintiffs"), by and through their attorneys Thomas

& Solomon LLP, bring this class and collective action complaint against Defendants Crab

Addison, Inc. d/b/a Joe's Crab Shack, Ignite Restaurant Group, Inc., Raymond A. Blanchette

III, Kevin Cottingim and Rodney Morris (collectively, "Defendants").

## NATURE OF ACTION

1.     This lawsuit seeks to recover minimum wages, injunctive relief and declaratory

relief to redress the deprivation of rights secured to Named Plaintiffs and similarly situated

co-workers (servers, bartenders, bussers, hosts and all other tipped employees) who worked or

have worked at Defendants' Joe's Crab Shack restaurants.

2.     Named Plaintiffs bring this action on behalf of themselves and similarly

situated current and former tipped hourly food service workers who elect to opt-in to this

action pursuant to the Fair Labor Standards Act of 1938 as amended, 29 U.S.C. § 201 *et seq.* ("FLSA"), specifically, the collective action provision of 29 U.S.C. § 216(b). To date, in addition to the six Named Plaintiffs, forty-one individuals have already opted-in into this lawsuit.

3.     Named Plaintiffs also bring this action on behalf of themselves and similarly situated current and former tipped hourly food service workers pursuant to Federal Rule of Civil Procedure 23 to remedy the violations of applicable state labor laws and regulations including: New York Minimum Wage Act, Article 19, § 650 *et seq.*, New York State Department of Labor Regulations, including, but not limited to, 12 N.Y.C.R.R. §137-2.2 and §146.2-2, New York Labor Law ("NYLL") § 195(3) as amended by the New York Wage Theft Prevention Act, Maryland Labor and Employment Code §§3-413, 3-507.2, Missouri's Minimum Wage Law, §290.502, *et seq.*, Arizona's Minimum Wage Act §23-363, *et seq.*, Illinois Minimum Wage Law - 820 ILCS 105/1 *et seq.*, and Illinois Wage Payment and Collection Act – 820 ILCS 115/1 *et seq.* (collectively "State Labor Laws").

4.     Defendants have a policy to pay Plaintiffs subminimum wage rates as described in more detail in Plaintiffs' Affirmations submitted contemporaneously with this Complaint in support of Plaintiffs' Motion for Expedited Notice Pursuant to the FLSA.

5.     Defendants' policy is to not pay Plaintiffs the legally required minimum wage even though the Plaintiffs are performing jobs unrelated to their tipped job.

6.     Instead, Defendants, as matter of policy, pay Plaintiffs subminimum wage rates and require they perform non tip producing duties such as washing dishes, kitchen prep and janitorial tasks which Defendants refer to as "back of the house" duties.

7.     Accordingly, Defendants cannot meet the FLSA's tip credit requirements

codified at 29 U.S.C. §203(m).

8.      Therefore Defendants are not entitled to a tip credit against the minimum wage owed to the tipped employees.  As a result, like the Named Plaintiffs, Defendants' tipped employees are entitled to at least $7.25 for each hour worked.

9.      Further, none of the Defendants nor any of the managers of Defendants' business provided requisite notice to Plaintiffs regarding the tip credit as required by the FLSA, NYLL codified at N.Y.C.R.R. §§137-2.2, 146.2-2 and Arizona's Administrative Code § R20-5-1207(c).

## JURISDICTION AND VENUE

10.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343 (3) and (4) conferring original jurisdiction upon this Court of any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights; under 28 U.S.C. § 1337 conferring jurisdiction of any civil action arising under any Act of Congress regulating interstate commerce; under the Declaratory Judgment Statute, 28 U.S.C. § 2201; and under 29 U.S.C. § 216(b).

11.     The Court has jurisdiction over Plaintiffs' State Labor Law claims under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d).  Plaintiffs' claims for violations of the State Labor Laws have a value in excess of $5,000,000 exclusive of fees and costs. Citizenship of the members of the proposed subclasses is dispersed among a number of states. Upon information and belief, greater than two-thirds of the members of all proposed subclasses in the aggregate are not citizens of the same state.  The number of putative subclass members exceeds 100.  At least one member of the proposed subclasses is a citizen of a state different from that of at least one defendant.  Plaintiffs' claims involve matters of

national or interstate interest.

12.     This Court also has supplemental jurisdiction over the State Labor Laws under 28 U.S.C. § 1367(a) because the Plaintiffs' allegations of State Labor Laws are related and arise from the same core of operative facts as Plaintiffs' allegations for violations of the FLSA.

## COLLECTIVE ACTION ALLEGATIONS

13.     Named Plaintiffs bring this action on behalf of themselves and all other similarly situated employees as authorized under 29 U.S.C. § 216(b).   The employees similarly situated for purposes of the collective action are:

> All Defendants' current and former employees who in the last three years have worked as tipped hourly food service workers and were paid subminimum wages at Defendants' Joe's Crab Shack restaurants, who elect to opt-in to this action.

14.     In addition, at all times relevant to the litigation, Defendants' policy and pattern or practice did not notify the Named Plaintiffs and similarly situated employees of the FLSA's tip credit provision 29 U.S.C. § 203(m) and supporting Federal Regulations, including, but not limited to, 29 C.F.R. §516.4.  Accordingly, Defendants are not entitled to pay Plaintiffs' subminimum wages under the FLSA.

15.     Defendants knowingly and willfully operate their business with a policy of not paying the FLSA minimum wage to the Named Plaintiffs and other similarly situated employees.  Moreover, Defendants were sued for minimum wage violations, and thus were properly put on notice of their invalid compensation schemes.   However, Defendants continued to ignore the law and failed to properly compensate the Named Plaintiffs and other similarly situated employees even though they were put on notice that they had violated employees' rights.

16.     Moreover, Defendants are aware or should have been aware that federal law

required them to pay employees minimum wage for performing non tip producing work.

17.     Further, Defendants are aware or should have been aware that federal law required them to provide requisite notice to tipped employees as required by the FLSA.

18.     Plaintiffs are similarly situated in that they have similar job duties and similar pay provisions based on Defendants' illegal pay policy requiring they perform non-tip producing duties and are paid subminimum wages.

19.     There are numerous similarly situated current and former tipped employees of Defendants who work or worked at Joe's Crab Shack restaurants who would benefit from issuance of a Court supervised notice of the instant lawsuit and the opportunity to join in the present lawsuit.

20.     Similarly situated employees are known to Defendants and readily identifiable by Defendants through Defendants' payroll records.

21.     Therefore, Named Plaintiffs should be permitted to bring this action as a collective action for and on behalf of those employees similarly situated pursuant to the opt-in provision of the FLSA, 29 U.S.C. § 216(b).

22.     Annexed hereto as Exhibit A are the written consents to filing this complaint duly executed by the six Named Plaintiffs pursuant to 29 U.S.C. §216(b).

23.     Annexed hereto as Exhibit B are the written consents to filing this complaint duly executed by forty-one additional Plaintiffs pursuant to 29 U.S.C. §216(b).

## CLASS ACTION ALLEGATIONS

24.     The claims arising under the State Labor Laws of New York, Maryland, Missouri, Arizona and Illinois are properly maintainable as a class action under Federal Rule of Civil Procedure 23 ("Rule 23").

25.     The Rule 23 class consists of the following five subclasses:

**1. New York Subclass**: All persons who have worked as tipped, hourly food service workers at Joe's Crab Shack restaurants in New York, between August 28, 2007 and the date of final judgment in this matter ("New York Subclass").

**2. Maryland Subclass**: All persons who have worked as tipped, hourly food service workers at Joe's Crab Shack restaurants in Maryland between August 28, 2010 and the date of final judgment in this matter ("Maryland Subclass").

**3. Missouri Subclass**: All persons who have worked as tipped, hourly food service workers at Joe's Crab Shack restaurants in Missouri between August 28, 2011 and the date of final judgment in this matter ("Missouri Subclass").

**4. Arizona Subclass**: All persons who have worked as tipped, hourly food service workers at Joe's Crab Shack restaurants in Arizona between August 28, 2010 and the date of final judgment in this matter (Arizona Subclass").

**5. Illinois Subclass**: All persons who have worked as tipped, hourly food service workers at Joe's Crab Shack restaurants in Illinois between August 28, 2003 and the date of final judgment in this matter ("Illinois Subclass").

26.     The class action is maintainable under subsections (1), (2), (3) and (4) of Rule 23(a).

27.     The number of putative subclass members is over 100.

28.     The Named Plaintiffs claims share common issues of law and fact as to whether they were paid properly and have common claims that are typical of the claims of the subclass members because they are employed by Defendants, paid subminimum wages and required to perform non tip producing duties including "back of the house" duties such as washing dishes, kitchen prep and janitorial tasks.

29.     Common issues of law and fact predominate in this action because resolution of them will resolve a significant aspect of this litigation for each subclass member in one stroke including, but are not limited to, the following:

- Whether Defendants violated the respective State Labor Laws and supporting regulations by paying employees subminimum wages and requiring tipped

employees to perform non tip producing duties such as washing dishes, kitchen prep and janitorial tasks;

- Whether Defendants correctly compensated the Named Plaintiffs and the members of the subclasses for all hours worked;

- Whether Defendants knew or should have known that tipped employees were performing non-tip producing duties, including, but not limited to, kitchen and janitorial duties;

- Whether Named Plaintiffs and subclass members were systematically not paid minimum wage for performing non-tip producing duties, including, but not limited to, janitorial and kitchen related jobs;

- The minimum wage rate to which the subclasses are entitled;

- Whether Defendants' policy of failing to pay Named Plaintiffs and the subclass members was willful or in reckless disregard of the law;

- Whether Defendants violated the NYLL and supporting regulations by failing to provide the requisite notice to New York Subclass regarding the tip credit; and

- Whether Defendants violated the Arizona Administrative Code by failing to provide the requisite notice to the Arizona Subclass regarding the tip credit.

30. Further, there are no known conflicts of interest between the Named Plaintiffs and the subclass members. Moreover, the Named Plaintiffs will adequately represent the interests of the subclass members because they are similarly situated to the subclass members.

31. The Class Counsel, Thomas & Solomon LLP, is qualified and able to litigate the Named Plaintiffs' and subclass members' claims.

32. The Class Counsel concentrates its practice in employment litigation, and its attorneys are experienced in class action litigation, including class actions arising under wage and hour laws.

33. The class action is also maintainable under subsection (2) of Rule 23(b) because the Named Plaintiffs and subclass members seek injunctive relief against Defendants

and their officer, agents, successors, employees, representatives and any all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein.

34.     Moreover, the class action is maintainable under subsection (3) of Rule 23(b) because the Named Plaintiffs and subclass members seek to resolve common questions of law and fact (*see supra* ¶29) that predominate among the Named Plaintiffs and subclass members and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

35.     The subclasses are also maintainable under Rule 23(c)(4) because resolution of common issues will significantly advance the litigation or entitle Plaintiffs to injunctive relief.

**PARTIES**

A.     **Plaintiffs**

36.     Christopher Hart, Jeffrey Beyer, Taylor Ramsey, Maria Sargent, Andrea Randlett and Shelly Carrera were tipped hourly employees of Defendants under the FLSA and the relevant State Labor Laws.

37.     Christopher Hart worked for Defendants as a server from approximately August 2011 to January 2013 at the Henrietta, New York location. Mr. Hart resides within this District.

38.     Jeffrey Beyer worked for Defendants as a server from approximately August 2011 to December 2012 at the Henrietta, New York location.  Mr. Beyer resides within this District.

39.     Taylor Ramsey worked for Defendants as a hostess from approximately July 2012 to September 2012 at the Branson, Missouri location. Ms. Ramsey resides in Illinois.

40.     Maria Sargent worked for Defendants as a server from approximately May 2011 to June 2012 at the Greenbelt, Maryland location. Ms. Sargent resides in Maryland.

41.     Andrea Randlett worked for Defendants as a server from approximately May 2012 to August 2012 at the Tempe, Arizona location.  Ms. Randlett resides in Arizona.

42.     Shelly Carrera worked for Defendants as a server and bartender from approximately June 2011 to June 2012 at the Fairview Heights, Illinois location. Ms. Carrera resides in Illinois.

43.     The Named Plaintiffs, along with other tipped employees, were subject to Defendants' policy which paid them subminimum wages for work in jobs that were unrelated to their tipped jobs or were jobs that were not directed towards producing tips.

44.     Some examples of the jobs Named Plaintiffs, along with other tipped employees, had to perform under Defendant's policy at subminimum wages were:

- cleaning the dining room,

- dusting the pictures on the walls,

- windexing all the interior windows and picture frames,

- scrubbing the legs of all the chairs,

- degreasing and shining exposed metal including tables, garage doors and window sills,

- cleaning the cracks of the booths,

- cleaning, cutting and portioning out vegetables, noodles and rice for cooks,

- preparing sanitation buckets for prep and expo areas,

- setting up the expo line,

- breaking apart and cleaning the soda machines, tea dispensers and expo line,

- removing, then cleaning the light fixtures,

- scrapping gum from under every table in the store,

- cleaning and wiping down all the shelves in the kitchen after removing all the items on the shelves,

- cleaning every window in the store and moving furniture to clean underneath,

- deck brushing the floors,

- cleaning and sanitizing sinks,

- sweeping the entire restaurant,

- emptying garbage and replacing liners,

- taking garbage to the dumpsters,

- washing dishes,

- stocking beverage stations,

- keeping ice bins full,

- sorting and polishing silverware and placing it in racks,

- sweeping the floor of the expo line,

- cleaning the keg cooler,

- wiping down the bar stools,

- cleaning the blinds,

- cleaning every display bottle at the bar and the display surfaces and

- stocking lemons, creamers and "to go" containers.

45.    Plaintiffs performed these jobs at subminimum wages with great frequency.

46.    Moreover, Named Plaintiffs were not informed of the tip credit as required by the FLSA.

*Christopher Hart*

47.    Pursuant to Defendants' policy, Named Plaintiff Christopher Hart was regularly scheduled to work an 8 hour shift and would spend more than half of his shift (4.5 hours) performing non tip producing duties and was paid a subminimum wage.

48.    Depending on the shift, Mr. Hart was assigned "opener duties" or "closer duties" in addition to "running sidework".  Defendants required that Mr. Hart complete the following "opener duties": cleaning the dining room and all the wood work with a bucket filled with sanitizer solution; dusting the pictures on the walls and windexing the interior windows and picture frames; scrubbing the legs of all the chairs; degreasing and shining exposed metal including: tables, garage doors and window sills; cleaning out the cracks of the booths; cleaning, cutting and portioning out vegetables, noodles and rice for cooks; preparing sanitation buckets for prep and expo areas and setting up the expo line.  Mr. Hart spent one hour per shift performing these "opener duties" for which he was paid a subminimum wage.

49.    Depending on the shift, Defendants also required that Mr. Hart complete the following "closer duties" which included: breaking apart and cleaning the soda machines, tea dispensers and expo line; removing, then cleaning the light fixtures; scraping the gum from under every table in the store; cleaning and wiping down all the shelves in the kitchen after removing all the items on the shelves; cleaning every window in the store; moving furniture to clean underneath; deck brushing the floors; cleaning and sanitizing sinks; sweeping the entire restaurant; emptying garbage and replacing liners then taking the garbage to the dumpsters. Mr. Hart would spend one hour per shift performing these "closer duties" for which he was paid a subminimum wage.

50.    When he was assigned opener or closer duties, Defendants also required Mr.

Hart to complete "running sidework" for the entire restaurant which consisted of: washing dishes because often the restaurant did not have a dishwasher; emptying trash cans and replacing liners; hand wiping all plates and silverware; sweeping, dusting, sanitizing and bleaching coffee cups, mugs, pots and tea kettles. Mr. Hart would spend 3.5 hours completing "running sidework" for which he was paid a subminimum wage.

51.     Together with opener or closer duties, Mr. Hart spent more than half of his shift (4.5 hours) performing non tip producing duties and was paid a subminimum wage.

52.     Defendants failed to provide Mr. Hart with wage statements that contained allowances claimed by Defendants including the tip credit as required by the NYLL.

*Jeffrey Beyer*

53.     Pursuant to Defendants' policy, Named Plaintiff Jeffrey Beyer was regularly scheduled to work 6 and 8 hour shifts and would spend more than half of his shift (3.5 hours or 4.5 hours) performing non tip producing duties and was paid a subminimum wage.

54.     Depending on the shift, Mr. Beyer was assigned "opener duties" or "closer duties" in addition to "running sidework".  Defendants required Mr. Beyer to complete the following "opener duties": cleaning the dining room and all the wood work with a bucket filled with sanitizer solution; dusting the pictures on the wall and windexing the interior windows and picture frames; scrubbing the legs of all the chairs; degreasing and shining exposed metal tables, garage doors and window sills; cleaning out the cracks of the booths; cleaning, cutting and portioning out vegetables, noodles and rice for cooks; preparing sanitation buckets for prep and expo areas and setting up the expo line. Mr. Beyer spent one hour per shift performing these "opener duties" for which he was paid a subminimum wage.

55.     Depending on the shift, Defendants also required Mr. Beyer to complete the

following "closer duties": breaking apart and cleaning the soda machines, tea dispensers and expo line; removing, then cleaning the light fixtures; scraping the gum from under every table in the store; cleaning and wiping down all the shelves in the kitchen after removing all the items on the shelves; cleaning every window in the store; moving furniture to clean underneath; deck brushing the floors; cleaning and sanitizing sinks; sweeping the entire restaurant; emptying garbage and replacing liners then taking the garbage to the dumpsters. Mr. Beyer spent one hour per shift performing these "closer duties" for which he was paid a subminimum wage.

56.    When he was assigned opener or closer duties, during the same shift Defendants also required Mr. Beyer to complete "running sidework" for the entire restaurant which consisted of: washing dishes because the restaurant often did not have a dishwasher; empting trash cans and replacing liners; hand wiping all plates and silverware; sweeping, dusting, sanitizing and bleaching coffee cups, mugs, pots and tea kettles; performing expediter duties; stocking beverage stations; keeping ice bins full; sorting and polishing silverware and placing it in racks; sweeping the floor of the expo line and stocking lemons, creamers and "to go" containers. Depending on the shift he worked, Jeffrey Beyer would spend 2.5 hours (6 hour shift) or 3.5 hours (8 hour shift) completing "running sidework" for which he was paid a subminimum wage.

57.    Together with the opener or closer duties, Mr. Beyer spent more than half of his shift (3.5 or 4.5 hours) performing non tip producing duties and was paid a subminimum wage.

58.    Defendants failed to provide Mr. Beyer with wage statements that contained allowances claimed by Defendants including the tip credit as required by the NYLL.

*Taylor Ramsey*

59.    Pursuant to Defendants' policy, Named Plaintiff Taylor Ramsey was regularly scheduled to work 8 hour shifts and would spend more than half of her shift (4.5 hours) performing non tip producing duties and was paid a subminimum wage.

60.    Ms. Ramsey was assigned "closer duties" in addition to "running sidework". Defendants required Ms. Ramsey to complete the following "closer duties": breaking apart and cleaning the soda machines, tea dispensers and expo line; cleaning and wiping down all the shelves in the retail area; cleaning every window in the store and moving furniture to clean underneath. Ms. Ramsey spent one hour per shift performing these "closer duties" for which she was paid a subminimum wage.

61.    When she was assigned closer duties, during the same shift Defendants also required Ms. Ramsey to complete "running sidework" for the entire restaurant which consisted of: vacuuming, sweeping, dusting, sanitizing and replacing all paper products in the bathrooms; cleaning the bathroom floors; washing the store's windows; rolling silverware and filling salt and pepper shakers. Ms. Ramsey would spend 3.5 hours completing "running sidework" for which she was paid a subminimum wage.

62.    Together with the closer duties, Ms. Ramsey spent more than half of her shift (4.5 hours) performing non tip producing duties and was paid a subminimum wage.

*Maria Sargent*

63.    Pursuant to Defendants' policy, Named Plaintiff Maria Sargent was regularly scheduled to work 6 hour shifts and would spend more than half of her shift (3.5 hours) performing non tip producing duties and was paid a subminimum wage.

64.    Depending on the shift, Ms. Sargent was assigned "opener duties" or "closer

duties" in addition to "running sidework".  Defendants required Ms. Sargent to complete the following "opener duties": cleaning the dining room with a bucket filled with sanitizer solution; dusting the pictures on the wall and windexing the interior windows and picture frames; scrubbing the legs of all the chairs; degreasing and shining exposed metal including: tables, garage doors and window sills; cleaning out the cracks of the booths; portioning out sugar for iced tea; preparing sanitation buckets for prep and expo areas; setting up the expo line.  Ms. Sargent spent one hour per shift performing these "opener duties" for which she was paid a subminimum wage.

65.    Depending on the shift, Defendants also required Ms. Sargent to complete the following "closer duties": breaking apart and cleaning the soda machines, tea dispensers and expo line; removing, then cleaning the light fixtures; scraping the gum from under every table in the store; cleaning and wiping down all the shelves in the kitchen after removing all the items on the shelves; cleaning every window in the store; moving furniture to clean underneath; cleaning and sanitizing sinks; sweeping the entire restaurant; emptying garbage and replacing liners.  Ms. Sargent spent one hour per shift performing these "closer duties" for which she was paid a subminimum wage.

66.    When she was assigned opener or closer duties, during the same shift, Defendants also required Ms. Sargent to complete "running sidework" for the entire restaurant which consisted of: washing the dishes for the entire store because often the store did not have a dishwasher present to clean the dishes; emptying trash cans and replacing liners; hand wiping all plates and silverware before they left the kitchen; sweeping, dusting, sanitizing and washing the store's windows; bleaching coffee cups, mugs, pots and tea kettles; performing expediter duties; stocking beverage stations; keeping ice bins full; sorting and

polishing silverware and placing it in racks; sweeping the floor of the expo line and stocking lemons, creamers and "to-go" containers. Ms. Sargent would spend 2.5 hours completing "running sidework" for which she was paid a subminimum wage.

67. Together with the opener or closer duties, Ms. Sargent spent more than half of her shift (3.5 hours) performing non tip producing duties and was paid a subminimum wage.

*Andrea Randlett*

68. Pursuant to Defendants' policy, Named Plaintiff Andrea Randlett was regularly scheduled to work 8 hour shifts and would spend more than half of her shift (4.5 hours) performing non tip producing duties and was paid a subminimum wage.

69. Depending on the shift, Ms. Randlett was assigned "opener duties" or "closer duties" in addition to "running sidework". Defendants required Ms. Randlett to complete the following "opener duties": cleaning the dining room with sanitizer; dusting the artifacts and memorabilia hanging on the walls; windexing all photos on the walls; scrubbing the legs of all the chairs; dusting all TVs; wiping down all the wrought iron; cleaning out the cracks of the booths; preparing sanitation buckets; preparing desserts for the entire store; setting up the salad bar and expo line. Ms. Randlett spent at least one hour performing these "opener duties" for which she was paid a subminimum wage.

70. Depending on the shift, Defendants required Ms. Randlett complete the following "closer duties": breaking apart and cleaning the soda machine and expo line; removing, then cleaning the light fixtures; scrapping the gum from under every table in the store; cleaning and wiping down all the shelves in the kitchen after removing all the items on the shelves; cleaning every window in the store and moving furniture to clean underneath. Ms. Randlett spent at least one hour performing these "closer duties" for which she was paid

a subminimum wage.

71.    When she was assigned opener or closer duties, during the same shift Defendants required Ms. Randlett to complete "running sidework" for the entire restaurant which consisted of: washing dishes; sweeping, dusting, sanitizing; replacing all paper products in the bathrooms; cleaning the bathroom floors; washing the store's windows; bleaching coffee cups, mugs, pots and tea kettles; cleaning crackers and zippers.  Ms. Randlett would spend at least 3.5 hours completing "running sidework" for which she was paid a subminimum wage.

72.    Together with the opener or closer duties, Ms. Randlett spent more than half of her shift (4.5 hours) performing non tip producing duties and was paid a subminimum wage.

73.    Defendants failed to provide Ms. Randlett with a wage statement that included the amount the Defendants took as a tip credit as required by the Arizona Administrative Code.

### Shelly Carrera

74.    Pursuant to Defendants' policy, Named Plaintiff Shelly Carrera was regularly scheduled to work 8 hour shifts and would half of her shift (4 hours) performing non tip producing duties and was paid a subminimum wage.

75.    Depending on the shift, Ms. Carrera was assigned "opener duties" or "closer duties" in addition to "running sidework".  Defendants required Ms. Carrera to complete the following "opener duties": cleaning the dining room and all the wood work with sanitizer; cleaning the mats in the beverage area; taking out the trash and cleaning the cracks in the booths; prepping desserts; making ice cream balls; plating up desserts; washing dishes;

preparing sanitation buckets; stocking ice; slicing lemons and stocking fruit. Ms. Carrera spent at least one hour per shift performing these "opener duties" for which she was paid a subminimum wage.

76.     Defendants also required that Ms. Carrera complete the following "closer duties": breaking apart and cleaning the soda machine and expo line; removing then cleaning the light fixtures; stock and clean silverware; scrapping the gum from under every table in the store; clean and wipe down all the shelves in the kitchen after removing all the items on the shelves; moving furniture to clean underneath; wiping down the bar stools; cleaning the keg cooler; cleaning the blinds and cleaning every display bottle at the bar and the display surfaces. Ms. Carrera spent at least one hour per shift performing these "closer duties" for which she was paid a subminimum wage.

77.     When she was assigned opener or closer duties, during the same shift Defendants required Ms. Carrera to complete "running sidework" for the entire restaurant which consisted of: sweeping, dusting, sanitizing and washing the store's windows; bleaching coffee cups, mugs, pots and tea kettles; cleaning the zippers and crackers. Ms. Carrera would spend at least 3 hours completing "running sidework" for which she was paid a subminimum wage.

78.     Together with the opener or closer duties, Ms. Carrera spent half of her shift (4 hours) performing non tip producing duties and was paid a subminimum wage.

**B.     Defendants**

79.     At all times relevant hereto, Plaintiffs were "employees" of Defendants within the meaning of the FLSA and the respective State Labor Laws.

80.     At all times relevant hereto, Defendants are a covered employer within the

meaning of the FLSA and the respective State Labor Laws.

81.     Defendants are engaged in interstate commerce, and their annual gross volume of sales made or business done exceeds $500,000, exclusive of excise taxes.

82.     During the course of their employment by Defendants, Plaintiffs handled goods, including perishable produce and other food products that moved in interstate commerce.

*Ignite Restaurant Group, Inc.*

83.     Defendant Ignite owns and operates 135 Joe's Crab Shack restaurants in 34 states and are known as "come as you are" family-friendly seafood restaurants.  Joe's Crab Shack restaurants vary somewhat in size and dimensions, but, on average, the typical restaurant averages 8,000 square feet and can serve over 200 guests at one time.

84.     Ignite is one of the nation's largest full service restaurant companies.  Along with owning and operating Joe's Crab Shack restaurants, Ignite owns and operates other well-known chain restaurants nationwide including: Romano's Macaroni Grill and Brick House Tavern + Tap.

85.     Ignite is a publicly traded company on the NASDAQ (ticker symbol IRG). Ignite is incorporated in the State of Delaware and maintains corporate offices located at 9900 Westpark Drive, Suite 300, Houston, Texas 77063.  Information for Ignite can be found at www.igniterestaurants.com.

86.     Ignite reported total revenues of over $400 million for fiscal year 2012.

87.     Ignite's corporate address is listed on Plaintiff's paystubs and Ignite is listed as the employer on Plaintiffs' W-2 Wage and Tax Statements.

88.     Ignite is the employer of the Plaintiffs as it maintains control, oversight and

- 19 -

direction over Plaintiffs and Class Members including time keeping, payroll and other employment practices that applied to them.

89.    For example, Ignite manages Plaintiffs' work schedules by using "Hot Schedules" at its Joe's Crab Shack restaurants.  Employees access their work schedule on-line through "Hot Schedules".  Accordingly, Ignite maintains Plaintiffs' employment records.

90.    Moreover, Ignite's management team includes a Chief Executive Officer and Senior Vice President of Human Resources who manage the conditions of Plaintiffs' employment and exercises financial control over all Joe's Crab Shack restaurants throughout the nation.  Additionally, Ignite's Board of Directors maintains management control over all Joe's Crab Shack restaurants.

91.    Further, Ignite hires employees by posting job vacancies throughout Joe's Crab Shack restaurants across the nation on their website, www.igniterestaurants.com.

92.    In addition, Ignite's employees are permitted to transfer to any Ignite owned restaurant.

93.    Based in part on these facts, Ignite can be held liable as an employer of the Plaintiffs for the violations complained of in this matter.

*Crab Addison, Inc. d/b/a Joe's Crab Shack*

94.    Crab Addison, Inc. ("Crab Addison") is a wholly-owned subsidiary of Ignite that is responsible for the lease purchases and facilities maintenance of Joe's Crab Shack restaurants.

95.    Crab Addison is a Texas Corporation and shares the same corporate office as Ignite.

96.    Crab Addison is separately incorporated in every state where Joe's Crab Shack

restaurants are operated.

97.    Crab Addison in conjunction with the other Defendants maintains control, oversight and direction over the Plaintiffs including time keeping, payroll and other employment practices that are applied to them.

98.    Crab Addison has admitted that it is an employer of employees who work at Joe's Crab Shack restaurants in other litigation.

99.    Based in part on these facts, Crab Addison can be held liable as an employer of the Plaintiffs for the violations complained of in this matter.

### Raymond A. Blanchette III

100.    Raymond A. Blanchette III is longtime food executive who has served as the Chief Executive Officer of Ignite since 2007.   In terms of his ownership interest, Mr. Blanchette owns stock options in Ignite valued at $170,000.

101.    Defendant Raymond A. Blanchette III is directly in charge of the overall operations of Ignite.   As such, Raymond A. Blanchette III is primarily responsible for enforcing the business decisions as they pertain to Joe's Crab Shack restaurants including the illegal policies complained of in this case.

102.    For example, Mr. Blanchette has the authority to, and does, make decisions that concern Defendants' operations, including functions related to employment, human resources, training, payroll, and benefits.   For example, when Joe's Crab Shack restaurants were acquired in 2007 by JCS Holdings LLC (later renamed Ignite) Mr. Blanchette decided to not layoff any employees and instead decided to hire additional staff to shore up operations at the restaurants.

103.    Moreover, Mr. Blanchette has made several human resource policy decisions

that affect Plaintiffs including requiring that they sing and dance while working to enhance the fun image of Joe's Crab Shack restaurants. Further, Mr. Blanchette decides Plaintiffs' benefit issues, such as how his employees at Joe's Crab Shack restaurants will afford employer provided healthcare through the federal government's recent mandate. In fact, Mr. Blanchette is leading efforts to create opportunities for his employees at Joe's Crab Shack restaurants to have health care for the first time.

104. In addition, Mr. Blanchette manages Ignite's branding activities to gain market share and increase sales by constantly looking to introduce new ideas like Joe's Crab Shack "100% Shore" campaign by focusing on the restaurant's Gulf Coast roots. As part of this branding campaign, Mr. Blanchette made the decision that his employees need to do a better job facilitating the "Joe's Experience", which includes eating food that is shareable, wearing bibs, and eating with your hands while having a drink that looks like you're on vacation. Accordingly, under Mr. Blanchette's direction Ignite regularly runs contests for the Plaintiffs to see who can sell the most tropical drinks or most crab legs on a particular day, week or month to improve the "Joe's Experience".

105. Moreover, Mr. Blanchette makes record-keeping decisions, including the decision to outsource accounting and payroll at the time of the acquisition in 2007.

106. Further, with respect to his financial control, Mr. Blanchette took personal responsibility when Ignite "stumbled out of the gate" and significantly misstated its revenues in it first earning statement as a publically traded company and needed to file revised earning statements.

107. Based in part on these facts, Raymond A. Blanchette III is actively involved in the illegal policies complained of in this case and can be held liable as an employer of the

Plaintiffs for the violations complained of in this matter.

*Kevin Cottingim*

108.   Kevin Cottingim served as Ignite's Senior Vice President & Chief Administrative Officer responsible for human resources and payroll from 2008 until April 2013.  Currently, Mr. Cottingim consults exclusively with Ignite.  In terms of ownership interest, Mr. Cottingim owns stock options in Ignite valued at approximately $40,000.

109.   Defendant Kevin Cottingim was directly in charge of overseeing human resources and payroll and ensuring Defendants' compliance or non-compliance with the Federal and State Labor Laws where Defendants operate Joe's Crab Shack restaurants.  As such, Kevin Cottingim was responsible for the creation and application of the illegal policies complained of in this case.

110.   For example, Mr. Cottingim was actively involved in the determination and drafting of human resources policies, the resolution of issues and disputes regarding hiring and firing Plaintiffs, determining rates of pay and maintaining employment records.  For example, Mr. Cottingim would directly email Plaintiffs who complain about Defendants' human resource policies.  Mr.  Cottingim personally encouraged employees at Joe's Crab Shack restaurants to have open dialogue with himself and Ignite's HR team concerning working conditions and pay rates.

111.   Mr. Cottingim oversaw a team of human resource professionals based at Defendants' headquarters in Houston, Texas that includes Patti Simpson and Robyn Martin. Mr. Cottingim's HR team travelled to Joe's Crab Shack restaurant locations to meet with Plaintiffs to counsel them on their working conditions and pay rates.

112.   Mr. Cottingim was actively involved in Defendants' payroll functions.   For

instance, when Plaintiffs lodge complaints about their compensation, Mr. Cottingim and his HR team would immediately respond directly.

113. Mr. Cottingim was actively involved in Defendants' system for keeping and maintaining employees' payroll records, the timing and method with which payment is conveyed to employees, and the manner and method in which employees receive payroll information including their payroll checks. For example, Mr. Cottingim directed Defendants' payroll department issue checks to Plaintiffs to resolve pay discrepancies

114. Based in part on these facts, Kevin Cottingim can be held liable as an employer of the Plaintiffs for the violations complained of in this matter.

### *Rodney Morris*

115. Rodney Morris is Ignite's current Senior Vice President of Human Resources responsible for all facets of human capital including human resources and payroll at Joes' Crab Shack restaurants. As part of Ignite's recent acquisition of Romano's Macaroni Grill, Mr. Morris was hired to replace Mr. Cottingim who resigned in March 2013. Mr. Morris continues Mr. Cottingim's active approach to human resource management, including developing human resource training, benefits and employee incentive programs at Ignite.

116. For instance, defendant Rodney Morris is directly in charge of overseeing human resources and payroll and ensuring Defendants' compliance or non-compliance with the Federal and State Labor Laws where Defendants operate Joe's Crab Shack restaurants. As such, Rodney Morris is responsible for the maintenance and application of the illegal policies complained of in this case.

117. Further, Mr. Morris's responsibilities include the determination and drafting of human resources policies, the resolution of issues and disputes regarding hiring and firing

Plaintiffs, determining rates of pay and maintaining employment records. Similar to his predecessor, Mr. Cottingim, Mr. Morris is responsible for resolving complaints from employees about Defendants' human resource policies. Further, given his specialty in building organizational relationships from the dish room to the board room, Mr. Morris is responsible for the management of the work environment at Joe's Crab Shack restaurants.

118. Mr. Morris oversees a team of human resource professionals based at Defendants' headquarters in Houston, Texas that includes Patti Simpson and Robyn Martin.

119. Given that Mr. Morris assumed Mr. Cottingim responsibilities he is involved in Defendants' payroll functions including resolving issues concerning employee compensation.

120. Mr. Morris is also carrying out his predecessor's responsibilities with respect to Defendants' system for keeping and maintaining employees' payroll records, the timing and method with which payment is conveyed to employees, and the manner and method in which employees receive payroll information including their payroll checks.

121. Based in part on these facts, Rodney Morris can be held liable as an employer of the Plaintiffs for the violations complained of in this matter

## COUNT I
### Violation of the Fair Labor Standards Act – Minimum Wages
### Section 216(b) Collective Action

122. Named Plaintiffs hereby re-allege and incorporate the allegations set forth above.

123. This count arises from Defendants' willful violation of the FLSA, 29 U.S.C. §201, *et seq.*, for their failure to pay minimum wages to the Plaintiffs. Plaintiffs bring this claim as a collective action under Section 16(b) of the Act. 29 U.S.C. §216(b).

124.   Defendants have a practice of paying Named Plaintiffs and similarly situated employees subminimum wages.

125.   Plaintiffs are not exempt from the minimum wage provisions of the FLSA.

126.   Defendants' policy is not to pay Plaintiffs the legally required minimum wage even though the Plaintiffs are performing jobs unrelated to their tipped job (*see supra* ¶¶44, 47-78).

127.   Defendants' policy is also to not pay Plaintiffs the legally required minimum wage even though the Plaintiffs are spending more than 20% of their time on jobs that are related to, but not themselves, their tipped jobs.

128.   Specifically, Defendants' policy is to utilize the Named Plaintiffs and similarly situated employees to perform "back of the house" duties and other jobs that are not tipped jobs (*see supra* ¶¶44, 47-78).

129.   Additionally, Defendants are not eligible to avail themselves of the federal tipped minimum wage rate under the FLSA, 29 U.S.C. §203(m), because Defendants failed to provide notice of the tip credit to Named Plaintiffs as required under Federal law.

130.   Defendants' practices violate the minimum wage provisions of the FLSA.

131.   Because the Plaintiffs were all deprived minimum wage payments by the Defendants' policy, Plaintiffs are similarly situated to each other pursuant to 29 U.S.C. § 216(b).

WHEREFORE, Named Plaintiffs and those similarly situated employees pray for judgment against Defendants as follows:

> (a)   judgment in the amount of the owed minimum wages for all time worked by Named Plaintiffs and those employees who join this lawsuit;

(b)     an injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law from engaging in each of the unlawful practices, policies and patterns set forth herein;

(c)     liquidated damages in an amount equal to the amount of unpaid minimum wages;

(d)     an award crediting Named Plaintiffs and those employees who join the lawsuit all hours worked;

(e)     an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Named Plaintiffs and those whose joint the lawsuit rights;

(f)     an award of pre- and post-judgment interest; and

(g)     such other and further legal or equitable relief as this Court deems to be just and appropriate.

## COUNT II
### Violation of the New York Labor Law – Minimum Wages
### Class Action – New York Subclass

132.    Christopher Hart and Jeffrey Beyer bring this count as a Rule 23 class action on behalf of themselves and the New York Subclass.

133.    Christopher Hart and Jeffrey Beyer hereby re-allege and incorporate the allegations set forth above.

134.    This count arises from Defendants' willful violation of the NYLL, New York Minimum Wage Act, Article 19, § 650 *et seq.*, for Defendants' failure to pay Mr. Hart, Mr. Beyer and the New York Subclass their earned minimum wages.  Mr. Hart, Mr. Beyer and the New York Subclass are current and former tipped employees of Defendants who are due, and who have not been paid, minimum wages under the provisions of the NYLL.

135.    Defendants have a practice of paying Mr. Hart, Mr. Beyer and the New York Subclass subminimum wages.

136.    Defendants pay Mr. Hart, Mr. Beyer and the New York Subclass these wages even though they perform jobs that are not within the scope of the "Food service worker" definition under the NYLL or associated regulations.

137.    For example, Defendants' policy is to pay Mr. Hart, Mr. Beyer and the New York Subclass subminimum wages even though they are performing jobs unrelated to their tipped jobs (*see supra* ¶¶47-58).

138.    Additionally, Defendants' policy is to pay Mr. Hart, Mr. Beyer and the New York Subclass subminimum wages even on days in which they spend more than 20% of their work day performing non-tipped occupations.

139.    Further, Defendants' policy is to pay Mr. Hart, Mr. Beyer and the New York Subclass subminimum wages even on days in which the Plaintiffs are assigned to work in an occupation in which tips are not customarily received.

140.    Specifically, Defendants' policy is to utilize Mr. Hart, Mr. Beyer and the New York Subclass to perform "back of the house" duties and other jobs that are not tipped jobs (*see supra* ¶¶47-58).

141.    Thus, as described above, Defendants regularly require Mr. Hart, Mr. Beyer and the New York Subclass to perform such jobs as food preparation and general restaurant cleaning, but continued to pay Plaintiffs subminimum wages while the employees are engaged in those jobs.

142.    Defendants also failed to provide written notice of the tip credit or allowance to Mr. Hart, Mr. Beyer and the New York Subclass as required under New York State law.

143.    At all relevant times relevant to the litigation, Defendants did not comply with NYLL's tip credit provision and the supporting New York State Department of Labor

Regulations, including, but not limited to 12 N.Y.C.R.R. §137-2.2 and 146.2-2.

144.    Moreover, the Defendants failed to provide Mr. Hart, Mr. Beyer and those similarly situated with wage statements that complied with the requirements of NYLL.  For example, Mr. Hart, Mr. Beyer and the New York Subclass were not given wage statements that contained allowances claimed by Defendants including the tip credit as required by NYLL § 195(3) as amended by the New York Wage Theft Prevention Act.

145.    Accordingly, Defendants are not entitled to pay Mr. Hart, Mr. Beyer and the New York Subclass subminimum wages under the NYLL.

146.    Mr. Hart and Mr. Beyer will seek to certify Count II as a class action, and ask the Court to determine the rights of the class, enjoin the illegal conduct, order the payment of other damages due, and to direct Defendants to account for all back wages, penalties and prejudgment interest thereon due to them and the New York Subclass.

147.    Count II is brought as a class action because the New York Subclass is similarly situated to Mr. Hart and Mr. Beyer, and is so numerous that joinder of all members is impracticable.  Mr. Hart and Mr. Beyer therefore bring this action on their own behalf as aggrieved employees, and in their representative capacities, against Defendants.  Mr. Hart, Mr. Beyer and similarly situated persons are equally affected by the minimum wage violations of Defendants and the relief sought is for the benefit of Mr. Hart, Mr. Beyer and the New York Subclass they seek to represent.

148.    The issues involved in this lawsuit present common questions of law and fact (*see supra* ¶29).  These common questions of law and fact predominate over the variations which may exist between the New York Subclass, if any.  Mr. Hart, Mr. Beyer and the New York Subclass have a commonality of interest in the subject matter and remedy sought,

namely owed minimum wages plus penalties, interest, attorneys' fees and the cost of this lawsuit. Mr. Hart and Mr. Beyer believe and assert that they are able to fairly and adequately represent and protect the interests of the New York Subclass. If individual actions were required to be brought by each of the similarly situated persons injured or affected, it would necessarily result in multiplicity of lawsuits, creating a hardship to the individuals, to the Court, and to Defendants. Accordingly, a class action is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the New York Subclass is entitled.

149. The books and records of Defendants are material to the action as they disclose certain of the hours worked by each employee and the rate of pay for that work.

150. Defendants violated the NYLL by failing to compensate Mr. Hart, Mr. Beyer and the New York Subclass consistent with the minimum wage provisions.

WHEREFORE, Mr. Hart, Mr. Beyer and the New York Subclass pray for judgment against Defendants as follows:

(a) an order preliminarily and permanently restraining Defendants from engaging in the aforementioned pay violations;

(b) An award of the value of Mr. Hart, Mr. Beyer and the New York Subclass members' unpaid wages;

(c) an award crediting Mr. Hart, Mr. Beyer and the New York Subclass members for all hours worked;

(d) an additional amount as liquidated damages in an amount equal to the amount of unpaid minimum wages;

(e) an award of one hundred dollars for each work week that violations occurred for Mr. Hart, Mr. Beyer and each New York Subclass member not to exceed a total of twenty five hundred dollars pursuant to the New York Wage Theft Prevention Act;

(f)     an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Mr. Hart, Mr. Beyer and the New York Subclass members' rights;

(g)     an award of pre- and post-judgment interest;

(h)     The amount equal to the value which would make Mr. Hart, Mr. Beyer and the New York Subclass members whole for the violations; and

(i)     such other and further legal or equitable relief as this Court deems to be just and appropriate.

## COUNT III
### Violation of the Missouri Minimum Wage Law – Minimum Wages
### Class Action – Missouri Subclass

151.    Plaintiff Taylor Ramsey brings this count as a Rule 23 class action on behalf of herself and the Missouri Subclass.

152.    Plaintiff Taylor Ramsey hereby re-alleges and incorporates the allegations set forth above.

153.    This count arises from Defendants' willful violation of the Missouri Minimum Wage Law § 290.502, *et seq.*, for Defendants' failure to pay Ms. Ramsey and the Missouri Subclass all their earned minimum wages.  Plaintiffs and the class are current and former tipped employees of Defendants who are due, and who have not been paid, minimum wages under the provisions of the Missouri Minimum Wage Law.

154.    Defendants have a practice of paying Ms. Ramsey and the Missouri Subclass subminimum wages.

155.    For example, Defendants' policy is to pay Ms. Ramsey and the Missouri Subclass subminimum wages even though they are performing jobs unrelated to their tipped jobs (*see supra* ¶¶59-62).

156.    Further, Defendants' policy is to pay Ms. Ramsey and the Missouri Subclass

subminimum wages even on days in which the Plaintiffs are assigned to work in an occupation in which tips are not customarily received.

157.   Specifically, Defendants' policy is to utilize Ms. Ramsey and the Missouri Subclass to perform "back of the house" duties and other jobs that are not tipped jobs (*see supra* ¶¶59-62).

158.   Thus, as described above, Defendants regularly required Ms. Ramsey and the Missouri Subclass to perform such jobs as food preparation and general restaurant cleaning, but continued to pay subminimum wages while the employees were engaged in those jobs.

159.   Defendants' practices violate the minimum wage provisions of the Missouri Minimum Wage Law.

160.   Ms. Ramsey will seek to certify Count III as a class action, and asks the Court to determine the rights of the Missouri Subclass, enjoin the illegal conduct, order the payment of other damages due, and to direct Defendants to account for all back wages, penalties and prejudgment interest thereon due to her and the class that she seeks to represent.

161.   Count III is brought as a class action because the Missouri Subclass is similarly situated to Ms. Ramsey and is so numerous that joinder of all members is impracticable.  Ms. Ramsey therefore brings this action on her own behalf as an aggrieved employee, and in her representative capacity, against Defendants.  Ms. Ramsey and similarly-situated persons are equally affected by the minimum wage violations of Defendants, and the relief sought is for her benefit and the Missouri Subclass that she seeks to represent.

162.   The issues involved in this lawsuit present common questions of law and fact (*see supra* ¶29).  These common questions of law and fact predominate over the variations

which may exist between members of the Missouri subclass, if any. Ms. Ramsey and the Missouri Subclass have a commonality of interest in the subject matter and remedy sought, namely owed minimum wages plus penalties, interest, attorneys' fees and the cost of this lawsuit. Ms. Ramsey believes and asserts that she is able to fairly and adequately represent and protect the interests of the Missouri Subclass. If individual actions were required to be brought by each of the similarly-situated persons injured or affected, it would necessarily result in multiplicity of lawsuits, creating a hardship to the individuals, to the Court, and to Defendants. Accordingly, a class action is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the class is entitled.

163. The books and records of Defendants are material to the action as they disclose certain of the hours worked by each employee and the rate of pay for that work.

164. Defendants violated the Missouri Minimum Wage Law by failing to compensate Ms. Ramsey and the Missouri Subclass consistent with the minimum wage provisions.

WHEREFORE, Ms. Ramsey and the Missouri Subclass pray for judgment against Defendants as follows:

(a)   an order preliminarily and permanently restraining Defendants from engaging in the aforementioned pay violations;

(b)   An award of the value of Taylor Ramsey and the Missouri Subclass members' unpaid wages;

(c)   an award crediting Taylor Ramsey and the Missouri Subclass members for all hours worked;

(d)   an additional amount as liquidated damages in an amount equal to the amount of unpaid minimum wages;

(e) an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Taylor Ramsey and the Missouri Subclass members' rights;

(f) an award of pre- and post-judgment interest;

(g) The amount equal to the value which would make Taylor Ramsey and the Missouri Subclass members whole for the violations; and

(h) such other and further legal or equitable relief as this Court deems to be just and appropriate.

## COUNT IV
### Violation of the Maryland Labor & Employment Code – Minimum Wages
### Class Action – Maryland Subclass

165. Plaintiff Maria Sargent brings this count as a Rule 23 class action on behalf of herself and the Maryland Subclass.

166. Plaintiff Ms. Sargent hereby re-alleges and incorporates the allegations set forth above.

167. This count arises from Defendants' willful violations of the Maryland Labor and Employment Code §§ 3-413, 3-507.2 for Defendants' failure to pay Ms. Sargent and the Maryland Subclass. Ms. Sargent and the Maryland Subclass are current and former tipped employees of Defendants who are due, and who have not been paid, minimum wages under the provisions of the Maryland Labor and Employment Code.

168. Defendants have a practice of paying Ms. Sargent and the Maryland Subclass subminimum wages.

169. For example, Defendants' policy is to pay Ms. Sargent and the Maryland Subclass subminimum wages even though the Plaintiffs are performing jobs unrelated to their tipped jobs (*see supra* ¶¶63-67).

170. Further, Defendants' policy is to pay Ms. Sargent and the Maryland Subclass

subminimum wages even on days in which Maria Sargent and the Maryland Subclass are assigned to work in an occupation in which tips are not customarily received.

171.    Specifically, Defendants' policy is to utilize Ms. Sargent and the Maryland Subclass to perform "back of the house" duties and other jobs that are not tipped jobs (*see supra* ¶¶63-67).

172.    Thus, as described above, Defendants regularly required Ms. Sargent and the Maryland Subclass to perform such jobs as food preparation and general restaurant cleaning, but continued to pay subminimum wages while the employees were engaged in those jobs. Defendants unlawfully withheld minimum wage payments from Ms. Sargent and the Maryland Subclass by improperly relying on the tip credit for their minimum wage obligation.  Defendants' policy to pay Ms. Sargent and the Maryland Subclass subminimum wages was not the result of a bona fide dispute.

173.    Defendants' practices violate the minimum wage provisions of the Maryland Labor and Employment Code.

174.    Ms. Sargent will seek to certify Count IV as a class action, and asks the Court to determine the rights of the class, enjoin the illegal conduct, order the payment of other damages due, and to direct Defendants to account for all back wages, penalties and prejudgment interest thereon due to her and the Maryland Subclass.

175.    Count IV is brought as a class action because the Maryland Subclass is similarly situated to Ms. Sargent and is so numerous that joinder of all members is impracticable.  Ms. Sargent therefore brings this action on their own behalf as an aggrieved employee, and in her representative capacity, against Defendants.  Ms. Sargent and similarly situated persons are equally affected by the minimum wage violations of Defendants, and the

relief sought is for her benefit and the Maryland Subclass that she seeks to represent.

176.   The issues involved in this lawsuit present common questions of law and fact (*see supra* ¶29).   These common questions of law and fact predominate over the variations which may exist between members of the classes, if any.   Ms. Sargent and the Maryland Subclass have a commonality of interest in the subject matter and remedy sought, namely owed minimum wages plus penalties, interest, attorneys' fees and the cost of this lawsuit. Ms. Sargent believes and asserts that she is able to fairly and adequately represent and protect the interests of the Maryland Subclass.   If individual actions were required to be brought by each of the similarly-situated persons injured or affected, it would necessarily result in multiplicity of lawsuits, creating a hardship to the individuals, to the Court, and to Defendants.   Accordingly, a class action is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the class is entitled.

177.   The books and records of Defendants are material to this action as they disclose certain of the hours worked by each employee and the rate of pay for that work.

178.   Defendants violated the Maryland Labor and Employment Code by failing to compensate Ms. Sargent and the Maryland Subclass consistent with the minimum wage provisions.

WHEREFORE, Ms. Sargent and the Maryland Subclass pray for judgment against Defendants as follows:

(a)   an order preliminarily and permanently restraining Defendants from engaging in the aforementioned pay violations;

(b)   an award of the value of Ms. Sargent and the Maryland Subclass members' unpaid wages;

(c)     an award crediting Ms. Sargent and the Maryland Subclass members for all hours worked;

(d)     an additional amount in an amount equal to three times the unpaid wages;

(e)     an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Ms. Sargent and the Maryland Subclass members' rights;

(f)     an award of pre- and post-judgment interest;

(g)     The amount equal to the value which would make Ms. Sargent and the Maryland Subclass members whole for the violations; and

(h)     such other and further legal or equitable relief as this Court deems to be just and appropriate.

## COUNT V
### Violation of the Arizona Minimum Wage Act - Minimum Wages
### Class Action - Arizona Subclass

179.   Named Plaintiff Andrea Randlett brings this count as a Rule 23 class action on behalf of herself and the Arizona Subclass.

180.   Named Plaintiff Ms. Randlett hereby re-alleges and incorporates the allegations set forth above.

181.   This count arises from Defendants' willful violation of the Arizona Minimum Wage Act §23-363 *et seq.,* for Defendants' failure to pay Plaintiffs and the Arizona Subclass Members all their earned minimum wages.   Ms. Randlett and the Arizona Subclass are current and former employees of Defendants who have not been paid minimum wages under the provisions of the Arizona Minimum Wage Act.

182.   Defendants have a practice of paying Ms. Randlett and the Arizona Subclass subminimum wages.

183.   For example, Defendants' policy is to pay Ms. Randlett and the Arizona

Subclass subminimum wages even though the Plaintiffs are performing jobs unrelated to their tipped jobs (*see supra* ¶¶68-73).

184.   Further, Defendants' policy is to pay Ms. Randlett and the Arizona Subclass subminimum wages even on days in which the Plaintiffs are assigned to work in an occupation in which tips are not customarily received.

185.   Specifically, Defendants' policy is to utilize Ms. Randlett and the Arizona Subclass to perform "back of the house" duties and other jobs that are not tipped jobs (*see supra* ¶¶68-73).

186.   Thus, as described above, Defendants regularly required Ms. Randlett and the Arizona Subclass to perform such jobs as food preparation and general restaurant cleaning, but continued to pay subminimum wages while the employees were engaged in those jobs.

187.   Defendants also failed to provide written notice of the tip credit or allowance to Ms. Randlett and the Arizona Subclass as required by the Arizona Administrative Code § R20-5-1207(c).

188.   At all relevant times relevant to the litigation, Defendants failed to provide Plaintiffs and those similarly situated with wage statements that complied with the requirements of Arizona Administrative Code § R20-5-1207(c).  For example, Ms. Randlett and the Arizona Subclass were not given wage statements that contained the amount per hour that Defendants withheld as a tip credit as required by Arizona Administrative Code § R20-5-1207(c).

189.   Defendants' practices violate the minimum wage provisions of the Arizona Minimum Wage Act.

190.   Ms. Randlett will seek to certify Count V as a class action, and asks the Court

to determine the rights of the class, enjoin the illegal conduct, order the payment of other damages due, and to direct Defendants to account for all back wages, penalties and interest thereon due to her and the Arizona Subclass.

191.   Count V is brought as a class action because the Arizona Subclass members are similarly situated to Ms. Randlett and is so numerous that joinder of all members is impracticable.  Ms. Randlett therefore brings this action on her own behalf as an aggrieved employee, and in her representative capacity, against Defendants.  Ms. Randlett and similarly situated persons are equally affected by the minimum wage violations of Defendants, and the relief sought is for the benefit of herself and the Arizona Subclass that she seeks to represent.

192.   The issues involved in this lawsuit present common questions of law and fact (*see supra* ¶29).  These common questions of law and fact predominate over the variations which may exist between members of the classes, if any.  Ms. Randlett and the Arizona Subclass have a commonality of interest in the subject matter and remedy sought, namely owed minimum wages plus penalties, interest, attorneys' fees and the cost of this lawsuit. Ms. Randlett believes and asserts that she is able to fairly and adequately represent and protect the interests of the class.  If individual actions were required to be brought by each of the similarly situated persons injured or affected, it would necessarily result in multiplicity of lawsuits, creating a hardship to the individuals, to the Court, and to Defendants. Accordingly, a class action is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the class is entitled.

193.   The books and records of Defendants are material to this action as they disclose certain of the hours worked by each employee and the rate of pay for that work.

194.   Defendants violated the Arizona Minimum Wage Act by failing to compensate

Plaintiffs and members of the class consistent with the minimum wage provisions.

WHEREFORE, Ms. Randlett and the Arizona Subclass pray for judgment against Defendants as follows:

(a)     judgment in the amount of the owed minimum wages for all time worked by Ms. Randlett and the Arizona Subclass;

(b)     an injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

(c)     damages in an amount equal to the amount of unpaid minimum wages;

(d)     an award crediting Ms. Randlett and the Arizona Subclass for all hours worked;

(e)     an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Ms. Randlett and the Arizona Subclass members' rights;

(f)     an award of two hundred dollars for the first violation and $1,000 for each subsequent violation of Arizona Administrative Code § R20-5-1207(c) pursuant to Arizona Statute § 23-364, Arizona Administrative Code § R20-5-1210;

(g)     an award of pre- and post-judgment interest; and

(h)     such other and further legal or equitable relief as this Court deems to be just and appropriate.

## COUNT VI
### Violation of the Illinois Minimum Wage Act - Minimum Wages
### Class Action – Illinois Subclass

195.    Named Plaintiff Shelly Carrera brings this count as a Rule 23 class action on behalf of herself and the Arizona Subclass.

196.    Named Plaintiff Ms. Carrera hereby re-alleges and incorporates the allegations set forth above.

- 40 -

197.    This count arises from Defendants' willful violation of the Illinois Minimum Wage Law - 820 ILCS 105/1 *et seq.*, and Illinois Wage Payment and Collection Act – 820 ILCS 115/1 *et seq.*, for Defendants' failure to pay Ms. Carrera and the Illinois Subclass s all their earned minimum wages.  Ms. Carrera brings Count VI as a class action under 735 ILCS 5/2-801.    Ms. Carrera and the Illinois Subclass are current and former employees of Defendants who have not been paid minimum wages under the provisions of the Illinois Minimum Wage Law and Illinois Wage Payment and Collection Act.

198.    Defendants have a practice of paying Plaintiffs subminimum wages.

199.    For example, Defendants' policy is to pay Ms. Carrera and the Illinois Subclass subminimum wages even though the Plaintiffs are performing jobs unrelated to their tipped jobs.

200.    Specifically, Defendants' policy is to utilize Ms. Carrera and the Illinois Subclass to perform "back of the house" duties and other jobs that are not tipped jobs (*see supra* ¶¶74-78).

201.    Thus, as described above, Defendants regularly required Ms. Carrera to perform such jobs as food preparation and general restaurant cleaning, but continued to pay Plaintiffs subminimum wages while the employees are engaged in those jobs.

202.    Defendants agreed to properly compensate Ms. Carrera and the Illinois Subclass for all hours worked.  However, Defendants' policies resulted in Ms. Carrera and the Illinois Subclass performing non-tip producing jobs (*see supra* ¶¶74-78) but were only paid subminimum wages.

203.    Defendants' practices violate the minimum wage provisions of the Illinois Minimum Wage Act and Illinois Wage Payment and Collection Act.

204.    Ms. Carrera will seek to certify Count VI as a class action, and asks the Court to determine the rights of the class, enjoin the illegal conduct, order the payment of other damages due, and to direct Defendants to account for all back wages, penalties and interest thereon due to her and the Illinois Subclass.

205.    Count VI is brought as a class action because the Illinois Subclass members are similarly situated to Ms. Carrera and is so numerous that joinder of all members is impracticable.   Ms. Carrera therefore brings this action on her own behalf as an aggrieved employee, and in her representative capacity, against Defendants.   Ms. Carrera and the Illinois Subclass are equally affected by the minimum wage violations of Defendants, and the relief sought is for the benefit of herself and the Illinois Subclass that she seeks to represent.

206.    The issues involved in this lawsuit present common questions of law and fact (*see supra* ¶29).   These common questions of law and fact predominate over the variations which may exist between members of the classes, if any.   Ms. Carrera and the Illinois Subclass have a commonality of interest in the subject matter and remedy sought, namely owed minimum wages plus penalties, interest, attorneys' fees and the cost of this lawsuit. Ms. Carrera believes and asserts that she is able to fairly and adequately represent and protect the interests of the class.   If individual actions were required to be brought by each of the similarly-situated persons injured or affected, it would necessarily result in multiplicity of lawsuits, creating a hardship to the individuals, to the Court, and to Defendants. Accordingly, a class action is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the class is entitled.

207.    The books and records of Defendants are material to this action as they disclose certain of the hours worked by each employee and the rate of pay for that work.

208.    Defendants violated the Illinois Minimum Wage Act and the Illinois Wage Payment and Collection Act by failing to compensate Ms. Carrera and the Illinois Subclass consistent with the minimum wage provisions.

WHEREFORE, Ms. Carrera and the Illinois Subclass pray for judgment against Defendants as follows:

(a)    judgment in the amount of the owed minimum wages for all time worked by Ms. Carrera and the Illinois Subclass;

(b)    an injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

(c)    damages in an amount equal to the amount of unpaid minimum wages;

(d)    an award crediting Ms. Carrera and the Illinois Subclass for all hours worked;

(e)    an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Ms. Carrera and the Illinois Subclass members' rights;

(f)    an award of pre- and post-judgment interest; and

(g)    such other and further legal or equitable relief as this Court deems to be just and appropriate.

## JURY DEMAND

Plaintiffs demand a jury to hear and decide all issues of fact in accordance with Federal Rule of Civil Procedure 38(b).

Dated: August 28, 2013

THOMAS & SOLOMON LLP

By: _____
    J. Nelson Thomas, Esq.
    Michael J. Lingle, Esq.
    Justin M. Cordello, Esq.
    Jared K. Cook, Esq.
    *Attorney for Plaintiffs*
    693 East Avenue
    Rochester, New York 14607
    Telephone:  (585) 272-0540
    nthomas@theemploymentattorneys.com
    mlingle@theemploymentattorneys.com
    jcordello@theemploymentattorneys.com
    jcook@theemploymentattorneys.com