UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CHRISTOPHER HART, et al.,                                    DECISION AND ORDER

                              Plaintiffs,                    13-CV-6458 CJS

            -v-

CRAB ADDISON, INC. d/b/a JOE'S CRAB
SHACK, IGNITE RESTAURANT GROUP, INC.,
RAYMOND A. BLANCHETTE, III, KEVIN
COTTINGIM, and RODNEY MORRIS,

                              Defendants.

---

APPEARANCES

For Plaintiff:              J. Nelson Thomas, Esq.
                            Jared Kimball Cook, Esq.
                            Michael J. Lingle, Esq.
                            Justin M. Cordello, Esq.
                            Thomas & Solomon LLP
                            693 East Avenue
                            Rochester, NY 14607

For Defendants:             Jeffrey Howard Ruzal, Esq.
                            Kenneth John Kelly, Esq.
                            Epstein, Becker & Green, P.C.
                            250 Park Avenue
                            New York, NY 10177

INTRODUCTION

Now before the Court are Defendants' motions to dismiss the Complaint for failure
to state a claim, or, in the alternative, to transfer venue. (Docket Nos. [#23][#30][#43][#50]).
The request to transfer venue is denied.  The application to dismiss is granted as to the
FLSA minimum wage claim, and Plaintiffs are granted leave to re-plead.   Otherwise,
Defendants' motions are denied.

BACKGROUND

Unless otherwise noted, the following facts are taken from the Complaint [#1], and are presumed to be true for purposes of this Decision and Order.  Defendant Crab Addison, Inc. ("Crab Addison") is a wholly-owned subsidiary of Ignite Restaurant Group, Inc. ("Ignite"), which is a Delaware corporation with its principal place of business in Houston, Texas. Ignite owns and operates more than 135 "Joe's Crab Shack" restaurants in thirty-two states,[1] including New York, Maryland, Missouri, Illinois and Arizona.  During the relevant three-year period at issue in this action, Ignite employed 29,945 employees, though it is unclear how many of those employees worked in the five states involved in this action (New York, Maryland, Missouri, Illinois and Arizona).[2]

Virtually all of Ignite's corporate infrastructure, including "finance and accounting, marketing, business development/publicity, operations, information technology, purchasing, human resources and legal,"[3] is located in Houston.  Ignite does not maintain regional offices.[4]  Ignite's "principal personnel and payroll records" are kept in Houston.[5]  In that regard, while each restaurant manager maintains documentation pertaining to his employees, other "information and documents regarding compensation of current and former employees, including payroll, hours worked, and tip credits[,] are consolidated,

---

[1]Affidavit of Patricia Simpson at ¶ 3.

[2]Affidavit of Patricia Simpson at ¶ 8.

[3]Affidavit of Patricia Simpson at ¶ 4.

[4]Affidavit of Patricia Simpson at ¶ 4.

[5]Affidavit of Patricia Simpson at ¶ 6.

recorded and maintained in Houston."[6]   Ignite's CEO, defendant Raymond Blanchette ("Blanchette"),  and Ignite's Senior Vice President of Human Resources, defendant Rodney Morris ("Morris"), both live in Houston and maintain their offices there.[7]   Morris's predecessor, defendant Kevin Cottingim ("Cottingim"), is retired from Ignite and resides in Florida.[8]

The six named Plaintiffs are Christopher Hart ("Hart"), Jeffrey Beyer ("Beyer"), Maria Sargent ("Sargent"), Taylor Ramsey ("Ramsey"), Andrea Randlett ("Randlett") and Shelly Carrera ("Carrera").  When this action was commenced, Hart and Beyer resided in New York; Ramsey and Carrera resided in Illinois; and Sargent and Randlett resided, respectively, in Maryland and Arizona.  All six of the Plaintiffs previously worked at Joe's Crab Shack restaurant locations.  At all relevant times, Hart and Beyer worked at the restaurant in Henrietta, New York, as servers; Ramsey worked in Branson, Missouri, as a hostess; Sargent worked in Greenbelt, Maryland, as a server; Randlett worked in Tempe, Arizona, as a server; and Carrera worked in Fairview Heights, Illinois, as a server and bartender.

On August 28, 2013, Plaintiffs commenced this action.  The Complaint purports to assert claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and under the state minimum-wage laws of New York, Maryland, Missouri, Illinois and Arizona.

---

[6]Affidavit of Patricia Simpson at ¶ 6.  The Complaint indicates that Defendants maintain "control, oversight and direction over the Plaintiffs including time keeping, payroll and other employment practices." Complaint [#1] at ¶ 97.

[7]Affidavit of Patricia Simpson at ¶ 5.  Plaintiff's Complaint indicates that Blanchette and Morris "manage the conditions of Plaintiffs' employment and exercise financial control over all Joe's Crab Shack restaurants throughout the nation." Complaint [#1] at ¶ 90.

[8]Affidavit of Patricia Simpson at ¶ 5.

The action is styled as a proposed class action, with five subclasses for the state minimum-wage claims.  The Complaint maintains that Defendants paid Plaintiffs less than the required minimum wage, in the following respects:

> Defendants' policy is not to pay Plaintiffs the legally required minimum wage even though the Plaintiffs [were] performing jobs unrelated to their tipped job[s].  Defendants' policy [was] also to not pay Plaintiffs the legally required minimum wage even though the Plaintiffs [were] spending more than 20% of their time on jobs that [were] related to, but not themselves, tipped jobs.  Specifically, Defendants' policy [was] to utilize the Named Plaintiffs and similarly situated employees to perform "back of the house" duties and other jobs that [were] not tipped jobs.

Complaint [#1] at ¶ ¶ 126-128.  The Complaint further alleges that Defendants violated the FLSA by failing to provide Plaintiffs with notice regarding the minimum wage "tip credit." *Id*. at ¶ 129.  Finally, the Complaint asserts similar claims under the minimum-wage laws of New York, Maryland, Missouri, Illinois and Arizona.

There are presently 46 plaintiffs in this action, consisting of six named Plaintiffs and forty "opt-in" Plaintiffs.[9]   These Plaintiffs reside in fourteen different states.[10]   More specifically, the states in which the Plaintiffs reside, and the number of Plaintiffs residing in those states, is as follows: New York 11; Florida 10; New Jersey 5; Virginia 3; Illinois 3; Arizona 3; Texas 3; Maryland 2; Massachusetts 1; Michigan 1; Pennsylvania 1; Iowa 1; Indiana 1; and Utah 1.[11]

---

[9]Affirmation of Jared Cook [#38-1], dated November 5, 2013,  at p. 3.

[10] *Id*.

[11] *Id*.

4

In lieu of answering the Complaint, Defendants filed the subject motions to dismiss,[12] or, in the alternative, to transfer venue to the U.S. District Court for the Southern District of Texas.

On February 26, 2014, counsel for the parties appeared before the undersigned for oral argument.

DISCUSSION

Where district courts are presented with both a motion to dismiss, under Fed. R. Civ. P. 12(b)(6), and a motion to transfer venue, under 28 U.S.C. § 1404(a), they commonly address the venue motion first, and, where transfer is appropriate, leave the motion to dismiss to be decided by the transferee court. *See, e.g., Hafstad v. Hornick*, Civ. A. No. 86–2811, 1987 WL 10871 at *3 (D.D.C. May 6, 1987) ("[I]t is fitting to leave all decisions on the merits to [the transferee] court, rather than to tie that court's hands with substantive decisions made in this jurisdiction."); *Brown v. New York*, 947 F.Supp.2d 317, 326 (E.D.N.Y. 2013) ("As the Court finds that transfer is appropriate, it defers decision on the Defendants' motion to dismiss for failure to state a claim to allow the transferee court an opportunity to consider the merits of the case."); *Lyon v. Cornell University*, No. 97 Civ. 7070(JGK), 1998 WL 226193 at *2 (S.D.N.Y. May 4, 1998) ("It is appropriate for the transferee court to consider the merits of a motion for summary judgment. That Court should decide the critical issues on that motion, including whether there are any disputed issues of material fact. The defendant's motion is critical to the disposition of this case. The transferee court in the Northern District should rule on the motion in the first instance.") (citations omitted).

---

[12]As discussed further below, Defendants moved to dismiss the claims against the individual defendants, the state-law class action claims and the FLSA minimum wage claims, but not the FLSA notice claims.

Accordingly, although Defendants asked the Court to consider the venue transfer motion only in the event that their motion to dismiss was denied, the Court will consider the venue motion before the motion to dismiss.

<u>Motion to Transfer Venue</u>

Defendants maintain that the Court should transfer venue of this action to the United States District Court for the Southern District of Texas, pursuant to 28 U.S.C. § 1404(a), which states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."[13]   "The threshold question in deciding a § 1404(a) motion is whether venue would be proper in the transferee forum." *Lewis v. C.R.I., Inc.*, No. 03 Civ. 651(MBM), 2003 WL 1900859 at *2 (S.D.N.Y. Apr. 17, 2003) (citations omitted).  If so,

> [a] district court may exercise its discretion to transfer venue "for the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). Among the factors to be considered in determining whether to grant a motion to transfer venue are, *inter alia*: (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties.

*New York Marine and General Ins. Co. v. Lafarge North America, Inc.*,  599 F.3d 102, 112 (2d Cir. 2010) (citation and internal quotation marks omitted).  In addition to those factors, many district courts consider additional factors, such as "a forum's familiarity with the governing law" and "trial efficiency and the interests of justice." See, e.g., *Lewis v. C.R.I.,*

---

[13]28 U.S.C.A. § 1404 (West 2014).

*Inc.*, 2003 WL 1900859 at *2.  The party requesting the transfer has the "burden of making out a strong case for transfer," by clear and convincing evidence. *New York Marine and General Ins. Co. v. Lafarge North America, Inc.*, 599 F.3d at 114  (citations omitted).

In the instant case, the parties do not dispute that the action could have been filed in the proposed transferee court.  Accordingly, the Court will proceed to consider the convenience factors set forth above.  In that regard, Defendants admit that three of the factors – the relative means of the parties, the forum's familiarity with the law and the availability of process to compel attendance of witnesses, do not weigh in favor of transfer. Accordingly, the Court will only consider the remaining factors.

### *The Convenience of Witnesses*

This factor is generally considered the most important in deciding whether to transfer venue under § 1404(a). *See, Truk International Fund, LP v. Wehlmann*, No. 08 Civ. 8462(PGG), 2009 WL 1456650 at *3 (S.D.N.Y. May 20, 2009) ("The convenience of the witnesses is generally considered the most important factor in deciding a motion to transfer venue.  Moreover, the convenience of non-party witnesses is accorded more weight than that of party witnesses.") (citations and internal quotation marks omitted).  Generally, to sustain its burden, "the moving party submits an affidavit explaining why the transferee forum is more convenient, which includes the potential principal witnesses expected to be called and the substance of their testimony." *EasyWeb Innovations, LLC v. Facebook, Inc.*, 888 F.Supp. 2d 342, 350 (E.D.N.Y. 2012) (citations and internal quotation marks omitted).

Defendants contend that this factor weighs in favor of transfer, since, under Plaintiffs' theory of liability, the focus of the proof will be on Defendant's "human resources employees,

7

most of [whom are] located in Houston."[14]    In that regard, Defendants indicate that the

witnesses are likely to be the named Defendants, as well as unnamed "employees who were

involved in the alleged policies, procedures and human resources matters at issue."[15]

Plaintiff responds that this factor weighs against transfer, since "the vast majority of relevant

witnesses are located outside of [Texas]," including many witnesses in this District.[16]

Plaintiffs also indicate that any inconvenience to Defendants' employees will be minimal in

any event, since they will be deposed in Texas.  Considering all of the foregoing, Defendants

have not made a strong showing that this factor weighs in favor of transfer.

### *The Convenience of the Parties*

 "As to whether the convenience of the parties favors transfer, the Court first looks

to the residence of the parties, and then ensures an order of transfer would not simply

switch the burden of inconvenience from one party to another." *Novel v. Lowe*, No.

1:12–CV–01447 (MAD/RFT), 2013 WL 3206977 at *7 (N.D.N.Y. Jun. 24, 2013) (citation

omitted).  Ordinarily, in considering the effect that a transfer would have on the convenience

of the plaintiffs in a proposed class action, the proper focus in on the residences of named

plaintiffs.[17]  However, the Second Circuit has, on at least one occasion, also considered the

---

[14]Patricia Simpson Affidavit at ¶ 7.

[15]Defendants' Memo of Law [#26] at pp. 21-22.

[16]Crab Addison Memo of Law [#38] at p. 23.

[17] *See, Joseph v. Liberty Nat. Life Ins. Co.*, No. 08-20117-CIV, 2008 WL 2026006 at *1 (S.D.Fla. May 9, 2008) ("This Court agrees that in considering venue, the inquiry must be focused only on the named Plaintiffs and not the potential class members."); *Universal Grading Service v. eBay, Inc.*, No. 08–CV–3557 (CPS), 2009 WL 2029796 at *21 (E.D.N.Y. Jun. 10, 2009)  ("The convenience of witnesses and the parties is a neutral factor, as the only potential witnesses identified in this action are the parties themselves, and while the *named plaintiffs* appear to be located either in New York or in states close to New York, defendants are located either in California or states close to California.") (emphasis added); *Quan v. Computer Sciences Corp.*, 2008 WL 89679 at *6 (E.D.N.Y. Jan. 7, 2008) ("Residence is the touchstone [under § 1404(a)] for party convenience, and the majority of all parties to this litigation—two of the four *named plaintiffs* and two of the

residences of "putative class members." *See, In re Warrick*, 70 F.3d at 741, n. 7 (Though in the context of considering the weight to accord to the Plaintiff's choice of forum).

Defendants maintain that this factor favors transfer, since their key employees are located in Texas, and litigation in New York will disrupt Ignite's business.  However, Plaintiffs contend that this factor weighs against transfer, since "the vast majority of [the] parties are . . . located outside of Texas," and "more of th[o]se parties reside in New York than in any other state."[18]   It appears that transferring venue from this District to Texas would merely shift the burden of inconvenience from Defendants to Plaintiffs, and accordingly the Court finds that this factor does not weigh in favor of transfer.

> ### The Location of Relevant Documents and
> ### Relative Ease of Access to Sources of Proof

Defendants maintain that this factor favors transfer, since Ignite's corporate records, including payroll records, are located in Texas.  Plaintiffs respond that while some evidence is located in Texas, much of the evidence is located elsewhere, and in any event, evidence is easily transferred electronically.   Courts generally agree with Plaintiffs that, "[g]iven modern technological capacity for transmitting documents, this factor has become less important." *Williams v. Swack*, No. 12–cv–1552 (CBA), 2013 WL 5423791 at *7 (E.D.N.Y.

---

five individual defendants—reside or are located in California.") (emphasis added, citation omitted); 7A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. § 1757 (3d ed.) ("The general rule [in class actions] is that only the residence of the named parties is relevant for determining whether venue is proper."); 20 CHARLES ALAN WRIGHT & MARY KAY KANE, FED. PRAC. & PROC. DESKBOOK § 77("It long has been the rule that in a class action only the citizenship of the named representatives is to be considered, and that it is no objection to jurisdiction that other members of the class, not named as parties, are of such citizenship as would defeat diversity.  This continues to be so under the amended rule. Indeed, the rule would be totally unworkable in a diversity case if the citizenship of all members of the class, many of them unknown, had to be considered.  *Similarly for purposes of venue only the residence of the named parties should be considered.*") (emphasis added; footnotes omitted).

[18]Crab Addison Memo of Law [#38] at p. 26.

Sep. 26, 2013) (*Citing Aerotel Ltd. v. Sprint Corp.*, 100 F.Supp.2d 189, 197 n. 9 (S.D.N.Y.2000)).  Defendants have not explained why the pertinent corporate documents cannot be easily transmitted electronically.  Accordingly, this factor does not weigh in favor of transfer.

### The Locus of Operative Facts

Defendants maintain that the locus of operative facts is Texas, since that is where Ignite allegedly created and implemented its pay policies.  Plaintiffs, on the other hand, contend that there are multiple loci of operative facts, involving each separate restaurant location, including the Henrietta, New York, location.  There is case authority in FLSA class actions supporting both views. *Compare, Earley v. BJ's Wholesale Club, Inc.*, No. 06 Civ. 3529(WHP), 2007 WL 1624757 at *2-3  (S.D.N.Y. Jun. 4, 2007) ("Because Plaintiff's claims focus on the nature and implementation of Defendant's company-wide overtime policies and not those of the Pennsylvania store in particular, it is likely that most discovery will take place at BJ's headquarters in Massachusetts. Accordingly, this factor weighs in favor of transfer to Massachusetts."), *with Hicks v. T.L. Cannon Corp.*,  No. 12–CV–6517T, 2013 WL 2423782 at *5 (W.D.N.Y. Jun. 4, 2013) ("[T]here is no single locus of operative facts in this action. Plaintiffs purport to represent hundreds of tipped employees who worked in different restaurant throughout the state of New York-both in this district and in the N.D.N.Y. As there is no single locus of operative facts, I find that this factor is neutral.") *and with Fairchild v. Eisai, Inc.*, No. 3:11cv452 MRK, 2011 WL 3438408 at *3 (D.Conn. Aug. 4, 2011) ("[T]he locus of operative facts in this case is split between New Jersey—the location of Eisai's corporate headquarters, where, according to Eisai, all the relevant decisions in this case occurred—and the various districts in which the plaintiffs worked.").  The Court finds that

10

there is no single locus of operative events in this action.  The proof of the claims will focus on events in Texas, as well as events at the individual restaurants which are spread around the U.S., including the restaurant in this District.  Accordingly, this factor does not weigh in favor of transfer.

### The Plaintiff's Choice of Forum

It is well-settled that a plaintiff's choice of forum is ordinarily "entitled to substantial consideration," though it is "a less significant consideration" in a proposed class action than in an individual action." *In re Warrick*, 70 F.3d 736, 740, n. 7 (2d Cir. 1995).  "The reason [for that] is that in a class action there will be numerous potential plaintiffs, each possibly able to make a showing that a particular forum is best suited for the adjudication of the class's claim." *Goggins v. Alliance Capital Management, L.P.*, 279 F.Supp.2d 228, 232 (S.D.N.Y. 2003) (citation and internal quotation marks omitted).  In this case, Hart and Beyer live in this judicial district and worked for Defendants here, hence there is a connection between their claims and this district.  However, the remaining named Plaintiffs have no connection to this district, and Plaintiffs have not offered any explanation why this district has more significance than the other districts in which the action could have been brought.  Nevertheless, Defendants have not made a strong showing that this factor weighs in favor of transfer.

### Trial Efficiency/Interests of Justice

This factor sometimes comes into play when there is a related action pending in the proposed transferee district.  *See, e.g., Brown v. New York*, 947 F.Supp.2d 317, 326 (E.D.N.Y. 2013) ("It is beyond dispute [that] the existence of a related action in the transferee district weighs heavily in favor of transfer when considering judicial economy and the interests of justice.") (citation and internal quotation marks omitted).  In the instant case,

there is no such related litigation pending in Texas.  Defendants maintain, though, that the

Southern District of Texas would be a more efficient forum, since the district courts there are

less congested.  Plaintiffs dispute that, and contend that Defendants failed to account for

the Texas' district's criminal caseload, which, according to Plaintiffs, is significantly greater

than the Western District of New York's.  In any event, the undersigned's docket is not

significantly congested, and Defendants have not shown that a transfer would result in

greater efficiency in this action.  Accordingly, this factor does not favor transfer.

Based on the foregoing discussion, the Court finds that Defendants have not made

a strong showing for transfer by clear and convincing evidence.  Consequently, Defendants'

motion to transfer venue is denied.

*Motion to Dismiss*

Defendants have moved to dismiss the complaint for failure to state a claim, and the

standard for such motions is well settled:

> Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain
> statement of the claim showing that the pleader is entitled to relief, in order to
> give the defendant fair notice of what the claim is and the grounds upon which
> it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does
> not need detailed factual allegations, a plaintiff's obligation to provide the
> grounds of his entitlement to relief requires more than labels and conclusions,
> and a formulaic recitation of the elements of a cause of action will not do.
> Factual allegations must be enough to raise a right to relief above the
> speculative level, on the assumption that all the allegations in the complaint
> are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929

(2007); *see also, ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d

Cir.2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim

rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (*quoting Bell Atl. Corp. v. Twombly* ) (footnote omitted).

When applying this "plausibility standard," the Court is guided by "two working principles":

> First, although a court must accept as true all of the allegations contained in a complaint,[19] that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss, and determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations and internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 1950 (2009) (citation omitted).

<u>FLSA Failure to Pay Minimum Wage, 29 U.S.C. § 206</u>

As mentioned above, the Complaint alleges two types [20] of FLSA claim: 1) a failure to pay the minimum wage, in violation of 29 U.S.C. § 206; and 2) a failure to provide notice, in violation of 29 U.S.C. § 203(m) and 29 C.F.R. § 516.4. Defendants have moved to dismiss the first of these, but not the second.

---

[19]The Court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir.1999), cert. den. 531 U.S. 1052, 121 S.Ct. 657 (2000).

[20]Plaintiffs maintain that the first of these is actually two separate claims.

The Complaint maintains that Defendants failed to pay Plaintiffs the correct minimum wage as required by 29 U.S.C. § 206.  As noted earlier, Plaintiffs indicate that Defendants do not pay them minimum wage, ostensibly because they are tipped employees,[21] but that Defendants nevertheless required them to spend an inordinate amount of certain shifts performing non-tipped work.  The Complaint sets forth the approximate dates of the period that each Plaintiff worked for Ignite, and the location where each worked. *See, e.g.*, Complaint [#1] at ¶ 37 ("Christopher Hart worked for Defendants as a server from approximately August 2011 to January 2013 at the Henrietta, New York location.")

The Complaint then purports to assert factual allegations concerning the particular work experiences of the six named Plaintiffs underlying their claims.  The Complaint does not allege any particular date on which any particular event occurred, and the factual allegations concerning each of the plaintiffs are worded similarly, and, in some cases, identically.  For example, the factual allegations concerning Plaintiff Hart are as follows:

> Pursuant to Defendant's policy, Named Plaintiff Christopher Hart was regularly scheduled to work an 8 hour shift and would spend more than half of his shift (4.5 hours) performing non tip producing duties and was paid a subminimum wage.

> Depending on the shift, Mr. Hart was assigned 'opener duties' or 'closer duties' in addition to 'running sidework.'  Defendants required that Mr. Hart complete

---

[21] *See*, 29 U.S.C.A. § 203(m) (Westlaw 2014) ("In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to– (1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996; and (2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206(a)(1) of this title.  The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.")


Case 6:13-cv-06458-CJS   Document 63   Filed 06/24/14   Page 15 of 29

the following 'opener duties':  cleaning the dining room and all the wood work with a bucket filled with sanitizer solution; dusting the pictures on the walls and windexing the interior windows and picture frames; scrubbing the legs of all the chairs; degreasing and shining exposed metal including: tables, garage doors and window sills; cleaning out the cracks of the booths; cleaning, cutting and portioning out vegetables, noodles and rice for cooks; preparing sanitation buckets for prep and expo areas and setting up the expo line.  Mr. Hart spent one hour per shift[22] performing these 'opener duties' for which he was paid a subminimum wage.

Depending on the shift, Defendants also required that Mr. Hart complete the following 'closer duties' which included: breaking apart and cleaning the soda machines, tea dispensers and expo line; removing, then cleaning the light fixtures; scraping the gum from under every table in the store; cleaning and wiping down all the shelves in the kitchen after removing all the items on the shelves; cleaning every window in the store; moving furniture to clean underneath; deck brushing the floors; cleaning and sanitizing sinks; sweeping the entire restaurant; emptying garbage and replacing liners then taking the garbage to the dumpsters.   Mr. Hart would spend one hour per shift performing these 'closer duties' for which he was paid a subminimum wage.

When he was assigned opener or closer duties, Defendants also required Mr. Hart to complete 'running sidework' for the entire restaurant which consisted of: washing dishes because often the restaurant did not have a dishwasher; emptying trash cans and replacing liners; hand wiping all plates and silverware; sweeping, dusting, sanitizing and bleaching coffee cups, mugs, pots and tea kettles.  Mr. Hart would spend 3.5 hours completing 'running sidework' for which he was paid a subminimum wage.

Together with opener or closer duties, Mr. Hart spent more than half of his shift (4.5 hours) performing non tip producing duties and was paid a subminimum wage.

---

[22]This reference to "per shift," and every subsequent one, refers not to all shift, but only those shifts in which he was assigned opener or closer duties.  The actual frequency of such shifts is not stated.

the following 'opener duties':  cleaning the dining room and all the wood work with a bucket filled with sanitizer solution; dusting the pictures on the walls and windexing the interior windows and picture frames; scrubbing the legs of all the chairs; degreasing and shining exposed metal including: tables, garage doors and window sills; cleaning out the cracks of the booths; cleaning, cutting and portioning out vegetables, noodles and rice for cooks; preparing sanitation buckets for prep and expo areas and setting up the expo line.  Mr. Hart spent one hour per shift[22] performing these 'opener duties' for which he was paid a subminimum wage.

Depending on the shift, Defendants also required that Mr. Hart complete the following 'closer duties' which included: breaking apart and cleaning the soda machines, tea dispensers and expo line; removing, then cleaning the light fixtures; scraping the gum from under every table in the store; cleaning and wiping down all the shelves in the kitchen after removing all the items on the shelves; cleaning every window in the store; moving furniture to clean underneath; deck brushing the floors; cleaning and sanitizing sinks; sweeping the entire restaurant; emptying garbage and replacing liners then taking the garbage to the dumpsters.   Mr. Hart would spend one hour per shift performing these 'closer duties' for which he was paid a subminimum wage.

When he was assigned opener or closer duties, Defendants also required Mr. Hart to complete 'running sidework' for the entire restaurant which consisted of: washing dishes because often the restaurant did not have a dishwasher; emptying trash cans and replacing liners; hand wiping all plates and silverware; sweeping, dusting, sanitizing and bleaching coffee cups, mugs, pots and tea kettles.  Mr. Hart would spend 3.5 hours completing 'running sidework' for which he was paid a subminimum wage.

Together with opener or closer duties, Mr. Hart spent more than half of his shift (4.5 hours) performing non tip producing duties and was paid a subminimum wage.

---

[22]This reference to "per shift," and every subsequent one, refers not to all shift, but only those shifts in which he was assigned opener or closer duties.  The actual frequency of such shifts is not stated.

Defendants failed to provide Mr. Hart with wage statements that contained
allowances claimed by Defendants including the tip credit as required by the
NYLL.

(Complaint [#1], ¶ ¶ 47-52, Paragraph numbers omitted).

The allegations concerning Jeffrey Beyer are essentially identical, except that he
sometimes worked six-hour shifts, and, in addition to the "running sidework" duties that Hart
allegedly performed, he also performed "expediter duties," stocked beverage stations, kept
ice bins full, sorted and polished silverware, swept the floor of the expo line, and stocked
lemons, creamers and "to-go containers." *Id*. at ¶ 56. Similarly, the allegations concerning
Maria Sargent are also essentially the same, and identically-worded, with very minor
variation, to those of Hart and Beyer. For example, the pleading alleges that, in addition to
performing the exact same "opener" duties performed by Hart and Beyer, Sargent also had
to "portion out sugar for iced tea." *Id*. at ¶ 64.[23] The allegations concerning Andrea Randlett
are also essentially identical to those of Hart, Beyer and Sargent, with only slight variation.
For example, Randlett indicates that her opener duties also included "dusting artifacts and
memorabilia" and "setting up the salad bar." *Id*. at ¶ 69. Taylor Ramsey's factual allegations
are also almost the same, and identically-worded, except that she does not allege that she
was required to perform "opener duties." *Id*. at ¶ ¶ 59-62. Likewise, Shelley Carrera's
allegations are essentially the same as those of the other Plaintiffs, except for some slight
variation in tasks. For example, she indicates that her opener duties included, in addition
to the other opener duties already mentioned, "prepping desserts, making ice cream balls,
"plating up desserts' and stocking fruit. *Id*. at ¶ 75. She also alleges that her closer duties

---

[23]Also, unlike Hart and Beyer, Sargent was apparently not required to carry bags of trash to the
dumpster.

included cleaning the keg cooler, blinds and bar bottles, and that her running sidework included "cleaning the zippers and crackers," whatever that means. *Id*. at ¶ 77.

Overall, the allegations boil down to the general contention that each Plaintiff was a tipped employee but was "regularly" assigned shifts in during which he or she was required to perform non-tipped opener duties, closer duties and running sidework, consisting of essentially the same tasks, and that such tasks took up at least half, and usually more than half, of such shift, throughout the period of his or her employment. In that regard, the length of the Plaintiffs' periods of employment were, respectively, as follows: Hart, seventeen months; Beyer, sixteen months; Ramsey, three months; Sargent, thirteen months; Randlett, four months; and Carrera, twelve months. *See*, Complaint, ¶ ¶ 37-42.

Defendants maintain that the Complaint fails to state a plausible claim under 29 U.S.C. § 206. In that regard, Defendants contend that

> Plaintiffs advance the implausible claim that, although each was employed as a 'tipped' server at one of more than 135 Joe's Crab Shack restaurants nationwide, they 'regularly' spent more than half of their eight-hour shifts not generating tips at all, but rather working as janitors, cook's helpers and dishwashers, at a pay rate of $2.13 an hour. None of the plaintiffs provides any degree of specificity as to any date he or she worked at these tasks, how long each task took, or how often they were done. They simply claim in conclusory fashion that they 'regularly' worked a shift and 'would' spend a majority of their time engaging in activities contained in an identical list of non-serving tasks.

Def. Memo of Law [#26] at p. 1. Defendants rely primarily on the recent trio of cases from the Second Circuit Court of Appeals dealing with pleading standards in FLSA overtime cases, consisting of *Lundy v. Catholic Health System of Long Island, Inc.* ("*Lundy*"), 711 F.3d 106 (2d Cir. 2013), *Nakahata v. New York-Presbyterian Healthcare System, Inc.*

("*Nakahata*"), 723 F.3d 192 (2d Cir. 2003) and *DeJesus v. HF Management Services, LLC* ("*DeJesus*"), 726 F.3d 85 (2d Cir. 2013).[24]   Defendants contend that the standards enunciated in those cases also apply in FLSA minimum wage cases, and cite, on this point, decisions including *Roberts v. Apple Sauce, Inc.*, No. 3:12–CV–830–TLS, 2013 WL 2083467 (N.D.Ill. May 13, 2013), *White v. Classic Dining Acquisition Corp.*, No. 1:11-cv-712-JMS-MJD, 2012 WL 1252589 (S.D.Ind. Apr. 13, 2012) and *Jones v. Casey's Gen. Stores*, 538 F.Supp.2d 1094 (S.D.Iowa 2008).   Defendants maintain that all of those cases require that "a plaintiff seeking to plead a violation of the FLSA must set forth, at a minimum, at least some dates and times with some degree of quantifiable specificity, to show that the claim crosses the line into the realm of plausibility." Def. Memo of Law [#26] at p. 6.   Defendants argue that the Complaint fails in that regard, since

> [n]ot a single date, or even a date range, is specified as to when any of the plaintiffs' work exceeded the presumed 20 percent non-tip threshold.  Nothing is said, even by way of example, as to how long each task took, or the frequency with which a particular task was assigned, or the circumstances under which the duties were performed.  Indeed, the complaint does not even contain an approximation of the number of days any one of the plaintiffs' non-tip-producing tasks exceeded 20 percent of the time worked.

*Id*. at p. 7.  In addition, Defendants maintain that the allegations are simply not plausible from a common-sense perspective, since it is unlikely that an employee would continue working for an employer who consistently paid him far less than the minimum wage. *Id*.

---

[24]*Lundy* and *Nakahata* involved pleadings prepared by the law firm of Thomas & Solomon, LLP, who represent Plaintiffs in this action.  In *Nakahata*, the Circuit Court observed that Thomas & Solomon had filed many FLSA actions "premised on a stock set of allegations concerning underpayment in the healthcare industry." *Nakahata*, 723 F.3d at 196.

At the outset, Defendants' argument, that it is unlikely that Plaintiffs would have continued working for such little pay, is not a proper consideration on a 12(b)(6) motion. *See, Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("The plausibility standard is not akin to a probability requirement.  A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely.") (citations and internal quotation marks omitted).

However, the Court agrees and concludes that the Complaint fails to state a minimum-wage claim under the FLSA.  As to this conclusion, *Lundy*, *Nakahata* and *DeJesus* are instructive, even though they pertain specifically to overtime claims.  Significantly, the pleadings in those cases failed to plausibly state overtime claims because they did not allege that the plaintiffs had worked more than forty hours in a given week, and been denied overtime pay for the hours worked in excess of forty hours. *See, e.g., DeJesus*, 726 F.3d at 88-89 ("The allegations in *Lundy* thus failed because of arithmetic: tallying the plausible factual allegations, we could not get beyond forty hours in any given week, and therefore to a plausible claim for overtime.").[25]      The instant case involves 29 U.S.C. § 206, which provides, in pertinent part, that "[e]very employer shall pay to each of his employees," the federal minimum wage.  There is an exception, however, for a "tipped employee," *see*, 29 U.S.C.A. § 203(m) (Westlaw 2014),  who is defined as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C.A. § 203 (Westlaw 2014).  Recently, one court explained this concept, and its limitations, as follows:

---

[25]*See also, DeJesus*, 726 F.3d at 89 ("In *Nakahata*, the plaintiffs also had alleged uncompensated work during meal breaks, training sessions, and extra shift time as evidence of an overtime violation without demonstrating how these instances added up to forty or more hours in a given week.") (citation omitted).

The FLSA generally requires employers to pay employees a federal minimum wage of $7.25 per hour. See 29 U.S.C. § 206(a)(1). However, under the statute's "tip credit," employers may pay tipped employees at an hourly wage rate below the minimum wage, provided that the hourly wage and the employees' tips, taken together, are at least equivalent to the minimum wage. See 29 U .S.C. § 203(m).FN4

> FN4. Under section 203(m), the minimum required cash wage that an employer can pay a tipped employee is $2.13 per hour, so the maximum tip credit that the employer can claim per employee is $5.12 per hour.

When an employee is employed by a single employer in both a tipped and a non-tipped position, DOL [Department of Labor] regulations permit the employer to utilize the tip credit only for hours spent by the employee in the tipped occupation. See 29 C.F.R. §§ 531.51. Thus, if a tipped employee works two jobs, one in which his work customarily and regularly produces tips and one in which it does not, the employee is considered employed in dual occupations, and the tip credit may not be taken for any hours worked in the non-tip-producing occupation. See id. § 531.56(e). However, the regulation distinguishes that situation from "a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses," concluding that "[s]uch related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips." *Id*.

In the case of servers and bartenders, the threshold between tip-producing and non-tip-producing work is particularly important. Waitstaff commonly perform "side work," such as setting and clearing tables, that is related to their tipped occupation but does not itself generate tips. In such circumstances, the DOL has stated that an employer can "take the tip credit for time spent in duties related to the tipped occupation, even though such duties are not by themselves directed toward producing tips (i.e. maintenance and preparatory or closing activities)," but that such duties must be "incidental to the regular duties of the server." DOL Field Operations Handbook § 30d00(e) (rev. June 30, 2000), available at http://www.dol.gov/whd/FOH/FOH_ Ch30.pdf (last visited Sept. 13, 2013). The DOL further clarified this issue in a March 2011 opinion in which it concluded that tipped employees who spend a substantial

amount of time, or <u>more than twenty percent of their workweeks</u>, engaged in related but non-tip-producing work must be paid the full minimum wage for the time spent performing the non-tipped work. *See* U.S. Department of Labor, Wage and Hour Division Fact Sheet # 15: Tipped Employees Under the Fair Labor Standards Act (FLSA) (rev. Mar. 2011) ("DOL Fact Sheet # 15"), available at http://www.dol.gov/whd/regs/compliance/whdfsl5.pdf (last visited September 3, 2013). While not expressly mandated in the DOL regulations, certain courts have concluded that the twenty percent limit on side work under the federal tip credit is entitled to deference. *See, e.g., Fast v. Applebee's International, Inc.*, 638 F.3d 872, 879–81 (8th Cir.2011); *Driver v. AppleIllinois, LLC*, 890 F.Supp.2d 1008, 1032–33 (N.D.Ill.2012).

*Chhab v. Darden Restaurants, Inc.*, No. 11 Civ. 8345(NRB), 2013 WL 5308004 at *2 -3 (S.D.N.Y. Sep. 20, 2013) (emphasis added).

As noted earlier, the claims in *Lundy*, *Nakahata* and *DeJesus* failed because the plaintiffs failed to allege that they worked more than forty hours during a particular week, for which they were not paid at the correct rate.  Similarly, minimum wage claims are based on the plaintiff's pay for a particular week:

> [T]he 'Supreme Court has emphasized the importance of paying an employee's minimum wage on a weekly basis.' *Marshall v. Sam Dell's Dodge Corp.*, 451 F.Supp. 294, 302 (N.D.N.Y.1978) (*citing Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707–08 (1945)). 'The Second Circuit has, likewise, in *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487 (2d Cir.1960), indicated that the workweek is the applicable time period for calculating the minimum wage.' *Id*."

*Perez v. Westchester Foreign Autos, Inc.*, No. 11 Civ. 6091(ER), 2013 WL 749497 at *10 (S.D.N.Y. Feb. 28, 2013)  Significantly, in that regard,

> [w]hile the FLSA's minimum wage provision speaks of an hourly wage, an employer's failure to compensate an employee for particular hours worked does not necessarily violate the minimum wage provision. *See Dove v. Coupe*, 759 F.2d 167, 171 (D.C.Cir.1985). That is because the workweek as a whole,

not each individual hour within the workweek, determines whether an employer has complied with the minimum wage provision. *Id*.; *see* 29 C.F.R. § 776.4(a). Under what has become known as the *Klinghoffer* rule, taking its name from *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir.1960), no minimum wage violation occurs so long as the total wage paid to an employee in any given workweek divided by the total hours worked in the workweek equals or exceeds the applicable minimum wage. *Accord Adair v. City of Kirkland*, 185 F.3d 1055, 1062 n. 6 (9th Cir.1999); *U.S. Dep't of Labor v. Cole Enters., Inc.*, 62 F.3d 775, 780 (6th Cir.1995); *Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353, 357 (8th Cir.1986); *Dove*, 759 F.2d at 171; *Blankenship v. Thurston Motor Lines, Inc.*, 415 F.2d 1193, 1198 (4th Cir.1969); *U.S. Dep't of Labor*, Opinion Letter FLSA 2008–5 (May 30, 2008), available at http://www.dol.gov/whd/opinion/flsa.htm (last visited September 23, 2010).

*Pruell v. Caritas Christi*, Civil Action No. 09–11466–GAO, 2010 WL 3789318 at *2 (D.Mass. Sep. 27, 2010); *see also, McElmurry v. US Bank Nat. Ass'n*, 2005 WL 2078334 at * 4 (D.Or. Aug. 24, 2005) ("[T]he establishment of an FLSA minimum wage violation depends on the total pay for the workweek divided by the total number of hours worked in that workweek. This 'workweek' concept is well-supported in the caselaw, starting with the seminal case of *United States v. Klinghoffer Brothers Realty Corp.*, 285 F.2d 487 (2d Cir.1961).")

Here, the Complaint alleges, in conclusory fashion, that Plaintiffs were paid less than the minimum wage.  However, the factual allegations pertain only to particular shifts, as opposed to entire work weeks.  That is, the Complaint alleges that Plaintiffs would "regularly" be assigned *a shift* in which an inordinate amount of time was spent on non-tipped work activities.  Such allegation, though, does not state a minimum wage claim, since the pleading never alleges that during any particular week, the average of the Plaintiffs' hourly

22

wages was less than the federal minimum wage.[26]  Accordingly, the FLSA minimum wage claim is dismissed.

However, the Court will permit Plaintiffs to re-plead this claim, provided that there is a good-faith basis to do so.  In that regard, the Second Circuit has stated that,

> [w]hile this Court has not required plaintiffs to keep careful records and plead their hours with mathematical precision, we have recognized that it is employees' memory and experience that lead them to claim in federal court that they have been denied [the minimum wage] in violation of the FLSA in the first place.  Our standard requires that plaintiffs draw on those resources in providing complaints with sufficiently developed factual allegations.

*DeJesus*, 726 F3d at 90.  In this case, if Plaintiffs actually have actionable FLSA minimum-wage claims, the Court would expect that Plaintiffs could provide some specific information to support those claims, regarding weeks in which they were supposedly paid less than the minimum wage, particularly given the relatively short length of time that each Plaintiff worked for Ignite.

<u>Motion to Dismiss By the Individual Defendants</u>

Blanchette, Cottingim and Morris maintain that all claims against them individually must be dismissed, because they are not "employers" within the meaning of the subject

---

[26]Plaintiffs maintain that the reasonable inference to be drawn from the Complaint is that Plaintiffs were required to perform an inordinate amount of non-tip-producing tasks "day in and day out." Pl. Memo of Law [#38] at p. 9; *see also, id.* ("[T]he complaint allows the reasonable inference that such was plaintiffs' employment, day in and day out, and thus, any such [express] allegation would be merely redundant.").  The Court disagrees.  Rather, the reasonable inference is that Plaintiffs were occasionally assigned shifts involving such work, but there is no indication how often that occurred. *See, e.g.*, Complaint ¶ ¶ 47-48 ("Hart was regularly scheduled to work an 8 hour shift and would spend more than half of his shift (4.5 hours) performing non tip producing duties and was paid a subminimum wage.  Depending on the shift, Mr. Hart was assigned 'opener duties' or 'closer duties' in addition to 'running sidework.'")  If, as Plaintiffs' counsel seems to imply, Plaintiffs are claiming under Rule 11 that they were given such assignments every day, they need to say so.  But in any event, regardless of the frequency with which such assignments were given, no minimun wage claim is stated unless the worker's average wage for the week, including tips, fell below the minimum wage.

federal and state minimum-wage statutes.  In support of their position, Defendants focus on the FLSA's "economic reality" test, and argue that the individual state's laws on this point are "nearly identical to that of the FLSA."[27]

Plaintiffs respond that the Complaint contains sufficient factual allegations to plausibly indicate that Blanchette, Cottingim and Morris are employers under all of the various statutes. In that regard, the Complaint contains factual assertions concerning Blanchette, Cottingim and Morris. Complaint ¶ ¶ 100-121.  The Complaint alleges that Blanchette has been Ignite's CEO since 2007, and that he has authority, which he has exercised in particular instances, relating to hiring and firing and creating human resources policies. Blanchette also allegedly involves himself in the actual operation of Ignite's restaurants, by making decisions related to marketing and improving customers' dining experiences.  As for Cottingim, the Complaint alleges that he was Ignite's "Senior Vice President & Chief Administrative Officer responsible for human resources and payroll from 2008 until April 2013," and that he created and implemented the alleged "policy" to pay Plaintiffs less than the minimum wage.[28]   The Complaint maintains that Cottingim determined rates of pay, maintained employment records, drafted human resources policies and resolved "disputes regarding hiring and firing."[29]   The Complaint further indicates that Cottingim had direct interaction with employees about human resource matters through email communications,

---

[27]*See, e.g.*, Morris's Memo of Law [#31] at p. 5, n. 5.  Plaintiffs respond that Defendants' assertion on that point is "questionable," but they do not seriously dispute Defendants' contention that the federal and state laws' definitions of an "employer" are nearly identical. *See*, Pl. Memo of Law [#39] at pp. 5-6, n. 3.  In any event, Plaintiffs maintain that the Complaint adequately asserts claims against Morris, Cottingim and Blanchette under the federal *and* state statutes. *Id.*

[28]Complaint [#1] at ¶ 108.

[29]Complaint [#1] at ¶ 110.

and that his staff visited individual restaurants to meet with employees concerning "working conditions and pay rates."[30]  Cottingim also had the ability to cause Ignite to issue payments to employees to resolve pay disputes.[31]   As for Morris, the Complaint indicates that he succeeded Cottingim as Senior Vice President for Human Resources as of March 2013,[32] and that he essentially has the same level of operational control, and performs the same duties, that Cottingim performed, such as "overseeing human resources and payroll," resolving "issues and disputes regarding hiring and firing," "determining rates of pay and maintaining employment records."[33]

Recently, the Second Circuit clarified the test for determining whether an individual defendant can be held liable as an "employer" under the FLSA. *See, Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013) ("*Irizzary*").   Preliminarily, in *Irizzary* the Second Circuit emphasized that it had "consistently construed the [FLSA] liberally to apply to the furthest reaches consistent with congressional direction." *Id*., 722 F.3d at 103.  In that regard, "[t]he Second Circuit has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." *Id*. at 104 (citation and internal quotation marks omitted).  Significantly, someone may be liable as an "employer" under the FLSA even if he or she was not personally involved in the alleged violation. *Id*. at 110 ("Nothing in the ... FLSA  itself, requires an individual to have

---

[30]Complaint [#1] at ¶ 110.

[31]Complaint [#1] at ¶ 113.

[32]Morris therefore was not employed by Ignite at the same time that any of the named Plaintiffs worked for Ignite.

[33]Complaint [#1] at ¶ ¶ 116-117.

been personally complicit in FLSA violations; the broad remedial purposes behind the statute counsel against such a requirement."); *see also, id*. at 116 ("[T]he purpose of the FLSA is not to punish an employer but to remunerate aggrieved employees.") Furthermore, a defendant may be liable as an employer even if he never directly managed or personally interacted with the plaintiffs. *Id*. at 110, 116.

For an individual defendant, the question is whether he has "operational control" over the plaintiffs' employment:

> [T]o be an 'employer,' an individual defendant  must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment.  It is appropriate ... to require some degree of individual involvement in a company in a manner that affects employment-related factors such as workplace conditions and operations, personnel, or compensation[.]

*Irizzary*, 722 F.3d at 109.  Factors to be considered include whether the defendant has the power to hire and fire employees, whether he supervised and controlled employees' work schedules or conditions of employment, whether he determined the rate and method of payment to employees and whether he maintained employment records. *Id*. at 114-116 (referencing factors enunciated in *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984) ("the *Carter* factors")

In the instant case, the Court, having considered these legal principles, finds that the Complaint contains sufficient factual allegations to plausibly maintain that Blanchette, Cottingim and Morris are "employers" within the meaning of the FLSA and the state statutes. Again, though, the FLSA minimum-wage claims are dismissed on the other grounds discussed above, without prejudice.

The Five State-Law Class Action Claims

Defendants next maintain that the Court should dismiss the proposed state-law class action claims because Plaintiffs will not be able to "satisfy the commonality requirent of Rule 23(a), or the predominance and superiority requirements of Rule 23(b)(3)."[34]   Although a motion for class certification is not presently before the Court, Defendants contend that the Court should preemptively dismiss the state-law claims, since they will inevitably fail to meet the requirements for class certification.   For example, Defendants maintain that Plaintiffs cannot meet Rule 23's commonality requirements, because the five states' laws vary with regard to statutes of limitations, definitions of tipped employees, limits on non-tipped work, record-keeping requirements, remedies and calculations of back wages and liquidated damages.   Similarly, Defendants maintain that Plaintiffs cannot meet the predominance requirement, since the aforementioned differences between the various state laws predominate over common questions, and "would create insurmountable case management problems for the Court and the parties, as well as a morass for a jury."[35]

Plaintiffs oppose the application for several reasons.   First, Plaintiffs contend that it is generally not appropriate to rule on proposed class claims at the pleading stage, before any discovery has been conducted.   Additionally, Plaintiffs contend that this matter can be certified as a class action, notwithstanding the differences between various state laws, particularly where, as here, only five states' laws are involved, and the differences between them are minor.

---

[34]Def. Memo of Law [#26] at p. 10.

[35]Def. Memo of Law [#26] at p. 18.

The Court construes Defendants' motion as one to strike the class allegations, pursuant to Rule 23(d)(1)(D).  As Plaintiffs correctly point out, such motions are disfavored:

> Motions to strike are generally disfavored. *Chenensky v. N.Y. Life Ins. Co.*, No. 07–CV11504, 2011 WL 1795305, at *1 (S.D.N.Y. Apr. 27, 2011) (collecting cases). "A motion to strike class allegations is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects of [the] litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." *Id*. (alteration and internal quotation marks omitted) (collecting cases). "Accordingly, district courts in this Circuit have frequently found that a determination whether the Rule 23 requirements are met is more properly deferred to the class certification stage, when a more complete factual record can aid the Court in making this determination." *Mazzola v. Roomster Corp.*, 849 F.Supp.2d 395, 410 (S.D.N.Y.2012) (collecting cases) [(Koeltl, J.)].

*Belsito Communications, Inc. v. Dell, Inc.*, No. 12–CV–6255 (CS), 2013 WL 4860585 at *10 (S.D.N.Y. Sep.12, 2013); *see also, Kassman v. KPMG LLP*, 925 F.Supp.2d 453, 464 (S.D.N.Y. 2013) ("[I]n this Circuit, a motion to strike class claims is considered premature if the issues raised are the same ones that would be decided in connection with determining the appropriateness of class certification under Rules 23(a) and 23(b).") (citations and internal quotation marks omitted).

In this case, there has been no discovery, and the issues that Defendants raise are the same issues that would typically be raised in opposition to a motion for class certification.  Accordingly, Defendants' motion to dismiss/strike the state-law class action claims is denied as premature.  Such denial is without prejudice to Defendants raising the same issues at a later time in this action.

28

CONCLUSION

Defendants' motions to dismiss, or, in the alternative, to transfer venue (Docket Nos. [#23][#30][#43][#50]) are granted in part and denied in part.  The request to transfer venue is denied.  The application to dismiss is granted as to the FLSA minimum wage claims, and Plaintiffs are granted leave to re-plead.   Otherwise, Defendants' motions are denied.

Within twenty days of the date of this Decision and Order, Plaintiffs shall either file an amended complaint, or inform the Court and opposing counsel that they do not intend to do so.  If Plaintiffs file an amended complaint, Defendants shall have twenty days from the date of service to answer or otherwise move against the amended pleading.  If Plaintiffs indicate that they are not going to file an amended pleading, Defendants shall have twenty days from such notice to file an answer to the original Complaint [#1] (minus the dismissed FLSA minimum-wage claims).

SO ORDERED.

Dated:      June 24, 2014
            Rochester, New York

                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge