**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**CHRISTOPHER HART, MARIA SARGENT, TAYLOR RAMSEY, ANDREA RANDLETT, SHELLY CARRERA, MICHEAL WILLIAMS, LEAH HENCHELL, COURTNEY HOLLINS, AMBER INGRAM, and WHITNEY DOLAN,**
***on behalf of themselves and all other employees similarly situated,***

***Plaintiffs,***

**v.**

**CRAB ADDISON, INC. d/b/a JOE'S CRAB SHACK, IGNITE RESTAURANT GROUP, INC., RAYMOND A. BLANCHETTE III, KEVIN COTTINGIM and RODNEY MORRIS, ,**

***Defendants.***

**SECOND AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

**Civil Action**
**No. 13-cv-6458**

Plaintiffs Christopher Hart, Maria Sargent, Taylor Ramsey, Andrea Randlett, Shelly Carrera, Michael Williams, Leah Henchell, Courtney Hollins, Amber Ingram, and Whitney Dolan, ("Named Plaintiffs"), on behalf of themselves and all other persons similarly situated (collectively, "Plaintiffs"), by and through their attorneys Thomas & Solomon LLP, bring this class and collective action complaint against Defendants Crab Addison, Inc. d/b/a Joe's Crab Shack, Ignite Restaurant Group, Inc., Raymond A. Blanchette III, Kevin Cottingim, and Rodney Morris, (collectively, "Defendants").

## NATURE OF ACTION

1. This lawsuit seeks to recover minimum wages, injunctive relief and declaratory relief to redress the deprivation of rights secured to Named Plaintiffs and similarly situated co-workers (servers, bartenders, bussers, hosts and all other tipped employees) who worked or have worked at Defendants' Joe's Crab Shack restaurants.

2. Named Plaintiffs bring this action on behalf of themselves and similarly situated current and former tipped hourly food service workers who elect to opt in to this action pursuant to the Fair Labor Standards Act of 1938 as amended, 29 U.S.C. § 201 *et seq.* ("FLSA"), specifically, the collective action provision of 29 U.S.C. § 216(b). To date, in addition to the five Named Plaintiffs, more than two thousand individuals have already opted-in into this lawsuit.

3. Named Plaintiffs also bring this action on behalf of themselves and similarly situated current and former tipped hourly food service workers pursuant to Federal Rule of Civil Procedure 23 to remedy the violations of applicable state labor laws and regulations including: New York Minimum Wage Act, Article 19, § 650 *et seq.*, New York State Department of Labor Regulations, including, but not limited to, 12 N.Y.C.R.R. §137-2.2 and §146.2-2, New York Labor Law ("NYLL") § 195(3) as amended by the New York Wage Theft Prevention Act, Maryland Labor and Employment Code §§3-413, 3-507.2, Missouri's Minimum Wage Law, §290.502, *et seq*., Arizona's Minimum Wage Act §23-363, *et seq*., Illinois Minimum Wage Law - 820 ILCS 105/1 *et seq*., Illinois Wage Payment and Collection Act – 820 ILCS 115/1 *et seq*., the Florida Constitution, art. 10, § 24, the Florida Minimum Wage Act, 31 Fla. Stat. § 448.110(3), the Pennsylvania Minimum Wage Act, 43 Pa. Cons. Stat. § 333.104, *et seq.*, Pa. Con. Stat. § 231.34, Pa. Cons. Stat. § 260.9a, Pennsylvania Regulations, including, but not limited to 34 Pa. Code. § 231.34, Colorado Minimum Wage Law, Colorado Rev. Stat. § 8-6-118, Colorado Regulations, including, but not limited to 7 Colo. Code Regs., § 1103-1, and the Indiana Minimum Wage Act, Ind. Code § 22-2-2-4, *et seq.* (collectively "State Labor Laws").

4. Defendants have a policy to pay Plaintiffs subminimum wage rates as described in more detail in Plaintiffs' Affirmations submitted in support of Plaintiffs' Motion for Expedited Notice Pursuant to the FLSA.

5. Defendants' policy is to not pay Plaintiffs the legally required minimum wage even though the Plaintiffs are performing jobs unrelated to their tipped job.

6. Instead, Defendants, as matter of policy, pay Plaintiffs subminimum wage rates and require they perform non tip producing duties such as washing dishes, kitchen prep and janitorial tasks which Defendants refer to as "back of the house" duties.

7. Accordingly, Defendants cannot meet the FLSA's tip credit requirements codified at 29 U.S.C. §203(m).

8. Therefore Defendants are not entitled to a tip credit against the minimum wage owed to the tipped employees. As a result, like the Named Plaintiffs, Defendants' tipped employees are entitled to at least $7.25 for each hour worked.

9. Further, none of the Defendants nor any of the managers of Defendants' business provided requisite notice to Plaintiffs regarding the tip credit as required by the FLSA, the NYLL codified at N.Y.C.R.R. §§137-2.2, 146.2-2,Arizona's Administrative Code § R20-5-1207(c), the Florida Minimum Wage Act, 31 Fla. Stat. § 448.110(3), and the Pennsylvania Minimum Wage law and regulations, 43 Pa. Cons. Stat. § 333.104(d), 34 Pa. Code § 231.34.

## JURISDICTION AND VENUE

10. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343 (3) and (4) conferring original jurisdiction upon this Court of any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the

protection of civil rights; under 28 U.S.C. § 1337 conferring jurisdiction of any civil action arising under any Act of Congress regulating interstate commerce; under the Declaratory Judgment Statute, 28 U.S.C. § 2201; and under 29 U.S.C. § 216(b).

11. The Court has jurisdiction over Plaintiffs' State Labor Law claims under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). Plaintiffs' claims for violations of the State Labor Laws have a value in excess of $5,000,000 exclusive of fees and costs. Citizenship of the members of the proposed subclasses is dispersed among a number of states. Upon information and belief, greater than two-thirds of the members of all proposed subclasses in the aggregate are not citizens of the same state. The number of putative subclass members exceeds 100. At least one member of the proposed subclasses is a citizen of a state different from that of at least one defendant. Plaintiffs' claims involve matters of national or interstate interest.

12. This Court also has supplemental jurisdiction over the State Labor Laws under 28 U.S.C. § 1367(a) because the Plaintiffs' allegations of State Labor Laws are related and arise from the same core of operative facts as Plaintiffs' allegations for violations of the FLSA.

## COLLECTIVE ACTION ALLEGATIONS

13. Named Plaintiffs bring this action on behalf of themselves and all other similarly situated employees as authorized under 29 U.S.C. § 216(b). The employees similarly situated for purposes of the collective action are as follows:

> All Defendants' current and former employees who in the last three years before this action was commenced, have worked as tipped hourly food service workers and were paid subminimum wages at Defendants' Joe's Crab Shack restaurants, who elect to opt in to this action.

14. In addition, at all times relevant to the litigation, Defendants' policy and pattern or practice did not inform the Named Plaintiffs and similarly situated employees of the FLSA's tip credit provision 29 U.S.C. § 203(m) and supporting Federal Regulations, including, but not limited to, 29 C.F.R. §516.4. Accordingly, Defendants are not entitled to pay Plaintiffs' subminimum wages under the FLSA.

15. Defendants knowingly and willfully operate their business with a policy of not paying the FLSA minimum wage to the Named Plaintiffs and other similarly situated employees. Moreover, Defendants were sued for minimum wage violations, and thus were properly put on notice of their invalid compensation schemes. However, Defendants continued to ignore the law and failed to properly compensate the Named Plaintiffs and other similarly situated employees even though they were put on notice that they had violated employees' rights.

16. Moreover, Defendants are aware or should have been aware that federal law required them to pay employees minimum wage for performing non tip producing work.

17. Further, Defendants are aware or should have been aware that federal law required them to provide requisite notice to tipped employees as required by the FLSA.

18. Plaintiffs are similarly situated in that they have similar job duties and similar pay provisions based on Defendants' illegal pay policy requiring they perform non-tip producing duties and are paid subminimum wages.

19. There are numerous similarly situated current and former tipped employees of Defendants who work or worked at Joe's Crab Shack restaurants who would benefit from issuance of a Court supervised notice of the instant lawsuit and the opportunity to join in the present lawsuit.

20. Similarly situated employees are known to Defendants and readily identifiable by Defendants through Defendants' payroll records.

21. Therefore, Named Plaintiffs should be permitted to bring this action as a collective action for and on behalf of those employees similarly situated pursuant to the opt-in provision of the FLSA, 29 U.S.C. § 216(b).

22. The written consents to filing this complaint, duly executed by the nine Named Plaintiffs, and by more than two thousand additional Plaintiffs pursuant to 29 U.S.C. §216(b), have been filed previously. *See* Doc. No. 1-1, Doc. No. 1-2, Doc. No. 54-1, Doc. No. 91-1 through 123-1, Doc. No. 125-1 through 148-1, Doc. No. 150-1 through 159-1, Doc. No. 161-1 through 165-1, Doc. No. 167-1 through 176-1, Doc. No. 179-1 through 180-1, Doc. No. 182-1 through 186-1, Doc. No. 189-1 through 193-1, Doc. No. 195-1 through 205-1.

## CLASS ACTION ALLEGATIONS

23. The claims arising under the State Labor Laws of New York, Maryland, Missouri, Arizona, Illinois, Florida, Pennsylvania, Colorado, and Indiana are properly maintainable as a class action under Federal Rule of Civil Procedure 23 ("Rule 23").

24. The Rule 23 class consists of the following subclasses:

> **1. New York Subclass**: All persons who have worked as tipped, hourly food service workers at Joe's Crab Shack restaurants in New York, between August 28, 2007 and the date of final judgment in this matter ("New York Subclass").
>
> **2. Maryland Subclass**: All persons who have worked as tipped, hourly food service workers at Joe's Crab Shack restaurants in Maryland between August 28, 2010 and the date of final judgment in this matter ("Maryland Subclass").
>
> **3. Missouri Subclass**: All persons who have worked as tipped, hourly food service workers at Joe's Crab Shack restaurants in Missouri between August 28, 2011 and the date of final judgment in this matter ("Missouri Subclass").

**4. Arizona Subclass:** All persons who have worked as tipped, hourly food service workers at Joe's Crab Shack restaurants in Arizona between August 28, 2010 and the date of final judgment in this matter (Arizona Subclass").

**5. Illinois Subclass:** All persons who have worked as tipped, hourly food service workers at Joe's Crab Shack restaurants in Illinois between August 28, 2003 and the date of final judgment in this matter ("Illinois Subclass").

**6. Florida Subclass:** All persons who have worked as tipped, hourly food service workers at Joe's Crab Shack restaurants in Florida between August 28, 2008 and the date of final judgment in this matter ("Florida Subclass").

**7. Pennsylvania Subclass:** All persons who have worked as tipped, hourly food service workers at Joe's Crab Shack restaurants in Pennsylvania between August 28, 2010 and the date of final judgment in this matter ("Pennsylvania Subclass").

**8. Indiana Subclass:** All persons who have worked as tipped, hourly food service workers at Joe's Crab Shack restaurants in Indiana between August 28, 2010 and the date of final judgment in this matter ("Indiana Subclass"), who elect to opt in to this action.

**9. Colorado Subclass:** All persons who have worked as tipped, hourly food service workers at Joe's Crab Shack restaurants in Colorado between August 28, 2010 and the date of final judgment in this matter ("Colorado Subclass").

25. The class action is maintainable under subsections (1), (2), (3) and (4) of Rule 23(a).

26. The number of putative subclass members is over 100.

27. The Named Plaintiffs' claims share common issues of law and fact as to whether they were paid properly and have common claims that are typical of the claims of the subclass members because they are employed by Defendants, paid subminimum wages and required to perform non tip producing duties including "back of the house" duties such as washing dishes, kitchen prep and janitorial tasks.

28. Common issues of law and fact predominate in this action because resolution of them will resolve a significant aspect of this litigation for each subclass member in one stroke including, but are not limited to, the following:

- Whether Defendants violated the respective State Labor Laws and supporting regulations by paying employees subminimum wages and requiring tipped employees to perform non tip producing duties such as washing dishes, kitchen prep and janitorial tasks;
- Whether Defendants correctly compensated the Named Plaintiffs and the members of the subclasses for all hours worked;
- Whether Defendants knew or should have known that tipped employees were performing non-tip producing duties, including, but not limited to, kitchen and janitorial duties;
- Whether Named Plaintiffs and subclass members were systematically not paid minimum wage for performing non-tip producing duties, including, but not limited to, janitorial and kitchen related jobs;
- The minimum wage rate to which the subclasses are entitled;
- Whether Defendants' policy of failing to pay Named Plaintiffs and the subclass members was willful or in reckless disregard of the law;
- Whether Defendants violated the NYLL and supporting regulations by failing to provide the requisite notice to New York Subclasses regarding the tip credit;
- Whether Defendants violated the Arizona Administrative Code by failing to provide the requisite notice to the Arizona Joe's Crab Shack Subclass regarding the tip credit;
- Whether the Defendants violated the Florida Minimum Wage Act, 31 Fla. Stat. § 448.110(3), by failing to provide the requisite notice to the Florida Subclasses regarding the tip credit;
- Whether the Defendants violated the Pennsylvania Minimum Wage law and regulations, 43 Pa. Cons. Stat. § 333.104(d), 34 Pa. Code § 231.34, by failing to provide the requisite notice to the Pennsylvania Subclasses regarding the tip credit; and

29. Further, there are no known conflicts of interest between the Named Plaintiffs and the subclass members. Moreover, the Named Plaintiffs will adequately represent the interests of the subclass members because they are similarly situated to the subclass members.

30. The Class Counsel, Thomas & Solomon LLP, is qualified and able to litigate the Named Plaintiffs' and subclass members' claims.

31. The Class Counsel concentrates its practice in employment litigation, and its attorneys are experienced in class action litigation, including class actions arising under wage and hour laws.

32. The class action is also maintainable under subsection (2) of Rule 23(b) because the Named Plaintiffs and subclass members seek injunctive relief against Defendants and their officer, agents, successors, employees, representatives and any all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein.

33. Moreover, the class action is maintainable under subsection (3) of Rule 23(b) because the Named Plaintiffs and subclass members seek to resolve common questions of law and fact (*see supra* ¶ 28) that predominate among the Named Plaintiffs and subclass members and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

34. The subclasses are also maintainable under Rule 23(c)(4) because resolution of common issues will significantly advance the litigation or entitle Plaintiffs to injunctive relief.

## PARTIES

### A. Plaintiffs

35. Christopher Hart, Maria Sargent, Taylor Ramsey, Andrea Randlett, Shelly Carrera, Michael Williams, Leah Henchell, Courtney Hollins, Amber Ingram, and Whitney Dolan were tipped hourly employees of Defendants under the FLSA and the relevant State Labor Laws.

36. Christopher Hart worked for Defendants as a server from approximately August 2011 to January 2013 at the Henrietta, New York Joe's Crab Shack location. Mr. Hart resides within this District.

37. Taylor Ramsey worked for Defendants as a hostess from approximately July 2012 to September 2012 at the Branson, Missouri Joe's Crab Shack location. Ms. Ramsey resides in Illinois.

38. Maria Sargent worked for Defendants as a server from approximately May 2011 to June 2012 at the Greenbelt, Maryland Joe's Crab Shack location. Ms. Sargent resides in Maryland.

39. Andrea Randlett worked for Defendants as a server from approximately May 2012 to August 2012 at the Tempe, Arizona Joe's Crab Shack location. Ms. Randlett resides in Arizona.

40. Shelly Carrera worked for Defendants as a server and bartender from approximately June 2011 to June 2012 at the Fairview Heights, Illinois Joe's Crab Shack location. Ms. Carrera resides in Illinois.

41. Michael Williams worked for Defendants as a server from approximately March 2004 to February 2007 at the Wilmington, Delaware Joe's Crab Shack location, and

from approximately 2008 to October 2014 at the Fort Myers, Florida Joe's Crab Shack location. Mr. Williams resides in Florida.

42. Leah Henchell worked for Defendants as a server from approximately July 2010 to December 2014 at the Pittsburgh Station Square Joe's Crab Shack location. Ms. Henchell resides in Pennsylvania.

43. Courtney Hollins worked for the Defendants as a server from approximately April 2013 to November 2013 in the Indianapolis/ Greenwood, Indiana Joe's Crab Shack location. Ms. Hollins resides in Indiana.

44. Amber Ingram worked for the Defendants as a server from approximately June 2014 to August 2014 in the Westminster, Colorado Joe's Crab Shack location. Ms. Ingram resides in Colorado.

45. Whitney Dolan worked for the Defendants as a server from approximately January 2015 to April 2015 in the Tucson, Arizona Joe's Crab Shack location. Ms. Hollins resides in Arizona.

46. The Named Plaintiffs, along with other tipped employees, were subject to Defendants' policy which did not pay them the minimum wage for work in jobs that were unrelated to their tipped jobs or were jobs that were not directed towards producing tips.

47. Some examples of the jobs Named Plaintiffs, along with other tipped employees, had to perform under Defendant's policy at subminimum wages were:

- cleaning the dining room,
- dusting the pictures on the walls,
- windexing all the interior windows and picture frames,
- scrubbing the legs of all the chairs,

- degreasing and shining exposed metal including tables, garage doors and window sills,
- cleaning the cracks of the booths,
- cleaning, cutting and portioning out vegetables, noodles and rice for cooks,
- preparing sanitation buckets for prep and expo areas,
- setting up the expo line,
- breaking apart and cleaning the soda machines, tea dispensers and expo line,
- removing, then cleaning the light fixtures,
- scraping gum from under every table in the store,
- cleaning and wiping down all the shelves in the kitchen after removing all the items on the shelves,
- cleaning every window in the store and moving furniture to clean underneath,
- deck brushing the floors,
- cleaning and sanitizing sinks,
- sweeping the entire restaurant,
- emptying garbage and replacing liners,
- taking garbage to the dumpsters,
- washing dishes,
- stocking beverage stations,
- keeping ice bins full,
- sorting and polishing silverware and placing it in racks,
- sweeping the floor of the expo line,
- cleaning the keg cooler,
- wiping down the bar stools,

- cleaning the blinds,
- stocking lemons, creamers and "to go" containers,
- filling salt and pepper shakers, and
- washing trays or dishes,

48. Plaintiffs performed these jobs at subminimum wages with great frequency.

49. Moreover, Named Plaintiffs were not informed of the tip credit as required by the FLSA.

***Christopher Hart***

50. Pursuant to Defendants' policy, Named Plaintiff Christopher Hart was regularly scheduled to work an 8 hour shift, would spend more than half of his shift (4.5 hours) performing non tip producing duties, and was paid a subminimum wage.

51. Depending on the shift, Mr. Hart was assigned either "opener duties" or "closer duties" in addition to "running sidework". Defendants required that Mr. Hart complete the following "opener duties": cleaning the dining room and all the wood work with a bucket filled with sanitizer solution; dusting the pictures on the walls and windexing the interior windows and picture frames; scrubbing the legs of all the chairs; degreasing and shining exposed metal including: tables, garage doors and window sills; cleaning out the cracks of the booths; cleaning, cutting and portioning out vegetables, noodles and rice for cooks; preparing sanitation buckets for prep and expo areas and setting up the expo line. Mr. Hart spent one hour per shift performing these "opener duties" for which he was paid a subminimum wage.

52. Depending on the shift, Defendants also required that Mr. Hart complete the following "closer duties" which included: breaking apart and cleaning the soda machines, tea

dispensers and expo line; removing, then cleaning the light fixtures; scraping the gum from under every table in the store; cleaning and wiping down all the shelves in the kitchen after removing all the items on the shelves; cleaning every window in the store; moving furniture to clean underneath; deck brushing the floors; cleaning and sanitizing sinks; sweeping the entire restaurant; emptying garbage and replacing liners then taking the garbage to the dumpsters. Mr. Hart would spend one hour per shift performing these "closer duties" for which he was paid a subminimum wage.

53. Mr. Hart was typically assigned either "opener" or closer" duties each shift that he worked for the defendants. In addition to such duties, Defendants also required Mr. Hart to complete "running sidework" for the entire restaurant which consisted of: washing dishes because often the restaurant did not have a dishwasher; emptying trash cans and replacing liners; hand wiping all plates and silverware; sweeping, dusting, sanitizing and bleaching coffee cups, mugs, pots and tea kettles. Mr. Hart would spend 3.5 hours per shift completing "running sidework" for which he was paid a subminimum wage. Mr. Hart performed "running sidework" on every shift.

54. Together with opener or closer duties, Mr. Hart spent more than half of his shift (4.5 hours) performing non tip producing duties and was paid a subminimum wage.

55. Defendants failed to provide Mr. Hart with wage statements that contained allowances claimed by Defendants including the tip credit as required by the NYLL.

***Taylor Ramsey***

56. Pursuant to Defendants' policy, Named Plaintiff Taylor Ramsey was regularly scheduled to work 8 hour shifts, would spend more than half of her shift (4.5 hours) performing non tip producing duties, and was paid a subminimum wage.

57. Ms. Ramsey was assigned "closer duties" in addition to "running sidework". Defendants required Ms. Ramsey to complete the following "closer duties": breaking apart and cleaning the soda machines, tea dispensers and expo line; cleaning and wiping down all the shelves in the retail area; cleaning every window in the store and moving furniture to clean underneath. Ms. Ramsey spent one hour per shift performing these "closer duties" for which she was paid a subminimum wage.

58. Ms. Ramsey was typically assigned "closer" duties 3-4 shifts per week that she worked for the defendants, and would work a shift without being assigned closer duties typically only once or twice per week. In addition to such duties, Defendants also required Ms. Ramsey to complete "running sidework" for the entire restaurant which consisted of: vacuuming, sweeping, dusting, sanitizing and replacing all paper products in the bathrooms; cleaning the bathroom floors; washing the store's windows; rolling silverware and filling salt and pepper shakers. Ms. Ramsey also performed "running sidework" on every shift. Ms. Ramsey would spend 3.5 hours per shift completing "running sidework" for which she was paid a subminimum wage. Ms. Ramsey performed "running sidework" on every shift.

59. Together with the closer duties, Ms. Ramsey spent more than half of her shift (4.5 hours) performing non tip producing duties and was paid a subminimum wage.

***Maria Sargent***

60. Pursuant to Defendants' policy, Named Plaintiff Maria Sargent was regularly scheduled to work 6 hour shifts, would spend more than half of her shift (3.5 hours) performing non tip producing duties, and was paid a subminimum wage.

61. Depending on the shift, Ms. Sargent was assigned either "opener duties" or "closer duties" in addition to "running sidework". Defendants required Ms. Sargent to

complete the following "opener duties": cleaning the dining room with a bucket filled with sanitizer solution; dusting the pictures on the wall and windexing the interior windows and picture frames; scrubbing the legs of all the chairs; degreasing and shining exposed metal including: tables, garage doors and window sills; cleaning out the cracks of the booths; portioning out sugar for iced tea; preparing sanitation buckets for prep and expo areas; setting up the expo line. Ms. Sargent spent one hour per shift performing these "opener duties" for which she was paid a subminimum wage.

62. Depending on the shift, Defendants also required Ms. Sargent to complete the following "closer duties": breaking apart and cleaning the soda machines, tea dispensers and expo line; removing, then cleaning the light fixtures; scraping the gum from under every table in the store; cleaning and wiping down all the shelves in the kitchen after removing all the items on the shelves; cleaning every window in the store; moving furniture to clean underneath; cleaning and sanitizing sinks; sweeping the entire restaurant; emptying garbage and replacing liners. Ms. Sargent spent one hour per shift performing these "closer duties" for which she was paid a subminimum wage.

63. Ms. Sargent was typically assigned either "opener" or closer" duties each shift that she worked for the defendants. In addition to such duties, Defendants also required Ms. Sargent to complete "running sidework" for the entire restaurant which consisted of: washing the dishes for the entire store because often the store did not have a dishwasher present to clean the dishes; emptying trash cans and replacing liners; hand wiping all plates and silverware before they left the kitchen; sweeping, dusting, sanitizing and washing the store's windows; bleaching coffee cups, mugs, pots and tea kettles; performing expediter duties; stocking beverage stations; keeping ice bins full; sorting and polishing silverware and placing

it in racks; sweeping the floor of the expo line and stocking lemons, creamers and "to-go" containers. Ms. Sargent would spend 2.5 hours per shift completing "running sidework" for which she was paid a subminimum wage. Ms. Sargent performed "running sidework" on every shift.

64. Together with the opener or closer duties, Ms. Sargent spent more than half of her shift (3.5 hours) performing non tip producing duties and was paid a subminimum wage.

***Andrea Randlett***

65. Pursuant to Defendants' policy, Named Plaintiff Andrea Randlett was regularly scheduled to work 8 hour shifts, would spend more than half of her shift (4.5 hours) performing non tip producing duties, and was paid a subminimum wage.

66. Depending on the shift, Ms. Randlett was assigned either "opener duties" or "closer duties," or both, in addition to "running sidework". Defendants required Ms. Randlett to complete the following "opener duties": cleaning the dining room with sanitizer; dusting the artifacts and memorabilia hanging on the walls; windexing all photos on the walls; scrubbing the legs of all the chairs; dusting all TVs; wiping down all the wrought iron; cleaning out the cracks of the booths; preparing sanitation buckets; preparing desserts for the entire store; setting up the salad bar and expo line. Ms. Randlett spent at least one hour performing these "opener duties" for which she was paid a subminimum wage.

67. Depending on the shift, Defendants required Ms. Randlett complete the following "closer duties": breaking apart and cleaning the soda machine and expo line; removing, then cleaning the light fixtures; scrapping the gum from under every table in the store; cleaning and wiping down all the shelves in the kitchen after removing all the items on the shelves; cleaning every window in the store and moving furniture to clean underneath.

Ms. Randlett spent at least one hour performing these "closer duties" for which she was paid a subminimum wage.

68. Ms. Randlett was typically assigned either "opener" or closer" duties, or both, each shift that she worked for the defendants. In addition to such duties, Defendants required Ms. Randlett to complete "running sidework" for the entire restaurant which consisted of: washing dishes; sweeping, dusting, sanitizing; replacing all paper products in the bathrooms; cleaning the bathroom floors; washing the store's windows; bleaching coffee cups, mugs, pots and tea kettles; cleaning crackers and zippers. Ms. Randlett would spend at least 3.5 hours per shift completing "running sidework" for which she was paid a subminimum wage. Ms. Randlett performed "running sidework" on every shift.

69. Together with the opener or closer duties, Ms. Randlett spent more than half of her shift (4.5 hours) performing non tip producing duties and was paid a subminimum wage.

70. Defendants failed to provide Ms. Randlett with a wage statement that included the amount the Defendants took as a tip credit as required by the Arizona Administrative Code.

***Shelly Carrera***

71. Pursuant to Defendants' policy, Named Plaintiff Shelly Carrera was regularly scheduled to work 8 hour shifts, would half of her shift (4 hours) performing non tip producing duties, and was paid a subminimum wage.

72. Depending on the shift, Ms. Carrera was assigned either "opener duties" or "closer duties" in addition to "running sidework". Defendants required Ms. Carrera to complete the following "opener duties": cleaning the dining room and all the wood work with

sanitizer; cleaning the mats in the beverage area; taking out the trash and cleaning the cracks in the booths; prepping desserts; making ice cream balls; plating up desserts; washing dishes; preparing sanitation buckets; stocking ice; slicing lemons and stocking fruit. Ms. Carrera spent at least one hour per shift performing these "opener duties" for which she was paid a subminimum wage.

73. Defendants also required that Ms. Carrera complete the following "closer duties": breaking apart and cleaning the soda machine and expo line; removing then cleaning the light fixtures; stock and clean silverware; scrapping the gum from under every table in the store; clean and wipe down all the shelves in the kitchen after removing all the items on the shelves; moving furniture to clean underneath; wiping down the bar stools; cleaning the keg cooler; cleaning the blinds and cleaning every display bottle at the bar and the display surfaces. Ms. Carrera spent at least one hour per shift performing these "closer duties" for which she was paid a subminimum wage.

74. Ms. Carrera was typically assigned either "opener" or closer" duties each shift that she worked for the defendants. In addition to such duties, Defendants required Ms. Carrera to complete "running sidework" for the entire restaurant which consisted of: sweeping, dusting, sanitizing and washing the store's windows; bleaching coffee cups, mugs, pots and tea kettles; cleaning the zippers and crackers. Ms. Carrera would spend at least 3 hours per shift completing "running sidework" for which she was paid a subminimum wage. Ms. Carrera performed "running sidework" on every shift.

75. Together with the opener or closer duties, Ms. Carrera spent half of her shift (4 hours) performing non tip producing duties and was paid a subminimum wage.

***Michael Williams***

76. Pursuant to Defendants' policy, Named Plaintiff Michael Williams was regularly scheduled to work 10 to 12 hour shifts, would spend approximately half of his shift (4-7 hours) performing non tip producing duties, and was paid a subminimum wage.

77. Depending on the shift, Mr. Williams was assigned either "opener duties" or "closer duties" in addition to "running sidework". Defendants required Mr. Williams to complete the following "opener duties": cleaning the dining room and all the wood work with a bucket filled with sanitizer solution; dusting the pictures on the wall and windexing the interior windows and picture frames; scrubbing the legs of all the chairs; degreasing and shining exposed metal tables, garage doors and window sills; cleaning out the cracks of the booths; portioning out food; preparing sanitation buckets for prep and expo areas and setting up the expo line, making iced tea, cutting lemons, cutting and portioning out vegetables and rice for the cooks, and cleaning bathrooms. Mr. Williams spent one to two hours per shift performing these "opener duties" for which he was paid a subminimum wage.

78. Depending on the shift, Defendants also required Mr. Williams to complete the following "closer duties": breaking apart and cleaning the soda machines, tea dispensers and expo line; removing, then cleaning the light fixtures; scraping the gum from under every table in the store; cleaning and wiping down all the shelves in the kitchen after removing all the items on the shelves; cleaning every window in the store; moving furniture to clean underneath; deck brushing the floors; cleaning and sanitizing sinks; sweeping the entire restaurant; emptying garbage and replacing liners then taking the garbage to the dumpsters, and portioning out desserts for the kitchen staff. Mr. Williams spent one to two hours per shift performing these "closer duties" for which he was paid a subminimum wage.

79. Mr. Williams was typically assigned either "opener" or closer" duties each shift that he worked for the defendants. In addition to such duties, Defendants also required Mr. Williams to complete "running sidework" for the entire restaurant which consisted of: washing dishes because the restaurant often did not have a dishwasher; empting trash cans and replacing liners; hand wiping all plates and silverware; sweeping, dusting, sanitizing and bleaching coffee cups, mugs, pots and tea kettles; performing expediter duties; stocking beverage stations; keeping ice bins full; sorting and polishing silverware and placing it in racks; sweeping the floor of the expo line and stocking lemons, creamers and "to go" containers. Mr. Williams also performed "running sidework" on every shift. Depending on the shift he worked, Mr. Williams would spend 3 hours completing "running sidework" for which he was paid a subminimum wage. Mr. Williams performed "running sidework" on every shift.

80. Together with the opener or closer duties, Mr. Williams spent approximately half of his shift (4-7 hours) performing non tip producing duties and was paid a subminimum wage.

***Leah Henchell***

81. Pursuant to Defendants' policy, Named Plaintiff Leah Henchell was regularly scheduled to work 6 to 12 hour shifts, would spend approximately half of her shift (3-6 hours) performing non tip producing duties, and was paid a subminimum wage.

82. Depending on the shift, Ms. Henchell was assigned either "opener duties" or "closer duties" in addition to "running sidework". Defendants required Ms. Henchell to complete the following "opener duties": cleaning the dining room and all the wood work with a bucket filled with sanitizer solution; dusting the pictures on the wall and windexing the

interior windows and picture frames; scrubbing the legs of all the chairs; cleaning out the cracks of the booths; cleaning, cutting and portioning out vegetables, noodles and rice for cooks; preparing sanitation buckets for prep and expo areas and setting up the expo line. Ms. Henchell spent one to two hours per shift performing these "opener duties" for which he was paid a subminimum wage.

83. Depending on the shift, Defendants also required Ms. Henchell to complete the following "closer duties": breaking apart and cleaning the soda machines, tea dispensers and expo line; scraping the gum from under every table in the store; cleaning and wiping down all the shelves in the kitchen after removing all the items on the shelves; cleaning every window in the store; moving furniture to clean underneath; cleaning and sanitizing sinks; sweeping the entire restaurant; emptying garbage and replacing liners then taking the garbage to the dumpsters. Ms. Henchell spent approximately one to two hours per shift performing these "closer duties" for which he was paid a subminimum wage.

84. Ms. Henchell was typically assigned either "opener" or closer" duties each shift that he worked for the defendants. In addition to such duties, Defendants also required Ms. Henchell to complete "running sidework" for the entire restaurant which consisted of: washing dishes because the restaurant often did not have a dishwasher; empting trash cans and replacing liners; hand wiping all plates and silverware; sweeping, dusting; performing expediter duties; stocking beverage stations; keeping ice bins full; sorting and polishing silverware and placing it in racks; sweeping the floor of the expo line and stocking lemons, creamers and "to go" containers. Ms. Henchell also performed "running sidework" on every shift. Depending on the shift she worked, Ms. Henchell would spend approximately 1-4

hours completing "running sidework" for which she was paid a subminimum wage. Ms. Henchell performed "running sidework" on every shift.

85. Together with the opener or closer duties, Ms. Henchell spent approximately half of her shift (3-6 hours) performing non tip producing duties and was paid a subminimum wage.

***Courtney Hollins***

86. Pursuant to Defendants' policy, Named Plaintiff Courtney Hollins was regularly scheduled to work 6 to 12 hour shifts, would spend approximately half of her shift (3-6 hours) performing non tip producing duties, and was paid a subminimum wage.

87. Depending on the shift, Ms. Hollins was assigned either "opener duties" or "closer duties" in addition to "running sidework". Defendants required Ms. Hollins to complete the following "opener duties": cleaning the dining room and all the wood work with a bucket filled with sanitizer solution; dusting the pictures on the wall and windexing the interior windows and picture frames; scrubbing the legs of all the chairs; cleaning out the cracks of the booths; cleaning, cutting and portioning out vegetables, noodles and rice for cooks; preparing sanitation buckets for prep and expo areas and setting up the expo line, set up the patio with tables and umbrellas, filling ice machines, making ice tea, stocking condiments, salt and pepper, making desserts. Ms. Hollins spent one to two hours per shift performing these "opener duties" for which she was paid a subminimum wage.

88. Depending on the shift, Defendants also required Ms. Hollins to complete the following "closer duties": breaking apart and cleaning the soda machines, tea dispensers and expo line; scraping the gum from under every table in the store; cleaning and wiping down all the shelves in the kitchen after removing all the items on the shelves; cleaning every window

in the store; moving furniture to clean underneath; cleaning and sanitizing sinks; sweeping the entire restaurant; emptying garbage and replacing liners then taking the garbage to the dumpsters, breaking down the patio, sweeping the patios, removing trash and debris from the patio, and securing the patio furniture. Ms. Hollins spent approximately one to two hours per shift performing these "closer duties" for which she was paid a subminimum wage.

89. Ms. Hollins was typically assigned either "opener" or closer" duties each shift that he worked for the defendants. In addition to such duties, Defendants also required Ms. Hollins to complete "running sidework" for the entire restaurant which consisted of: washing dishes because the restaurant often did not have a dishwasher; empting trash cans and replacing liners; hand wiping all plates and silverware; sweeping, dusting; performing expediter duties; stocking beverage stations; keeping ice bins full; sorting and polishing silverware and placing it in racks; sweeping the floor of the expo line and stocking lemons, creamers and "to go" containers, and running the cash register. Ms. Hollins also performed "running sidework" on every shift. Depending on the shift she worked, Ms. Hollins would spend approximately 1-4 hours completing "running sidework" for which she was paid a subminimum wage. Ms. Hollins performed "running sidework" on every shift.

90. Together with the opener or closer duties, Ms. Hollins spent more half of her shift (approximately 3-6 hours) performing non tip producing duties and was paid a subminimum wage.

***Amber Ingram***

91. Pursuant to Defendants' policy, Named Plaintiff Amber Ingram was regularly scheduled to work 8 to 10 hour workday, would spend half of her shift (4-5 hours) performing non tip producing duties, and was paid a subminimum wage.

92. Depending on the shift, Ms. Ingram was assigned either "opener duties" or "closer duties" in addition to "running sidework". Defendants required Ms. Ingram to complete the following "opener duties": cleaning the dining room and all the wood work with sanitizer; cleaning the mats in the beverage area; taking out the trash and cleaning the cracks in the booths; washing dishes; preparing sanitation buckets; stocking ice; slicing lemons and stocking fruit, cleaning the drains for the soda machines, cleaning the bathrooms, taking out the trash to the dumpster, cleaning underneath booths, washing windows, picking up trash and cigarette butts outside the store, taking apart and cleaning light fixtures, sweeping and mopping floors, washing glasses, cleaning the galley and busser area, breaking down and cleaning the dishpit, and the kitchen. Ms. Ingram spent one to two hours per shift performing these "opener duties" for which she was paid a subminimum wage.

93. Defendants also required that Ms. Ingram complete the following "closer duties": cleaning the dining room and all the wood work with sanitizer; cleaning the mats in the beverage area; taking out the trash and cleaning the cracks in the booths; washing dishes; preparing sanitation buckets; stocking ice; slicing lemons and stocking fruit, cleaning the drains for the soda machines, cleaning the bathrooms, taking out the trash to the dumpster, cleaning underneath booths, washing windows, picking up trash and cigarette butts outside the store, taking apart and cleaning light fixtures, sweeping and mopping floors, washing glasses, cleaning the galley and busser area, breaking down and cleaning the dishpit, and the kitchen.. Ms. Ingram spent approximately one to two hours per shift performing these "closer duties" for which she was paid a subminimum wage.

94. Ms. Ingram was typically assigned either "opener" or closer" duties each shift that she worked for the defendants. In addition to such duties, Defendants required Ms.

Ingram to complete "running sidework" for the entire restaurant which consisted of: sweeping, dusting, sanitizing and washing the store's windows; bleaching coffee cups, mugs, pots and tea kettles; washing dishes, cleaning tables, and cleaning the zippers and crackers. Ms. Ingram would spend approximately 3 hours per shift completing "running sidework" for which she was paid a subminimum wage. Ms. Ingram performed "running sidework" on every shift.

95. Together with the opener or closer duties, Ms. Ingram spent approximately half of her shift (4-5 hours) performing non tip producing duties and was paid a subminimum wage.

***Whitney Dolan***

96. Pursuant to Defendants' policy, Named Plaintiff Whitney Dolan was regularly scheduled to work 7 to 8 hour shifts, would spend more than half of her shift (5.5-6 hours) performing non tip producing duties, and was paid a subminimum wage.

97. Depending on the shift, Ms. Dolan was assigned either "opener duties" or "closer duties" in addition to "running sidework". Defendants required Ms. Dolan to complete the following "opener duties": cleaning the dining room and all the wood work with a bucket filled with sanitizer solution; dusting the pictures on the wall and; scrubbing the legs of all the chairs; cleaning out the cracks of the booths; preparing sanitation buckets for prep and expo areas and setting up the expo line, polishing silverware, scrubbing walls, preparing desserts and salad, organizing the to-go station and stocking with containers, cleaning the cashier's area, refilling salt and pepper shakers and washing condiment bottles, washing dishes, cleaning tea maker, cleaing the beverage station, refilling ice, and sweeping, mopping,.

Ms. Dolan spent at least 1 hour per shift and up to 1.5 performing these "opener duties" for which he was paid a subminimum wage.

98. Depending on the shift, Defendants also required Ms. Dolan to complete the following "closer duties": breaking apart and cleaning the soda machines, tea dispensers and expo line; cleaning and wiping down all the shelves in the kitchen after removing all the items on the shelves; moving furniture to clean underneath; cleaning and sanitizing sinks; sweeping the entire restaurant; emptying garbage and replacing liners then taking the garbage to the dumpsters. Ms. Dolan spent approximately two hours per shift performing these "closer duties" for which she was paid a subminimum wage.

99. Ms. Dolan was typically assigned either "opener" or closer" duties each shift that he worked for the defendants. In addition to such duties, Defendants also required Ms. Dolan to complete "running sidework" for the entire restaurant which consisted of: washing dishes because the restaurant often did not have a dishwasher; emptying trash cans and replacing liners; hand wiping all plates and silverware; sweeping, dusting; performing expediter duties; stocking beverage stations; keeping ice bins full; sorting and polishing silverware and placing it in racks; sweeping the floor of the expo line and stocking lemons, creamers and "to go" containers. Ms. Dolan also performed "running sidework" on every shift. Depending on the shift she worked, Ms. Dolan would spend approximately 2 hours completing "running sidework" for which she was paid a subminimum wage. Ms. Dolan performed "running sidework" on every shift.

100. Together with the opener or closer duties, Ms. Dolan spent more half of her shift (at least 5.5-6 hours) performing non tip producing duties and was paid a subminimum wage.

**B. Defendants**

101. At all times relevant hereto, Plaintiffs were "employees" of Defendants within the meaning of the FLSA and the respective State Labor Laws.

102. At all times relevant hereto, Defendants are a covered employer within the meaning of the FLSA and the respective State Labor Laws.

103. Defendants are engaged in interstate commerce, and their annual gross volume of sales made or business done exceeds $500,000, exclusive of excise taxes.

104. During the course of their employment by Defendants, Plaintiffs handled goods, including perishable produce and other food products that moved in interstate commerce.

***Ignite Restaurant Group, Inc.***

105. Defendant Ignite owns and operates 135 Joe's Crab Shack restaurants in 34 states and are known as "come as you are" family-friendly seafood restaurants. Joe's Crab Shack restaurants vary somewhat in size and dimensions, but, on average, the typical restaurant averages 8,000 square feet and can serve over 200 guests at one time.

106. Ignite is one of the nation's largest full service restaurant companies. Along with owning and operating Joe's Crab Shack restaurants, Ignite owns and operates other well-known chain restaurants nationwide including: Romano's Macaroni Grill and Brick House Tavern + Tap.

107. Ignite is a publicly traded company on the NASDAQ (ticker symbol IRG). Ignite is incorporated in the State of Delaware and maintains corporate offices located at 9900 Westpark Drive, Suite 300, Houston, Texas 77063. Information for Ignite can be found at www.igniterestaurants.com.

108. Ignite reported total revenues of over $400 million for fiscal year 2012.

109. Ignite's corporate address is listed on Plaintiff's paystubs and Ignite is listed as the employer on Plaintiffs' W-2 Wage and Tax Statements.

110. Ignite is the employer of the Plaintiffs as it maintains control, oversight and direction over Plaintiffs and Class Members including time keeping, payroll and other employment practices that applied to them.

111. For example, Ignite manages Plaintiffs' work schedules by using "Hot Schedules" at its Joe's Crab Shack restaurants. Employees access their work schedule on-line through "Hot Schedules". Accordingly, Ignite maintains Plaintiffs' employment records.

112. Moreover, Ignite's management team includes a Chief Executive Officer and Senior Vice President of Human Resources who manage the conditions of Plaintiffs' employment and exercises financial control over all Joe's Crab Shack restaurants throughout the nation. Additionally, Ignite's Board of Directors maintains management control over all Joe's Crab Shack restaurants.

113. Further, Ignite hires employees by posting job vacancies throughout Joe's Crab Shack restaurants across the nation on their website, www.igniterestaurants.com.

114. In addition, Ignite's employees are permitted to transfer to any Ignite owned restaurant.

115. Based in part on these facts, Ignite can be held liable as an employer of the Plaintiffs for the violations complained of in this matter.

***Crab Addison, Inc. d/b/a Joe's Crab Shack***

116. Crab Addison, Inc. ("Crab Addison") is a wholly-owned subsidiary of Ignite that is responsible for the lease purchases and facilities maintenance of Joe's Crab Shack restaurants.

117. Crab Addison is a Texas Corporation and shares the same corporate office as Ignite.

118. Crab Addison is separately incorporated in every state where Joe's Crab Shack restaurants are operated.

119. Crab Addison in conjunction with the other Defendants maintains control, oversight and direction over the Plaintiffs including time keeping, payroll and other employment practices that are applied to them.

120. Crab Addison has admitted that it is an employer of employees who work at Joe's Crab Shack restaurants in other litigation.

121. Based in part on these facts, Crab Addison can be held liable as an employer of the Plaintiffs for the violations complained of in this matter.

***Raymond A. Blanchette III***

122. Raymond A. Blanchette III is longtime food executive who has served as the Chief Executive Officer of Ignite since 2007. In terms of his ownership interest, Mr. Blanchette owns stock options in Ignite valued at $170,000.

123. Defendant Raymond A. Blanchette III is directly in charge of the overall operations of Ignite. As such, Raymond A. Blanchette III is primarily responsible for enforcing the business decisions as they pertain to Joe's Crab Shack restaurants including the illegal policies complained of in this case.

124. For example, Mr. Blanchette has the authority to, and does, make decisions that concern Defendants' operations, including functions related to employment, human resources, training, payroll, and benefits. For example, when Joe's Crab Shack restaurants were acquired in 2007 by JCS Holdings LLC (later renamed Ignite) Mr. Blanchette decided to not layoff any employees and instead decided to hire additional staff to shore up operations at the restaurants.

125. Moreover, Mr. Blanchette has made several human resource policy decisions that affect Plaintiffs including requiring that they sing and dance while working to enhance the fun image of Joe's Crab Shack restaurants. Further, Mr. Blanchette decides Plaintiffs' benefit issues, such as how his employees at Joe's Crab Shack restaurants will afford employer provided healthcare through the federal government's recent mandate. In fact, Mr. Blanchette is leading efforts to create opportunities for his employees at Joe's Crab Shack restaurants to have health care for the first time.

126. In addition, Mr. Blanchette manages Ignite's branding activities to gain market share and increase sales by constantly looking to introduce new ideas like Joe's Crab Shack "100% Shore" campaign by focusing on the restaurant's Gulf Coast roots. As part of this branding campaign, Mr. Blanchette made the decision that his employees need to do a better job facilitating the "Joe's Experience," which includes eating food that is shareable, wearing bibs, and eating with your hands while having a drink that looks like you're on vacation. Accordingly, under Mr. Blanchette's direction Ignite regularly runs contests for the Plaintiffs to see who can sell the most tropical drinks or most crab legs on a particular day, week or month to improve the "Joe's Experience."

127. Moreover, Mr. Blanchette makes record-keeping decisions, including the decision to outsource accounting and payroll at the time of the acquisition in 2007.

128. Further, with respect to his financial control, Mr. Blanchette took personal responsibility when Ignite "stumbled out of the gate" and significantly misstated its revenues in it first earning statement as a publically traded company and needed to file revised earning statements.

129. Based in part on these facts, Raymond A. Blanchette III is actively involved in the illegal policies complained of in this case and can be held liable as an employer of the Plaintiffs for the violations complained of in this matter.

***Kevin Cottingim***

130. Kevin Cottingim served as Ignite's Senior Vice President & Chief Administrative Officer responsible for human resources and payroll from 2008 until April 2013. Currently, Mr. Cottingim consults exclusively with Ignite. In terms of ownership interest, Mr. Cottingim owns stock options in Ignite valued at approximately $40,000.

131. Defendant Kevin Cottingim was directly in charge of overseeing human resources and payroll and ensuring Defendants' compliance or non-compliance with the Federal and State Labor Laws where Defendants operate Joe's Crab Shack restaurants. As such, Kevin Cottingim was responsible for the creation and application of the illegal policies complained of in this case.

132. For example, Mr. Cottingim was actively involved in the determination and drafting of human resources policies, the resolution of issues and disputes regarding hiring and firing Plaintiffs, determining rates of pay and maintaining employment records. For example, Mr. Cottingim would directly email Plaintiffs who complain about Defendants'

human resource policies. Mr. Cottingim personally encouraged employees at Joe's Crab Shack restaurants to have open dialogue with himself and Ignite's HR team concerning working conditions and pay rates.

133. Mr. Cottingim oversaw a team of human resource professionals based at Defendants' headquarters in Houston, Texas that includes Patti Simpson and Robyn Martin. Mr. Cottingim's HR team travelled to Joe's Crab Shack restaurant locations to meet with Plaintiffs to counsel them on their working conditions and pay rates.

134. Mr. Cottingim was actively involved in Defendants' payroll functions. For instance, when Plaintiffs lodge complaints about their compensation, Mr. Cottingim and his HR team would immediately respond directly.

135. Mr. Cottingim was actively involved in Defendants' system for keeping and maintaining employees' payroll records, the timing and method with which payment is conveyed to employees, and the manner and method in which employees receive payroll information including their payroll checks. For example, Mr. Cottingim directed Defendants' payroll department issue checks to Plaintiffs to resolve pay discrepancies

136. Based in part on these facts, Kevin Cottingim can be held liable as an employer of the Plaintiffs for the violations complained of in this matter.

***Rodney Morris***

137. Rodney Morris is Ignite's current Senior Vice President of Human Resources responsible for all facets of human capital including human resources and payroll at Joes' Crab Shack restaurants. As part of Ignite's acquisition of Romano's Macaroni Grill, Mr. Morris was hired to replace Mr. Cottingim who resigned in March 2013. Mr. Morris

continues Mr. Cottingim's active approach to human resource management, including developing human resource training, benefits and employee incentive programs at Ignite.

138. For instance, defendant Rodney Morris is directly in charge of overseeing human resources and payroll and ensuring Defendants' compliance or non-compliance with the Federal and State Labor Laws where Defendants operate Joe's Crab Shack restaurants. As such, Rodney Morris is responsible for the maintenance and application of the illegal policies complained of in this case.

139. Further, Mr. Morris's responsibilities include the determination and drafting of human resources policies, the resolution of issues and disputes regarding hiring and firing Plaintiffs, determining rates of pay and maintaining employment records. Similar to his predecessor, Mr. Cottingim, Mr. Morris is responsible for resolving complaints from employees about Defendants' human resource policies. Further, given his specialty in building organizational relationships from the dish room to the board room, Mr. Morris is responsible for the management of the work environment at Joe's Crab Shack restaurants.

140. Mr. Morris oversees a team of human resource professionals based at Defendants' headquarters in Houston, Texas that includes Patti Simpson and Robyn Martin.

141. Given that Mr. Morris assumed Mr. Cottingim's responsibilities he is involved in Defendants' payroll functions including resolving issues concerning employee compensation.

142. Mr. Morris is also carrying out his predecessor's responsibilities with respect to Defendants' system for keeping and maintaining employees' payroll records, the timing and method with which payment is conveyed to employees, and the manner and method in which employees receive payroll information including their payroll checks.

143. Based in part on these facts, Rodney Morris can be held liable as an employer of the Plaintiffs for the violations complained of in this matter.

**COUNT I**
**Violation of the Fair Labor Standards Act – Minimum Wages**
**Section 216(b) Collective Action**

144. Named Plaintiffs hereby re-allege and incorporate the allegations set forth above.

145. This count arises from the defendants' willful violation of the FLSA, 29 U.S.C. §201, *et seq.*, for their failure to pay minimum wages to the Plaintiffs. Plaintiffs bring this claim as a collective action under Section 16(b) of the Act. 29 U.S.C. §216(b).

146. The defendants did not pay the minimum wages as required by the FLSA. That is, pursuant to the defendants' policies, in virtually every week in which the plaintiffs and class members worked, the average of their hourly wage from the defendants was less than the minimum wage.

147. The plaintiffs and class members are not exempt from the minimum wage provisions of the FLSA.

148. The pay was below the minimum wage because, as set forth above, the defendants' policy is to pay the plaintiffs and class members at a rate below the FLSA's minimum wage, supposedly pursuant to the "tip credit" provisions of the FLSA. But, as explained in more detail below, *see* ¶ 153, 154-161, that "tip credit" can only be paid for certain jobs; otherwise, the employer must pay at least the normal minimum wage rate.

149. Here, pursuant to defendants' policies, as set forth above, the defendants paid the class members at the subminimum tip credit rate for work that was not eligible for payment at that lower tip credit rate.

150. Because the defendants never paid the plaintiffs and class members more than the minimum wage rate in any week (and almost always paid class members only at the lower tip credit rate for all time worked), in each week in which the plaintiffs and class member did work at the improper tip credit rate, the average of that plaintiff's and class member's hourly wage for that week falls below the minimum wage for that week.

151. Further, class members suffered this loss of wages in virtually every week in which they worked for the defendants. This is true because the defendants consistently assigned the tasks described above to each class member on every shift, or almost every shift, which they worked. *See supra* ¶¶ 46-48, 50-100. Therefore, such violations occurred in each workweek in which the class members worked.

152. Therefore, over the course of a workweek, the class members were performing non-tip credit work at improper, lower, tip credit rates and never receiving sufficient compensation from the defendants over the course of the week to enable the class members' compensation to reach the average minimum hourly wage for that week.

153. As noted above, the defendants violated the FLSA's minimum wage provisions by failing to pay minimum wage for work that does not qualify to be paid at the tip credit rate. There are at least three ways in which work performed by plaintiffs and class members does not qualify to be paid at the lower tip credit rate: (1) such work was unrelated to their tipped jobs, (2) such work did not produce tips, and was performed more than 20% of the

workweek, and (3) the defendants failed to inform the plaintiffs and class members of the tip credit provisions.

***Work unrelated to tipped jobs.***

154. First, the defendants' pay the tip credit rate even when the plaintiffs and class members are performing jobs that do not produce tips and are unrelated to their tipped job *See supra* ¶¶ 46-48, 50-100.

155. Specifically, the defendants' policy is to utilize the Named Plaintiffs and similarly situated employees to perform "back of the house" duties and other jobs that are not tipped jobs *See supra* ¶¶ 46-48, 50-100.

156. During every workweek, and during every shift (or almost every shift), each plaintiff and class member performed jobs that were not related to his or her tip-producing job, including opener or closer duties (or both) and sidework, as described above. *See* ¶¶ 46-48, 50-100.

157. Because such duties are unrelated to plaintiffs' tipped occupations, they do not qualify for the lower tip credit, and the time plaintiffs and class members spent doing such jobs must be paid at least at the minimum wage.

***Work that does not produce tips exceeding 20% of the workweek.***

158. Second, the defendants' policy is also to not pay Plaintiffs the legally required minimum wage even though the Plaintiffs were spending more than 20% of their workweek on jobs that do not produce tips.

159. Each plaintiff and class member spent more than 20% of the workweek performing non-tip producing jobs. For example, as described above, the named plaintiffs all spent at least one third of every shift, or virtually every shift, performing work that did not

produce tips. *See supra* ¶¶ 50-55 (Christopher Hart, more than half of every shift), ¶¶ 56-59 (Taylor Ramsey, more than half of 3-4 shifts per week, and approximately 44% of the other 1-2 shifts per week), ¶¶ 60-64 (Maria Sargent, more than half of every shift), ¶¶ 65-70 (Andrea Randlett, more than half of every shift), ¶¶ 71-75(Shelly Carrera, half of every shift), ¶¶ 76-80 (Michael Williams, approximately half of every shift), ¶¶ 81-85 (Leah Henchell, approximately half of every shift), ¶¶ 86-90 (Courtney Hollins, approximately half of every shift); ¶¶ 91-95 (Amber Ingram, half of every shift), ¶¶ 96-100 (Whitney Dolan, more than half of every shift).

160. Because the plaintiffs and class members spent more than 20% of the workweek performing tasks that did not produce tips, the time they spent performing such tasks does not qualify for the tip credit, and the time plaintiffs and class members spent doing such jobs must be paid at least at the minimum wage.

***Failure to inform employees of the tip credit provisions.***

161. Third, the defendants are not eligible to avail themselves of the federal tipped minimum wage rate under the FLSA, 29 U.S.C. §203(m), because the defendants failed to inform the plaintiffs and class members of the tip credit provisions as required under Federal law.

162. Because the Plaintiffs were all deprived of minimum wage payments by the defendants' policy, as described above, Plaintiffs are similarly situated to each other pursuant to 29 U.S.C. § 216(b).

WHEREFORE, Named Plaintiffs and those similarly situated employees pray for judgment against Defendants as follows:

(a) judgment in the amount of the owed minimum wages for all time worked by Named Plaintiffs and those employees who join this lawsuit;

(b) an injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law from engaging in each of the unlawful practices, policies and patterns set forth herein;

(c) liquidated damages in an amount equal to the amount of unpaid minimum wages;

(d) an award crediting Named Plaintiffs and those employees who join the lawsuit all hours worked;

(e) an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Named Plaintiffs and those whose joint the lawsuit rights;

(f) an award of pre- and post-judgment interest; and

(g) such other and further legal or equitable relief as this Court deems to be just and appropriate.

**COUNT II**
**Violation of the New York Labor Law – Minimum Wages**
**Class Action – New York Subclass**

163. Christopher Hart brings this count as a Rule 23 class action on behalf of themselves and the New York Subclass.

164. Mr. Hart hereby re-alleges and incorporates the allegations set forth above.

165. This count arises from Defendants' willful violation of the NYLL, New York Minimum Wage Act, Article 19, § 650 *et seq*., for Defendants' failure to pay Mr. Hart, Mr. Beyer and the New York Subclass their earned minimum wages. Mr. Hart and the New York Subclass are current and former tipped employees of Defendants who are due, and who have not been paid, minimum wages under the provisions of the NYLL.

166. Defendants have a practice of paying Mr. Hart and the New York Subclass subminimum wages.

167. Defendants pay Mr. Hart and the New York Subclass these wages even though they perform jobs that are not within the scope of the "Food service worker" definition under the NYLL or associated regulations.

168. For example, Defendants' policy is to pay Mr. Hart and the New York Subclass subminimum wages even though they are performing jobs unrelated to their tipped jobs *See supra* ¶¶ 50-55.

169. Additionally, Defendants' policy is to pay Mr. Hart and the New York Subclass subminimum wages even on days in which they spend more than 20% of their work day performing non-tipped occupations, and during workweeks that they spend more than 20% of the workweek performing non-tipped occupations.

170. Further, Defendants' policy is to pay Mr. Hart and the New York Subclass subminimum wages even on days in which the Plaintiffs are assigned to work in an occupation in which tips are not customarily received.

171. Specifically, Defendants' policy is to utilize Mr. Hart and the New York Subclass to perform "back of the house" duties and other jobs that are not tipped jobs *See supra* ¶¶ 50-55.

172. Thus, as described above, Defendants regularly require Mr. Hart and the New York Subclass to perform such jobs as food preparation and general restaurant cleaning, but continued to pay Plaintiffs subminimum wages while the employees are engaged in those jobs.

173. Defendants also failed to provide written notice of the tip credit or allowance to Mr. Hart and the New York Subclass as required under New York State law.

174. At all relevant times relevant to the litigation, Defendants did not comply with NYLL's tip credit provision and the supporting New York State Department of Labor Regulations, including, but not limited to 12 N.Y.C.R.R. §137-2.2 and 146.2-2.

175. Moreover, the Defendants failed to provide Mr. Hart and those similarly situated with wage statements that complied with the requirements of NYLL. For example, Mr. Hart, and the New York Subclass were not given wage statements that contained allowances claimed by Defendants including the tip credit as required by NYLL § 195(3) as amended by the New York Wage Theft Prevention Act.

176. Accordingly, Defendants are not entitled to pay Mr. Hart and the New York Subclass subminimum wages under the NYLL.

177. Because the defendants never paid Mr. Hart and the New York Subclass more than the minimum wage rate in any week (and almost always paid them only at the lower tip credit rate for all time worked), in each week in which Mr. Hart, or any member of the New York Subclass did work at the improper tip credit rate, the average of that plaintiff or class member's wage for that week falls below the minimum wage for that week.

178. Further, Mr. Hart and the New York Subclass suffered this loss of wages in virtually every week in which they worked for the defendants. This is true because the defendants consistently assigned the tasks described in ¶¶ 50-55 to Mr. Hart, and the New York Subclass on every shift, or almost every shift, which they worked. Therefore, such violations occurred in each workweek in which Mr. Hart, and members of the New York Subclass worked.

179. Therefore, over the course of a workweek, Mr. Hart, and the New York Subclass were performing non-tip credit work at improper, lower, tip credit rates and never

receiving sufficient compensation from the defendants over the course of the week to enable the class members' compensation to reach the average minimum hourly wage for that week.

180. Mr. Hart will seek to certify Count II as a class action, and ask the Court to determine the rights of the class, enjoin the illegal conduct, order the payment of other damages due, and to direct Defendants to account for all back wages, penalties and prejudgment interest thereon due to him and the New York Subclass.

181. Count II is brought as a class action because the New York Subclass is similarly situated to Mr. Hart, and is so numerous that joinder of all members is impracticable. Mr. Hart therefore brings this action on his own behalf as an aggrieved employee, and in his representative capacity, against Defendants. Mr. Hart and similarly situated persons are equally affected by the minimum wage violations of Defendants and the relief sought is for the benefit of Mr. Hart and the New York Subclass he seeks to represent.

182. The issues involved in this lawsuit present common questions of law and fact. *See supra* ¶ 28. These common questions of law and fact predominate over the variations which may exist between the New York Subclass, if any. Mr. Hart and the New York Subclass have a commonality of interest in the subject matter and remedy sought, namely owed minimum wages plus penalties, interest, attorneys' fees and the cost of this lawsuit. Mr. Hart believes and asserts that he is able to fairly and adequately represent and protect the interests of the New York Subclass. If individual actions were required to be brought by each of the similarly situated persons injured or affected, it would necessarily result in multiplicity of lawsuits, creating a hardship to the individuals, to the Court, and to Defendants. Accordingly, a class action is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the New York Subclass is entitled.

183. The books and records of Defendants are material to the action as they disclose certain of the hours worked by each employee and the rate of pay for that work.

184. Defendants violated the NYLL by failing to compensate Mr. Hart, and the New York Subclass consistent with the minimum wage provisions.

WHEREFORE, Mr. Hart, and the New York Subclass pray for judgment against Defendants as follows:

(a) an order preliminarily and permanently restraining Defendants from engaging in the aforementioned pay violations;

(b) An award of the value of Mr. Hart and the New York Subclass members' unpaid wages;

(c) an award crediting Mr. Hart and the New York Subclass members for all hours worked;

(d) an additional amount as liquidated damages in an amount equal to the amount of unpaid minimum wages;

(e) an award of one hundred dollars for each work week that violations occurred for Mr. Hart and each New York Subclass member not to exceed a total of twenty five hundred dollars pursuant to the New York Wage Theft Prevention Act;

(f) an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Mr. Hart and the New York Subclass members' rights;

(g) an award of pre- and post-judgment interest;

(h) The amount equal to the value which would make Mr. Hart and the New York Subclass members whole for the violations; and

(i) such other and further legal or equitable relief as this Court deems to be just and appropriate.

**COUNT III**
**Violation of the Missouri Minimum Wage Law – Minimum Wages**
**Class Action – Missouri Subclass**

185. Plaintiff Taylor Ramsey brings this count as a Rule 23 class action on behalf of herself and the Missouri Subclass.

186. Ms. Ramsey hereby re-alleges and incorporates the allegations set forth above.

187. This count arises from Defendants' willful violation of the Missouri Minimum Wage Law § 290.502, *et seq*., for Defendants' failure to pay Ms. Ramsey and the Missouri Subclass all their earned minimum wages. Plaintiffs and the class are current and former tipped employees of Defendants who are due, and who have not been paid, minimum wages under the provisions of the Missouri Minimum Wage Law.

188. Defendants have a practice of paying Ms. Ramsey and the Missouri Subclass subminimum wages.

189. For example, Defendants' policy is to pay Ms. Ramsey and the Missouri Subclass subminimum wages even though they are performing jobs unrelated to their tipped jobs. *See supra* ¶¶ 56-59.

190. Further, Defendants' policy is to pay Ms. Ramsey and the Missouri Subclass subminimum wages even on days in which the Plaintiffs are assigned to work in an occupation in which tips are not customarily received.

191. Specifically, Defendants' policy is to utilize Ms. Ramsey and the Missouri Subclass to perform "back of the house" duties and other jobs that are not tipped jobs. *See supra* ¶¶ 56-59.

192. Thus, as described above, Defendants regularly required Ms. Ramsey and the Missouri Subclass to perform such jobs as food preparation and general restaurant cleaning, but continued to pay subminimum wages while the employees were engaged in those jobs.

193. Because the defendants never paid Ms. Ramsey and the Missouri Subclass more than the minimum wage rate in any week (and almost always paid them only at the lower tip credit rate for all time worked), in each week in which Ms. Ramsey or any member of the Missouri Subclass did work at the improper tip credit rate, the average of that plaintiff or class member's hourly wage for that week falls below the minimum wage for that week.

194. Further, Ms. Ramsey and the Missouri Subclass suffered this loss of wages in virtually every week in which they worked for the defendants. This is true because the defendants consistently assigned the tasks described in ¶¶ 56-59 to Ms. Ramsey and the Missouri Subclass on every shift, or almost every shift, which they worked. Therefore, such violations occurred in each workweek in which Ms. Ramsey and the Missouri Subclass worked.

195. Therefore, over the course of a workweek, Ms. Ramsey and the Missouri Subclass were performing non-tip credit work at improper, lower, tip credit rates and never receiving sufficient compensation from the defendants over the course of the week to enable the class members' compensation to reach the average minimum hourly wage for that week.

196. Defendants' practices violate the minimum wage provisions of the Missouri Minimum Wage Law.

197. Ms. Ramsey will seek to certify Count III as a class action, and asks the Court to determine the rights of the Missouri Subclass, enjoin the illegal conduct, order the payment of other damages due, and to direct Defendants to account for all back wages,

penalties and prejudgment interest thereon due to her and the class that she seeks to represent.

198. Count III is brought as a class action because the Missouri Subclass is similarly situated to Ms. Ramsey and is so numerous that joinder of all members is impracticable. Ms. Ramsey therefore brings this action on her own behalf as an aggrieved employee, and in her representative capacity, against Defendants. Ms. Ramsey and similarly-situated persons are equally affected by the minimum wage violations of Defendants, and the relief sought is for her benefit and the Missouri Subclass that she seeks to represent.

199. The issues involved in this lawsuit present common questions of law and fact. *See supra* ¶ 28. These common questions of law and fact predominate over the variations which may exist between members of the Missouri Subclass, if any. Ms. Ramsey and the Missouri Subclass have a commonality of interest in the subject matter and remedy sought, namely owed minimum wages plus penalties, interest, attorneys' fees and the cost of this lawsuit. Ms. Ramsey believes and asserts that she is able to fairly and adequately represent and protect the interests of the Missouri Subclass. If individual actions were required to be brought by each of the similarly-situated persons injured or affected, it would necessarily result in multiplicity of lawsuits, creating a hardship to the individuals, to the Court, and to Defendants. Accordingly, a class action is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the class is entitled.

200. The books and records of Defendants are material to the action as they disclose certain of the hours worked by each employee and the rate of pay for that work.

201. Defendants violated the Missouri Minimum Wage Law by failing to compensate Ms. Ramsey and the Missouri Subclass consistent with the minimum wage provisions.

WHEREFORE, Ms. Ramsey and the Missouri Subclass pray for judgment against Defendants as follows:

(a) an order preliminarily and permanently restraining Defendants from engaging in the aforementioned pay violations;

(b) An award of the value of Taylor Ramsey and the Missouri Subclass members' unpaid wages;

(c) an award crediting Taylor Ramsey and the Missouri Subclass members for all hours worked;

(d) an additional amount as liquidated damages in an amount equal to the amount of unpaid minimum wages;

(e) an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Taylor Ramsey and the Missouri Subclass members' rights;

(f) an award of pre- and post-judgment interest;

(g) The amount equal to the value which would make Taylor Ramsey and the Missouri Subclass members whole for the violations; and

(h) such other and further legal or equitable relief as this Court deems to be just and appropriate.

**COUNT IV**
**Violation of the Maryland Labor & Employment Code – Minimum Wages**
**Class Action – Maryland Subclass**

202. Plaintiff Maria Sargent brings this count as a Rule 23 class action on behalf of herself and the Maryland Subclass.

203. Ms. Sargent hereby re-alleges and incorporates the allegations set forth above.

204. This count arises from Defendants' willful violations of the Maryland Labor and Employment Code §§ 3-413, 3-507.2 for Defendants' failure to pay Ms. Sargent and the Maryland Subclass. Ms. Sargent and the Maryland Subclass are current and former tipped employees of Defendants who are due, and who have not been paid, minimum wages under the provisions of the Maryland Labor and Employment Code.

205. Defendants have a practice of paying Ms. Sargent and the Maryland Subclass subminimum wages.

206. For example, Defendants' policy is to pay Ms. Sargent and the Maryland Subclass subminimum wages even though the Plaintiffs are performing jobs unrelated to their tipped jobs. *See supra* ¶¶ 60-64.

207. Further, Defendants' policy is to pay Ms. Sargent and the Maryland Subclass subminimum wages even on days in which Ms. Sargent and the Maryland Subclass are assigned to work in an occupation in which tips are not customarily received.

208. Specifically, Defendants' policy is to utilize Ms. Sargent and the Maryland Subclass to perform "back of the house" duties and other jobs that are not tipped jobs. *See supra* ¶¶ 60-64.

209. Thus, as described above, Defendants regularly required Ms. Sargent and the Maryland Subclass to perform such jobs as food preparation and general restaurant cleaning, but continued to pay subminimum wages while the employees were engaged in those jobs. Defendants unlawfully withheld minimum wage payments from Ms. Sargent and the Maryland Subclass by improperly relying on the tip credit for their minimum wage obligation. Defendants' policy to pay Ms. Sargent and the Maryland Subclass subminimum wages was not the result of a bona fide dispute.

210. Because the defendants never paid Ms. Sargent and the Maryland Subclass more than the minimum wage rate in any week (and almost always paid them only at the lower tip credit rate for all time worked), in each week in which Ms. Sargent or any member of the Maryland Subclass did work at the improper tip credit rate, the average of that plaintiff or class member's hourly wage for that week falls below the minimum wage for that week.

211. Further, Ms. Sargent and the Maryland Subclass suffered this loss of wages in virtually every week in which they worked for the defendants. This is true because the defendants consistently assigned the tasks described in ¶¶ 60-64 to Ms. Sargent and the Maryland Subclass on every shift, or almost every shift, which they worked. Therefore, such violations occurred in each workweek in which Ms. Sargent and the Maryland Subclass worked.

212. Therefore, over the course of a workweek, Ms. Sargent and the Maryland Subclass were performing non-tip credit work at improper, lower, tip credit rates and never receiving sufficient compensation from the defendants over the course of the week to enable the class members' compensation to reach the average minimum hourly wage for that week.

213. Defendants' practices violate the minimum wage provisions of the Maryland Labor and Employment Code.

214. Ms. Sargent will seek to certify Count IV as a class action, and asks the Court to determine the rights of the class, enjoin the illegal conduct, order the payment of other damages due, and to direct Defendants to account for all back wages, penalties and prejudgment interest thereon due to her and the Maryland Subclass.

215. Count VI is brought as a class action because the Maryland Subclass is similarly situated to Ms. Sargent and is so numerous that joinder of all members is impracticable. Ms. Sargent therefore brings this action on their own behalf as an aggrieved employee, and in her representative capacity, against Defendants. Ms. Sargent and similarly situated persons are equally affected by the minimum wage violations of Defendants, and the relief sought is for her benefit and the Maryland Subclass that she seeks to represent.

216. The issues involved in this lawsuit present common questions of law and fact. *See supra* ¶ 28. These common questions of law and fact predominate over the variations which may exist between members of the classes, if any. Ms. Sargent and the Maryland Subclass have a commonality of interest in the subject matter and remedy sought, namely owed minimum wages plus penalties, interest, attorneys' fees and the cost of this lawsuit. Ms. Sargent believes and asserts that she is able to fairly and adequately represent and protect the interests of the Maryland Subclass. If individual actions were required to be brought by each of the similarly-situated persons injured or affected, it would necessarily result in multiplicity of lawsuits, creating a hardship to the individuals, to the Court, and to Defendants. Accordingly, a class action is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the class is entitled.

217. The books and records of Defendants are material to this action as they disclose certain of the hours worked by each employee and the rate of pay for that work.

218. Defendants violated the Maryland Labor and Employment Code by failing to compensate Ms. Sargent and the Maryland Subclass consistent with the minimum wage provisions.

WHEREFORE, Ms. Sargent and the Maryland Subclass pray for judgment against Defendants as follows:

(a) an order preliminarily and permanently restraining Defendants from engaging in the aforementioned pay violations;

(b) an award of the value of Ms. Sargent and the Maryland Subclass members' unpaid wages;

(c) an award crediting Ms. Sargent and the Maryland Subclass members for all hours worked;

(d) an additional amount in an amount equal to three times the unpaid wages;

(e) an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Ms. Sargent and the Maryland Subclass members' rights;

(f) an award of pre- and post-judgment interest;

(g) The amount equal to the value which would make Ms. Sargent and the Maryland Subclass members whole for the violations; and

(h) such other and further legal or equitable relief as this Court deems to be just and appropriate.

**COUNT V**
**Violation of the Arizona Minimum Wage Act - Minimum Wages**
**Class Action - Arizona Subclass**

219. Named Plaintiffs Andrea Randlett and Whitney Dolan bring this count as a Rule 23 class action on behalf of herself and the Arizona Subclass.

220. Named Plaintiffs Ms. Randlett and Ms. Dolan hereby re-allege and incorporate the allegations set forth above.

221. This count arises from Defendants' willful violation of the Arizona Minimum Wage Act §23-363 *et seq.,* for Defendants' failure to pay Plaintiffs and the Arizona Subclass Members all their earned minimum wages. Ms. Randlett and Ms. Dolan and the Arizona

Subclass are current and former employees of Defendants who have not been paid minimum wages under the provisions of the Arizona Minimum Wage Act.

222. Defendants have a practice of paying Ms. Randlett and Ms. Dolan and the Arizona Subclass subminimum wages.

223. For example, Defendants' policy is to pay Ms. Randlett and Ms. Dolan and the Arizona Subclass subminimum wages even though the Plaintiffs are performing jobs unrelated to their tipped jobs. *See supra* ¶¶ 65-70, 96-100.

224. Further, Defendants' policy is to pay Ms. Randlett and Ms. Dolan and the Arizona Subclass subminimum wages even on days in which the Plaintiffs are assigned to work in an occupation in which tips are not customarily received.

225. Specifically, Defendants' policy is to utilize Ms. Randlett and Ms. Dolan and the Arizona Subclass to perform "back of the house" duties and other jobs that are not tipped jobs. *See supra* ¶¶ 65-70, 96-100.

226. Thus, as described above, Defendants regularly required Ms. Randlett and Ms. Dolan and the Arizona Subclass to perform such jobs as food preparation and general restaurant cleaning, but continued to pay subminimum wages while the employees were engaged in those jobs.

227. Defendants also failed to provide written notice of the tip credit or allowance to Ms. Randlett and Ms. Dolan and the Arizona Subclass as required by the Arizona Administrative Code § R20-5-1207(c).

228. At all relevant times relevant to the litigation, Defendants failed to provide Plaintiffs and those similarly situated with wage statements that complied with the requirements of Arizona Administrative Code § R20-5-1207(c). For example, Ms. Randlett

and Ms. Dolan and the Arizona Subclass were not given wage statements that contained the amount per hour that Defendants withheld as a tip credit as required by Arizona Administrative Code § R20-5-1207(c).

229. Because the defendants never paid Ms. Randlett and Ms. Dolan and the Arizona Subclass more than the minimum wage rate in any week (and almost always paid them only at the lower tip credit rate for all time worked), in each week in which Ms. Randlett, Ms. Dolan or any member of the Arizona Subclass did work at the improper tip credit rate, the average of that plaintiff or class member's hourly wage for that week falls below the minimum wage for that week.

230. Further, Ms. Randlett and Ms. Dolan and the Arizona Subclass suffered this loss of wages in virtually every week in which they worked for the defendants. This is true because the defendants consistently assigned the tasks described in ¶¶ 65-70, 96-100 to Ms. Randlett and Ms. Dolan and the Arizona Subclass on every shift, or almost every shift, which they worked. Therefore, such violations occurred in each workweek in which Ms. Randlett and Ms. Dolan and the Arizona Subclass worked.

231. Therefore, over the course of a workweek, Ms. Randlett and Ms. Dolan and the Arizona Subclass were performing non-tip credit work at improper, lower, tip credit rates and never receiving sufficient compensation from the defendants over the course of the week to enable the class members' compensation to reach the average minimum hourly wage for that week.

232. Defendants' practices violate the minimum wage provisions of the Arizona Minimum Wage Act.

233. Ms. Randlett and Ms. Dolan will seek to certify Count V as a class action, and ask the Court to determine the rights of the class, enjoin the illegal conduct, order the payment of other damages due, and to direct Defendants to account for all back wages, penalties and interest thereon due to them and the Arizona Subclass.

234. Count V is brought as a class action because the Arizona Subclass members are similarly situated to Ms. Randlett and Ms. Dolan and are so numerous that joinder of all members is impracticable. Ms. Randlett and Ms. Dolan therefore bring this action on their own behalf as aggrieved employees, and in their representative capacity, against Defendants. Ms. Randlett and Ms. Dolan and similarly situated persons are equally affected by the minimum wage violations of Defendants, and the relief sought is for the benefit of themselves and the Arizona Subclass that they seek to represent.

235. The issues involved in this lawsuit present common questions of law and fact. *See supra* ¶ 28. These common questions of law and fact predominate over the variations which may exist between members of the classes, if any. Ms. Randlett and Ms. Dolan and the Arizona Subclass have a commonality of interest in the subject matter and remedy sought, namely owed minimum wages plus penalties, interest, attorneys' fees and the cost of this lawsuit. Ms. Randlett and Ms. Dolan believe and assert that they are able to fairly and adequately represent and protect the interests of the class. If individual actions were required to be brought by each of the similarly situated persons injured or affected, it would necessarily result in multiplicity of lawsuits, creating a hardship to the individuals, to the Court, and to Defendants. Accordingly, a class action is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the class is entitled.

236. The books and records of Defendants are material to this action as they disclose certain of the hours worked by each employee and the rate of pay for that work.

237. Defendants violated the Arizona Minimum Wage Act by failing to compensate Plaintiffs and members of the class consistent with the minimum wage provisions.

WHEREFORE, Ms. Randlett and Ms. Dolan and the Arizona Subclass pray for judgment against Defendants as follows:

(a) judgment in the amount of the owed minimum wages for all time worked by Ms. Randlett and Ms. Dolan and the Arizona Subclass;

(b) an injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

(c) damages in an amount equal to the amount of unpaid minimum wages;

(d) an award crediting Ms. Randlett and Ms. Dolan and the Arizona Subclass for all hours worked;

(e) an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Ms. Randlett and Ms. Dolan and the Arizona Subclass members' rights;

(f) an award of two hundred dollars for the first violation and $1,000 for each subsequent violation of Arizona Administrative Code § R20-5-1207(c) pursuant to Arizona Statute § 23-364, Arizona Administrative Code § R20-5-1210;

(g) an award of pre- and post-judgment interest; and

(h) such other and further legal or equitable relief as this Court deems to be just and appropriate.

**COUNT VI**
**Violation of the Illinois Minimum Wage Act - Minimum Wages**
**Class Action – Illinois Subclass**

238. Named Plaintiff Shelly Carrera brings this count as a Rule 23 class action on behalf of herself and the Illinois Subclass.

239. Named Plaintiff Ms. Carrera hereby re-alleges and incorporates the allegations set forth above.

240. This count arises from Defendants' willful violation of the Illinois Minimum Wage Law - 820 ILCS 105/1 *et seq*., and Illinois Wage Payment and Collection Act – 820 ILCS 115/1 *et seq*., for Defendants' failure to pay Ms. Carrera and the Illinois Subclass s all their earned minimum wages. Ms. Carrera brings Count VI as a class action under 735 ILCS 5/2-801. Ms. Carrera and the Illinois Subclass are current and former employees of Defendants who have not been paid minimum wages under the provisions of the Illinois Minimum Wage Law and Illinois Wage Payment and Collection Act.

241. Defendants have a practice of paying Plaintiffs subminimum wages.

242. For example, Defendants' policy is to pay Ms. Carrera and the Illinois Subclass subminimum wages even though the Plaintiffs are performing jobs unrelated to their tipped jobs.

243. Specifically, Defendants' policy is to utilize Ms. Carrera and the Illinois Subclass to perform "back of the house" duties and other jobs that are not tipped jobs. *See supra* ¶¶ 71-75.

244. Thus, as described above, Defendants regularly required Ms. Carrera to perform such jobs as food preparation and general restaurant cleaning, but continued to pay Plaintiffs subminimum wages while the employees are engaged in those jobs.

245. Defendants agreed to properly compensate Ms. Carrera and the Illinois Subclass for all hours worked. However, Defendants' policies resulted in Ms. Carrera and the Illinois Subclass performing non-tip producing jobs, *see supra* ¶¶ 71-75, but they were only paid subminimum wages.

246. Because the defendants never paid Ms. Carrera and the Illinois Subclass more than the minimum wage rate in any week (and almost always paid them only at the lower tip credit rate for all time worked), in each week in which Ms. Carrera or any member of the Illinois Subclass did work at the improper tip credit rate, the average of that plaintiff or class member's hourly wage for that week falls below the minimum wage for that week.

247. Further, Ms. Carrera and the Illinois Subclass suffered this loss of wages in virtually every week in which they worked for the defendants. This is true because the defendants consistently assigned the tasks described in ¶¶ 71-75 to Ms. Carrera and the Illinois Subclass on every shift, or almost every shift, which they worked. Therefore, such violations occurred in each workweek in which Ms. Carrera and the Illinois Subclass worked.

248. Therefore, over the course of a workweek, Ms. Carrera and the Illinois Subclass were performing non-tip credit work at improper, lower, tip credit rates and never receiving sufficient compensation from the defendants over the course of the week to enable the class members' compensation to reach the average minimum hourly wage for that week.

249. Defendants' practices violate the minimum wage provisions of the Illinois Minimum Wage Act and Illinois Wage Payment and Collection Act.

250. Ms. Carrera will seek to certify Count VI as a class action, and asks the Court to determine the rights of the class, enjoin the illegal conduct, order the payment of other

damages due, and to direct Defendants to account for all back wages, penalties and interest thereon due to her and the Illinois Subclass.

251. Count VI is brought as a class action because the Illinois Subclass members are similarly situated to Ms. Carrera and are so numerous that joinder of all members is impracticable. Ms. Carrera therefore brings this action on her own behalf as an aggrieved employee, and in her representative capacity, against Defendants. Ms. Carrera and the Illinois Subclass are equally affected by the minimum wage violations of Defendants, and the relief sought is for the benefit of herself and the Illinois Subclass that she seeks to represent.

252. The issues involved in this lawsuit present common questions of law and fact. *See supra* ¶ 28. These common questions of law and fact predominate over the variations which may exist between members of the classes, if any. Ms. Carrera and the Illinois Subclass have a commonality of interest in the subject matter and remedy sought, namely owed minimum wages plus penalties, interest, attorneys' fees and the cost of this lawsuit. Ms. Carrera believes and asserts that she is able to fairly and adequately represent and protect the interests of the class. If individual actions were required to be brought by each of the similarly-situated persons injured or affected, it would necessarily result in multiplicity of lawsuits, creating a hardship to the individuals, to the Court, and to Defendants. Accordingly, a class action is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the class is entitled.

253. The books and records of Defendants are material to this action as they disclose certain of the hours worked by each employee and the rate of pay for that work.

254. Defendants violated the Illinois Minimum Wage Act and the Illinois Wage Payment and Collection Act by failing to compensate Ms. Carrera and the Illinois Subclass consistent with the minimum wage provisions.

WHEREFORE, Ms. Carrera and the Illinois Subclass pray for judgment against Defendants as follows:

(a) judgment in the amount of the owed minimum wages for all time worked by Ms. Carrera and the Illinois Subclass;

(b) an injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

(c) damages in an amount equal to the amount of unpaid minimum wages;

(d) an award crediting Ms. Carrera and the Illinois Subclass for all hours worked;

(e) an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Ms. Carrera and the Illinois Subclass members' rights;

(f) an award of pre- and post-judgment interest; and

(g) such other and further legal or equitable relief as this Court deems to be just and appropriate.

**COUNT VII**
**Violation of the Florida Constitution and**
**Florida Minimum Wage Act - Minimum Wages**
**Class Action – Florida Subclass**

255. Named Plaintiff Michael Williams brings this count as a Rule 23 class action on behalf of himself and the Florida Subclass.

256. Named Plaintiff Michael Williams hereby re-alleges and incorporates the allegations set forth above.

257. This count arises from Defendants' willful violation of the Florida Constitution, art. 10, § 24, and the Florida Minimum Wage Act, 31 Fla. Stat. § 448.110(3), for Defendants' failure to pay Mr. Williams and the Illinois Subclass all their earned minimum wages. Mr. Williams brings Count VII as a class action under Fed. R. Civ. P. 23. Mr. Williams and the Florida Subclass are current and former employees of Defendants who have not been paid minimum wages under the provisions of the Florida Constitution and the Florida Minimum Wage Act.

258. Defendants have a practice of paying Plaintiffs subminimum wages.

259. For example, Defendants' policy is to pay Mr. Williams and the Florida Subclass subminimum wages even though the Plaintiffs are performing jobs unrelated to their tipped jobs.

260. Specifically, Defendants' policy is to utilize Mr. Williams and the Florida Subclass to perform "back of the house" duties and other jobs that are not tipped jobs. *See supra* ¶¶ 76-80.

261. Thus, as described above, Defendants regularly required Mr. Williams and the Florida Subclass to perform such jobs as food preparation and general restaurant cleaning, but continued to pay Plaintiffs subminimum wages while the employees are engaged in those jobs.

262. Defendants agreed to properly compensate Mr. Williams and the Florida Subclass for all hours worked. However, Defendants' policies resulted in Mr. Williams and the Florida Subclass performing non-tip producing jobs, *see supra* ¶¶ 76-80, but they were only paid subminimum wages.

263. Because the defendants never paid Mr. Williams and the Florida Subclass more than the minimum wage rate in any week (and almost always paid them only at the lower tip credit rate for all time worked), in each week in which Mr. Williams or any member of the Florida Subclass did work at the improper tip credit rate, the average of that plaintiff or class member's hourly wage for that week falls below the minimum wage for that week.

264. Further, Mr. Williams and the Florida Subclass suffered this loss of wages in virtually every week in which they worked for the defendants. This is true because the defendants consistently assigned the tasks described in ¶¶ 76-80 to Mr. Williams and the Florida Subclass on every shift, or almost every shift, which they worked. Therefore, such violations occurred in each workweek in which Mr. Williams and the Florida Subclass worked.

265. Therefore, over the course of a workweek, Mr. Williams and the Florida Subclass were performing non-tip credit work at improper, lower, tip credit rates and never receiving sufficient compensation from the defendants over the course of the week to enable the class members' compensation to reach the average minimum hourly wage for that week.

266. Defendants' practices violate the minimum wage provisions of the Florida Constitution and the Florida Minimum Wage Act.

267. Mr. Williams will seek to certify Count VII as a class action, and asks the Court to determine the rights of the class, enjoin the illegal conduct, order the payment of other damages due, and to direct Defendants to account for all back wages, penalties and interest thereon due to him and the Florida Subclass.

268. Count VII is brought as a class action because the Florida Subclass members are similarly situated to Mr. Williams and are so numerous that joinder of all members is

impracticable. Mr. Williams therefore brings this action on his own behalf as an aggrieved employee, and in his representative capacity, against Defendants. Mr. Williams and the Florida Subclass are equally affected by the minimum wage violations of Defendants, and the relief sought is for the benefit of himself and the Florida Subclass that he seeks to represent.

269. The issues involved in this lawsuit present common questions of law and fact. *See supra* ¶ 28. These common questions of law and fact predominate over the variations which may exist between members of the classes, if any. Mr. Williams and the Florida Subclass have a commonality of interest in the subject matter and remedy sought, namely owed minimum wages plus penalties, interest, attorneys' fees and the cost of this lawsuit. Mr. Williams believes and asserts that he is able to fairly and adequately represent and protect the interests of the class. If individual actions were required to be brought by each of the similarly-situated persons injured or affected, it would necessarily result in multiplicity of lawsuits, creating a hardship to the individuals, to the Court, and to Defendants. Accordingly, a class action is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the class is entitled.

270. The books and records of Defendants are material to this action as they disclose certain of the hours worked by each employee and the rate of pay for that work.

271. Defendants violated the Florida Constitution and the Florida Minimum Wage Act by failing to compensate Mr. Williams and the Florida Subclass consistent with the minimum wage provisions.

WHEREFORE, Mr. Williams and the Florida Subclass pray for judgment against Defendants as follows:

(a) judgment in the amount of the owed minimum wages for all time worked by Mr. Williams and the Florida Subclass;

(b) an injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

(c) damages in an amount equal to the amount of unpaid minimum wages;

(d) an award crediting Mr. Williams and the Florida Subclass for all hours worked;

(e) an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Mr. Williams and the Florida Subclass members' rights;

(f) an award of pre- and post-judgment interest; and

(g) such other and further legal or equitable relief as this Court deems to be just and appropriate.

**COUNT VIII**
**Violation of the Pennsylvania Minimum Wage Act - Minimum Wages**
**Class Action – Pennsylvania Subclass**

272. Named Plaintiff Leah Henchell brings this count as a Rule 23 class action on behalf of herself and the Pennsylvania Subclass.

273. Named Plaintiff Leah Henchell hereby re-alleges and incorporates the allegations set forth above.

274. This count arises from Defendants' willful violation of the Pennsylvania Minimum Wage Act, 43 Pa. Cons. Stat. § 333.104, *et seq.*, Pa. Con. Stat. § 231.34, Pa. Cons. Stat. § 260.9a, and Pennsylvania Regulations, including, but not limited to 34 Pa. Code. § 231.34, for Defendants' failure to pay Ms. Henchell and the Pennsylvania Subclass all their earned minimum wages. Ms. Henchell brings Count VIII as a class action under Fed. R. Civ. P. 23. Ms. Henchell and the Pennsylvania Subclass are current and former employees of

Defendants who have not been paid minimum wages under the provisions of the the Pennsylvania Minimum Wage Act and Pennsylvania Regulations.

275. Defendants have a practice of paying Plaintiffs subminimum wages.

276. For example, Defendants' policy is to pay Ms. Henchell and the Pennsylvania Subclass subminimum wages even though the Plaintiffs are performing jobs unrelated to their tipped jobs.

277. Specifically, Defendants' policy is to utilize Ms. Henchell and the Pennsylvania Subclass to perform "back of the house" duties and other jobs that are not tipped jobs. *See supra* ¶¶ 81-85.

278. Thus, as described above, Defendants regularly required Ms. Henchell and the Pennsylvania Subclass to perform such jobs as food preparation and general restaurant cleaning, but continued to pay Plaintiffs subminimum wages while the employees are engaged in those jobs.

279. Defendants agreed to properly compensate Ms. Henchell and the Pennsylvania Subclass for all hours worked. However, Defendants' policies resulted in Ms. Henchell and the Pennsylvania Subclass performing non-tip producing jobs, *see supra* ¶¶ 81-85, but they were only paid subminimum wages.

280. Because the defendants never paid Ms. Henchell and the Pennsylvania Subclass more than the minimum wage rate in any week (and almost always paid them only at the lower tip credit rate for all time worked), in each week in which Ms. Henchell or any member of the Pennsylvania Subclass, did work at the improper tip credit rate, the average of that plaintiff or class member's hourly wage for that week falls below the minimum wage for that week.

281. Further, Ms. Henchell and the Pennsylvania Subclass suffered this loss of wages in virtually every week in which they worked for the defendants. This is true because the defendants consistently assigned the tasks described in ¶¶ 81-85 to Ms. Henchell and the Pennsylvania Subclass on every shift, or almost every shift, which they worked. Therefore, such violations occurred in each workweek in which Ms. Henchell and the Pennsylvania Subclass worked.

282. Therefore, over the course of a workweek, Ms. Henchell and the Pennsylvania Subclass were performing non-tip credit work at improper, lower, tip credit rates and never receiving sufficient compensation from the defendants over the course of the week to enable the class members' compensation to reach the average minimum hourly wage for that week.

283. Defendants' practices violate the minimum wage provisions of the Pennsylvania Minimum Wage Act and Pennsylvania Regulations.

284. Ms. Henchell will seek to certify Count VIII as a class action, and asks the Court to determine the rights of the class, enjoin the illegal conduct, order the payment of other damages due, and to direct Defendants to account for all back wages, penalties and interest thereon due to her and the Pennsylvania subclass.

285. Count VIII is brought as a class action because the Pennsylvania Subclass members are similarly situated to Ms. Henchell, and are so numerous that joinder of all members is impracticable. Ms. Henchell therefore brings this action on her own behalf as an aggrieved employee, and in her representative capacity, against Defendants. Ms. Henchell and the Pennsylvania Subclass are equally affected by the minimum wage violations of Defendants, and the relief sought is for the benefit of herself and the Pennsylvania Subclass that she seeks to represent.

286. The issues involved in this lawsuit present common questions of law and fact. *See supra* ¶ 28. These common questions of law and fact predominate over the variations which may exist between members of the classes, if any. Ms. Henchell and the Pennsylvania Subclass have a commonality of interest in the subject matter and remedy sought, namely owed minimum wages plus penalties, interest, attorneys' fees and the cost of this lawsuit. Ms. Henchell believes and asserts that she is able to fairly and adequately represent and protect the interests of the class. If individual actions were required to be brought by each of the similarly-situated persons injured or affected, it would necessarily result in multiplicity of lawsuits, creating a hardship to the individuals, to the Court, and to Defendants. Accordingly, a class action is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the class is entitled.

287. The books and records of Defendants are material to this action as they disclose certain of the hours worked by each employee and the rate of pay for that work.

288. Defendants violated the Pennsylvania Minimum Wage Act and Pennsylvania Regulations by failing to compensate Ms. Henchell and the Pennsylvania Subclass consistent with the minimum wage provisions.

WHEREFORE, Ms. Henchell and the Pennsylvania Subclass pray for judgment against Defendants as follows:

(a) judgment in the amount of the owed minimum wages for all time worked by Ms. Henchell and the Pennsylvania Subclass;

(b) an injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

(c) damages in an amount equal to the amount of unpaid minimum wages;

(d) an award crediting Ms. Henchell and the Pennsylvania Subclass for all hours worked;

(e) an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Ms. Henchell and the Pennsylvania Subclass members' rights;

(f) an award of pre- and post-judgment interest; and

(g) such other and further legal or equitable relief as this Court deems to be just and appropriate.

**COUNT IX**
**Violation of the Colorado Minimum Wage Law - Minimum Wages**
**Class Action – Colorado Subclass**

378. Named Plaintiff Amber Ingram brings this count as a Rule 23 class action on behalf of herself and the Colorado Subclass.

379. Named Plaintiff Amber Ingram hereby re-alleges and incorporates the allegations set forth above.

380. This count arises from Defendants' willful violation of Colorado Minimum Wage Law, Colorado Rev. Stat. § 8-6-118, and Colorado Regulations, including, but not limited to 7 Colo. Code Regs., § 1103-1, for Defendants' failure to pay Ms. Ingram and the Colorado Subclass all their earned minimum wages. Ms. Ingram brings Count IX as a class action under Fed. R. Civ. P. 23. Ms. Ingram and the Colorado Subclass are current and former employees of Defendants who have not been paid minimum wages under the provisions of the Colorado Minimum Wage Law and Colorado Regulations.

381. Defendants have a practice of paying Plaintiffs subminimum wages.

382. For example, Defendants' policy is to pay Ms. Ingram and the Colorado Subclass subminimum wages even though the Plaintiffs are performing jobs unrelated to their tipped jobs.

383. Specifically, Defendants' policy is to utilize Ms. Ingram and the Colorado Subclass to perform "back of the house" duties and other jobs that are not tipped jobs. *See supra* ¶¶ 91-95.

384. Thus, as described above, Defendants regularly required Ms. Ingram and the Colorado Subclass to perform such jobs as food preparation and general restaurant cleaning, but continued to pay Plaintiffs subminimum wages while the employees are engaged in those jobs.

385. Defendants agreed to properly compensate Ms. Ingram and the Colorado Subclass for all hours worked. However, Defendants' policies resulted in Ms. Ingram and the Colorado Subclass performing non-tip producing jobs, *see supra* ¶¶ 91-95, but they were only paid subminimum wages.

386. Because the defendants never paid Ms. Ingram and the Colorado Subclass more than the minimum wage rate in any week (and almost always paid them only at the lower tip credit rate for all time worked), in each week in which Ms. Ingram and the Colorado Subclass did work at the improper tip credit rate, the average of that plaintiff or class member's hourly wage for that week falls below the minimum wage for that week.

387. Further, Ms. Ingram and the Colorado Subclass suffered this loss of wages in virtually every week in which they worked for the defendants. This is true because the defendants consistently assigned the tasks described in ¶¶ 91-95 to Ms. Ingram and the Colorado Subclass on every shift, or almost every shift, which they worked. Therefore, such violations occurred in each workweek in which Ms. Ingram and the Colorado Subclass worked.

388. Therefore, over the course of a workweek, Ms. Ingram and the Colorado Subclass were performing non-tip credit work at improper, lower, tip credit rates and never receiving sufficient compensation from the defendants over the course of the week to enable the class members' compensation to reach the average minimum hourly wage for that week.

389. Defendants' practices violate the minimum wage provisions of the Colorado Minimum Wage Law and Colorado Regulations.

390. Ms. Ingram will seek to certify Count IX as a class action, and asks the Court to determine the rights of the class, enjoin the illegal conduct, order the payment of other damages due, and to direct Defendants to account for all back wages, penalties and interest thereon due to him and the Colorado Subclass.

391. Count IX is brought as a class action because the Colorado Subclass members are similarly situated to Ms. Ingram, and are so numerous that joinder of all members is impracticable. Ms. Ingram therefore brings this action on her own behalf as an aggrieved employee, and in her representative capacity, against Defendants. Ms. Ingram and the Colorado Subclass are equally affected by the minimum wage violations of Defendants, and the relief sought is for the benefit of herself and the Colorado Subclass that she seeks to represent.

392. The issues involved in this lawsuit present common questions of law and fact. *See supra* ¶ 28. These common questions of law and fact predominate over the variations which may exist between members of the class, if any. Ms. Ingram and the Colorado Subclass have a commonality of interest in the subject matter and remedy sought, namely owed minimum wages plus penalties, interest, attorneys' fees and the cost of this lawsuit. Ms. Ingram believes and asserts that she is able to fairly and adequately represent and protect the

interests of the class. If individual actions were required to be brought by each of the similarly-situated persons injured or affected, it would necessarily result in multiplicity of lawsuits, creating a hardship to the individuals, to the Court, and to Defendants. Accordingly, a class action is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the class is entitled.

393. The books and records of Defendants are material to this action as they disclose certain of the hours worked by each employee and the rate of pay for that work.

394. Defendants violated the Colorado Minimum Wage Law and Colorado Regulations by failing to compensate Ms. Ingram and the Colorado Subclass consistent with the minimum wage provisions.

WHEREFORE, Ms. Ingram and the Colorado Subclass pray for judgment against Defendants as follows:

(a) judgment in the amount of the owed minimum wages for all time worked by Ms. Ingram and the Colorado Subclass;

(b) an injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

(c) damages in an amount equal to the amount of unpaid minimum wages;

(d) an award crediting Ms. Ingram and the Colorado Subclass for all hours worked;

(e) an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Ms. Ingram and the Colorado Subclass members' rights;

(f) an award of pre- and post-judgment interest; and

(g) such other and further legal or equitable relief as this Court deems to be just and appropriate.

**COUNT X**
**Violation of the Indiana Minimum Wage Act - Minimum Wages**
**Class Action – Indiana Subclass**

378. Named Plaintiff Courtney Hollins brings this count as a Rule 23 class action on behalf of herself and the Indiana Subclass.

379. Named Plaintiff Courtney Hollins hereby re-alleges and incorporates the allegations set forth above.

380. This count arises from Defendants' willful violation of the Indiana Minimum Wage Act, Ind. Code § 22-2-2-4, *et seq.*, for Defendants' failure to pay Ms. Hollins and the Indiana Subclass all their earned minimum wages. Ms. Hollins brings Count X as a class action under Fed. R. Civ. P. 23. Ms. Hollins and the Indiana Subclass are current and former employees of Defendants who have not been paid minimum wages under the provisions of the Indiana Minimum Wage Act.

381. Defendants have a practice of paying Plaintiffs subminimum wages.

382. For example, Defendants' policy is to pay Ms. Hollins and the Indiana Subclass subminimum wages even though the Plaintiffs are performing jobs unrelated to their tipped jobs.

383. Specifically, Defendants' policy is to utilize Ms. Hollins and the Indiana Subclass to perform "back of the house" duties and other jobs that are not tipped jobs. *See supra* ¶¶ 86-90.

384. Thus, as described above, Defendants regularly required Ms. Hollins and the Indiana Subclass to perform such jobs as food preparation and general restaurant cleaning, but continued to pay Plaintiffs subminimum wages while the employees are engaged in those jobs.

385. Defendants agreed to properly compensate Ms. Hollins and the Indiana Subclass for all hours worked. However, Defendants' policies resulted in Ms. Hollins and the Indiana Subclass performing non-tip producing jobs, *see supra* ¶¶ 86-90, but they were only paid subminimum wages.

386. Because the defendants never paid Ms. Hollins and the Indiana Subclass more than the minimum wage rate in any week (and almost always paid them only at the lower tip credit rate for all time worked), in each week in which Ms. Hollins and members of the Indiana Subclass did work at the improper tip credit rate, the average of that plaintiff or class member's hourly wage for that week falls below the minimum wage for that week.

387. Further, Ms. Hollins and the Indiana Subclass suffered this loss of wages in virtually every week in which they worked for the defendants. This is true because the defendants consistently assigned the tasks described in ¶¶ 86-90 to Ms. Hollins and the Indiana Subclass on every shift, or almost every shift, which they worked. Therefore, such violations occurred in each workweek in which Ms. Hollins and the Indiana Subclass worked.

388. Therefore, over the course of a workweek, Ms. Hollins and the Indiana Subclass were performing non-tip credit work at improper, lower, tip credit rates and never receiving sufficient compensation from the defendants over the course of the week to enable the class members' compensation to reach the average minimum hourly wage for that week.

389. Defendants' practices violate the minimum wage provisions of the Indiana Minimum Wage Act.

390. Ms. Hollins will seek to certify Count X as a class action, and asks the Court to determine the rights of the class, enjoin the illegal conduct, order the payment of other

damages due, and to direct Defendants to account for all back wages, penalties and interest thereon due to them and the Indiana Subclass.

391. Count X is brought as a class action because the Indiana Subclass members are similarly situated to Ms. Hollins, and are so numerous that joinder of all members is impracticable. Ms. Hollins therefore brings this action on her own behalf as a aggrieved employese, and in their representative capacity, against Defendants. Ms. Hollins and the Indiana Subclass are equally affected by the minimum wage violations of Defendants, and the relief sought is for the benefit of herself and the Indiana Subclass that she seeks to represent.

392. The issues involved in this lawsuit present common questions of law and fact. *See supra* ¶ 28. These common questions of law and fact predominate over the variations which may exist between members of the classes, if any. Ms. Hollins and the Indiana Subclass have a commonality of interest in the subject matter and remedy sought, namely owed minimum wages plus penalties, interest, attorneys' fees and the cost of this lawsuit. Ms. Hollins believes and asserts that she is able to fairly and adequately represent and protect the interests of the class. If individual actions were required to be brought by each of the similarly-situated persons injured or affected, it would necessarily result in multiplicity of lawsuits, creating a hardship to the individuals, to the Court, and to Defendants. Accordingly, a class action is an appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the class is entitled.

393. The books and records of Defendants are material to this action as they disclose certain of the hours worked by each employee and the rate of pay for that work.

394. Defendants violated the Indiana Minimum Wage Act by failing to compensate Ms. Hollins and the Indiana Subclass consistent with the minimum wage provisions.

WHEREFORE, Ms. Hollins and the Indiana Subclass pray for judgment against Defendants as follows:

(a) judgment in the amount of the owed minimum wages for all time worked by Ms. Hollins and the Indiana Subclass;

(b) an injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

(c) damages in an amount equal to the amount of unpaid minimum wages;

(d) an award crediting Ms. Hollins and the Indiana Subclass for all hours worked;

(e) an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Ms. Hollins and the Indiana Subclass members' rights;

(f) an award of pre- and post-judgment interest; and

(g) such other and further legal or equitable relief as this Court deems to be just and appropriate.

## JURY DEMAND

Plaintiffs demand a jury to hear and decide all issues of fact in accordance with Federal Rule of Civil Procedure 38(b).

Dated: May 31, 2016

**THOMAS & SOLOMON LLP**

By: s/ Jared K. Cook
J. Nelson Thomas, Esq.
Michael J. Lingle, Esq.
Jared K. Cook, Esq.
*Attorneys for Plaintiffs*
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
nthomas@theemploymentattorneys.com
mlingle@theemploymentattorneys.com
jcook@theemploymentattorneys.com