

EPSTEIN
BECKER
GREEN

Attorneys at Law

Christopher M. Farella
t 973.639.8541
f 973.639.8739
CFarella@ebglaw.com

December 13, 2018

VIA ECF

Honorable Marian W. Payson
United States District Court
Western District of New York
100 State Street
Rochester, NY 14612

      Re:  Christopher Hart, et al. v. Crab Addison, Inc. d/b/a Joe's Crab Shack, et al.
           13-CV-6458-CJS

Dear Judge Payson:

      Epstein Becker & Green, P.C. ("EBG") hereby submits this supplemental letter brief in lieu of a more formal brief, in opposition to the pending Motion for Sanctions.  As described more fully below, and inclusive of the arguments set forth in previous filings and during oral argument in this proceeding, EBG respectfully requests this Court to deny Plaintiffs' Motion for Sanctions.

## RELEVANT FACTS

      With the benefit of the briefing in April and May 2018, the arguments of June 6, 2018 and the testimony on October 25, 2018, Plaintiffs' grounds for sanctions against EBG on this record is even further unsupportable and would, if granted, be fundamentally unfair. It is important to note the facts gathered to date concerning EBG's involvement apply to a narrow window of time – that is, February 18, 2015 to March 19, 2015.  Viewing EBG's conduct in that compressed interval it is plain and simple that EBG's actions did not in any way rise near to the level necessary in order to impose sanctions under any legal theory.

      It is undisputed that the original class list was prepared solely by Ignite's in-house counsel Robin Martin.  To create this original list, Ms. Martin engaged in an "arduous" process consisting of melding two separate sets of payroll records from two different payroll providers, which then had to be compared against a master human resources list.  The latter file was inadvertently included in the Notice List, and contained the excess data that should not have been provided to Plaintiffs' counsel.

Hon. Marian W. Payson, USDJ
December 13, 2018
Page 2

More specifically, on February 18, 2015, the Notice List was provided to EBG by Ignite in approximately 250 spreadsheets, broken down by restaurant location, containing the contact information for the purported potential opt-in Plaintiffs; EBG delivered the data to Plaintiffs' counsel in email and overnight mail on a disk in the same form that it was maintained by Ignite. *See* March 12, 2015 letter from Kenneth Kelly, Esq. ("Kelly Letter") at p. 1 [D.E. 84]; *see also* Testimony of Steven Metzger ("Metzger Testimony") at p. 21, lines 4-13[D.E. 576-2].[1] Unbeknownst to EBG and Ignite, two of those files inadvertently contained a company-wide master human resources file that should have never been provided to Plaintiffs' counsel. *See* Metzger Testimony at p. 21, lines 16-18 and p.27, lines 10-13.

EBG subsequently provided the data in these spreadsheets in a single, consolidated spreadsheet at Plaintiffs' counsel's insistence. *See* Kelly Letter at p. 2.  Because the consolidated spreadsheet merely electronically consolidated the data in the individual lists, it too, included all of the individuals contained on the master human resources list.  *See* Metzger Testimony at p. 26, line 20 to p. 27, line 13.

Mr. Metzger testified, consistent with an earlier affidavit filed in this proceeding, this was an unintentional error; Ignite never meant to cause this happen.  Ms. Martin was unaware of the error – in fact, it was believed this original list was accurate.  See Metzger Testimony, p. 21, line 16-18.  Nevertheless, Ignite takes full responsibility for the errors in that first list.  *Id.* at p. 27, line 24 to p. 28 line 1 ("[T]o the extent that there was responsibility for what went out, that would have rested with [Ms. Martin] and the company.").

To somehow justify EBG's continued presence in this matter,  Plaintiffs purport to take issue with the fact that EBG originally had stated only 30,000 names would appear on the list, but the lists that were provided contained closer to 120,000.  Pl. Suppl. Br. at 9.  Interestingly, Plaintiffs' counsel was obviously satisfied with EBG's explanation of this discrepancy at the time it occurred.  In fact, after "confer[ring] in good faith" with EBG about this and other issues regarding the accuracy of the list, Plaintiffs' counsel contemporaneously informed this Court "[b]ased on defendants' representations that they will produce a complete and accurate class list without duplicates, and that they will work with us…we do not believe that a conference is necessary at this time to resolve our concerns regarding the class list[.]" *See* March 19, 2015 letter

---

[1] Although the documents referred to herein are listed on the docket, they are also provided for the Court's convenience as attachments to this letter brief as Ex. A (Kelly Letter), Ex. B. (pertinent portions of Metzger Testimony).

Hon. Marian W. Payson, USDJ
December 13, 2018
Page 3


from Jared Cook, Esq. ("Cook Letter")[2] at pp. 1-2.  This Court canceled a previously scheduled conference based on this letter.

The reality is EBG never had the opportunity to work with Plaintiffs' counsel on correcting the accuracy of the list.  On March 30, 2015, EBG was no longer counsel of record for Defendants.  [D.E. 85, 87-88](Notice of Appearance of Ogletree Deakins Nash Smoak & Stewart, P.C. ("Ogletree")).  EBG had no other involvement in this case from that point forward, including no chance to assess any issues with the list or correct any errors.

## LEGAL ARGUMENT

## SANCTIONS SHOULD NOT BE IMPOSED AGAINST EBG OR ITS ATTORNEYS

Plaintiffs have failed to demonstrate that EBG's actions fall within any sanctionable conduct under Federal Rules of Civil Procedure 16 and 37, and 28 U.S.C. § 1927 (as well as the court's inherent power).  Indeed, their motion, as well as the evidence marshalled throughout this proceeding, lacks even the most basic foundation for this Court to even consider sanctions, much less ordering them.   Moreover, even if EBG's actions called for sanctions (which they do not) Plaintiffs have not provided this Court with any credible legal basis disputing that the May 17, 2016 stipulation precludes sanctions against EBG.  Accordingly, Plaintiffs' motion should be denied, as is without merit as against EBG.


### A.   *Plaintiffs Cannot Demonstrate EBG Committed Sanctionable Conduct*


The common theme intertwined in each of the legal theories Plaintiffs espouse in support of their motion is that sanctions serve as punishment and a deterrent for willful, culpable and improper behavior.  The facts adduced throughout this proceeding fall woefully short of showing EBG engaged in any such behavior.  Here, EBG provided a Notice List that it believed at the time (as did its client) accurately portrayed the data that Judge Siragusa's order required.  Within weeks, there were several discussions and communications with Plaintiffs' counsel, culminating in a "good faith" conference where EBG represented it would look deeper into the accuracy of the list.  Plaintiffs' counsel represented to this Court it was satisfied with that agreement and there was, at the time, no further need for the Court's intervention.  Less than two weeks after that conference,

---

[2] Ex. C, hereto.

Hon. Marian W. Payson, USDJ
December 13, 2018
Page 4

EBG was no longer counsel of record in the case, and therefore lacked the opportunity to analyze, address or otherwise correct any errors in the original list.

Federal Rule of Civil Procedure 16(f)(1), "on motion or on its own, the court may issue any just orders, including those authorized by Rule 37(b)(2)(A) (ii-vii), if a party or its attorney . . . fails to obey a scheduling or other pretrial order."  Indeed, the Supreme Court has stated that "sanctions for violation of . . . scheduling orders `must be applied diligently both to penalize those whose conduct may be deemed to warrant such a sanction, and to deter those who might be tempted to such conduct in the absence of such a deterrent.'"  *Miltope Corp. v. Hartford Cas. Ins. Co.,* 163 F.R.D. 191, 194 (S.D.N.Y. 1995) (quoting *Roadway Exp., Inc. v. Piper,* 447 U.S. 752, 753 (1980)) (noting that "[d]ue regard for the need to vindicate the public interest in the sound administration of justice" warrants "the imposition of a fine, payable to the Clerk of the Court," and that "purpose" of such fine "imposed upon an offending attorney" is "essentially punitive and deterrent").

The evidence in this regard does not warrant application of Rule 16 sanctions.  EBG did not disregard, or in any way fail to comply with, Judge Siragusa's Order.  On the date and time required to do so, EBG provided, on behalf of Defendants, what it believed to be the Notice List called for in that Order.  Nevertheless, through absolute inadvertence, it contained an error.  EBG endeavored along with Plaintiffs' counsel to analyze the error and revisit the accuracy of the list (as demonstrated through the Cook Letter), but was replaced by Ogletree before it had any opportunity to do so.

Similarly, EBG's conduct does not rise to the level necessary for the imposition of sanctions under Rule 37.  Sanctions under Rule 37 of the Federal Rules of Civil Procedure for failure to comply with a discovery order is a drastic penalty reserved in general for culpable conduct, such as willful and conscious disregard of a court order. *See, e.g., Houghton v. Culver,* 467 F. App'x 63, 65 (2d Cir. 2012) (affirming district court's dismissal of action under Rule 37(b)(2) for plaintiff's failure to comply with three pretrial orders and failure to prepare for trial); *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,* 845 F.2d 1172, 1176 (2d Cir. 1988) (sanctions such as "[d]ismissal under Rule 37 [are] warranted . . . where a party fails to comply with the court's discovery orders willfully, in bad faith, or through fault") (citing *Salahuddin v. Harris,* 782 F.2d 1127, 1132 (2d Cir.1986)).

In its initial brief to this Court, EBG listed the numerous factors relevant to a district court's exercise of its broad discretion to order sanctions under Rule 37.  Plaintiffs have not even attempted to apply any of these factors to EBG either in their initial briefing, their arguments in Court, or in the supplemental briefing.  Instead, Plaintiffs paint EBG's conduct with broad, conclusory brushstrokes, pointing only to a representation of the size of the list that was different from what was subsequently produced.  Again, EBG and Plaintiffs' counsel discussed that issue and EBG

Hon. Marian W. Payson, USDJ
December 13, 2018
Page 5

agreed to revisit it, but shortly thereafter, was replaced as counsel by Ogletree. This hardly presents the situation calling for sanctions under Rule 37. Instead, applying the Rule 37 factors to the record evidence of EBG's conduct demonstrates this was inadvertence, pure and simple, and not some willful or conscious gamesmanship that this Court needs to punish. Accordingly, Plaintiffs' motion should be denied.

Finally, 28 U.S.C. § 1927 does not support sanctions against EBG in this matter. Sanctions under Section 1927 require a showing that an "attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay," and "a finding of conduct constituting or akin to bad faith." *In re 60 East 80th Street Equities,* 218 F.3d 109, 115 (2d Cir. 2000). In other words, imposition of a sanction under § 1927 requires a "clear showing of bad faith". *Kamen v. American Telephone & Telegraph Co.,* 791 F.2d 1006, 1010 (2d Cir.1986) (quoting *State of West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1092 (2d Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971)). As stated above, EBG's conduct does not rise to the level of anything even remotely resembling bad faith. Accordingly, Plaintiffs' motion for sanctions under this provision should be equally denied.

### B. The Settlement in the Bankruptcy Action Precludes Any Relief Against EBG

EBG raised at oral argument on June 6, 2018 the preclusionary effect of the Stipulation of Settlement ("Stipulation") as a bar to the sanctions action herein. Plaintiffs could not then, and fail to now, present any legal theory permitting them to continue against EBG in light of this document. In fact, at oral argument, Plaintiffs' only theory – without any evidence whatsoever - is that failing to carve out EBG from the settlement of all claims was a scrivener's error.

Under New York law, a court must find the intent of the parties to a contract as a matter of law if that intent is clear from the language of the contract. *Commander Oil Corp. v. Advance Food Serv. Equip.,* 991 F.2d 49, 51 (2d Cir.1993). Here the cited language of the settlement agreement, which was drafted, reviewed and executed by counsel in this matter is absolutely clear and unambiguous. Paragraph 8 is an all-encompassing release, which releases all parties, and their counsel, from any claims, known or unknown, at the time of settlement. *See* Ex. D. This paragraph reads, in pertinent parts, "…Employee Class Members…shall, without further action irrevocably and unconditionally, fully, finally and forever waive, release, acquit and discharge each of the Debtors …and Related Parties ... from any claim …damages, demand, …liability, … whether known or unknown, direct or indirect, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity, or otherwise, from the beginning of time through the Effective Date." The paragraph continues and defines "Related Parties" as, among other things, attorneys; but it does expressly carve out the Ogletree/Fisher Phillips parties. *See id.*

Hon. Marian W. Payson, USDJ
December 13, 2018
Page 6

Neither EBG nor any of its attorneys are carved out here or anywhere else in the document. Moreover, paragraph 17 of the Agreement contains a merger/integration clause, stating that the Agreement constitutes the "entire agreement between the Parties with respect to the transactions set forth herein" and supersedes any and all prior discussions or representations.

Settlement agreements draw upon standard contract principles. As part of the consideration for the payment to Plaintiffs in this matter, they gave up their right to pursue EBG for any additional sums, regardless of the theory. The Agreement was negotiated among all counsel, contains a merger clause, and thus explicitly protects EBG from further fee or other damage requests. EBG's allegedly sanctionable conduct was indeed known at that time of the drafting and execution of this document; in fact, Plaintiffs specifically provided for a carve out of the Ogletree and the Fisher Phillips parties from the Agreement so as to continue pursuing them for sanctions. EBG was not included in this carve-out, and as a result, is protected by the release from any further claims, including those sought herein.

## **CONCLUSION**

For the foregoing reasons, as well as those contained in previous briefs and at oral argument, Plaintiffs' Motion for Sanctions should be denied as to Epstein Becker & Green, P.C. for the conduct alleged, as none of the applicable legal standards can be met under the record facts of this matter.

Respectfully submitted,

Christopher M. Farella

# Ex. A

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE WESTERN DISTRICT OF NEW YORK

3                  ROCHESTER DIVISION

4 ----------------------------------

5 CHRISTOPHER HART, MARIA SARGENT,

6 TAYLOR RAMSEY, ANDREA RANDLETT, and

7 SHELLY CARRERA, *on behalf of themselves*

8 *and all other employees similarly situated,*

9                      Plaintiffs,

10

11 -versus-          CIVIL ACTION NO: 13-cv-6458 (CJS-MWP)

12

13 CRAB ADDISON, INC.,d/b/a JOE'S CRAB SHACK,

14 IGNITE RESTAURANT GROUP, INC.,

15 RAYMOND A. BLANCHETTE, III,

16 KEVIN COTTINGIM, AND RODNEY MORRIS,

17                    Defendants.

18 ----------------------------------

19                 TRANSCRIPT OF HEARING

20           BEFORE THE HONORABLE MARIAN W. PAYSON

21             UNITED STATES DISTRICT JUDGE

22            THURSDAY, OCTOBER 25, 2018

23

24

25

2

```
 1  A p p e a r a n c e s:

 2

 3  On Behalf of the Plaintiffs:

 4       Michael J. Lingle, Esq.

 5       Jessica L. Lukasiewicz, Esq.

 6       THOMAS & SOLOMON, LLP

 7       693 East Avenue

 8       Rochester, New York 14607

 9

10  On Behalf of the Defendants:

11       William G. Bauer, Esq.

12       WOODS, OVIATT, GILMAN, LLP

13       700 Crossroads Building

14       2 State Street

15       Rochester, New York 14614

16

17

18  R e p o r t e d   B y:

19

20       Briana L. Jeffords

21

22

23

24

25
```

1 payroll manager, and I had a few discussions with her as well.

2 Q.   So in terms of the facts that are set forth in your

3 declaration, what did Ms. Oguchi tell you?

4 A.   Well, she walked me through her understanding of the first

11:02:34AM 5 two class lists and how they were prepared, specifically,

6 Robin Martin's involvement.  She explained why Ms. Martin

7 endeavored to prepare those lists herself.  She helped me

8 understand the timeline.  She also provided me with

9 information regarding the overinclusion in that first class

11:03:14AM 10 list and how that came to be that, you know, employees from

11 restaurants that were not involved in the class were provided

12 and included.  Also walked me through the second class list

13 preparation.

14          Yeah, I think that covers most of what is addressed

11:04:14AM 15 in this, in this declaration.

16          You did mention, as I do in my declaration, that at

17 the time the class list went out, obviously, the company did

18 not believe there to be any inaccuracies.  That was clearly

19 not the intent, but they basically had two Class Lists that

11:04:37AM 20 went out that were not accurate.  So at that point we began

21 talking about how do we get a third.  How do we ensure this

22 third class list is correct?

23 Q.   Was Ms. Oguchi employed during the time where the initial

24 class list was produced?

11:05:00AM 25 A.   I can't recall.  I can't recall.

1  Q.   How about the July 2015 class list?

2  A.   Yes, I believe so.

3  Q.   And was Ms. Oguchi able to provide you with this

4  information because she was involved with the production of at

11:05:25AM 5  least the July 2015 class list?

6  A.   I can't recall if she said she was involved or if she

7  described it as she was made aware of Robin's efforts and

8  attempts to put the class list together.  So I don't know if

9  she assisted her at all.

11:05:48AM 10            And again, I apologize for not having more facts

11  but at that point my main concern was making sure we had a

12  more accurate class list.  So I didn't dig into the details of

13  the mistakes that were made before we got there.

14  Q.   Well, in terms of creating a new class list, did you think

11:06:08AM 15  it was important to understand what had happened previously so

16  that the mistakes were not repeated?

17  A.   Correct.  And I did.  Like I said, we talked about how the

18  overinclusion happened.  So the first class list that went

19  out, it was the opposite of where the company was.  It had too

11:06:24AM 20  many potential class members.  And then the second one that

21  went out, obviously, had some that were missing.  And so we

22  had two ends of the spectrum in terms of mistakes, which to me

23  when I came in, told me we have the wrong process and person

24  overseeing putting the class list together.  I did want to

11:06:44AM 25  make sure there was no intention there, obviously.  And the

1  overinclusion on that first class list signaled me to the fact

2  that, well, nobody is intentionally producing the wrong

3  information, but they clearly are not familiar with the

4  process they need to utilize for this.

11:07:00AM 5       So it is a long way of saying I understood at a

6  high level how the mistakes were made, but we had a short time

7  frame to make sure that we responded to the core of getting a

8  correct list out there.  So that's where the majority of our

9  focus was.

11:07:14AM 10 Q.  So based on your review, it was clear that whoever had

11  done the first list didn't have an understanding of how to put

12  the list together; is that right?

13  A.  That was my opinion, yes.

14  Q.  Did you come to an understanding of what caused errors in

11:07:43AM 15 the July 2015 class list?

16  A.  No.

17  Q.  Did you make the decision to create a brand new class list

18  at that point?

19  A.  I think that decision was already in the works when I

11:08:06AM 20 joined the company, but I was involved with the process to

21  make sure that we were comfortable as a company with the class

22  list that was being created.

23  Q.  What did Ms. Oguchi relay to you as to why Ms. Martin

24  undertook to put together the list herself?

11:08:39AM 25 A.  Yeah.  I think her understanding was generally that we --

1 the company didn't have a lot of resources.  I think it was an

2 attempt do as much as she could.  I mean, it came from a good

3 place.  Yeah.  I think that she just basically didn't want to

4 put that on somebody else.  She was overseeing that class

11:09:06AM 5 action.  She thought she could run that information, and she

6 wanted to take it on herself.

7 Q.    You also said you spoke with a payroll person whose name

8 was Amy.  Could you tell us what she told you --

9 A.    Yes.

11:09:17AM 10 Q.    -- that assisted you with your declaration?

11 A.    Well, it was more of a process standpoint.  I wanted to

12 understand from a payroll perspective what providers we used,

13 how we can ensure that the data we collected was accurate, and

14 so it was really more of an educational discussion.

11:09:41AM 15 Q.    So was your conversation more about how to put together

16 the new list?

17 A.    It was about how to put together the new list, but it was

18 also trying to understand the information that had been

19 provided previously, where that came from, understanding that

11:09:59AM 20 we had had some overlap with third-party vendors, and that may

21 have been one of the issues.  Moving from one vendor to the

22 other I think created some bumps along the road in creating

23 those lists for the internal team.

24 Q.    I think we already talked about your discussions with Lisa

11:10:24AM 25 Moore, correct, in terms of the facts that she provided to you

1  in terms of your declaration.

2  A.  We did.  We talked about Lisa Moore.

3  Q.  You don't have anything to add at this point on that do

4  you, your conversations with Ms. Moore?

11:10:40AM 5  A.  Certainly.

6  Q.  Excuse me?

7  A.  Certainly if you have something specific, not generally

8  no.

9  Q.  Okay.  Are there any other internal team members that you

11:11:01AM 10  spoke with in terms of putting together your declaration?

11  A.  No.

12  Q.  So we have gone through the categories, I believe, that

13  were listed in your declaration, senior management, other

14  advisors, and other members of you team.  Was there anybody

11:11:27AM 15  else that you spoke with that provided you with information

16  that you used for your declaration?

17  A.  No, I think that covers it.

18  Q.  You also say that the declaration is based on your

19  personal knowledge developed during the course of your

11:11:43AM 20  engagement with Ignite.  Would that be anything different --

21  A.  Right.

22  Q.  -- than the things we have already discussed?

23  A.  No, I think we covered it review, pleadings, and

24  conversations.

11:12:13AM 25  Q.  All right.  If you would not mind turning to paragraph

1 three in your declaration.  You mentioned a paralegal Lindsay

2 Robins; correct?

3 A.    Correct.

4 Q.    Did you ever speak with Ms. Robins about any of the issues

11:12:58AM 5 with the class list?

6 A.    I did not.  She was not an employee of Ignite when I

7 joined.

8 Q.    And even though she was not an employee, you did not reach

9 out to talk to her about the issues?

11:13:09AM 10 A.    I did not.

11 Q.    And you've also mentioned Robin Martin previously, and she

12 is also mentioned in this paragraph.  Did you ever speak to

13 Ms. Martin about the issues with the class list in the case?

14 A.    I did not.

11:13:26AM 15 Q.    Did you ever reach out to Ms. Martin?

16 A.    I did not, but others in the company attempted to.

17 Q.    You described the process in paragraph three of pulling

18 information -- or pulling the data from two different payroll

19 providers as arduous.  What about it was arduous?

11:14:01AM 20 A.    Right.  Well, that's based on my conversations -- that's

21 based on my conversations with Lisa Moore.  And what makes it

22 arduous is it's a lot of data.  And when you move from one

23 provider to another, accessing that data and certainly

24 accessing that data in formats that make it easy to review is

11:14:26AM 25 challenging.  And I think again, based on conversations with

1  Lisa that was a very arduous process.

2  Q.   As I think you mentioned, it was the amount of data and

3  also there were two different sources of the data.  Is that

4  what you are describing?

11:14:51AM 5  A.   Correct.

6  Q.   And that information also had to be, it sounds like,

7  matched up against a master human resources' list; is that

8  right?

9  A.   Right.

11:15:09AM 10  Q.   So in paragraph four, you say that the master list, the

11  master human resources' list, was included in the spreadsheets

12  provided to plaintiff's counsel; is that right?

13  A.   That's my understanding.

14  Q.   And that understanding also came from Ms. Moore?

11:15:46AM 15  A.   Ms. Moore or Ms. Oguchi, it's tough for me to recall or

16  distinguish between the various conversations.

17  Q.   Is it your opinion then that it was Ms. Martin who allowed

18  that to happen, allowed the production of the master human

19  resources' list?

11:16:19AM 20  A.   Yeah.  I don't know if I characterized it as allowed.  I

21  think it is certainly my opinion, based on what I have been

22  told, that Ms. Martin oversaw the process of doing that class

23  list.

24          Yes, so I think to the extent that there was

11:16:36AM 25  responsibility for what went out, that would have rested with

1    her and the company.

2           I don't think she was aware, which is why I'm

3    hesitant to use the word allow.

4    Q.   Well, do you know did Ms. Martin check the spreadsheets

11:16:55AM 5    before they were sent to plaintiff's counsel?

6    A.   I don't know.

7    Q.   Sorry.  Do you know of anybody at Ignite checked the

8    spreadsheets before they were provided to plaintiff's counsel?

9    A.   With respect to the first class list?

11:17:09AM 10    Q.   Correct.

11    A.   Yeah, I'm not aware.

12    Q.   Do you know if anybody checked the spreadsheets before

13    they were provided to plaintiff's counsel?

14    A.   I don't know.

11:17:22AM 15    Q.   If you would not mind turning to paragraph nine of the

16    declaration, again page seven.

17    A.   Yes.

18    Q.   You say that General Counsel Martin along with the

19    Ogletree attorneys thoroughly investigated the matter; is that

11:18:54AM 20    right?

21    A.   Correct.

22    Q.   What did they do to thoroughly investigate the matter?

23    A.   I don't know the details of that.  So my understanding,

24    again, on the fact that it was looked at and reviewed by

11:19:08AM 25    counsel internally and externally came from Ms. Moore and Ms.

 1  Oguchi.

 2  Q.   Did you ask what the investigation involved?

 3  A.   I did not.

 4  Q.   And you go on to say that it was discovered that the

11:19:35AM 5  master human resources' list had been provided; is that right?

 6  A.   Correct.

 7  Q.   And did that information also come from Ms. Oguchi?

 8  A.   Ms. Oguchi or Ms. Moore.

 9  Q.   And going to paragraph ten, if you can take a look at

11:20:24AM 10  paragraph ten if you would like.

 11  A.   Yes.

 12  Q.   So you say prior to the mailing of the class notice

 13  neither Ignite nor its counsel had any reason to suspect there

 14  were any issues with the notice list; correct?  That's the

11:20:49AM 15  statement.

 16  A.   That's correct.

 17  Q.   In your investigation, did you find that outside counsel

 18  had represented in the matter that it was nearly 30,000 people

 19  who were subject to the notice in the case if it was granted?

11:21:11AM 20            MR. BAUER:  Objection.

 21            THE COURT:  Overruled.

 22            THE WITNESS:  I'm sorry.  Can you restate the

 23  question?

 24  Q.   In the course of your investigation or looking at the

11:21:26AM 25  facts, did it come to your attention that outside counsel had

represented, in a brief filed with the Court, that notice, if it were to be granted, would involve nearly 30,000 people?

A. I don't recall.

Q. If that representation had been made and the class list that was produced involved 120,000 people, would that be an indicator that the class list was incorrect?

11:21:59AM

MR. BAUER: Objection.

MR. FARELLA: Objection.

MR. BAUER: Argumentative.

11:22:13AM

THE COURT: Overruled. You may answer.

THE WITNESS: Yeah, I think if a representation had been made that the class list included 30,000 -- is that what you said?

Q. If a representation by outside counsel had been made indicating that notice, if granted, would go out to nearly 30,000 people and the list included over 120,000 people, would that be an indicator that there was a problem with the class list?

11:22:27AM

A. Yes, in my opinion.

11:22:44AM

Q. In paragraph ten you state that the production of the master human resources' list was completely inadvertent and was due solely to human error on the part of Ignite. Can you tell me what the human error was?

A. I think the human error was including it. I mean, Ignite the company put together the information. And as part of that

11:23:25AM

1   batch of information, they included the list.  So that's --

2   that would be the human error.

3   Q.   So the error was including the master spreadsheet?

4   A.   Correct.

11:23:42AM 5   Q.   You are not aware of any other error that occurred that

6   resulted in the inclusion of the master spreadsheet.

7   A.   No, I mean, obviously, I was not involved with the

8   process.  I just understood that it went out from the company

9   and it included the master class list.

11:24:00AM 10          To your earlier question, rather they knew or

11  should have known that it was in there, they obviously didn't.

12  So that to me is human error.

13  Q.   But your testimony is that you are not aware whether or

14  not anybody checked the spreadsheets before they were sent;

11:24:22AM 15  right?

16  A.   Right.  And that's what I'm saying.  Regardless if they

17  did or didn't, it obviously went out, and it was a mistake.

18  Q.   But since you don't know, it's possible then that somebody

19  did check the spreadsheets and knew that the master

11:24:37AM 20  spreadsheet was there.

21          MR. BAUER:  Objection.  Argumentative.

22          THE COURT:  Sustained.

23          THE WITNESS:  Yeah --

24          THE COURT:  Sustained.  You don't have to answer.

11:24:45AM 25  Q.   Is it fair to say that you don't know one way or another

Ex. B

**EPSTEIN
BECKER
GREEN**

Attorneys at Law

Kenneth J. Kelly
t 212.351.4606
f 212.878.8600
kkelly@ebglaw.com



March 12, 2015

**VIA FACSIMILE: (585) 613-4085**

Honorable Marian W. Payson
United States District Court
Western District of New York
100 State Street
Rochester, NY 14612

      Re:  Christopher Hart, et al. v. Crab Addison, Inc. d/b/a Joe's Crab Shack, et al.
           13-CV-6458-CJS

Dear Judge Payson:

    This firm represents Defendants in the referenced matter. We write to respond to Plaintiffs' March 9, 2015 letter.

    First, Defendants do not object to a telephonic conference with the Court to discuss the issues raised in that letter. Defendants, however, disagree that they have "fail[ed] to produce a complete and accurate class list." To the contrary, we have complied with Judge Siragusa's Order and, at Plaintiffs' request, provided additional information to Plaintiffs.

    Judge Siragusa granted Plaintiffs' motion for conditional collective action certification on January 27, 2015. Consistent with Judge Siragusa's Order, Defendants were required to provide, electronically and in hard copy, a list containing each employee's name, current or last known address, telephone number, location of employment, position held and dates of employment from September 30, 2010. Judge Siragusa's Order did not state that one spreadsheet was to be provided. Defendants were to produce this list by February 11, 2015. Defendants requested and obtained an extension to produce this information to February 18, 2015, during which time the statute of limitations was tolled. [DE 81.]

    On February 18, 2015 we e-mailed the required information to Plaintiffs' counsel, and also sent a hard copy by overnight delivery. The information was contained in approximately 254 separate spreadsheets listing each employee by name, current or last known address, telephone number, location of employment, position held and dates of employment. The information pertained to 136 separate store locations, and was extracted from two separate payroll systems during the relevant time period. The information was produced this way because that is the way it is maintained in the ordinary course of business. The employer "outsources" its

03/12/2015 THU 11:31 FAX                                                                              ☒003/004

Case 6:13-cv-06458-CJS-MWP   Document 577   Filed 12/13/18   Page 23 of 49
Case 6:13-cv-06458-CJS-MWP   Document 84   Filed 03/13/15   Page 2 of 3

Honorable Marian W. Payson
March 12, 2015
Page 2

payroll function and does not maintain its employee records centrally as a single spreadsheet, nor can the data be extracted from the two separate payroll systems as one spreadsheet. Rather, records are maintained separately by store by year and can only be extracted in that format. Thus, for example, if an employee worked at the store in Rochester, New York from 2012 to mid-2014, his or her name would appear three times (once each time for 2012, 2013 and 2014) on the spreadsheet for that store.

After receiving the spreadsheets electronically, on February 23, 2015, counsel for Plaintiffs requested that the information be provided in a single spreadsheet. We then spoke with Plaintiffs' counsel and told them that we disagreed that we were required to produce a single spreadsheet that combined all the spreadsheets that had previously been provided to Plaintiffs' counsel. Nevertheless, we asked our firm's data processing department to create for the purpose of this litigation a single list in electronic form that combined the information on the separate spreadsheets. On March 5, 2015, we e-mailed this single spreadsheet to Plaintiffs' counsel containing the required information, and also sent a disk containing this one spreadsheet by overnight delivery. We also explained to Plaintiffs' counsel that because this single spreadsheet represented the combination of the separate multiple spreadsheets, a number of duplicate entries existed within the combined spreadsheet and if the entries were "de-duped" (i.e., the apparent duplication of names was eliminated), data such as changes in store location, changes in home address, etc., was at risk of being deleted – which risk we were not ready to assume. Of course, because the data was provided in electronic form, there is nothing preventing the Plaintiffs from creating a single spreadsheet on their own or otherwise manipulating the data that was provided to them as they see fit. It is not Defendants' obligation to do this.[1]

Defendants have complied with both Judge Siragusa's Order and with Plaintiffs' request for a single spreadsheet. There are no inconsistencies or errors. They should not be required to provide any more information to Plaintiffs.

Second, Defendants have not refused to discuss their anticipated method of dissemination of the Notice once it is finalized and ready for distribution. To the contrary, Defendants are ready to discuss how they anticipate posting the Notice in the stores, and publishing it once the Notice is finalized. Given the extraordinarily large number of individuals at issue, however, finalization of the Notice is not imminent and Defendants are prepared to discuss timing and methods regarding internal distribution of the Notice with Plaintiffs' counsel once the Notice is closer to finalization. For example, Defendants intend to e-mail the finalized Notice, before it is mailed out, to each of the Store Managers with a direction as to how and where the Notice should be posted in each store. Defendants also publish a weekly newsletter (the *Crab Pot*) and intend to publish the finalized Notice in that newsletter in the five weeks immediately following its mailing. There is a table of contents for this newsletter and prominent reference to the Notice

---

[1] Plaintiffs are correct that once the single spreadsheet is "de-duped," there are approximately 125,000 unique individuals listed. Plaintiffs' assertion that the separate spreadsheets contain only approximately 25,000 unique individuals is both unexplained and impossible since the single spreadsheet is simply a combination of the separate ones.

03/12/2013 THU 11:31 FAX                                                                Ø004/004
Case 6:13-cv-06458-CJS-MWP   Document 577   Filed 12/13/18   Page 24 of 49
Case 6:13-cv-06458-CJS-MWP   Document 84   Filed 03/13/15   Page 3 of 3

Honorable Marian W. Payson
March 12, 2015
Page 3

will be made in that listing. (The Notice is of course not yet final and once Plaintiffs' counsel
has done this, Defendants will have this discussion with them.)

Finally, because Defendants have gone beyond what is required by the Order, let alone
complied with it, Defendants respectfully submit that any further tolling of the statute of
limitations is not appropriate and should be denied.

Respectfully submitted,

Kenneth J. Kelly

cc:     Plaintiffs' counsel (via email)

Counsel for the parties are
directed to confer with
one another in a telephone
conference to attempt to resolve
the disputes in good faith.
Such conference shall occur
by no later than 3/17/15.
In the event that their
disputes cannot be resolved,
this Court shall hold a telephone
conference with counsel
on 3/19/15 at noon.

SO ORDERED
Marian W Payson
USMJ
3/13/15

# Ex. C

Thomas & Solomon LLP
THE EMPLOYMENT ATTORNEYS

March 19, 2015

**VIA FACSIMILE**

Honorable Marian W. Payson
United States District Court
Western District of New York
100 State Street
Rochester, New York 14612

Re:   <u>Hart, et al. v. Crab Addison, Inc., et al.</u>
      Civil Action No. 13-cv-6458

Dear Judge Payson:

We write, pursuant to the Court's order dated March 13, 2015, to notify the Court that, given the defendants' representations that they will produce a single, complete, accurate list without duplicates, we do not believe that a conference is necessary at this time.

As you are aware, we wrote to the Court on March 9, 2015 to request a conference to address the parties' dispute about the production of a class list. The defendants responded to our letter on March 12, 2015, and on March 13, 2015, the Court directed the parties to confer again, and directed that a conference would be held March 19, 2015, at noon, if the parties were unable to resolve the dispute. (Doc. No. 84.)

Following the Court's order, counsel conferred in good faith again on March 17, 2015 and again yesterday on March 18, 2015. In our first conferral, the defendants addressed our concerns about publication and posting of the notice, and we discussed the issues surrounding the class list. In our conferral yesterday, the defendants agreed to produce a single combined spreadsheet with duplicates removed.[1] Defendants have represented that this single, combined, de-duped spreadsheet will be complete and accurate.

In our March 9, 2015 letter, we raised four concerns: (1) the production of the class list, (2) verification that the class list is accurate and complete (3) publication and posting of the class notice, and (4) tolling of the statute of limitations. Based on the defendants'

---

[1]   The defendants also said that, along with this single de-duped spreadsheet, they would also produce the 254 spreadsheets that were culled from the defendants' records, and a combined single spreadsheet without duplicates removed.

693 East Avenue, Rochester, New York 14607  **tel:** 585.272.0540  **fax:** 585.272.0574
jcook@theemploymentattorneys.com • www.theemploymentattorneys.com

Honorable Marian W. Payson
March 19, 2015
Page 2

representations that they will produce a complete and accurate class list without duplicates, and that they will work with us, once the date of mailing of the class notice is determined, to publish the class list in their employee newsletter and post it in a prominent place in all restaurants, we do not believe that a conference is necessary at this time to resolve our concerns regarding the class list and posting and publication of the class notice. If there continue to be issues, we can address those issues with the defendants as they arise, and if they cannot be resolved, can bring those issues to the Court's attention.

Regarding tolling, the defendants do not agree at this time to toll the statute of limitations. We continue to believe that tolling is appropriate, for the reasons stated in Judge Siragusa's order granting tolling, as explained in our March 9, 2015 letter. And we reserve the right to raise that issue to the extent that the defendants raise the statute of limitations as a defense to claims that would otherwise have expired during the period between Judge Siragusa's order granting tolling through February 18, 2015 (Doc. No. 81), and the date that the defendants produce a complete and accurate class list without duplicates.

Based on the foregoing, we do not believe that it is necessary to hold a conference today on these issues. Thank you for your attention to this matter.

Respectfully submitted,

Jared K. Cook

Jared Cook

Cc:    Ken DiGia (via email)
       Ken Kelly (via email)
       Jeff Ruzal (via email)

# Ex. D

IN UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| IGNITE RESTAURANT GROUP, INC., *et al.*[1] | § | Case No. 17-33550 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |

**STIPULATION RESOLVING CLAIMS OF CERTAIN EMPLOYEES WHO HAVE OR
MAY HAVE CLAIMS ARISING UNDER THE FAIR LABOR STANDARDS ACT
AND SIMILAR STATE LAWS**
(Resolves Docket Nos. 662, 890, 891, 892 and 893)

This stipulation (the "Stipulation") is made among (i) the above-captioned debtors and

debtors in possession (collectively, the "Debtors"), (ii) the Official Committee of Unsecured

Creditors (the "Committee"), (iii) Credit Suisse AG, Cayman Islands Branch (f/k/a Credit Suisse

AG), as administrative agent (the "Agent") for the lenders party to that certain Credit and

Security Agreement, dated as of August 13, 2014 (as amended, restated, supplemented, or

otherwise modified from time to time) (the "Lenders"), (iv) Christopher Hart and Lydarius Wiley

(the "Unpaid Wage Representatives"); and (v) the individuals identified on Exhibit "A" attached

here (the "Employee Class Members")[2] who have or could have asserted a claim under the Fair

Labor Standards Act or under similar state laws.  The Debtors, the Committee, the Agent, the

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if any), are:  Ignite Restaurant Group, Inc. (1359); Ignite Restaurant Group – RSC LLC (1791); Joe's Crab Shack, LLC (4189); Joe's Crab Shack – Redondo Beach, Inc. (5107); BHTT Entertainment, LLC (9818); Ignite Restaurants – New Jersey, LLC (5907); Joe's Crab Shack – Maryland, LLC (5297); Joe's Crab Shack – Anne Arundel MD, LLC (9318); Brick House Development, LLC (2944); JCS Monmouth Mall – NJ, LLC (3509); JCS Development LLC (4235).  The Debtors' service address is: 10555 Richmond Avenue, Houston, Texas 77042.
[2]  See Exhibit "A" for a list of the named class representative, all Opt-in "class" members, and other individuals for whom Thomas & Solomon LLP filed Proofs of Claim together with such Administrative Claims filed on or before the Administrative Claims Bar Date that are both Allowed and determined by the Court to be based on similar allegations asserted by the Unpaid Wage Representatives.

Employee Class Members and the Unpaid Wage Representatives are collectively referred to as the "Parties" with each being a "Party").[3]

## RECITALS

A.  WHEREAS, on June 6, 2017 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of title 11 of the U.S. Bankruptcy Code (the "Bankruptcy Code"), thereby commencing the bankruptcy cases that are being jointly administered under the case styled as *In re: Ignite Restaurant Group Inc.*, Case No. 17-33350, which is pending in the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases.

B.  WHEREAS, on June 21, 2017, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code. The Committee consists of the following five (5) members: (i) Mall I Bay Plaza LLC; (ii) Christopher Hart; (iii) PFG Customized Distribution; (iv) The Coca-Cola Company; and (v) Charles P. Young Co.

C.  WHEREAS, on July 24, 2017, the Bankruptcy Court entered the *Final Order (1) Authorizing the Debtors to Use Cash Collateral, (2) Granting Adequate Protection to Lenders, and (3) Modifying the Automatic Stay* [Docket No. 481] (the "Final Cash Collateral Order"), attached to which as Exhibit A was a Settlement Term Sheet (the "Settlement") between the Lenders and the Committee.

---

[3] Capitalized terms not otherwise defined herein shall have the meanings as set forth in the Debtors' Joint Chpater 11 Plan as of September 18, 2017 filed at Docket No. 708.

2

D.    WHEREAS, as more fully described in the Settlement and subject to the terms and conditions thereof, the Lenders and the Committee agreed to, among other things, (A) the establishment of a general unsecured creditor trust (the "GUC Trust"), which would receive the first $800,000 of net sale proceeds, in the aggregate, and an upside sharing percentage, on an incremental basis, to the extent the purchase price for assets exceeds $55,000,000; (B) the treatment of avoidance actions and commercial tort claims; (C) the treatment of secured lender deficiency claims and (D) a maximum recovery amount for holders of allowed general unsecured claims. The Committee and the Lenders also agreed to support the Debtors' chapter 11 plan so long as the plan is consistent with the terms of the Settlement.  At the time of the entry of the Final Cash Collateral Order, the Debtors were not parties to the Settlement and had not approved or consented to the Settlement.

E.    WHEREAS, on August 17, 2017, the Court approved the sale (the "Sale") of substantially all of the Debtors assets to Landry's Inc. *See Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Assets of the Debtors Outside the Ordinary Course of Business, (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (C) Authorizing the Assumption and Sale and Assignment of Certain Executory Contracts and Unexpired Leases, and (D) Granting Related Relief* [Docket No. 615] (the "Sale Order").

F.    WHEREAS, on August 23, 2017, the Debtors filed the *Debtors' Expedited Motion for Entry of an Order Authorizing and Approving Settlement and Granting Related Relief* [Docket No. 644] (the "Settlement Motion"), seeking approval of the Settlement and indicating that the Debtors approved of and consented to the Settlement, and would seek to distribute the proceeds of the Sale through a plan that is consistent with the Settlement.

G.      WHEREAS, Unpaid Wage Representative Christopher Hart is a named plaintiff in an action currently pending against Crab Addison, Inc. (n/k/a Joe's Crab Shack, LLC), Ignite Restaurant Group, Inc., and certain other non-debtor defendants pending in the United States District Court for the Western District of New York as Case No. 13-CV-6458 (the "*Hart* Class Action").

H.      WHEREAS, on September 1, 2017, the Unpaid Wage Representatives, on behalf of the Employee Class Members, filed the Motion for Allowance of Class Proof of General Unsecured and Priority Claims, or, in the Alternative, to Adopt a Suitable Noticing and Claims Procedure [Docket No. 662] (the "Class Claim Motion"), seeking to allow the filing of a class proof of claim on behalf of unpaid employees of the Debtors for general unsecured and priority claims arising under the Fair Labor Standards Act and similar state labor laws (collectively, the "Federal and State Labor Laws"). The Unpaid Wage Representatives have also each filed class proofs of claims against the Debtors (collectively, the "Class POCs"), including, without limitation, Claims No. 961, 959, 998, and 738 on behalf of unpaid employees of the Debtors for general unsecured and priority claims arising under the Federal and State Labor Laws (the "Asserted Class Claims").

I.      WHEREAS, on September 9, 2017, the Court entered an order approving the Settlement [Docket No. 689].

J.      WHEREAS, on September 18, 2017, the Debtors filed the *Debtors' Joint Chapter 11 Plan Dated as of September 18, 2017* [Docket No. 708] (the "Plan") and the *Disclosure Statement With Respect to the Joint Chapter 11 Plan Dated as of September 18, 2017* [Docket No. 709] (the "Disclosure Statement").

4

K.      WHEREAS, on September 19, 2017, the Court entered the *Order Approving: (I)*
*the Disclosure Statement; (II) Procedures for the Solicitation and Tabulation of Votes to Accept*
*or Reject the Plan; and (III) Related Notice and Objection Procedures* [Docket No. 714],
approving the Disclosure Statement and scheduling the hearing to consider confirmation of the
Plan.

L.      WHEREAS, on September 29, 2017, the Debtors filed the *Objection to Motion*
*for Allowance of Class Proof of General Unsecured and Priority Claims or, in the Alternative, to*
*Adopt a Noticing and Claims Procedure* [Docket No. 754] (the "Objection").  On October 13,
2017, the Debtors filed their First through Fourth Omnibus Claim Objections [Docket Nos. 890-
893] (the "Claims Objections").

M.      WHEREAS, the Parties have now agreed to terms to settle the Class Claim
Motion, the Objection and the Claims Objections, on the terms and conditions set for in this
Stipulation as follows:

**STIPULATION**

**NOW, THEREFORE, IN CONSIDERATION OF THE FOREGOING, THE
PARTIES HEREBY AGREE AND STIPULATE AS FOLLOWS:**

1.      Recitals.  The foregoing recitals are incorporated herein by reference as if set
forth in full herein and are made an express part of this Stipulation.

2.      Effective Date.  The term "Effective Date" shall mean the date on which an order
entered by the Bankruptcy Court approving this Stipulation (the "Approval Order") becomes a
final non-appealable order.

3.      Withdrawal of Class Claim Motion and Dismissal of the *Hart* Class Action.  The
Class Claim Motion and the Class POCs shall all be deemed withdrawn with prejudice on the
Effective Date.   Within ten Business Days of the Effective Date, the Unpaid Wage

5

Representatives and the Employee Class Members shall voluntarily dismiss the Debtors and the D&O Releasees (as defined in the Plan) from the *Hart* Class Action with prejudice. The plaintiffs in the *Hart* Class Action, including the Unpaid Wage Representatives and the Employee Class Members, shall limit any recovery against any remaining individual defendants (including Raymond A. Blanchette, III, Kevin Cottingim, and Rodney Morris) in the *Hart* Class Action to any available insurance.

4.      Plan Support; Objection. The Unpaid Wage Representatives and Employee Class Members shall support confirmation of the Plan subject to the terms and conditions of this Stipulation and the Objection shall be deemed withdrawn with prejudice at the hearing on confirmation of the Plan. The Approval Order shall resolve the Claims Objection.

5.      Funding of Distributions for FLSA Claims. The Unpaid Wage Representatives and the Employee Class Members hereby agree that any Employee Class Members who have or could have asserted a claim (whether as an administrative expense, priority unsecured claim, or prepetition claim) against any Debtor arising under any Federal and State Labor Laws based on similar allegations as asserted by the Unpaid Wage Representatives (each an "FLSA Claim" and collectively, the "FLSA Claims") shall share in $700,000 in the aggregate to be distributed, in accordance with the priorities under the Bankruptcy Code (the "FLSA Claims Distribution Amount").[4] The FLSA Claims Distribution Amount shall be funded solely from the Debtors' cash on hand as of the Effective Date that would otherwise have been considered part of the Secured Lender Fund (as defined in the Plan), and paid to a trust established to distribute the

---

[4] For the avoidance of doubt, following the distribution of attorney's fees as provided in paragraph 9 and the service awards of Seven Thousand Five Hundred Dollars ($7,500) to Unpaid Wage Representative Christopher Hart and Two Thousand Five Hundred Dollars ($2,500) to Unpaid Wage Representative Lydarius Wiley as provided in paragraph 10, for services rendered on behalf of the Employee Class Members, any Employee Class Member that has an administrative claim shall be paid first from FLSA Claims Distribution Amount, followed by any Employee Class Member that has a priority claim, with the Employee Class Members that have general unsecured claims paid

6

FLSA Claims Distribution Amount to holders of valid FLSA Claims (the "Ignite FLSA Trust") pursuant to a trust agreement that is reasonably acceptable in form and substance to the Parties. Upon payment of the FLSA Claims Distribution Amount to the Ignite FLSA Trust, the Debtors' obligation under the Settlement with the Committee to fund the GUC Trust from net sale proceeds shall be reduced by $100,000 (i.e., from $800,000 to $700,000 in the aggregate), but no other provision of the Settlement shall be deemed to be amended, modified, or waived by this Stipulation. The Trustee of the Ignite FLSA Trust shall be [_____][5] (the "Ignite FLSA Trustee"). For the avoidance of doubt, no Employee Class Member who has or could have asserted an FLSA Claim shall be entitled to a distribution from the GUC Trust, the Secured Lender Fund, or from any other asset or property of the Debtors on account of such FLSA Claim, with their sole and exclusive recourse and remedy being payment from the FLSA Claims Distribution Amount.

6.     <u>Approval of Stipulation</u>.   Within five (5) business days after execution and delivery of this Stipulation by all Parties, the Debtors shall file a motion in a form reasonably acceptable to the Parties (the "<u>9019 Motion</u>") with the Bankruptcy Court to approve the Stipulation.

7.     <u>Conditions Precedent</u>.   The following are conditions precedent to the effectiveness of this Stipulation:

    a.     The Bankruptcy Court enters the Approval Order and the Effective Date of the Stipulation occurs; and

    b.     The Plan is confirmed by the Bankruptcy Court and the Effective Date (as defined in the Plan) under the Plan occurs.

---

pro rata from the remainder of the FLSA Claims Distribution Amount. All such payments, tax withholdings, and tax reporting shall be made by the Ignite FLSA Trustee.
[5] Such Trustee to be designated by the Unpaid Wage Representatives subject to the reasonable consent of the Liquidating Trustee and the GUC Trustee.

8.   <u>Releases</u>.   Upon the Effective Date, except for the obligations under this Stipulation, the Unpaid Wage Representatives and each of the Employee Class Members and any employee who asserts an FLSA Claim shall, without further action, irrevocably and unconditionally, fully, finally and forever waive, release, acquit and discharge each of the Debtors (and their estates), the Committee, the Agent, each of the Lenders, the GUC Trust and the GUC Trustee (as defined in the Plan) and their respective Related Parties (collectively, the "<u>Released Parties</u>") from any claim (as that term is defined in section 101(5) of the Bankruptcy Code), obligation, suit, judgment, damages, demand, debt, right (including without limitation, rights of indemnity, contribution, payment, and reimbursement), liability, or cause of action, whether known or unknown, direct or indirect, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity, or otherwise, from the beginning of time through the Effective Date.  For purposes of this Stipulation, the term "Related Parties" means, with respect to any person or entity, such person's or entity's predecessors, successors, assigns and present and former affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including ex officio members), managers, managed accounts or funds, management companies, fund advisors, advisory board members, partners, agents, financial advisors, attorneys (excluding Brian Gershengorn, Melissa Osipoff, and Seth Kaufman of Fisher & Phillips LLP and previously associated with Ogletree, Deakins, Nash, Smoak & Stewart, P.C; Fisher & Phillips LLP; and Ogletree, Deakins, Nash, Smoak & Stewart, P.C.), accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at any time through the date hereof, provided

8

that such persons or entities were retained by, employed by or affiliated with a Debtor on or after June 6, 2017.

9.     Attorneys' Fees, Costs and Expenses. From the FLSA Claims Distribution Amount, the Ignite FLSA Trustee shall pay Thomas & Solomon LLP, counsel for Unpaid Wage Representatives, attorneys' fees and costs and expenses in the amount to not exceed Two Hundred and Eighty Thousand Dollars and No Cents ($280,000).   Thomas & Solomon LLP shall receive a Form 1099 for the payment.    Each of the Parties shall be responsible for its respective costs and expenses (including, without limitation, attorneys' fees) incurred by it in negotiating, drafting, and executing this Stipulation and shall not be responsible for the payment of any such fees or costs incurred by any other party hereto.

10.     Service Awards.  From the FLSA Claims Distribution Amount, the Ignite FLSA Trustee shall pay Seven Thousand Five Hundred Dollars ($7,500) to Unpaid Wage Representative Christopher Hart, and Two Thousand Five Hundred Dollars ($2,500) for Unpaid Wage Representative Lydarius Wiley, for services rendered on behalf of the Employee Class Members.   These awards shall be in addition to any additional amount the Unpaid Wage Representatives may be entitled to recover under this Stipulation from the FLSA Claims Distribution Amount as an Employee Class Member.

11.     Cooperation. Debtors, and the Liquidating Trustee as their successor in interest, shall cooperate in providing information to the Ignite FLSA Trustee relevant to the subject matter of this Stipulation.  The Debtors shall disclose each location of the Debtors' books and records and shall provide copies of any and all insurance policies (if any) that cover or potentially cover the acts or omissions alleged in the *Hart* Class Action.  Further, the Parties also

9

agree that the stay shall be lifted in the *Hart* Class Action for the limited purpose of the resolution of the sanctions motion.

12.  Successors and Assigns.  This Stipulation shall be binding upon, and shall inure to the benefit of each of the Debtors (and their estates), the Committee, the Agent, the Lenders, and the Unpaid Wage Representatives, each of the Employee Class Members, and their respective agents, employees, representatives, assigns, successors in interest, and attorneys, and shall be binding and effective despite any conversion of any of these bankruptcy cases to a case under any other chapter of the Bankruptcy Code.  Each of the Released Parties who is not named as a Party hereto is an intended third-party beneficiary with respect to all provisions of this Stipulation that apply to the Released Parties, as applicable, with full rights of enforcement as if a Party hereto.  Except as expressly set forth in this Stipulation, no other person or entity not a Party hereto shall be deemed a third-party beneficiary of any provision of this Stipulation or shall otherwise be entitled to enforce any provision hereof

13.  No Assignment.  Each of the Parties represents and warrants that it has not assigned or transferred any released matter or any right to consideration provided pursuant to this Stipulation.

14.  No Admission of Liability.  The execution of this Stipulation is not, and may not be construed or portrayed as, an admission of liability by any Party or as an admission of the value or lack thereof of any claim or right held by any Party.

15.  Joint Drafting.  This Stipulation shall be deemed to have been jointly drafted by the Parties, and in construing or interpreting this Stipulation, no provision shall be construed or interpreted for or against any Party because such provision or any other provision of the Stipulation was purportedly prepared or requested by such Party.

16.     Counterparts.  This Stipulation may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Stipulation.  Delivery of a signature page to this Stipulation by facsimile or other electronic means shall be effective as delivery of the original signature page to this Stipulation.

17.     Entire Agreement.  This Stipulation constitutes the entire agreement between the Parties with respect to the transactions set forth herein and supersede all prior agreements, covenants, arrangements, communications, representations or warranties made, whether oral or written, by the Parties hereto or by any officer, employee or representative of any Party.

18.     Amendments; Waivers.  This Stipulation may not be amended, modified or waived in any manner except by a writing signed by each of the Parties or their respective counsel and approved by order of the Bankruptcy Court.  No waiver of any of the provisions of this Stipulation shall be deemed or constitute a waiver of any other provision of this Stipulation, whether or not similar, nor shall any waiver be deemed a continuing waiver.  The failure of any Party hereto to exercise any right, power, or remedy provided under this Stipulation or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the Parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such compliance.

19.     Applicable Law.  This Stipulation shall be governed by and construed in accordance with the laws of the State of Texas without regard to any law concerning the conflicts of laws.

20.   <u>Party Representations</u>. Each Party and signatory to this Stipulation represents and warrants, with respect to itself only, to each other Party that such Party or signatory has full power, authority, and legal right and has obtained all approvals and consents necessary to execute, deliver, and perform all actions required under this Stipulation, where applicable, has obtained all authority, approvals, and consents necessary to act on behalf of such Party to execute, deliver, and perform all actions required under this Stipulation.

21.   <u>Continuing Bankruptcy Court Jurisdiction</u>.   The Bankruptcy Court shall retain exclusive jurisdiction to hear and finally determine all disputes arising from or related to this Stipulation, including the performance of the Parties' obligations hereunder. The Parties consent to the Bankruptcy Court hearing and finally determining all such disputes.   Further, the Parties each agree to waive trial by jury in an action, proceeding, or counterclaim brought by or on behalf of the Parties hereto with respect to any such dispute.


[Remainder of page left blank]


12

WHEREFORE, the Parties have agreed to this Stipulation as of November _____, 2017.

KING & SPALDING LLP

COLE SCHOTZ P.C.

/s/

Edward L. Ripley (TX Bar No. 16935950)
1100 Louisiana Street, Suite 4000
Houston, Texas 77002
Telephone: 713-751-3200
Facsimile: 713-751-3290
Email: ERipley@kslaw.com

/s/

Michael D. Warner (TX Bar No. 00792304)
301 Commerce Street, Suite 1700
Fort Worth, TX 76102
Telephone: (817) 810-5265
Facsimile: (817) 977-1611
Email: mwarner@coleschotz.com

-and-

Sarah R. Borders (admitted pro hac vice)
Jeffrey R. Dutson (admitted pro hac vice)
Elizabeth T. Dechant (admitted pro hac vice)
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Telephone: 404-572-4600
Email: SBorders@kslaw.com
       JDutson@kslaw.com
       EDechant@kslaw.com

-and-

Bradford J. Sandler (admitted pro hac vice)
Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100
Email: bsandler@pszjlaw.com

*Counsel for the Debtors and Debtors-in
Possession*

-and-

Jeffrey N. Pomerantz (admitted pro hac vice)
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Email: jpomerantz@pszjlaw.com

*Counsel to the Official Committee of Unsecured
Creditors*

13

PORTER HEDGES LLP

/s/
John F. Higgins
Eric M. English
1000 Main Street, 36th Floor
Houston, Texas 77002
(713) 226-6000
(713) 226-6248 (fax)
Email: jhiggins@porterhedges.com
      eenglish@porterhedges.com

-and-

Keith A. Simon
David A. Hammerman
Hugh K. Murtagh
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: david.hammerman@lw.com
      keith.simon@lw.com
      hugh.murtaugh@lw.com

*Counsel to Credit Suisse AG,*
*Cayman Islands Branch, in its capacity as Agent to the Lenders*

THOMAS & SOLOMON LLP

/s/
Jessica L. Lukasiewicz, Esq.
Attorneys for Plaintiffs
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
Email: jlukasiewicz@theemploymentattorneys.com

-and-

JACKSON WALKER, LLP
Patricia B. Tomasco, Esq.
State Bar No. 01797600
S.D.TX Bar No. 10542
1401 McKinney, Suite 1900
Houston, Texas 77010
Email: ptomasco@jw.com

*Counsel to the Unpaid Wage Representatives and the*
*Employee Class Members*

14

<u>Exhibit A</u>

**[TO INCLUDE NAMES REPS, ALL OPT-IN CLASS MEMBERS, AND ANY OTHER INDIVIDUALS FOR WHOM THOMAS & SOLOMON LLP FILED PROOFS OF CLAIM]**

**EXHIBIT B**

**PROPOSED ORDER**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | **Chapter 11** |
|  | ) |  |
| **IGNITE RESTAURANT GROUP, INC.,** *et al.*,[1] | ) | **Case No. 17-33550** |
|  | ) |  |
|  | ) | **(Jointly Administered)** |
| **Debtors.** | ) |  |
|  | ) |  |

## ORDER AUTHORIZING AND APPROVING STIPULATION
### [Relates to Docket No. _____]

This Matter is before the Court on the *Debtors' Motion for Entry of an Order Authorizing and Approving Stipulation* (the "Motion") of the above captioned debtors and debtors in possession (collectively, the "Debtors"). All capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

The Court has considered the Motion and the matters reflected in the record of the hearing held on the Motion on February 8, 2018. It appears that the Court has jurisdiction over this proceeding; that this is a core proceeding; that proper and adequate notice of the Motion has been given; that no further notice is necessary; that the relief sought in the Motion is in the best interests of the Debtors, their estates, and their creditors; and that good and sufficient cause exists for such relief.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if any), are: Ignite Restaurant Group, Inc. (1359); Ignite Restaurant Group – RSC LLC (1791); Joe's Crab Shack, LLC (4189); Joe's Crab Shack – Redondo Beach, Inc. (5107); BHTT Entertainment, LLC (9818); Ignite Restaurants – New Jersey, LLC (5907); Joe's Crab Shack – Maryland, LLC (5297); Joe's Crab Shack – Anne Arundel MD, LLC (9318); Brick House Development, LLC (2944); JCS Monmouth Mall – NJ, LLC (3509); JCS Development LLC (4235). The Debtors' service address is: 10555 Richmond Avenue, Houston, Texas 77042.

Accordingly, IT IS HEREBY FOUND AND ORDERED:

1.  The Motion is GRANTED.

2.  The Stipulation is approved and incorporated herein.

3.  The settlement reflected in the Stipulation is reasonable, fair and equitable and in the best interests of the Debtors and their estates.

4.  The Debtors' approval of and consent to the Stipulation is hereby authorized, and the terms and conditions of the Stipulation are binding on the Debtors and their estates.

5.  The Stipulation is hereby approved and the Debtors are authorized to take all actions reasonably necessary or appropriate to effectuate the Stipulation and the transactions embodied therein.

6.  The Court retains jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this order.

7.  Counsel for the Debtors is directed to serve a copy of this Order on the Master Service List within three (3) days of the entry of this Order and to file a certificate of service with the Clerk of Court.

Dated: _____, 2018
      Houston, Texas

                                      _____
                                        THE HONORABLE DAVID R. JONES
                                        UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT C

**Notice of Hearing**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

In re:                             )       Chapter 11

                                 )

IGNITE RESTAURANT GROUP, INC., *et al.*,[4] )    Case No. 17-33550

                                 )

        Debtors.                 )       (Jointly Administered)

_____ )

## NOTICE OF HEARING ON MOTION TO APPROVE STIPULATION

PLEASE TAKE NOTICE that on December 21, 2017, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors' Motion for Entry of an Order Authorizing and Approving Stipulation* [Docket No. __] (the "Motion") (capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion). By the Motion, the Debtors seek court approval of a settlement (the "Settlement") reached by and among the Debtors, the Committee, the Agent, the Unpaid Wage Representatives Christopher Hart and Lydarius Wiley, and the Employee Class Members.

PLEASE TAKE FURTHER NOTICE that the Settlement provides for the establishment of a trust for the payment of claims that have or could have been asserted (whether as an administrative expense, priority unsecured claim, or prepetition claim) against any Debtor arising under the Fair Labor Standards Act and similar state labor laws based on similar allegations as asserted by the Unpaid Wage Representatives (collectively, the "FLSA Claims").

PLEASE TAKE FURTHER NOTICE that the Settlement provides for the following release: **Upon the Effective Date, except for the obligations under the Stipulation, the Unpaid Wage Representatives and each of the Employee Class Members and any employee who asserts an FLSA Claim shall, without further action, irrevocably and unconditionally, fully, finally and forever waive, release, acquit and discharge each of the Debtors (and their estates), the Committee, the Agent, each of the Lenders, the GUC Trust and the GUC Trustee (as defined in the Plan) and their respective Related Parties from any claim (as that term is defined in section 101(5) of the Bankruptcy Code), obligation, suit, judgment, damages, demand, debt, right (including without limitation, rights of indemnity, contribution, payment, and reimbursement), liability, or cause of action, whether known or unknown, direct or indirect, liquidated or unliquidated, fixed or contingent, foreseen or**

---

[4] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if any), are: Ignite Restaurant Group, Inc. (1359); Ignite Restaurant Group – RSC LLC (1791); Joe's Crab Shack, LLC (4189); Joe's Crab Shack – Redondo Beach, Inc. (5107); BHTT Entertainment, LLC (9818); Ignite Restaurants – New Jersey, LLC (5907); Joe's Crab Shack – Maryland, LLC (5297); Joe's Crab Shack – Anne Arundel MD, LLC (9318); Brick House Development, LLC (2944); JCS Monmouth Mall – NJ, LLC (3509); JCS Development, LLC (4235). The Debtors' service address is: 10555 Richmond Avenue, Houston, Texas 77042.

unforeseen, matured or unmatured, in law, equity, or otherwise, from the beginning of time through the Effective Date. For purposes of the Stipulation, the term "Related Parties" means, with respect to any person or entity, such person's or entity's predecessors, successors, assigns and present and former affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including ex officio members), managers, managed accounts or funds, management companies, fund advisors, advisory board members, partners, agents, financial advisors, attorneys (excluding Brian Gershengorn, Melissa Osipoff, and Seth Kaufman of Fisher & Phillips LLP and previously associated with Ogletree, Deakins, Nash, Smoak & Stewart, P.C; Fisher & Phillips LLP; and Ogletree, Deakins, Nash, Smoak & Stewart, P.C.), accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity at any time through the date hereof, provided that such persons or entities were retained by, employed by or affiliated with a Debtor on or after June 6, 2017.

    **PLEASE TAKE FURTHER NOTICE** that the Motion seeks an order that could adversely affect you, and a hearing to consider approval of the Motion will commence on **FEBRUARY 8, 2018 AT 2:00 P.M.**, prevailing Central Time (the "Hearing"), before the Honorable David R. Jones, United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Avenue, Courtroom 400, Houston, Texas 77002 (the "Court"). The Hearing may be continued from time to time by announcing such continuance in open court or otherwise, without further notice to parties in interest. If you object to the relief set forth in the Motion, you must file a response and send a copy to the Debtors. **You must file and serve your response within 21 days of the date this was served on you.** Your response must state why the Motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the Motion and have not reached an agreement, you must attend the Hearing. Unless the parties agree otherwise, the court may consider evidence at the Hearing and may decide the Motion at the Hearing.

    **PLEASE TAKE FURTHER NOTICE** that the Motion is available free of charge by visiting www.gardencitygroup.com/cases/IRG. You may also obtain copies of any pleadings filed in these chapter 11 cases by visiting the Court's website at https://ecf.txsb.uscourts.gov in accordance with the procedures and fees set forth therein.

Date: December 21, 2017
Houston, Texas

KING & SPALDING LLP
Edward L. Ripley
Texas Bar No. 16935950
1100 Louisiana Street, Suite 4000
Houston, Texas 77002
Telephone: 713-751-3200
Facsimile: 713-751-3290
Email: ERipley@kslaw.com

COUNSEL FOR THE
DEBTORS IN POSSESSION