UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHRISTOPHER HART, et al.,

                          Plaintiffs,

        v.

RAYMOND A. BLANCHETTE, III,
et al.,

                        Defendants.
_____

<u>REPORT & RECOMMENDATION</u>

13-CV-6458CJS

       Attorneys who practice before this Court assume responsibilities to their client, to the opposing parties and their counsel, and to the Court.  The sources of these duties are varied and include codes of professional conduct, statutes, the Federal Rules of Civil Procedure, and the local rules of this Court.  The motion addressed herein, which seeks the imposition of sanctions on attorneys who represented parties no longer before the Court, implicates the duties of attorneys concerning court orders directed to their clients and representations to the Court.

       Disputes relating to the discharge of those duties have become all too commonplace in federal litigation.  No matter how tempting it may be to dismiss such disputes as unfortunate examples of that trend, particularly where, as here, the disputes that brought the parties before the Court in the first instance have been resolved, courts must assess such disputes with sufficient care to identify those that raise genuine issues deserving of the court's thoughtful attention.  This is one such matter.

## INTRODUCTION

Five years ago, plaintiffs Christopher Hart, Maria Sargent, Taylor Ramsey, Andrea Randlett, and Shelly Carrera commenced this lawsuit as a collective action against Crab Addison, Inc., d/b/a Joe's Crab Shack, and Ignite Restaurant Group ("Ignite") (collectively, the "corporate defendants"), and Raymond A. Blanchette, III, Kevin Cottingim, and Rodney Morris (collectively, the "individual defendants"), alleging violations of the Fair Labor Standards Act (the "FLSA") and various state laws.  (Docket # 1).  The merits of the claims against the defendants have since been resolved, largely through the resolution of claims in *In re Ignite Group, et al.*, No. 17-33550 (Bankr. S.D. Tx.), bankruptcy proceedings involving the corporate defendants (the "bankruptcy proceedings").  (Docket # 549).  On May 22, 2018, the claims against the corporate defendants were dismissed with prejudice, and, approximately one month later, plaintiffs filed a Stipulation dismissing the claims against the individual defendants. (Docket ## 549, 556).

Despite the resolution of the claims against the defendants, still pending before the Court is plaintiffs' motion for an order imposing sanctions on the attorneys who represented the defendants, namely, Epstein Becker & Green, P.C. (the "Epstein Firm"),[1] Fisher & Phillips, LLP ("Fisher Phillips"), and individual attorneys Brian J. Gershengorn ("Gershengorn"), Esq., Melissa J. Osipoff ("Osipoff"), Esq., and Seth D. Kaufman ("Kaufman"), Esq. (collectively, the "Fisher Parties").  (Docket ## 455, 544).  The Stipulation signed by United States District Judge Charles J. Siragusa dismissing the individual defendants expressly provides that "the Court retains jurisdiction over the matter, including any interested party, concerning the pending motion for sanctions (Dkt. 544, as modified by Dkt. 553) and any additional motion(s) related to

---

[1] During oral argument on June 6, 2018, plaintiffs' counsel confirmed that they seek an order sanctioning the Epstein Firm, but not any individual Epstein attorneys.  (Docket # 557 at 17).

or arising therefrom, and may award any relief available in its discretion, including attorneys'

fees and costs."  (Docket # 558).

## PROCEDURAL HISTORY OF
## PLAINTIFFS' SANCTIONS MOTION

On March 22, 2016, plaintiffs filed a motion to compel seeking, among other

things, an order setting a hearing date to determine whether sanctions should be imposed against

defendants relating to their failure to provide an accurate class list in accordance with a prior

court order.  (Docket # 326).  On June 10, 2016, this Court scheduled a sanctions hearing for

August 11, 2016.  (Docket # 357).  Defendants sought reconsideration of that Order (Docket

# 363), and the Court granted reconsideration in part (Docket # 432).  Specifically, the Court

directed plaintiffs to provide additional specificity regarding the alleged conduct as to which they

sought sanctions.[2]  (Docket # 432).

Plaintiffs provided the additional specificity directed by the Court on March 10,

2017, and filed their written submission in support of their requested sanctions on March 31,

2017.  (Docket ## 439, 455).  In response, on April 10, 2017, defendants submitted a letter to the

Court requesting a conference.  (Docket # 546-1 at Exhibit ("Ex.") F).  On June 8, 2017, Ignite

filed a suggestion of bankruptcy, which delayed resolution of the pending motion for sanctions.

(Docket # 485).  On December 27, 2017, the Court directed defendants to file their response to

the sanctions motion on or before January 12, 2018.  (Docket # 506).  The Epstein Firm filed its

response on January 12, 2018, and the Fisher Parties, after receiving an extension, filed their

---

[2]  By letter dated September 12, 2016, plaintiffs sought permission to proceed by written submission rather
than through testimonial evidence.  The Court confirmed this intention during proceedings before the Court on
September 13, 2016.  (Docket # 401-2 at 52-53).  Plaintiffs also requested that they be permitted to defer submission
of their time records until the merits of their request for sanctions had been resolved.  (*Id.* at 54).  The Court granted
that request.  (Docket # 432 at 13).

response on March 7, 2018.  (Docket ## 511, 538).  On March 19, 2018, the Court granted

plaintiffs' request to withdraw its motion for sanctions without prejudice to renewal in order to

permit the parties to mediate the issues raised by the motion.  (Docket # 541).  Those efforts

were unsuccessful.

On April 16, 2018, plaintiffs renewed their motion for sanctions against counsel

for defendants.[3]  (Docket # 544).  The Fisher Parties opposed the motion on May 15, 2018, and

plaintiffs replied on May 29, 2018.  (Docket ## 546, 551).  The Court held oral argument on the

pending motion on June 6, 2018.  During the proceedings, the Fisher Parties sought to reserve

the right to supplement the record.  (Docket # 557 at 87).  The Court denied the oral request to

supplement the record and indicated that counsel should make any request to supplement in

writing.  (*Id.*).

Approximately six weeks later, on July 26, 2018, without first seeking permission

of the Court, the Fisher Parties filed a declaration signed by Osipoff (the "Osipoff Declaration").

(Docket # 560).  Plaintiffs moved to strike the Osipoff Declaration (Docket # 561), which the

Court denied on the condition that Osipoff and Steve Metzger ("Metzger"), the former General

Counsel of Ignite, who had previously submitted a declaration in opposition to the motion for

sanctions (the "Metzger Declaration") (Docket # 546-1 at Ex. A), appear and testify at an

evidentiary hearing (Docket # 567).

The evidentiary hearing was held on October 25, 2018, after which the parties

filed post-hearing submissions.  (Docket ## 573, 575, 576, 577, 578).  Based upon the testimony

provided during the hearing, the Court issued an Order to Show Cause to the Fisher Parties on

---

[3]  As a result of Ignite's bankruptcy and the subsequent dismissal from the action of the corporate
defendants (Docket # 549), and a subsequent Stipulation and Order withdrawing plaintiffs' motion for sanctions
against the individual defendants (Docket # 553), the only parties against whom plaintiffs currently seek sanctions
are counsel for defendants.

November 6, 2018, to which they responded.  (Docket ## 574, 579).  For the reasons stated

below, this Court recommends that the District Court grant in part and deny in part plaintiffs'

renewed motion for sanctions.[4]


## FACTUAL BACKGROUND

The pending sanctions motion arises from Judge Siragusa's January 27, 2015

Order conditionally certifying this case as a collective action under the FLSA (the "Notice

Order").  (Docket # 80).  The Notice Order required defendants to produce by February 18, 2015,

a list of members of the conditionally-certified class (the "class"), namely, current and former

employees of Joe's Crab Shack who were paid a subminimum wage, and approved with some

modifications the proposed notice to be sent by plaintiffs' counsel to class members.[5]  (Docket

## 80; 455-1 at 5; 511 at 1).  The inability of defendants over the next eighteen months to

produce an accurate class list in compliance with the Notice Order precipitated extensive and

protracted motion practice and multiple court orders, and lies at the heart of this sanctions

motion.


## I.   The March 2015 List

On February 18, 2015, the Epstein Firm provided a list of putative class members

to plaintiffs' counsel.  (Docket ## 254 at ¶ 4; 254-1; 254-4; 254-5; 511 at 1; 577 at 2).  The list

---

[4]  The issue whether a magistrate judge has authority to impose sanctions under Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, or its inherent powers remains unresolved in the Second Circuit.  *See*, *e.g.*, *Kiobel v. Millson*, 592 F.3d 78, 79 (2d Cir. 2010); *Joint Stock Co. Channel One Russia Worldwide v. Infomir, LLC*, 2017 WL 3671036, *17 (S.D.N.Y. 2017); *Gelicity UK Ltd. v. Jell-E-Bath, Inc.*, 2014 WL 1330938, *1 n.1 (E.D.N.Y. 2014)  Given that open question, in an abundance of caution, I address the pending sanctions motion by report and recommendation.

[5]  The Order originally provided a deadline of February 11, 2015, for production of the class list; that deadline was subsequently extended by the Court until February 18, 2015.  (Docket # 81).

comprised approximately 250 separate spreadsheets and contained many duplicate entries.  (*Id.*).

At plaintiffs' request, on March 5, 2015, the Epstein Firm produced one consolidated spreadsheet

reflecting approximately 200,000 names.  (Docket ## 254 at ¶¶ 5-6; 254-3; 254-5 at 3; 511 at 2).

Even accounting for the inclusion of duplicate names, the list contained four to five times as

many putative class members as plaintiffs had expected (based upon prior estimates by the

Epstein Firm that the class would number approximately 30,000).  (Docket ## 35 at 29; 254 at

¶¶ 7-8).

      Recognizing that the list was much larger than anticipated, counsel for plaintiffs

wrote to the Court raising concerns regarding the accuracy of the list and requesting a

conference.  (Docket # 254-4).  The Epstein Firm responded, acknowledging that the list

contained approximately 125,000 unique individuals, but asserting that it did not contain

"inconsistencies or errors" and maintaining that defendants should not be required to provide

further information regarding the list.  (Docket # 254-5).  The Court directed the parties to confer

about the issues.  (Docket # 84).  The parties did so, leading plaintiffs' counsel to withdraw their

request for a court conference, and the Epstein attorneys promised to produce a single,

de-duplicated list and work to address any issues relating to that list.  (Docket ## 254 at

¶¶ 14-15; 254-6).  On March 18, 2015, the Epstein Firm produced a single, de-duplicated list

containing approximately 125,000 names (the "March 2015 list").  (Docket ## 84; 254 at

¶¶ 14-17; 254-6; 254-7; 577).

      Approximately two weeks later, on March 30, 2015, Osipoff, who was then

associated with Ogletree Deakins, Nash, Smoak, and Stewart, P.C. (the "Ogletree Firm"),

entered a notice of appearance on behalf of defendants, and Gershengorn, who was a partner in

the Ogletree Firm, entered his notice of appearance on April 7, 2015.[6]   (Docket ## 85, 87).   The

Epstein Firm ceased representation of defendants after Osipoff and Gershengorn entered their

notices of appearance.   (Docket ## 511 at 2; 546 at 4 n.4).

On June 1, 2015, plaintiffs issued notices to the individuals on the March 2015

list.   (Docket # 254 at ¶ 21).   Shortly thereafter, counsel for plaintiffs were contacted by

individuals who had received notice but were not putative class members.   (Docket ## 232-2 at

¶¶ 12-15; 254 at ¶¶ 22-23; 455-1 at 7).   Plaintiffs' counsel contacted the Fisher Parties and

informed them of their concerns regarding the accuracy of the March 2015 list.   (*Id.*).   After

investigating the source of the problem, counsel for defendants informed plaintiffs' counsel and

the Court that the March 2015 list contained "tens of thousands of individuals" who should not

have been included on the list.   (Docket ## 232-2 at ¶ 17; 254 at ¶¶ 24-27; 455-1 at 7-8; 546 at

4).   The inaccuracy resulted from the inadvertent inclusion of information from a

"company-wide master human resources file" into two of the approximately 250 individual

spreadsheets produced in February 2015, an error that carried over into the consolidated

"de-duped" March 18, 2015 class list.   (Docket ## 232-2 at ¶¶ 9-10, 16; 546 at 4; 546-1 at Ex. A

at ¶¶ 3-6).

Many court conferences with counsel were held and multiple motions were filed

arising from and relating to the inaccuracy of the March 2015 list and the notice that issued to

individuals on that list.   (*See* Docket ## 149, 178, 207, 217, 220, 232, 250, 255, 256, 278, 291,

300).   Among the motions filed by plaintiffs were applications requesting the issuance of

corrective notices, an order requiring defendants to bear the costs of the corrective notices, and

---

[6]   On December 12, 2015, Kaufman, a more junior associate attorney at the Ogletree Firm, entered his notice of appearance.   (Docket # 297).   In July 2016, Gershengorn, Osipoff, and Kaufman moved to Fisher Phillips and continued to represent defendants in this case.   (Docket ## 374, 375, 381).   During oral argument on June 6, 2018, plaintiffs confirmed that they do not seek sanctions against the Ogletree Firm.

an order requiring defendants to reimburse plaintiffs' counsel for the costs of mailing the original

notices to individuals who should not have been included on the March 2015 list.[7]  (Docket

# 256).

On May 17, 2016, by Stipulation and Order (the "May 2016 Stipulation") (Docket

# 346), the parties resolved the majority of the issues raised by the then-outstanding motions,

including plaintiffs' motion to amend the complaint or to sever (Docket # 207), defendants'

motion to compel and for a protective order (Docket # 232), plaintiffs' motion to strike (Docket

# 255), and plaintiffs' motion for corrective notice and costs (Docket # 256).  The May 2016

Stipulation required defendants to pay for the issuance of corrective notices and to reimburse

plaintiffs' counsel $67,460.50 for costs they incurred in mailing notice to individuals on the

March 2015 list who were not part of the conditionally-certified class.  (Docket # 346 at ¶ 19).


## II.     The July 2015 List

While the parties continued to litigate over the inaccuracy of the March 2015 list,

the Fisher Parties informed plaintiffs' counsel that defendants were in the process of preparing a

revised class list, which would only include members of the putative class.  (Docket # 232-2 at

¶ 18).  According to plaintiffs, it took defendants more than a month after the notices were issued

during which the Fisher Parties repeatedly assured plaintiffs' counsel that the time was necessary

to ensure that errors were not repeated and that the new list would be "100% accurate."[8]  (Docket

## 343 at ¶¶ 4-6; 439 at ¶ 5).

---

[7]  Plaintiffs made clear in their papers that they were not seeking sanctions under Rule 11 of the Federal
Rules of Civil Procedure.  (Docket # 256-1 at 8 n.1).

[8]  The Fisher Parties have described plaintiffs' counsel's characterizations of their conversations as
"self-serving" (Docket # 546 at 6 n.6), but have not provided any facts to dispute the characterizations.

On July 17, 2015, the Fisher Parties provided plaintiffs' counsel with the corrected list containing approximately 32,962 putative class members (the "July 2015 list"). (Docket ## 232-2 at ¶ 19; 254 at ¶ 29; 455-1 at 8; 546-1 at Ex. A at ¶ 12).  The Fisher Parties represented that the July 2015 list contained only putative class members of Joe's Crab Shack tipped employees who were paid a subminimum wage, and they repeatedly referred to the list as the "corrected" class list.  (Docket ## 326-3; 326-4; 232-1 at 12; 232-2 at ¶ 19; 245 at 10; 273 at 4).  The Fisher Parties also represented that the July 2015 list added approximately 175 individuals who were putative class members, but had not been included in the March 2015 list and would require notice.  (Docket # 326-4).

According to plaintiffs' counsel, they spent "a significant amount of time" during the next eight months reviewing various versions of the lists to determine who was properly a member of the class and who was not.  (Docket # 455-2 at ¶ 3).  In mid-March 2016, plaintiffs' counsel informed the Fisher Parties that they believed the July 2015 list excluded some employees who were proper class members.  (Docket ## 326-6; 455-1 at 10; 546-1 at Ex. A at ¶ 14).  Specifically, plaintiffs identified fifteen individuals whom they maintained were wrongly excluded from the July 2015 list.  (Docket ## 326-7, 326-9).  Plaintiffs thereafter filed a motion to compel seeking an order requiring defendants to provide the reasons that the identified individuals had not been included on the July 2015 list, identifying any other individuals improperly excluded from the July 2015 list, and setting a hearing date to determine appropriate sanctions.  (Docket # 326).

Defendants began to investigate the fifteen individuals identified by plaintiffs. (Docket # 340-1 at ¶¶ 5-6).  They determined that two of the individuals had been improperly

excluded from the July 2015 list.[9]  (Docket ## 340-1 at ¶¶ 6-7 and Ex. A; 546-1 at Ex. A at ¶ 14).

Defendants also represented that they were investigating whether any other putative class

members had been improperly excluded from the list and requested sixty days to complete that

process.  (Docket # 340-1 at ¶ 8).

This Court held oral argument on plaintiffs' motion to compel on May 17, 2016.

(Docket # 349).  At the time of the argument before the Court, the Fisher Parties were still unable

to explain the cause or the scope of any inaccuracies in the July 2015 list.  (Docket # 349 at

10-12).  When the Court asked about the scope of the suspected inaccuracies, Gershengorn

responded that the investigation was still ongoing, but represented his belief that "there are a few

additional individuals who should have been on the [July 2015 list]."  (*Id.* at 11-12).  Upon

follow-up questioning from the Court, Gershengorn conceded that the July 2015 list possibly

contained over one hundred inaccuracies.  (*Id.* at 12-13).  The Fisher Parties were also unable to

identify the reasons for the inaccuracies beyond the fact that "[p]art of the problem is that the

data is from two separate payroll providers" (*id.* at 12) or to explain to the Court what had been

done during the previous two months to investigate the problem or to correct it (*id.* at 10-15).

The absence of any explanation for the inaccuracies or proposed plan to identify and correct the

errors prompted the Court to order a hearing in order to obtain testimony from a corporate

representative on the following subjects:

> [H]ow was the list put together[?]  How many mistakes are there
> on the list?  What caused the mistakes?  How have those mistakes
> been rectified?  Is the list now accurate?  What is the degree of
> confidence . . . in that accuracy?

(*Id.* at 15-17).  The Court scheduled the hearing for June 6, 2016.  (*Id.* at 18-19).

---

[9]  A third individual had not been included on the July 2015 list because that person did not work in a tipped position until after the July 2015 list was created.  (Docket # 340-1 at Ex. A).

III.    **The June 6, 2016 Hearing**

Approximately one week later, on May 25, 2016,[10] the Fisher Parties wrote to the

Court requesting a telephone conference to discuss the June 6, 2016 hearing.  (Docket # 455-4).

Specifically, the Fisher Parties represented that they had confirmed that the only person "with

any detailed knowledge" regarding the creation of the July 2015 list was no longer employed by

the defendants.  (*Id.*).  The Fisher Parties maintain that they were unaware prior to this time that

this individual, former General Counsel Robyn Martin ("Martin"), had been the only person

involved in the creation of the July 2015 list.[11]  (Docket # 546 at 4).  They requested a telephone

conference to discuss how to proceed at the hearing scheduled for June 6, 2016, considering the

fact that they did not have a witness who could testify regarding the creation of the July 2015

list.  (Docket # 455-4).

The Court held a telephone conference with counsel for plaintiffs and defendants

on June 1, 2016.  (Docket # 355).  During the telephone conference, Gershengorn reported that

Martin was the only individual who had been involved in the creation of the July 2015 list and

that she was no longer with the company.  (Docket # 353 at 7).  He also reported, for the first

time, that the Fisher Parties' investigation had determined that the July 2015 list was not reliable

and that Osipoff had taken responsibility for preparing an entirely new list (a third list).  (*Id.*).

As the motion papers reveal, the Court's recollection of portions of the

unrecorded telephone conference differ from the Fisher Parties' recollection.  (Docket # 578 at

22 n.23).  This Court recalls that although the Fisher Parties expressed concern about potential

---

[10]  Emails attached to the Fisher Parties' letter suggest that they first contacted plaintiffs' counsel and the Court indicating a desire for a telephone conference on May 23, 2016.

[11]  Defendants assert that Martin left Ignite in March 2016 and that the company attempted unsuccessfully to contact her during this time.  (Docket # 546-1 at Ex. A. at ¶¶ 13, 17).

privilege issues, they did agree to make Osipoff available to testify to address the Court's

concerns that appropriate steps were being taken to ensure the accuracy of the third class list, the

new focus of the Court's attention.  (Docket # 353 at 7-8).  The Fisher Parties recall that they did

not agree she would appear and testify.  (*Id.* at 11).  Following the call, Osipoff prepared and

submitted a declaration on Thursday, June 2, 2016, accompanied by a letter stating that Osipoff

would "be prepared to testify at the June 6, 2016 hearing on the limited issue of the process

being used to create the corrected class notice list."  (Docket # 359-14 at 2).  According to

Osipoff's declaration, her work to date had uncovered 483 employees who had been wrongly

excluded from the July 2015 list and 5,247 employees who had been wrongly included.  (*Id.* at 6,

¶ 9).

       At approximately 4:00 p.m. the following day, which was the last business day

prior to the scheduled hearing, Gershengorn faxed a letter to Judge Siragusa requesting "a stay of

Magistrate Judge Marian W. Payson's June 1, 2016 Order compelling the testimony of Melissa J.

Osipoff, Esq. on June 6, 2016," in order to permit defendants to appeal the order under Rule 72

of the Federal Rules of Civil Procedure on the grounds that the "order" was "clearly erroneous

and contrary to law."  (Docket # 455-7).  Gershengorn later emailed Judge Siragusa's law clerk

and indicated that, despite the absence of a written order, "Judge Payson's order/directive was

clear – the June 6, 2016 Hearing was going forward, and Ms. Osipoff would be testifying at the

hearing."  (Docket # 359-18).  On Sunday, June 5, 2016, at 12:09 a.m., Judge Siragusa denied

defendants' request for a stay.  (Docket # 359-19).

       Plaintiffs' counsel and the Fisher Parties appeared for the scheduled hearing on

June 6, 2016.  (Docket ## 353, 356).  The Court indicated that it was authorized to explore how

the class list was created in order to ensure its reliability, that it had not ordered Osipoff to

testify, that defendants made the decision to have Osipoff, one of the two outside litigation counsel, prepare an entirely new list without involvement by any in-house employees or representatives, that defendants evidently made that decision after the Court had scheduled the hearing, and that defendants had not suggested any suitable alternative to Osipoff's testimony. (Docket # 353 at 2-17).  The Fisher Parties responded that they were not making a witness available to testify for the scheduled hearing and that they would not tender Osipoff for testimony in the absence of an explicit order from the Court, which they indicated they would immediately appeal.  (*Id.* at 20-22).  Given defendants' refusal to produce a witness for the hearing, the Court adjourned the hearing and provided the parties an opportunity to provide written submissions regarding the propriety of Osipoff's testimony.  (*Id.* at 26-27).

## IV.   <u>The August 2016 List</u>

On August 10, 2016, defendants produced a third class list (the "August 2016 list").  (Docket # 393 at 3).  According to defendants, the list contained 28,377 unique individuals, approximately 523 of whom had been wrongly excluded from the July 2015 list. (*Id.*).  Defendants also represented that the names of approximately 5,220 individuals had been improperly included on the July 2015 list and thus had been removed from the August 2016 list. (*Id.*).  The next day, the Court modified its previous order regarding the hearing to direct that a deposition be held pursuant to Fed. R. Civ. P. 30(b)(6) under the Court's supervision on September 13, 2016.  (Docket ## 386; 393 at 29-33).

On September 13, 2016, Lisa Moore ("Moore"), Vice President of Human Resources for Ignite Restaurant Group, was deposed as a corporate representative pursuant to Rule 30(b)(6).  (Docket ## 398; 401-2 at 5-6).  Moore, who was not personally involved in the

preparation of the list, testified concerning the creation of the August 2016 list and the process for verifying the accuracy of that list.  (Docket ## 401-1; 401-2 at 4, 38).  After the deposition, Moore submitted an affidavit to clarify aspects of her testimony.  (Docket # 406-5).

Moore testified that defendants' payroll administrators were instructed to provide lists of employees who were paid a subminimum wage during a specified time period.  (Docket ## 401-2 at 7-9, 13-14, 16-17; 406-5 at ¶¶ 2-3).  The data was compiled (hereinafter, the "subminimum wage list") and compared against the July 2015 list to identify any employees who were not included on the July 2015 list.  (Docket ## 401-2 at 7-9, 13-14; 406-5 at ¶¶ 2-3).  Approximately 600 individual employees were on the subminimum wage list but not the July 2015 list.  (Docket # 401-2 at 7-9).

Review of the list of 600 employees revealed that the list did not include some employees who were expected to be on that list.  (*Id.* at 7-9, 19-23, 25-28).  Investigation of the discrepancy disclosed that it resulted from the failure by one of the payroll administrators to pull payroll information for employees who were not paid by Crab Addison, but were paid by related entities.  (*Id.*).  Payroll data from these related entities was pulled and, after comparing the employee names against the July 2015 list, 400 additional employees were identified.  (*Id.* at 7-9, 25-28).  In sum, defendants identified a total of approximately 1,000 employees who were paid a subminimum wage but were excluded from the July 2015 list; those employees were compiled into one list (hereinafter referred to as "List A").  (*Id.* at 7-9, 19-23, 25-28, 44).

A line-by-line review of the employees contained on List A revealed that of the 1,000 employees on the list, approximately 600 should have been included on the July 2015 list but had not been.  (Docket ## 401-2 at 30-31, 44-45; 406-5 at ¶ 7).  Of those 600 employees, 300 had nonetheless received notice because they had been included on the original class list,

14

although excluded on the July 2015 class list.  (*Id.*).  They were added to the August 2016 list.

(Docket ## 401-2 at 30-31; 406-5 at ¶ 7).  Another 100 employees also had already received

notice under different employee identification numbers.  (*Id.*).  These 100 employees were added

to the August 2016 list under the second identification numbers.  (Docket ## 401-2 at 30-31, 45;

406-5 at ¶ 7).  Approximately 200 employees on List A had never received notice because they

had not been included on either the original class list or the July 2015 list.  (Docket ## 401-2 at

22, 44-45, 47; 406-5 at ¶ 7).  They were also added to the August 2016 list.

The line-by-line review of the 1,000 employees on List A identified

approximately 400 employees who did not belong on July 2015 list.  (Docket ## 401-2 at 30-31;

406-5 at ¶ 5).  Moore testified that the 400 employees were not in fact subminimum wage

employees, despite having been included on the subminimum wage list.  (Docket # 401-2 at

31-32, 44).  She testified that she did not know why these individuals appeared on the

subminimum wage list.  (*Id.*).  In her post-deposition affidavit, she clarified that the 400

employees were included on the subminimum wage list due to anomalies in their pay, but

individualized review of each employee demonstrated that they were not proper putative class

members.[12]  (Docket # 406-5 at ¶¶ 5-6).

As an additional check, defendants also compared the subminimum wage list

against the July 2015 list to identify any employees who were on the July 2015 list but not on the

subminimum wage list.  (Docket ## 401-2 at 35, 37; 406-5 at ¶ 2).  Approximately 6,000

employees were identified (hereinafter referred to as "List B").  (Docket # 401-2 at 35, 37).  Of

these 6,000 employees, approximately 500 were determined to have been paid a subminimum

---

[12]  As one example, Moore explained that some of the employees had payroll entries indicating that they had worked at an hourly rate of $.01/hour for zero hours.  (Docket # 406-5 at ¶ 6).  Because those employees had not actually worked any time at that rate, they were not in fact paid a subminimum wage.  (*Id.*).

wage and thus to belong on the class list.[13]  (Docket ## 401-2 at 36-37, 39-40, 47; 406-5 at ¶ 8).

These individuals were included on the August 2016 list.  (Docket ## 401-2 at 36-37, 39-40;

406-5 at ¶¶ 8-9).  According to Moore, the reason that the vast majority of the 500 or so

employees appeared on the July 2015 class list but not on the subminimum wage list was

because they had worked during February 2015.  (Docket ## 401-2 at 40-41; 406-5 at ¶¶ 8-9).

The July 2015 list included individuals who had worked through the end of February 2015, while

the subminimum wage list retrieved payroll data only through February 1, 2015.  (*Id.*).

Based upon Moore's testimony, the Court denied an application by plaintiffs to

compel further discovery concerning the errors in the July 2015 list.  (Docket # 432 at 9).  The

Court found that Moore's testimony and declarations satisfied the purpose of the Rule 30(b)(6)

deposition – "to obtain reasonable assurance that the methodology employed by defendants to

prepare the August 2016 class list would produce an accurate class list and avoid the significant

errors that permeated the prior lists" – and that no evidence had been adduced that the August

2016 list was inaccurate.  (*Id.*).

Following the production of the August 2016 class list, merits-related discovery

continued until early June 2017, when the litigation was stayed as a result of Ignite's bankruptcy

proceedings.  After the bankruptcy proceedings were resolved, which settled plaintiffs' claims

against the corporate defendants, the Court ordered the Epstein Firm and the Fisher Parties to file

their responses to the sanctions motion.  (Docket ## 504, 519).  The motion was withdrawn on

March 19, 2018, while the parties mediated to determine if the disputes could be resolved absent

formal motion practice.  (Docket # 541).  When those efforts failed, plaintiffs renewed their

sanctions motion.  (Docket # 544).

---

[13]  The remaining approximately 5,500 employees on List B had been wrongly included on the July 2015 list and thus were not included on the August 2016 list.  (Docket ## 393 at 3; 401-2 at 39-40; 406-5 at ¶ 8).

**V.      The Metzger Declaration and the June 6, 2018 Oral Argument**

**A.      Metzger's Declaration**

In opposition to plaintiffs' motion for sanctions, the Fisher Parties submitted the

Metzger Declaration.  (Docket # 546-1 at Ex. A).  The Declaration was signed by Metzger on

December 14, 2017, when he still held the position of General Counsel of Ignite.  (*Id.*).

Gershengorn first submitted it to this Court through a letter signed by him, dated December 19,

2017.  (Docket # 581).  In his letter, he asserted:

> The Metzger Declaration makes clear that the repeated failure of
> Ignite to produce an accurate class notice list, and all conduct
> flowing therefrom, was *solely* the fault of Ignite – and not the
> Individual Defendants or current or prior defense counsel.  The
> Metzger Declaration seriously undercuts [p]laintiffs' sanctions
> motion as against the Individual Defendants and current and prior
> defense counsel and calls into question whether [p]laintiffs should
> be permitted to proceed with the motion consistent with the law
> and with their professional responsibilities.

(*Id.* at 2) (emphasis in original).  When the Fisher Parties later submitted the Metzger

Declaration in May 2018 in opposition to plaintiffs' renewed motion for sanctions, the claims for

sanctions against the corporate defendants had been settled in the bankruptcy proceeding, and the

claims against the individual defendants had been stayed pending a stipulation signed by

plaintiffs' counsel approximately one week later withdrawing the sanctions claims against them.

(Docket # 550).  Those actions left defendants' attorneys as the only real parties of interest on the

sanctions motion.

Metzger's Declaration addressed the preparation of the initial class list, the

subsequent investigation into the cause of the errors in that list, the preparation of the second

class list, the discovery that it too had significant errors, and the decision to decline to make

Osipoff available to testify at the Court's scheduled June 6, 2016 hearing.  (Docket # 546-1 at

Ex. A).  In sum, Metzger affirmed that Ignite's former General Counsel Martin had worked with a paralegal at Ignite to compile the first list.  (*Id.* at ¶ 3).  He explained that a "master human resources list" was inadvertently included in two of the spreadsheets used to compile the first list, which caused the inclusion of approximately one hundred thousand individuals on the initial class list who did not belong in the class, including high level corporate executives.  (*Id.* at ¶¶ 3-6, 12).  Ignite learned of the mistake in early June 2015, which was after the Ogletree Firm had replaced the Epstein Firm as counsel to defendants.  (*Id.* at ¶¶ 7-8).  According to Metzger, Martin, "along with Ogletree attorneys, thoroughly investigated the matter" and discovered that the inclusion of the master human resources list was the cause of the error.  (*Id.* at ¶ 9).

With respect to the preparation and production of the second list in July 2015, Metzger affirmed:

> Ignite then endeavored to correct the Notice List as quickly as possible, a task undertaken by General Counsel Martin personally. Though Ignite's counsel was aware that General Counsel Martin was spearheading the effort to correct the Notice List, unbeknownst to its counsel, General Counsel Martin did so individually, without assistance from anyone else at Ignite.
>
> Ignite provided its counsel with what Ignite believed to be a corrected class notice list of 32,962 putative class members (the "July 2015 Class Notice List"), which Ignite's counsel then provided to Plaintiffs' counsel on July 17, 2015.

(*Id.* at ¶¶ 11-12).  Metzger's Declaration did not mention any involvement by Osipoff or any of her firm's attorneys or paralegals in any part of the preparation or "vetting"[14] of the July 2015 list beyond the act of providing the list to plaintiffs' counsel.  (*Id.*).  Indeed, Metzger affirmed that:

---

[14]  As described *infra*, "vetting" is the term used by Osipoff to describe the bulk of the work she did with the July 2015 list.

> The errors on the July 2015 Class Notice List were solely the fault
> of Ignite.  The repeated failure of Ignite to produce an accurate
> class Notice List was solely the fault of Ignite.

*   *   *

> Ms. Osipoff had no knowledge about the creation of the July 2015
> Class Notice List.

*   *   *

> The class Notice List was an issue solely undertaken by Ignite.

(*Id.* at ¶¶ 20-22).

The assertion that Martin, who did not respond to Ignite's attempts to reach her, was the "only person at Ignite who was involved in the preparation of the July 2015 Class Notice List" was the proffered reason why Ignite could not produce a witness to testify at the Court's June 6, 2016 scheduled hearing.  (*Id.* at ¶¶ 17-18).  As Metzger affirmed:

> [N]obody else at Ignite could testify as to how the July 2015 Class
> Notice List was prepared and what caused any errors in the list.
> Ignite never intended to evade producing a witness to testify about
> the July 2015 Class Notice List; rather, it was impossible for Ignite
> to comply with the May 17, 2016 Order, as there was nobody who
> Ignite could produce to testify about the preparation of the July
> 2015 Class Notice List.  . . .  The failure to comply with the May
> 17, 2016 Order is solely the fault of Ignite, as it was impossible for
> Ignite to comply with the Order.

(*Id.* at ¶ 18).  With respect to the issue raised in the June 1, 2016 conference call with the Court regarding testimony by Osipoff, Metzger's Declaration states:

> Whether or not the Court Ordered Ms. Osipoff to testify, Ignite
> ultimately did not believe it was appropriate for Ms. Osipoff to
> testify about her efforts [beginning in March 2016] to correct the
> July 2015 Class Notice List – *and Ms. Osipoff had no knowledge*
> *about the creation of the July 2015 Class Notice List*.  As a result,
> Ignite did not waive the attorney-client privilege to permit its
> counsel to testify at the June 6, 2016 hearing.

(*Id.* at ¶ 21 (emphasis added)).

19

The thrust of the Fisher Parties' defense against sanctions was the assertion, repeated in one form or another throughout their memorandum, that the errors and delays were not their fault but were their client's fault.  (*See* Docket # 546).  To underscore the point, Section IV in their Statement of Facts is captioned:

> The Metzger Declaration Confirms All Errors Related to the Class Notice List Are Solely The Fault of Debtor-Defendants.

(*Id.* at 13).  Indeed, they repeatedly relied on the Metzger Declaration as support, often the only support, for the contentions that "the difficulties and problems associated with the accuracy of class lists through August 2016 resided with the Debtor-Defendants, and [were] not the fault of the [Fisher Parties]" and that Martin "was the only individual with knowledge of the July 2015 Class List."  (*Id.* at 14).  Among other things, they asserted in their memorandum:

> Though Ignite's counsel was aware that Ms. Martin was spearheading the effort to correct the Class List, unbeknownst to counsel, Ms. Martin did so without assistance from anyone else at Ignite[;] Ignite provided its counsel with what Ignite believed to be a corrected class notice of 32,962 putative class members (the "July 2015 Class List"), which Ignite's counsel then provided to [p]laintiffs' counsel on July 17, 2015) (citing Metzger Decl., ¶ 12).
>
> \*   \*   \*
>
> Notably, Ms. Osipoff could only testify about creation of a third class list, and not about the July 2015 Class List as was required by the May 17 Order.
>
> \*   \*   \*
>
> [T]he errors in regards to the class list . . . were *solely* the responsibility of Ignite.

(*Id.* at 4-5, 11 n.11, 18).  They also acknowledged and reaffirmed:

> [d]efendants' repeated assertions (both on the June 1 conference call and since) that no one left under Ignite's control had knowledge of the July 2015 Class List (a fact confirmed by the

> Metzger Decl., ¶ 21), and that [d]efendants' [c]ounsel only had
> knowledge of efforts to create a new list from scratch.

(*Id.* at 19).  In sum, Metzger's affidavit was the factual centerpiece of their opposition to the

sanctions motion.  The recitation of facts in their brief, and the arguments based upon them,

derived principally from the assertions made in the Declaration.  (*See id.* at 3-14, 18-22).[15]

Specifically, they argued that sanctions were not warranted against them because (1) they had

nothing to do with the preparation of the first list, which was created and produced before they

assumed representation of the defendants (*id.* at 19 n.21, 22 n.26); (2) they had no involvement

with or knowledge concerning the preparation of the second list, which was handled entirely by

Martin without assistance from anyone, including counsel (*id.* at 4-5, 10, 11 n.11, 14, 19, 21);

(3) they worked with appropriate diligence to produce the third list, which has not been shown to

be inaccurate (*id.* at 12, 19); and, (4) they did not disobey the Court's Order regarding the June 6,

2016 scheduled hearing because Martin was the only person who had knowledge of the issues

identified by the Court and she was unavailable to the defendants (*id.* at 10, 11 n.11, 14, 19, 21).

## B.      June 6, 2018 Oral Argument

The Court entertained oral argument on plaintiffs' sanctions motion on June 6,

2018.  (Docket # 557).  At the hearing, the Fisher Parties relied upon the Metzger Declaration

(*see*, *e.g.*, *id.* at 55, 81, 85) noting that "there's not a single fact that [plaintiffs] put forward that

suggested what Mr. Metzger said is not truthful and not accurate" (*id.* at 85).  Indeed, the Fisher

Parties contended that in the absence of any evidence to question the Metzger Declaration, no

evidentiary hearing was needed, and the Court should deny the sanctions motion without further

proceedings.  (*Id.* at 49, 74, 84-85).  Addressing the Metzger Declaration, the Court observed:

---

[15]  Their May 15, 2018 memorandum is materially identical to the brief submitted before the unsuccessful
mediation.  (*Compare* Docket # 538 *with* Docket # 546).  Their citation to and reliance upon assertions in Metzger's
Declaration is identical.

> [Y]ou put a lot of reliance on the Metzger affidavit, which strikes
> me as a little bit of a double-edged sword. . . . [O]n the one
> hand[,] when attorneys are being accused of bad faith – . . . a very
> serious charge to be leveled at an officer of the court – to be able to
> say, . . . ["][I] wasn't involved in that,["] makes sense that that
> would be a response to bad faith.  ["]No, I wasn't misrepresenting.
> I didn't know the facts.["]  . . .  [A]s I sit here today, I have a
> greater concern about whether the record gives rise to a reasonable
> inference that counsel did not adequately discharge its duty of
> supervision and management of compliance with the court order.

(*Id.* at 53).  The Court emphasized its understanding of the Metzger Declaration to state that

"in-house counsel prepared that July 201[5] list with no one else's help."  (*Id.* at 56).  Noting that

Gershengorn's statements at the May 17, 2016 hearing suggested that counsel did not know

either the cause or the scope of the errors in the July 2015 list and did not even know that no one

at Ignite could testify at a court-ordered hearing about the list, the Court informed counsel for the

Fisher Parties that the record raised the reasonable inference that the Fisher Parties had not been

involved with the July 2015 list.  (*Id.* at 57).  Finally, the Court noted that the record also "has

precious little in it with respect to what, if anything, counsel was doing from . . . March of 2016

when plaintiffs filed a motion [alleging inaccuracies in the July 2015 list]" and the May 17, 2016

hearing.  (*Id.* at 60).  Counsel responded by asking for leave to supplement the record on those

issues.  (*Id.* at 87).  The Court responded that counsel should make such a request in writing.

(*Id.*).


## VI.   Osipoff's Declaration

On July 26, 2018, Osipoff signed and submitted her Declaration in opposition to

the sanctions motion.  (Docket # 560).  Paragraph Two of the Declaration states that its purpose

is "to describe defense counsel's role in vetting the accuracy of the corrected July 17, 2015 Class

List prepared by Robyn Martin, then General Counsel of Ignite, and subsequently, in

investigating the errors Ignite made with that list which were later discovered." (*Id.* at ¶ 2).

With respect to the July 2015 list, Osipoff's Declaration affirms:

After the initial errors with the class list were uncovered, Ignite endeavored to prepare a corrected class list in order to comply with the Court's January 27, 2015 Order (Dkt. # 80.) Ms. Martin represented that she knew what needed to be done to correct the list and insisted that she personally take ownership of preparing the corrected class list. Although Ogletree was aware that Ms. Martin was taking the lead on preparing the corrected class list, Ogletree was not aware that there was no one at Ignite assisting Ms. Martin in the preparation of the corrected class list.

Although Ignite prepared the corrected class list internally, Ogletree nevertheless provided oversight and support to Ms. Martin on various issues that arose during the preparation and then worked to vet the accuracy of the corrected class list prepared by Ms. Martin.

On July 4, 2015, Ms. Martin sent me an updated class list file. On or about July 6, 2015, Ms. Martin and I spoke, in detail, about this updated class list file.

Following my conversation with Ms. Martin, I took numerous steps to vet the accuracy of the class list. Jill Miller, a paralegal at Ogletree, assisted me with vetting the class list. Additionally, Ms. Martin took additional steps to vet the accuracy of the class list.

a. On July 9, 2015, I had numerous detailed communications with Ms. Miller regarding different ways to vet the accuracy of the class list. Ms. Miller, acting at my direction, ran various reports and provided me with the results. On July 10, 2015, Ms. Miller provided me with results of the ve[t]ting process. These results were then discussed in detail with Ms. Martin.

b. As a result of the vetting process, on July 10, 2015, Ms. Martin confirmed that she was making additional changes to the class list.

c. On approximately July 14, 2015, Ms. Martin provided me with an updated class list. On July 14, 2015, I

provided Ms. Miller with a list of multiple queries to
run on the class list data to once again vet the accuracy
of the class list.  Ms. Miller and I had numerous
detailed communications about those inquiries.

d.  On July 14, 2015, I sent Ms. Martin a number of
questions that arose from Ogletree's vetting inquiries.
Ms. Martin provided responses to these questions on
July 15, 2015.

e.  On July 15, 2015, Ms. Miller provided me with initial
results of queries done to vet the accuracy of the class
list.  I reviewed these results and had numerous detailed
conversations with Ms. Martin about them.

f.  On July 16, 2015, Ms. Miller provided me additional
results of queries done to vet the accuracy of the class
list.  I reviewed these results in detail.  Also on July 16,
2015, Ms. Miller and I had numerous detailed
communications regarding the queries done to vet the
accuracy of the class list and the results thereof.  Also
on July 16, 2015, Ms. Miller and I had numerous
detailed communications with Ms. Martin regarding the
queries done to vet the accuracy of the class list and the
results thereof, as well as any necessary changes to the
class list.

g.  On July 17, 2015, I directed Ms. Miller to run
additional queries to vet the accuracy of the class list.
Ms. Miller provided those results to me.  Also on July
17, 2015, Ms. Miller and I had numerous detailed
communications with Ms. Martin regarding queries
done to vet the accuracy of the class list and the results
thereof, as well as any necessary changes to the class
list.

h.  Throughout this process, Ms. Miller inputted any
necessary changes to the class list that were revealed
through the vetting process.

(*Id.* at  ¶¶ 5-8).  "Ogletree" provided plaintiffs' counsel with the second list on July 17, 2015.

(*Id.* at ¶ 9).  According to Osipoff, her firm "logged approximately forty-four (44) hours for time

spent *overseeing the creation* of the July 17, 2015 Class List and vetting the accuracy of that list."  (*Id.* at ¶ 10 (emphasis added)).

With respect to the investigation of the errors discovered in the July 2015 list and Osipoff's involvement in the preparation of the August 2016 list, her Declaration affirms that Osipoff "personally led th[e] efforts" to investigate the accuracy of the July 2015 list following concerns raised by plaintiffs' counsel in March 2016, assisted by two paralegals with her firm. (*Id.* at ¶ 11).  As outlined in her Declaration, Osipoff had numerous communications with Leslie Oguchi, Ignite's Corporate Counsel, during the period March 22, 2016, through May 11, 2016, "regarding the need to investigate the concerns raised by [plaintiffs' counsel] as well as the need to investigate any additional errors that may exist with the July 17, 2015 Class List beyond the concerns raised by [counsel]."  (*Id.* at ¶ 11(d); *see also id.* at ¶¶ 11(c), (h), (r), (s), (t), (v)).  In addition, she communicated frequently during that period with Ignite's payroll providers, from which she obtained and analyzed data to investigate "potential errors" in the July 2015 list.  (*Id.* at ¶¶ 11(e)-(q)).  Between March 14, 2016, and the May 17, 2016, oral argument, Osipoff and paralegals at her firm worked approximately 255 hours investigating the July 2015 list.  (*Id.* at ¶ 13).  According to Osipoff, at the time of the argument, her investigation "remained in progress and it had not yet been determined how many individuals were inadvertently left off [or inadvertently included in] the July 17, 2015 Class List."  (*Id.* at ¶ 12).

VII.    **October 25, 2018 Hearing and the Order to Show Cause**

The Court denied plaintiffs' motion to strike the Osipoff Declaration on the condition that both Metzger and Osipoff appear and testify at an evidentiary hearing before the

Court.  (Docket # 567).  The hearing proceeded as scheduled, and both Metzger and Osipoff testified.[16]  (Docket ## 571, 573, 575).

### A.   Metzger's Testimony

Metzger testified that he was employed as General Counsel to Ignite from July 11, 2016, through December 30, 2017.  (Docket # 575 at 7).  He testified that he had no personal involvement in the preparation of the first two class lists, which were produced to plaintiffs' counsel well before his employment with Ignite began.  (*Id.* at 11, 12).

Metzger testified that Gershengorn and Osipoff asked him to submit a declaration. (*Id.* at 9).  The body of his Declaration was drafted by an attorney or attorneys with Fisher Phillips based on conversations with him, and he reviewed it for accuracy before he signed it. (*Id.* at 10).  According to Metzger, he learned the information asserted in his Declaration from discussions with Ignite senior management, review of documents, and privileged communications with Gershengorn and Osipoff.  (*Id.* at 11-12, 18).  He did not speak to former General Counsel Martin about the class lists.  (*Id.* at 26).  Metzger testified that he did not have "firsthand" knowledge of the information in his Declaration.  (*Id.* at 11).

Based upon those discussions and document review, Metzger understood that no one other than Martin had been involved in correcting the initial class list or preparing and producing the July 2015 list.  (*Id.* at 32, 38-39).  In other words, he affirmed that it was his understanding that "whatever list Ms. Martin came up with would then be provided to plaintiffs' counsel."  (*Id.* at 32).  Metzger testified that he believed that any errors in the July 2015 list were "solely the fault" of Ignite and not their counsel because Ignite was solely responsible for "creating and producing the [July 2015] class list."  (*Id.* at 36).  Indeed, he offered, "[I]f I

---

[16] Metzger testified by video.  Osipoff testified in person.

believed that our law firm had anything to do with the inaccuracies that went out, obviously, we would have found a different partner." (*Id.*).

As to Metzger's understanding of Osipoff's role with respect to the July 2015 class list, he testified as follows:

> Q. So correct me if I'm wrong, but my understanding of what you said is that other than providing the list to plaintiff[s'] counsel, defense counsel was not otherwise involved in the creation or production of the Class Notice List[,] is that right?
>
> A. Yeah. I don't – I wouldn't be able to speak to – I think Ms. Osipoff is probably in a better position to answer that question than me. I don't have any knowledge of that, of her involvement.
>
> Q. So nobody told you about that involvement?
>
> A. No.
>
> Q. If there was any involvement, nobody told you about it?
>
> A. With the second class list, no.

(*Id.* at 38-39).

## B.      Osipoff's Testimony

Osipoff testified that she is a member of the Fisher Phillips firm. (Docket # 575 at 41). She joined the firm in July 2016 and became a partner in January 2018. (*Id.*). Prior to joining Fisher Phillips, Osipoff worked as an associate attorney at the Ogletree Firm. (*Id.* at 41-42). She began representing the defendants in this action at the end of March 2015 and continued to represent them following her move to Fisher Phillips through the dismissal of the claims against them. (*Id.* at 42).

Osipoff testified that her firm produced the July 2015 list. (*Id.* at 51). She testified at length about her involvement in the production of the July 2015 list. (*See generally*

*id.* at 51-108).  Osipoff testified that Robyn Martin, then-General Counsel for Ignite, took

responsibility for and personally undertook the preparation of the list.  (*Id.* at 53, 62).  According

to Osipoff, Martin told her that she knew how to correct the first list and was taking the steps

necessary to do so.  (*Id.* at 62).  Osipoff testified that Martin never told her the "process" that she

used to compile the corrected list and Osipoff never asked her to explain it, although they did

discuss "steps [Martin] was taking to ensure the list was accurate."  (*Id.* at 63-64, 67).

   With respect to Osipoff's involvement, she testified that she communicated with

Martin on several occasions as Martin compiled the list.  Specifically, Osipoff testified:

> [Martin] asked some questions along the way of things that came
> up during her preparation and we discussed those with her.

*   *   *

> [M]y recollection was [the discussions were] more about specific
> individuals and whether or not they should be included or not
> included.  The questions were not about the process.

(*Id.* at 68-69).  Once Martin had compiled the list, she forwarded it to Osipoff.  (*Id.* at 69, 71).

For the next two weeks, Osipoff, assisted by a paralegal at the Ogletree Firm, attempted to verify

the accuracy of the list.  Specifically, she testified:

> THE WITNESS:   We – I worked with the paralegal Ms. Miller
> to run some different reports through
> Microsoft Access to get some basic
> information about the list.  Who was
> included?  What positions were they in?
> What stores did they work at?  We also just
> looked generally at the face of the
> document.  Do dates make sense?  You have
> hire date, termination date.  Do those dates
> make sense?  And then ultimately, presented
> Ms. Martin with some questions and things
> to consider.  Things that we picked up on
> having looked at that list.

(*Id.* at 69-70).  That process – which involved running "Microsoft Access or a similar database program" (*id.* at 73)[17] and comparing the new list to the old list "to get an understanding of who was no longer on that list and what the make up of those people were as well" (*id.* at 76) – revealed certain inaccuracies in the list, such as, errors in certain employees' termination dates (*id.* at 70) and the exclusion of one particular restaurant (*id.* at 73).  During the two week period, Osipoff spoke regularly with Martin, as well as with Gershengorn and the paralegal.  (*Id.* at 53, 55, 69-76).  Osipoff testified that as a result of the errors discovered during this phase, corrections and modifications were made to the list, some inputted by the Ogletree team, some inputted by Martin at Osipoff's direction, and some inputted by Martin on her own.  (*Id.* at 70-77).  The changes were made on an Excel spreadsheet.  (*Id.* at 81).

On July 14, 2015, Martin presented Osipoff with a corrected list, and Osipoff and her paralegal ran the same type of programs and queries on the July 14 list.  (*Id.* at 77, 80-81).  She and her paralegal also compared the July 4 and July 14 lists "so we could understand who was either removed or added and understand why."  (*Id.* at 81).  Osipoff and her paralegal evidently inputted changes to the July 14 version as a result of their review.  (*Id.* at 82).

After those changes were made, Osipoff, on behalf of defendants, produced the list to plaintiffs' counsel.  (*Id.*).  That occurred on July 17, 2015.  (*Id.* at 83).  Osipoff testified that her firm logged forty-four hours performing the work described above.  (*Id.*).

In relevant part, Osipoff testified as follows:

> Q.          Is it correct that your office provided a corrected
>             notice list on or about July 2015?
>
> A.          In July 2015?

---

[17] Osipoff explained that the database program involved "running certain queries, getting compilations of what positions are represented in the list, how many people are in that position, what stores are represented in the list." (*Id.* at 75).

Q.        Yes.

A.        Yes, we did.

Q.        And is it fair to say that you were involved in
          that process?

A.        In providing the list?

Q.        Yes.

A.        Yes.

Q.        Okay.  And were you involved in the process of
          compiling or preparing the list?

A.        No, I was not involved in the process of
          compiling or preparing the list.

Q.        So other than producing it to plaintiff[s']
          counsel, is there – I just want to make sure I am
          clear.  Is there some other way that you were
          involved?

A.        Yes.  Once we received the list that was
          prepared by the company, I was involved in
          taking steps to try to vet the accuracy of that list.

Q.        Okay.  When working on the July 2015 notice
          list, who else at Ogletree was involved?

A.        Paralegal Jill [M]iller, and I certainly had
          conversations with Mr. Gershengorn and
          another attorney at Ogletree Mr. Hulla.

                          *    *    *

THE COURT:    Ms. Osipoff, when you said you were involved
              in efforts to vet the accuracy of the list, was that
              involvement – did that involvement occur
              between receipt of the list from your client and
              prior to production of that list to counsel to
              defense – to plaintiff's counsel?

THE WITNESS:  Yes, that's correct.  It would have taken place
              over about a two-week period.

                              30

*   *   *

Q.              Are you saying today that it's accurate to say
                that you had no knowledge about the creation at
                all of the corrected notice list?

A.              Yes.

Q.              So during – when you were making changes to
                the corrected notice list, that doesn't count as
                knowledge; is that correct?

MR. BAUER:      Objection, your Honor.

THE COURT:      Overruled.

Q.              You don't consider that knowledge?

A.              I don't consider that knowledge about the
                creation of the class list, no.  I consider that
                knowledge about vetting the accuracy of the
                class list.

Q.              But those were changes that were made to the
                class list as you testified, correct, that was
                ultimately produced to plaintiff's counsel?

A.              Yes.

THE COURT:      And that vetting occurred before the class list
                was produced, [did] it not?

THE WITNESS:    Yes, it did.

THE COURT:      And that vetting was part of the process of
                ensuring that the class list that was turned over
                was accurate and reliable[,] correct?

THE WITNESS:    Yes.

THE COURT:      And you also had a role in overseeing the
                preparation of the class list, did you not?

THE WITNESS:    Yes.

31

THE COURT:        And during that overseeing role, isn't it true that Ms. Martin asked you certain questions about whether people should be included or excluded and you were involved in answering those questions and providing advi[c]e, were you not?

THE WITNESS:    Yes.

THE COURT:        To your knowledge, Ms. Martin relied on advi[c]e that you gave her in connection with the preparation of that list?

THE WITNESS:    Yes.

THE COURT:        Okay. And you think it's accurate to represent to the Court that you had no knowledge of the creation of the 2015 list notwithstanding your testimony about what you did?

THE WITNESS:    I think there is a difference between creation and vetting.

THE COURT:        The vetting, of course, having occurred again prior to the production of the list[,] correct?

THE WITNESS:    Correct.

THE COURT:        Okay.  And the vetting have resulted in changes to the creation of the list[,] correct?

THE WITNESS:    Correct.

THE COURT:        Okay.  Did you ensure in any of the papers that were submitted that the Court was to understand the distinction that you draw now between the involvement that you testified you had and the statement that you had no knowledge of the creation of the list?  Is there anything I can look to that would say, Judge, that is what I mean when I say I had no knowledge in the creation of the list?

THE WITNESS:    My current declaration.

> THE COURT:     Okay.  But that declaration came well after – is
> there anything in the papers that were submitted
> – when was it – in May of 2018 that explained
> to me that you were [drawing] that distinction?
>
> THE WITNESS:  No.

(*Id.* at 51-52, 52-53, 104-107).

Osipoff also testified that she learned shortly before Martin's departure on March 11, 2016, that Martin would be leaving Ignite.  (*Id.* at 84-85).  According to Osipoff, "[i]t wasn't until May, after the May 15th or 16th hearing in court, that's when Leslie [Oguchi] stated in no uncertain terms that nobody else at the company besides Ms. Martin was involved in the preparation of the class list."  (*Id.* at 87).

With respect to the Metzger Declaration, Osipoff acknowledged that she was involved in drafting it and reviewed it before its submission.  (*Id.* at 101-103).  She also acknowledged that she was involved in drafting the Fisher Parties' memorandum in opposition to the sanctions motion and reviewed drafts of it before it was filed.  (*Id.* at 101-102).  The Court inquired whether she believed that all the statements in the Metzger Declaration about her role and knowledge were "fully and completely accurate."  (*Id.* at 103).  Osipoff replied:

> Well, I don't think that this really spoke to everything that I did.
> There [were] things that I did that are outside the scope of this
> declaration, but there is nothing in here that I think is inaccurate.

(*Id.*).

At the end of the hearing, the Court articulated its concerns over apparently inconsistent statements made to the Court concerning the role of counsel in the preparation of the July 2015 class list:

> The concern is whether there was a statement that was submitted to
> the Court . . . [–] I have no knowledge[;] [t]herefore, there's no
> basis to sanction attorneys[;] [i]t's purely a company issue.  Then I

33

raise the question of . . . you have some diligence . . . obligation.
And then I get an affidavit that says . . . [–] actually, I was
overseeing it.  I was answering questions,  I was vetting it.  There
were changes that were made.  And I think it fairly raises the
question of how . . . that testimony squares with a statement that I
have no knowledge of the creation of the class list.

(*Id.* at 112).


## VIII.   <u>The Court's Order to Show Cause</u>

Following the evidentiary hearing, on November 6, 2018, this Court issued an

Order to the Fisher Parties to show cause why certain representations identified in the Order "did

not violate Rule 11(b) of the Federal Rules of Civil Procedure and why sanctions based upon

those representations are not otherwise warranted pursuant to 28 U.S.C. § 1927 and/or this

Court's inherent powers."  (Docket # 574 at 3).[18]  The Court explained that the purpose of the

Order was to "ensure that the Fisher Interested Parties [were] fully aware of both the conduct and

legal authority at issue and that they ha[d] an opportunity to be fully heard before a decision

[was] rendered."  (*Id.* at 3 n.1).  As the Court also noted in the Order, the Fisher Parties received

notice before the evidentiary hearing that plaintiffs contended that Osipoff's July 26, 2018

Declaration was "inconsistent with both Metzger's affidavit and previous statements made

during the course of this litigation."  (*Id.*).

The Show Cause Order stated that Osipoff's Declaration and testimony at the

October 25, 2018 hearing raised "concerns about the truthfulness of other [earlier] statements

---

[18]  As the Fisher Parties have correctly noted in their post-hearing submission (Docket # 579 at 2), the
Order docketed was unsigned and undated (*see* Docket # 574).  That was an error, as the Court had signed and dated
an original version of the same Order, which was maintained and remains in the Court's file.  The signed original
Order has now been docketed.  (*See* Docket # 580).  Counsel did not contact the Court with any questions about the
unsigned Order and did respond to it.  (*See* Docket # 579).

made by the Fisher Interested Parties to the Court during the course of this litigation, including

the following":

- "We have now confirmed with our client that the *only* person with any detailed knowledge of the July 2015 Revised Notice List is no longer with the company and thus is not under Defendant's control."  May 25, 2016 letter from Brian J. Gershengorn, Esq. to Hon. Marian W. Payson at p.1 (emphasis in original).

- "Defendants' counsel confirmed with our client that the *only* person with any knowledge of the July 2015 Class List is no longer with the company and thus not under Defendants' control."  June 3, 2016 letter from Brian J. Gershengorn, Esq. to Hon. Charles J. Siragusa at p.2 (emphasis in original).

- "[T]he former general counsel is the one who has the knowledge certainly of the errors of July 2015."  Statement of Brian J. Gershengorn, Esq. during proceedings held on June 6, 2016 (Docket # 353 at 17).

- "[T]he individual with knowledge of the class list was no longer in the defendant's employ, and we didn't have control of that individual."  Statement of Brian J. Gershengorn, Esq. during proceedings held on August 11, 2016 (Docket # 393 at 7).

- "This is, as the Court is aware, contrary to Defendants' repeated assertions (both on the June 1 conference call and since) that *no one* left under the Company's control had knowledge of the July 2015 class notice list, and the Defendants' Counsel *only* had knowledge of efforts to create a new list from scratch."  April 10, 2017 letter from Brian J. Gershengorn, Esq. to Hon. Marian W. Payson at p.2 (emphasis in original).

- "Additionally, the Metzger Declaration confirms that . . . Ms. Martin . . . was the only individual with knowledge of the July 2015 Class List."  Memorandum of Law in Opposition to Plaintiff's Renewed Motion for Sanctions on Behalf of the Fisher Interested Parties (Docket # 546 at 14).

- "This is, as the Court is aware, contrary to Defendants' repeated assertions (both on the June 1 conference call and since) that no one left under Ignite's control had knowledge of the July 2015 Class List (a fact confirmed by the Metzger Decl., ¶ 21), and that Defendants' Counsel only had knowledge of efforts to

> create a new list from scratch." Memorandum of Law in
> Opposition to Plaintiff's Renewed Motion for Sanctions on
> Behalf of the Fisher Interested Parties (Docket # 546 at 19).

(*Id.* at 2-3).


# DISCUSSION

## I.     The Parties' Contentions

As plaintiffs' counsel acknowledged at the June 6, 2018 oral argument, the scope of the sanctions they seek has been narrowed as a result of the resolution of the claims against the corporate and individual defendants.  (Docket # 557 at 18-19).  Plaintiffs now request the imposition of three categories of sanctions on the attorneys and firms before the Court: (1) attorneys' fees and costs stemming from counsel's conduct; (2) monetary sanctions; and, (3) disciplinary sanctions against counsel, including reprimands, notification of their conduct to future courts, and/or referral to attorney disciplinary authorities.[19]  (*Id.*).  Plaintiffs urge that sanctions should be imposed based upon counsel's participation in or responsibility for three types of conduct:  (1) repeated non-compliance with Judge Siragusa's Notice Order; (2) false and misleading representations to the Court about the class lists; and, (3) the failure to produce a witness to testify at the June 6, 2016 court-ordered hearing.  (Docket ## 439, 455-1 at 17-27; 576 at 6-18).  The sources of authority that plaintiffs cite for the requested sanctions are Rules 16(f) and 37 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the Court's inherent power.  (Docket ## 371-1; 455-1 at 13-17).

As to the first category of conduct – the failure to comply with the Notice Order requiring production of a class list – plaintiffs maintain that sanctions are warranted under Rules

---

[19] Plaintiffs seek referral to disciplinary authorities of Gershengorn and Osipoff only.  (Docket # 455-1 at 25, 27).

16 and 37 because the non-compliance persisted over a prolonged period of approximately eighteen months following Judge Siragusa's Order, and gave rise to extensive, protracted and expensive motion practice before a correct class list was produced in August 2016.  (Docket # 455-1 at 17-21).  Plaintiffs further contend that sanctions are warranted under Section 1927 and the Court's inherent power because the repeated failure to produce the list for such a lengthy period of time justifies an inference of bad faith.  (*Id.* at 18-20).  Even in the absence of a bad faith finding, plaintiffs continue, sanctions are warranted in an exercise of the Court's inherent power.  (*Id.* at 20).  In their post-hearing memorandum, plaintiffs argue that Osipoff's testimony makes clear that the Fisher Parties remained "willfully ignorant" of the process Martin used to compile the July 2015 class list "despite the errors in the initial list" and underscores the appropriateness of sanctions.  (Docket # 576 at 8).

As to the second category of conduct – counsel's representations regarding their involvement with and knowledge of the preparation and accuracy of the class lists and their compliance with the Notice Order – plaintiffs seek sanctions pursuant to Section 1927 and the Court's inherent power on the grounds that counsel's representations were made in bad faith or at least with sufficient recklessness or negligence to support sanctions under the Court's inherent powers.  (Docket # 455 at 21-25).  Plaintiffs' post-hearing submission relies upon Osipoff's hearing testimony as further evidence of the Fisher Parties' responsibility for making false and misleading statements to the Court.  (Docket # 576 at 11-15).  As they argue, Osipoff's testimony demonstrates that

> the Fisher Attorneys created a record devoid of any reference to their involvement in the creation of the July 2015 class list and affirmatively created a factual record to the contrary, including through the declaration they drafted for Mr. Metzger – until Ms. Osipoff submitted her declaration weeks after oral argument on the motion . . . in response to the Court's notice that their conduct was

potentially sanctionable because of their failure to oversee the
compilation of the list.

(*Id.* at 14).

As to the third category of conduct – counsel's "vexatious" failure to produce a
witness to testify at the court-ordered June 6, 2016 hearing – plaintiffs seek sanctions under
Section 1927 and the Court's inherent powers.  (Docket # 455 at 26-27).  As their post-hearing
submission makes clear, plaintiffs believe that sanctions are appropriate for this conduct because
the hearing testimony of Metzger and Osipoff shows that (1) "it is not believable that the Fisher
Attorneys had no knowledge that Ms. Martin was the only person with knowledge of the class
list issues until just days before the hearing" and (2) Martin was not the only person with
knowledge, and Osipoff herself "had knowledge and could have testified at the June 2016
hearing as to the compilation of the July 2015 class list."  (Docket # 576 at 15-17).

The Epstein Firm opposes plaintiffs' sanctions motion on several grounds.  (*See*
Docket ## 511, 577).  Principally, the Epstein Firm maintains that their attorneys did not violate
the Notice Order; rather, they produced a class list (that consisted of approximately 250
spreadsheets) that it believed to be accurate on February 18, 2015, in compliance with the Notice
Order.  (Docket ## 511 at 1-5; 577 at 1-5).  A few weeks later, at plaintiffs' request, they
produced a consolidated class list on one spreadsheet.  (*Id.*).  When plaintiffs' counsel raised
concerns about its accuracy due to the surprisingly large number of individuals included, Epstein
promptly conferred with plaintiffs' counsel and undertook to investigate the concern.  (Docket
# 577 at 2-3).  Only two weeks later, and before the cause of the error was discovered, they were
replaced as counsel.  (*Id.* at 3).  This record, in Epstein's view, demonstrates that they neither
disregarded or disobeyed the Notice Order, nor acted with "anything even remotely resembling
bad faith."  (*Id.* at 4-5).  In addition, Epstein contends that the Stipulation and Order entered in

the corporate defendants' bankruptcy proceedings bars any claim for sanctions against them as their former attorneys.  (*Id.* at 5-6).

The Fisher Parties likewise oppose plaintiffs' motion for sanctions on several grounds.[20]  (Docket ## 546, 578, 579).  As an initial matter, they maintain that the Court lacks authority to impose sanctions on them because the Notice Order was not directed at them, but was directed at their clients.[21]  (Docket ## 546 at 18; 578 at 5-6 ("[t]he [Fisher Parties] cannot be sanctioned for a failure to comply with an Order that did not mandate – or even *suggest* – any conduct on the part of counsel")).  In any event, they vigorously dispute that their conduct was sanctionable.  (Docket ## 546 at 14-22; 578 at 4-24; 579 at 5-18).  According to them, the record establishes that the July 2015 class list was compiled by Ignite's General Counsel, upon whom they reasonably relied for that purpose, and their involvement was limited to "vetting" the list – an undertaking independent of the preparation of the list and insufficient to invest them with any knowledge of its preparation.  (Docket # 578 at 7-13).  The Fisher Parties forcefully dispute that they made any inaccurate representations to the Court about the class list or compliance with the Notice Order, let alone any intentionally false or misleading representations.  (Docket ## 546 at 19-21; 578 at 13-17; 579 at 5-18).

---

[20]  In addition to the arguments described *infra*, the Fisher Parties also contend that any sanctions stemming from the March 2015 list are barred by the May 2016 Stipulation and Order and that the amounts paid to plaintiffs' counsel as a result of the settled bankruptcy claims "satisfies [plaintiffs'] claims for sanctions."  (Docket # 546 at 22, 26 (citing Docket ## 256, 346)).  In response, plaintiffs maintain that neither the bankruptcy settlement nor the May 2016 Stipulation and Order preclude their current request for sanctions.  (Docket # 551 at 3).  Although the Fisher Parties are correct that plaintiffs withdrew their previous motion seeking corrective notice and costs pursuant to the May 2016 Stipulation and Order (Docket ## 256, 346), nothing in the previous motion explicitly requested sanctions for the conduct of defendants or the Fisher Parties.  (*See* Docket ## 256, 256-1).  Rather, the relief they sought was expressly limited to "the costs of the corrective notice," as well as "the costs of mailing the court-approved notice to" persons improperly included on the March 2015 list.  (Docket ## 256 at 1; 256-1 at 8).  In any event, as discussed *infra*, I do not find that an award of sanctions in connection with the March 2015 list is appropriate.  I also do not find that the Fisher Parties have demonstrated that the bankruptcy settlement "satisfies [plaintiffs'] claims for sanctions."

[21]  The Fisher Parties also dispute that the Notice Order is an order within the meaning of Rule 16.  (Docket # 578 at 4-5).

## II.     Jurisdiction over the Sanctions Motion

In their separate response to the Court's Order to Show Cause, the Fisher Parties contest the Court's jurisdiction to impose sanctions for "conduct or events occurring subsequent to June 15, 2018."  (Docket # 579 at 3-5).  Specifically, they maintain, "[a]s the alleged 'offending' [Osipoff] declaration and testimony were not provided until July 26, 2018, and October 25, 2018, respectively, . . . the conduct at issue is not properly before the Court because it had been divested of jurisdiction during the period at issue" by virtue of the bankruptcy settlement and subsequent dismissal of the claims against the corporate and individual defendants.  (*Id.* at 4-5).  They omit mention of the language of the June 15, 2018 Stipulation of Dismissal signed by Osipoff that provides "the Court retains jurisdiction over the matter, including any interested party, concerning the pending motion for sanctions (Dkt. 544, as modified by Dkt. 553), *and any additional motion(s) relating to or arising therefrom*, and may award any relief available in its discretion, including attorneys' fees and costs."  (Docket # 558 (emphasis added)).

The Fisher Parties' contention, despite the express language to the contrary in the Stipulation of Dismissal, that this Court lacks jurisdiction to adjudicate sanctions concerning their litigation conduct relating to the Osipoff Declaration and testimony plainly lacks merit. (Docket # 579 at 3-5).  Rather, it is well-settled that a district court retains jurisdiction "to impose sanctions irrespective of the status of the underlying case because the imposition of sanctions is an issue collateral to and independent from the underlying case."[22]  *Schlaifer Nance*

---

[22]  Of the cases cited by the Fisher Parties in support of their erroneous contention that this Court lacks jurisdiction, only one, *Johnson Chem. Co. v. Home Care Prods., Inc.*, 823 F.2d 28, 31 (2d Cir. 1987), addressed the imposition of post-dismissal sanctions.  However, the Second Circuit's holding in *Johnson* that "a voluntary dismissal acts as a jurisdictional bar to further Rule 11 proceedings" was explicitly rejected by the Supreme Court. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 394, 398 (1990).  Indeed, one of the cases cited by the Fisher Parties expressly acknowledges a district court's continuing jurisdiction to impose sanctions.  *See, e.g.*, *Commercial Space Mgmt. Co. v. Boeing Co.*, 193 F.3d 1074, 1079 n.8 (9th Cir. 1999) ("a voluntary dismissal under Rule

*& Co. v. Estate of Warhol*, 194 F.3d 323, 333 (2d Cir. 1999) ("'a federal court may consider collateral issues after an action is no longer pending,' including [later filed] motions for costs, attorney's fees, contempt sanctions, and Rule 11 sanctions because they are 'not a judgment on the merits of an action'") (quoting *Cooter & Gell*, 496 U.S. at 395-96); *see also Cooter & Gell*, 496 U.S. at 395, 396 ("district courts may enforce Rule 11 even after the plaintiff has filed a notice of dismissal under Rule 41(a)(1)"; "[a motion for sanctions] requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate[,] . . . a determination [that] may be made after the principal suit has been terminated"); *Martin v. Giordano*, 185 F. Supp. 3d 339, 350 & n.6 (E.D.N.Y. 2016) (stipulation of dismissal acknowledged that court "retained jurisdiction to adjudicate the motion for attorney's fees and sanctions that defendants indicated they planned to file"; "[n]one of the parties dispute this court's jurisdiction to adjudicate the instant motion notwithstanding its endorsement of the stipulation for voluntary dismissal").

## III.    Compliance with Court Orders

### A.    Applicable Legal Standards

Plaintiffs seek sanctions against the Epstein Firm and the Fisher Parties pursuant to Rules 16(f) and 37 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the Court's inherent powers based upon the defendants' repeated failures to provide an accurate class list in accordance with the Notice Order and their failure to produce a witness at the June 6, 2016 hearing in accordance with the Court's May 17, 2016 Order.  Counsel's conduct in connection

---

41(a)(1)(i) does not divest the district court of jurisdiction to impose sanctions") (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. at 393-98).

with these Orders is most appropriately assessed under Rule 16(f).[23]  *See Hicks v. Client Servs.,*

*Inc.*, 2009 WL 10667497, *2 (S.D. Fla. 2009) (analyzing compliance with order to produce class

list under Rule 16(f)); *Estate of Shaw v. Marcus*, 2017 WL 825317 at *5 ("'when there is

bad-faith conduct in the course of litigation that could be adequately sanctioned under the

Federal Rules of Civil Procedure or a specific statute, the court ordinarily should rely on the

Rules rather than the inherent power'") (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50

(1991) (brackets omitted)).  Rule 16(f) requires compliance with any "scheduling or other

pretrial order" and authorizes a court to order sanctions against "a party or its attorney" for

failure to comply.  *See* Fed. R. Civ. P. 16(f).  Parties and their attorneys have an uncompromising

duty to comply with court orders, which "are not suggestions or recommendations, [but] are

directives with which compliance is mandatory," *U.S. Bank N.A. v. SFR Investments Pool 1,*

*LLC*, 2018 WL 701816, *3 (D. Nev. 2018) (quotations omitted), and the purpose of Rule 16(f) is

to "encourage forceful judicial management."  *Sherman v. United States*, 801 F.2d 1133, 1135

(9th Cir. 1986) (*per curiam*).

> "[V]iolations of Rule 16 are neither technical nor trivial, but involve a matter

most critical to the court itself: management of its docket and the avoidance of unnecessary

delays in the administration of its cases."  *Martin Family Trust v. Heco/Nostalgia Enters.*, 186

F.R.D. 601, 603 (E.D. Cal. 1999) (internal quotation omitted).  In the context of an FLSA

collective action, a notice order is critical to ensure that individuals who have a right to

participate in the lawsuit receive notice and an opportunity to opt in to the litigation; indeed,

prompt notice is especially important because the statute of limitations continues to run until an

---

[23]  Although plaintiffs argue that Rule 37 also applies, that rule addresses discovery disputes, and it is not clear that the Notice Order is, strictly speaking, a discovery order.  In any event, "[i]n determining whether sanctions pursuant to Rule 16(f) are appropriate, courts apply the same standards developed with respect to Rule 37(b)(2) sanctions."  *Estate of Shaw v. Marcus*, 2017 WL 825317, *4 (S.D.N.Y. 2017).

individual affirmatively opts in to the action.  *See Roach v. T.L. Cannon Corp.*, 2013 WL 1316397, *6 n.8 (N.D.N.Y.) (ordering defendants to produce class list; "[t]he court is cognizant of the need for expediency, given the potential effect of the FLSA's statute of limitations that may result in expiring claims literally on a daily basis"), *report and recommendation adopted as modified on other grounds*, 2013 WL 1316452 (N.D.N.Y. 2013), *vacated and remanded on other grounds*, 778 F.3d 401 (2d Cir. 2015).  The importance of compliance with case management orders is underscored by the applicability of sanctions even in the absence of intentional, willful, repeated, or bad faith conduct; indeed, an unexcused failure to comply with a court order is all that is required.  *See In re Baker*, 744 F.2d 1438, 1440 (10th Cir. 1984) ("neither contumacious attitude nor chronic failure is a necessary threshold to the imposition of sanctions") (quotations omitted), *cert. denied*, 471 U.S. 1014 (1985); *Mahoney v. Yamaha Motor Corp. U.S.A.*, 290 F.R.D. 363, 368 (E.D.N.Y. 2013) ("this [c]ourt does not need to find that a party acted in bad faith[,] . . . [r]ather, the fact that a party violated a pretrial order is sufficient to allow a Rule 16 sanction"); *Barkouras v. Hecker*, 2007 WL 777664, *5 (D.N.J. 2007) ("[u]nder Rule 16, a party's failure to comply . . . does not have to be purposeful or done in bad faith; unexcused failure to comply may result in sanctions on the violating party").

   "The purpose of [Rule 16] sanctions is three-fold: (1) to ensure that a party will not benefit from its own failure to comply; (2) to obtain compliance with the particular order issued; and (3) to serve as a general deterrent effect on the case and on other litigants as well." *Martinez v. New York City Health & Hosps. Corp.*, 2017 WL 6729296, *3 (S.D.N.Y. 2017) (quotations omitted).  Where a court has determined that a violation of Rule 16(f) has occurred and that sanctions are warranted, "it has broad discretion in fashioning an appropriate sanction." *U.S. Bank N.A. v. SFR Investments Pool 1, LLC*, 2018 WL 701816 at *4.  Indeed, the language

of Rule 16(f) provides that the court may issue "any just order," including those authorized by Rule 37(b)(2)(A)(ii)-(vii).  *See* Fed. R. Civ. P. 16(f); *see also Duval v. U.S. Xpress Enters., Inc.*, 2005 WL 6021864, *3 (N.D.N.Y. 2005) ("[Rule 16(f)] authorizes a full range of sanctions . . . and confers broad discretion on a court to fashion a remedy appropriate to the violation").  Rule 16(f) also requires the Court to order the payment of reasonable expenses, including attorney's fees, incurred as a result of a violation of the rule unless the violating party can demonstrate that their "noncompliance was substantially justified or other circumstances make an award of expenses unjust."  *Estate of Shaw*, 2017 WL 825317 at *4.

It is axiomatic that attorneys must comply with court orders and have a responsibility to oversee their clients' compliance.  *See*, *e.g.*, *Sun River Energy, Inc. v. Nelson*, 800 F.3d 1219, 1229 (10th Cir. 2015) ("[c]ounsel has an obligation to assure that the client complies with . . . court orders[;] . . . [counsel] cannot rely on his practical abdication of that very duty of oversight and inquiry as a substantial justification for failure to comply"); *U.S. Bank N.A.*, 2018 WL 701816 at *4 ("[i]t is a foundational element of our judicial system that attorneys must comply with [c]ourt orders"); *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 2013 WL 3833065, *5 (D. Minn. 2013) ("as the attorney advising [the party's] conduct and as an officer of the [c]ourt, [the attorney] was required to do *something* to try to assure [his client's] compliance [with a noticed Rule 30(b)(6) deposition;] . . . [an attorney] has a professional responsibility not only to his client, but also to the [c]ourt; . . . [counsel] cannot stick his head in the sand and cower behind his client's disobedient conduct"); *Fish v. Liberty Mut. Fire Ins. Co.*, 2013 WL 12216679, *1 (D. Nev. 2013) ("[a]ttorneys are required to follow [c]ourt orders"); *Knudson v. Wachovia Bank, N.A.*, 2008 WL 2542686, *2 (M.D. Ala. 2008) ("[a]ttorneys have not only a duty to comply with orders of the court, but also a right to expect other attorneys to do the

same"); *Cardenas v. Dorel Juvenile Grp., Inc.*, 2006 WL 1537394, *7 (D. Kan. 2006) ("counsel have a duty to exercise some degree of oversight over their clients' employees to ensure that they are acting competently, diligently, and ethically in order to fulfill their responsibility to the [c]ourt and opposing parties") (citing *Bratka v. Anheuser-Busch Co.*, 164 F.R.D. 448, 461 (S.D. Ohio 1995)).  The Fisher Parties' suggestion that they may not be sanctioned under Rule 16 because the Notice Order was directed to their clients flies in the face of this well-established caselaw, as well as the language of Rule 16 itself, which expressly authorizes a court to impose sanctions against a party "*or its attorney.*"  Fed. R. Civ. P. 16(f)(1) (emphasis added).  "If the fault lies with the attorneys, that is where the impact of the sanctions should be lodged."  *U.S. Bank N.A.*, 2018 WL 701816 at *6 (quoting *In re Baker*, 744 F.2d at 1442).

**B.**     **The Notice Order**

No dispute exists that defendants failed to timely produce an accurate class list in compliance with the Notice Order.  The Order required production of the class list by February 18, 2015, and an accurate list was not produced until August 2016, approximately eighteen months later.  The earlier lists produced in March 2015 and July 2015 were substantially flawed, a fact that caused the Court sufficient concern when it first occurred to hold multiple conferences with counsel to address the need to promptly produce a corrected list, and when it occurred a second time led the Court to schedule an evidentiary hearing and to supervise a Rule 30(b)(6) deposition.  Thus, the real dispute is not whether a class list was accurate – concededly, the first two were not – but whether the attorneys for the defendants bear responsibility for and should be sanctioned as a result of the failure until August 2016 to satisfy the Notice Order.

45

1.    **March 2015 List**

Although the first class list was produced by the February 18, 2015 court-ordered deadline, it suffered from one monumental error that caused it to over-identify approximately one hundred thousand putative class members and, as explained in more detail *infra*, additional errors less substantial in scope that were not uncovered for some time. The production of the erroneous list led to numerous formal motions, copious correspondence between and among counsel and the Court, and numerous conferences with the Court to address the need to ensure prompt production of an accurate class list. Without question, the Court and counsel expended significant time and resources addressing the errors in the March 2015 list.

The record before the Court demonstrates that the first class list was prepared by the corporate defendant Ignite, under the supervision of its General Counsel Robyn Martin, based upon payroll data provided by two of its outside vendors. The Epstein Firm, Ignite's outside counsel at the time, deferred to Martin to prepare the list and evidently did not assist or participate in that process. (Docket # 577 at 1). The list originally comprised approximately 250 spreadsheets and was timely produced to plaintiffs' counsel. After plaintiffs' counsel objected to receiving hundreds of spreadsheets, the Epstein Firm produced a consolidated one. Review of the consolidated spreadsheet led plaintiffs' counsel to question the size of the list because the Epstein attorneys had previously indicated that their client expected the size of the class to be about 30,000 individuals, rather than the approximately 200,000 on the consolidated spreadsheet. Following a conferral about the concerns, the Epstein attorneys produced a single, de-duplicated list of approximately 125,000 names on March 18, 2015, and assured counsel they would address issues that arose from that list (which, as the parties later learned, still included about 100,000 people who should not have been on the list because of the perpetuation of the error into the

consolidated list).  Less than two weeks later, however, the Epstein firm was replaced as counsel of record by Osipoff and Gershengorn.  By the time the Fisher Parties entered their notices of appearance, the first class list had been produced, and no basis exists upon which they should be sanctioned for the preparation or production of that list.

With respect to the motion against the Epstein Firm, I find that sanctions are not warranted.  Ignite assumed responsibility for collecting and compiling the data necessary to create the list.  The Epstein attorneys had no reason to doubt that its client, especially under the direction of its General Counsel, was not competent to produce an accurate list or would not execute those responsibilities with appropriate diligence.  In the absence of controlling caselaw establishing an affirmative duty of involvement by outside counsel in the process of identifying a client's employees or former employees who meet class criteria, I decline to sanction the Epstein Firm for deferring to Ignite in the first instance to compile the list.  When plaintiffs' counsel raised concerns and objections about the organization of the list and the size of the class, the Epstein attorneys responded and ensured that revised, better-organized lists were produced.  As to the accuracy concerns, the Epstein attorneys represented that they would work to ensure that an accurate list was produced and address any issues that arose following the production of the consolidated, de-duplicated list, which occurred on March 18, 2015.  Plaintiffs' counsel was sufficiently satisfied with that assurance that they withdrew their request for a conference with the Court to address the list.  Less than two weeks later, the Epstein Firm was replaced.  On this record, I find that the Epstein Firm's failure to have identified the cause of or corrected the inaccurate list within twelve days of the production of the March 18, 2015 class list does not warrant the imposition of sanctions.  *See*, *e.g.*, *Hicks v. Client Servs., Inc.*, 2009 WL 10667497 at *2-4 (declining to impose sanctions under Rule 16(f) against defendant for failing to provide

accurate class list by deadline where defendant attempted to comply with court order by producing list by deadline and subsequent revisions within days thereafter; "the [c]ourt finds that [d]efendant was substantially justified in its position that it was in compliance with the [c]ourt's [o]rder requiring disclosure of the class list").

### 2.   July 2015 List

Whether sanctions should be imposed on the Fisher Parties based upon the substantial delay in producing an accurate class list between the time they were put on notice of the likelihood of significant errors in the first list (April 2015) and the production of the third class list (August 2016) is a much closer question.  In making this assessment, the Court is mindful of the fact that the party most responsible for the substantial period of non-compliance is Ignite, the corporate defendant which employed the putative class members and maintained records of their employment.  Because Ignite is no longer before the Court, and has not been heard on this motion, the Court may not impose sanctions against it, notwithstanding the demonstrable evidence that the errors in the first and second lists resulted most directly from the apparent failure of Ignite's former General Counsel to compile or oversee the compilation of an accurate list.  Whether that failure resulted from conduct properly characterized as bad faith, negligence, or inadvertence cannot be determined on the record before the Court, which does not include testimony from the former General Counsel herself, who assumed principal responsibility for the production of both the first and the second lists.  Of course, Rule 16 sanctions do not require a finding of bad faith; substantial delay resulting in a prolonged period of non-compliance with a court order may be sufficient.  Moreover, Rule 16 permits the Court to assess attorneys' fees and costs resulting from a sanctionable delay – an exercise that in this case

would have shifted the financial consequences of the delay more equitably to the party most responsible had Ignite been found to have violated Rule 16.

Instead, the sole questions remaining before the Court relate to the absent defendants' attorneys' responsibility for the non-compliance: namely, (1) whether the Fisher Parties bear any responsibility for ensuring their client's compliance with the Notice Order; (2) if so, whether they have adequately discharged their responsibility; (3) if they have not, whether that shortcoming amounts to sanctionable conduct; and, (4) if sanctions are appropriate, whether the Fisher Parties should be held responsible for all, some, or none of the attorneys' fees and costs incurred by plaintiffs in connection with their efforts to obtain an accurate class list. As to the last issue, the record plainly reveals that all of the parties still involved in the sanctions motion at this stage – plaintiffs' counsel, the Fisher Parties, the Epstein Firm, and the Court – have expended substantial resources on the endeavor to ensure production of an accurate class list and the motions arising therefrom. While plaintiffs' counsel emphasize that their pursuit of class list-related issues has cost hundreds of thousands of dollars, the Fisher Parties respond that they have incurred similar fees and costs that remain unpaid by their bankrupt client.

With respect to the Fisher Parties' involvement in Ignite's efforts to ensure production of an accurate class list, the record before the Court demonstrates the following. They did not begin representation of Ignite and the individual defendants until April 2015, after the first list had been produced. Although questions about the size of the list had already been raised when they began their representation, they had not had any involvement in or responsibility for the production of the first list. Although the size of the first list was substantially larger than Ignite's original counsel had expected, the existence of the errors was not confirmed until the notices were sent to the putative class members on June 1, 2015, and

49

plaintiffs' counsel began to be contacted by individuals who had received the notice but were not members of the class.  It was at this time that Ignite discovered that the error had been caused by the inadvertent inclusion of the master human resources list.

Before Osipoff submitted her Declaration, the record contained no information about any participation or oversight by the Fisher Parties in the production of the July 2015 list. Indeed, the Court informed counsel for the Fisher Parties at the June 6, 2018 oral argument of its belief that the record gave rise to the reasonable inference that the Fisher Parties had no involvement in the second list and questioned whether that inference conflicted with counsel's Rule 16 obligations.  Osipoff offered her Declaration and testimony in an effort to satisfy those articulated concerns.  Prior representations aside (they are addressed *infra*), Osipoff's testimony credibly established that the Fisher Parties did not ignore the court-imposed obligation to produce a class list and sit by idly while an obviously incompetent client foundered in its efforts to satisfy the Notice Order.  *Cf. Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 2013 WL 3833065 at *4 (attorney's knowledge of client's prior non-compliance should have placed attorney on notice and "it was unreasonable for [the attorney] to rely on any further assurances from [his client] that the deficiencies would be corrected").  Rather, Osipoff affirms, when the Fisher Parties learned in early June 2015 that the class list was grossly over-inclusive, she spent over twenty-seven hours investigating the cause of the errors, including speaking with Ignite's General Counsel.  When the cause of the error was discovered – the inclusion of the master human resources list in two of the individual store level class files – Osipoff deferred to her client to correct it.  Osipoff's deference under these circumstances – the cause of the error had been discovered; although its effect had been substantial, the nature of the error itself had been simple; the cause of the error had apparently explained the unexpectedly large class size; and, the

client's ability to correct the list by removing the master human resources list had been assured and seemed sound – was reasonable.

Significantly, Osipoff did not take a completely hands-off approach once the cause of the problem was identified. Rather, as her testimony makes clear, when she received the purportedly corrected list from her client on July 4, 2015, she spent the next two weeks attempting to ensure that it was accurate. Specifically, as outlined above, she worked with a paralegal in her firm to run various reports and queries to verify its accuracy. When errors were discovered, Osipoff's paralegal or Ignite's General Counsel made the appropriate modifications to the list to correct the errors. None of the errors appeared substantial enough to doubt the integrity of the compilation process. On July 17, 2015, after forty-four hours of work with the July 4, 2015 list, Osipoff produced the July 17, 2015 second class list.

Judged under the unusual circumstances confronting the Fisher Parties when they entered the case, their conduct in (1) assisting in investigating the cause of the error in a class list in which they had no involvement, (2) deferring to General Counsel to correct the list once the cause of the error had been identified, and (3) working to verify the accuracy of the list before production does not violate their obligations under Rule 16. Nor does it amount to bad faith justifying sanctions under any other authorities relied upon by plaintiffs. *See Bratka v. Anheuser-Busch Co.*, 164 F.R.D. at 461 ("[t]he court recognizes that corporate defendants with in-house legal departments often attempt to mitigate the cost of litigation, . . . by using in-house counsel to assist trial counsel[;] [w]hile there is nothing inherently wrong with this, it is clear that in order to avoid the kind of problems which occurred in the instant case, trial counsel must exercise some degree of oversight to ensure that their client's employees are acting competently, diligently and ethically in order to fulfill their responsibility to the [c]ourt").

Osipoff's Declaration also provides information previously missing from the record about her subsequent work to investigate the accuracy of the July 2015 list after plaintiffs' counsel raised questions about it on March 14, 2016, eight months after it had been produced and corrected notices had issued.  Specifically, her Declaration explains that she "personally led" the efforts to investigate those concerns.  (Docket # 560 at ¶ 11).  By the time of the renewed concerns about the accuracy of the class list, Martin had left Ignite.  Because Martin was no longer accessible to Ignite, Osipoff worked with Oguchi, Ignite's Corporate Counsel, and Amy English, Ignite's Payroll Manager, and two paralegals at Osipoff's firm to investigate potential errors in the July 2015 list.  Osipoff's affidavit states that she communicated with Oguchi and Ignite's two outside payroll providers regularly and frequently over the next eight weeks.  In addition, she obtained payroll data from those vendors on several occasions and reviewed it as part of her investigation into the possible errors.  All told, Osipoff's Declaration identifies numerous communications with her client and the payroll providers on nineteen dates between March 14, 2016 and May 17, 2016, the date on which the parties appeared for oral argument on plaintiffs' motion relating to the accuracy of the second list and during which the Court scheduled the June 6, 2016 hearing.  According to Osipoff, she and her firm's paralegals logged 255 hours during that period investigating potential errors on the July 2015 list.  Despite those intensive efforts, the investigation was still ongoing at the time of the May 17 appearance before the Court, and defendants had still not determined how many individuals were inaccurately included in and excluded from the list.

The record demonstrates that shortly after the May 17 argument Ignite made the decision to abandon the effort to correct the July 2015 list and undertake the preparation of an entirely new, third list.  Osipoff assumed personal responsibility for doing so.  Although the time

that it took to produce the new list – approximately ten weeks from the decision – was longer than counsel had estimated and far longer than the Court or plaintiffs had hoped, Moore's subsequent deposition testimony explained why the process was as lengthy and complicated as it was.  The need to produce a reliable list was paramount, and Osipoff's Declaration and Moore's testimony demonstrate that Osipoff's efforts to do so were diligent, appropriate and competent.  Significantly, the list has not been determined to suffer from any inaccuracies.

The length of the delay in producing an accurate class list, measured in any number of ways – from the time it was ordered (18 months), from the time questions were raised about the first list (17 months), from the time questions were raised about the second list (5 months) – would likely warrant Rule 16 sanctions against Ignite, were it before the Court.  But it is not.  The record before the Court, slow as it was to be fully developed and the facts fully revealed, satisfies this Court that Ignite's counsel acted with sufficient diligence to attempt to ensure that an accurate list would be produced in compliance with the Notice Order.  I thus recommend that sanctions not be imposed against the Fisher Parties on the grounds that their conduct violated their obligations with respect to the Notice Order.

## C.    The May 17, 2016 Order

Plaintiffs also seek an order imposing sanctions on the Fisher Parties based upon the failure to produce a witness for the scheduled June 6, 2016 hearing.  As described above, at the conclusion of oral argument on May 17, 2016, on plaintiffs' motion to compel a corrected class list, the Court ordered defendants to produce a company witness to testify at an evidentiary hearing on June 6, 2016.  The Court delineated the scope of the testimony to cover the preparation and correction of the July 2015 class list, specifically:

> [H]ow was the list put together[?]  How many mistakes are there
> on the list?  What caused the mistakes?  How have those mistakes

> been rectified?  Is the list now accurate?  What is the degree of
> confidence . . . in that accuracy?

(Docket # 349 at 16).  The Court's decision to order an evidentiary hearing resulted from its

consternation over Ignite's failure to have corrected the July 2015 list by the time of the

argument and the potentially significant, but still unknown, scope of the errors, and its frustration

with Gershengorn's lack of information about the cause of the errors.  Gershengorn represented

that his client Ignite was working hard to understand and correct the errors (*id.* at 14

("defendants have been and continue to make a good-faith effort to obviously deal with [the

errors]")), but he was unable to provide more information about that undertaking beyond the fact

that the errors seemed to have something to do with the fact that Ignite had two payroll

providers.  At no time did Gershengorn or Osipoff, who accompanied Gershengorn at the

hearing, explain to the Court that the efforts to get to the bottom of the errors had been impeded

by the departure and inaccessibility of Ignite's former General Counsel.  The absence of that

information, coupled with Gershengorn's representations of the efforts being undertaken by

Ignite to address the July 2015 class list issues, led the Court reasonably to believe that Ignite

had the capacity to produce a company witness to testify about the issues identified by the Court.

In the Court's view, an evidentiary hearing, at which the Court could consider and explore

testimony from a company witness about the efforts to correct the July 2015 class list, would

better enable it to discharge its duty to ensure that accurate notice was provided to putative class

members so that they could decide whether to opt into the lawsuit.  At no time before the May 17

argument concluded did the Fisher Parties even hint that there might be problems producing a

knowledgeable company witness.

   The first indication to the Court that the hearing might be derailed was

Gershengorn's May 25, 2016 letter to this Court, sent more than a week after the hearing Order

issued.  For the first time, Gershengorn informed the Court that "the *only* person with any

detailed knowledge of the July 2015 Revised Notice List is no longer with the company and thus

is not under Defendants' control."  (Docket # 455-4).

   The Court held a telephone conference with counsel on June 1, 2016, to address

the hearing.  Although the Court and the Fisher Parties have different recollections of whether

the Court ordered or the Fisher Parties agreed to produce Osipoff to testify at the hearing, there is

no dispute that as a result of the information provided to the Court about the absence of any

knowledgeable company witness, the focus of the June 6, 2016 hearing shifted to the new list.

The Court made clear that its objective at that stage was not to explore whether sanctions were

warranted relating to the inaccurate July 2015 class list (an issue that was deferred), but to

explore the process for preparing the third list in order to satisfy itself that a reliable list would

finally be produced.  The Fisher Parties agreed to submit an affidavit from Osipoff in advance of

the hearing outlining the steps she was taking to prepare the list.  The next day Osipoff submitted

her declaration, accompanied by a letter stating that she would "be prepared to testify at the June

6, 2016 hearing on the limited issue of the process being used to create the corrected class notice

list."  (Docket # 359-14 at 2).

   Given the submission of Osipoff's declaration – and the implicit

acknowledgement from that Declaration that a description of the process would not invade or

waive privilege – and the letter affirming Osipoff's intent to testify, the Fisher Parties' appeal to

Judge Siragusa of this Court's "order" to produce Osipoff was surprising, at best.  Judge

Siragusa declined the relief sought in the absence of any docketed order.  The next day

Gershengorn and Osipoff appeared for the scheduling hearing, stated that there was no witness

from Ignite prepared to testify, and declined to produce Osipoff in the absence of a court order,

which they affirmed they would immediately appeal.  Rather than issue such an order, the result

of which would be more delay and frustration of the Court's efforts to oversee the production of

an accurate class list, the Court consented to permit the parties to brief the appropriateness of

Osipoff's testimony.  As described *supra*, the Court subsequently determined that the most

effective manner to proceed to achieve its objectives was to conduct a court-supervised Rule

30(b)(6) deposition.

   Whether sanctions should be imposed on the Fisher Parties for the failure to

produce a witness for the June 6, 2016 hearing is a closer question than it might first appear.  The

salient facts that inform this determination include the following:

1. The Court's May 17, 2016 Order directed Ignite to produce a
   company witness to testify at the June 6, 2016 evidentiary
   hearing.

2. The scope of the June 6 hearing was the preparation of the July
   2015 class list, the cause and scope of the errors in the list, the
   process to correct it, and the degree of confidence that the
   correction process was reliable.

3. Based upon representations made by the Fisher Parties, the
   scope of the evidentiary hearing shifted to the preparation of a
   new class list by Osipoff.

4. Osipoff was never ordered by the Court to testify at the June 6,
   2016 hearing.

5. No witness was produced at the June 6, 2016 hearing.

On these facts, this Court cannot find that the Fisher Parties disobeyed a court order.  The May

17, 2016 Order required a company witness with meaningful knowledge of the compilation of

the July 2015 class list.  I agree with the Fisher Parties that the record before the Court, which

includes Osipoff's subsequent Declaration and testimony, demonstrates that the only Ignite

representative with that personal knowledge was its former General Counsel, who was no longer

with the company and not cooperating with it.  Although plaintiffs' counsel suggests that Oguchi

or Moore may have been able to testify, the record demonstrates otherwise.  Had Ignite proffered

either of them, given their extremely limited, if any, knowledge in June 2016 about the

preparation of the July 2015 list, their testimony would likely have prompted another sanctions

motion.  Rather, the reasonable response under the circumstances was to advise the Court that no

company witness with meaningful knowledge could be produced by Ignite, and the Fisher Parties

did that.  Upon learning that information, the Court's focus changed to the preparation of the

new, third list; the new focus, in turn, led to the dispute over whether the Court had ordered

Osipoff to testify.  Of course, the Court's recollection that it never ordered Osipoff to testify

nullifies any request to sanction the Fisher Parties for disobeying the order by not producing her.

That said, counsel's failure to advise the Court prior to the May 25 letter that

Ignite had no company witness who could satisfy its May 17, 2016 Order is troubling.  Plaintiffs'

counsel contends that it strains credulity to believe that the Fisher Parties did not know by the

time of the May 17, 2016 hearing that Martin had compiled the July 2015 class list without

assistance from anyone at Ignite and was thus the only person who could satisfy the Order.

Certainly, the record contains facts that would appear to support that contention – namely,

Osipoff's extensive involvement in "vetting" the July 2015 class list before its production and

her very extensive involvement from March through May 2016 in investigating the scope and

cause of the errors in that list.  In any event, even if Osipoff and Gershengorn previously had not

known that Martin alone compiled the list, they should have known that fact by the time of the

May 17, 2016 court appearance.  Osipoff's efforts to uncover the errors in the list, which

commenced in mid-March 2016, should have led her to identify the persons at Ignite with

knowledge about its compilation; presumably, she would have quickly learned that the only such

person had left the company in March 2016.  Moreover, once the Court scheduled the June 6, 2016 hearing and reiterated the urgency of obtaining testimony on the identified subjects, Gershengorn and Osipoff should have acted with greater dispatch to learn and notify the Court that no witness was available.

Gershengorn and Osipoff's conduct in addressing the May 17, 2016 Order, while not amounting to disobedience, was sufficiently remiss to warrant an order requiring them to reimburse plaintiffs' counsel for their attorneys' fees and costs incurred from May 17, 2016, through June 6, 2016, to prepare for and attend the hearing.  From May 17 through May 25, the Court and plaintiffs' counsel reasonably believed that Ignite would produce a company witness to testify about the July 2015 class list and related issues identified by the Court.  After the June 1 court conference on the letter, they reasonably believed that Osipoff would testify about her efforts to prepare a third list, a belief confirmed by her letter the next day affirming her intent to testify.  Although defendants sought to obtain a ruling from Judge Siragusa that Osipoff should be protected from testifying, that request was denied.  In view of that denial, plaintiffs' counsel needed to be prepared that the hearing would proceed and she would testify.  Under these circumstances, reimbursement by Gershengorn and Osipoff of plaintiffs' reasonable attorneys' fees and costs between May 17 and June 6 to prepare for and attend the court-ordered June 6 evidentiary hearing is appropriate.  *See MHD-Rockland Inc. v. Aerospace Distribs. Inc.*, 102 F. Supp. 3d 734, 739-40 (D. Md. 2015) (imposing costs and fees pursuant to Rule 16(f) incurred by defendant to prepare for settlement conference that plaintiff cancelled without reasonable notice or substantial justification); *Caraballo v. Homecomings Fin.*, 2013 WL 1499403, *5 (S.D.N.Y. 2013) (imposing costs and fees pursuant to Rule 16(f) incurred by plaintiffs to prepare and attend settlement conference for which defendants were unprepared).

58

IV.     **Representations to the Court**

Having evaluated counsel's conduct in connection with the Notice Order and the

May 17, 2016 Order and determined that sanctions are not justified, I turn now to an evaluation

of their representations to this Court about that conduct.

A.      **Applicable Legal Standards**

The dispute whether the sanctions are appropriate against the Fisher Parties based

upon representations that they made and advocated to this Court is sharp, heavily-dependent

upon facts relating to events that occurred over a prolonged period of time, and calls upon the

Court to discharge the unenviable responsibility of determining whether to sanction attorneys.

Thirty years ago, Judge Dearie made the following observations about that responsibility, which

are as resonant today as they were three decades ago:

> The imposition of sanctions is a serious matter and should be
> approached with circumspection.  An attorney's name and
> reputation are his [or her] stock in trade and thus any unfair or
> hasty sullying of that name strikes at the sanctioned attorney's
> livelihood.  These considerations suggest that, wherever possible,
> doubts should be resolved in counsel's favor.  The Court has taken
> considerable time to review the full record of the proceedings, the
> papers, and the transcript[s] of the oral argument [and the
> evidentiary hearing].  The passage of time may have restored some
> welcomed objectivity to the Court's analysis of the issues
> presented, leaving the Court nevertheless committed to the
> regrettable conclusion that . . . sanctions must be imposed.

*Veliz v. Crown Lift Trucks*, 714 F. Supp. 49, 56 (E.D.N.Y. 1989) (internal quotations and

citations omitted).  With those considerations in mind, this Court turns to the sources of authority

for the sanctions sought.

It is well-settled that a court has authority to impose sanctions on attorneys

pursuant to its inherent authority.  *United States v. Seltzer*, 227 F.3d 36, 41 (2d Cir. 2000).

Where the attorney's conduct at issue involves actions "not undertaken for the client's benefit," a

finding of bad faith is not required for the court to exercise its inherent power to sanction. *Id.* at 42. By contrast, where the challenged conduct involves conduct "inherent to client representation," an explicit finding of bad faith is a prerequisite for the imposition of sanctions. *Id.* The reason for the requirement is "to strike a balance between the vigorous pursuit of litigation and the right to be free of litigation that is undertaken 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.* at 40 (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986), *cert. denied*, 480 U.S. 918 (1987)). "Bad faith may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation." *Hall v. Cole*, 412 U.S. 1, 15 (1973). An award of sanctions under a court's inherent powers must be supported by "both 'clear evidence that the challenged actions are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes, and a high degree of specificity in the [court's] factual findings.'" *Carling v. Peters*, 2013 WL 865842, *9 (S.D.N.Y. 2013) (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78 (2d Cir. 2000)) (internal quotation, emphasis, and brackets omitted). Under the inherent power of the court, "sanctions are appropriate where an individual has made a false statement to the court and has done so in bad faith." *SEC v. Smith*, 710 F.3d 87, 97 (2d Cir. 2013).

As with sanctions imposed pursuant to its inherent authority, sanctions imposed under 28 U.S.C. § 1927 may be imposed on attorneys admitted to practice before the Court upon a clear showing of bad faith. *Oliveri v. Thompson*, 803 F.2d at 1273 (citing *Kamen v. AT&T Co.*, 791 F.2d 1006, 1010 (2d Cir. 1986)). Section 1927 provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. "Sanctionable behavior under [Section] 1927

includes bringing claims for an improper purpose, pursuing abusive litigation practices, and

'continually engaging in obfuscation of the issues.'" *Alexander Interactive, Inc. v. Adorama,

Inc.*, 2014 WL 12776440, *13 (S.D.N.Y. 2014) (quoting *Keller v. Mobil Corp.*, 55 F.3d 94, 99

(2d Cir. 1995)).  "Further, the presentation of factual misstatements in support of [or in

opposition to] a motion can support an award of sanctions under [Section] 1927." *Ceglia v.*

*Zuckerberg*, 2012 WL 12995636, *15 (W.D.N.Y. 2012) (citing *Johnson v. Univ. of Rochester*

*Med. Ctr.*, 715 F. Supp. 2d 427, 429-30 (W.D.N.Y. 2010), *aff'd*, 642 F.3d 121 (2d Cir. 2011)).

　　　　Bad faith in the context of sanctions against an attorney under either Section 1927

or a court's inherent authority refers to actions "so completely without merit as to require the

conclusion that they must have been undertaken for some improper purpose such as delay."

*Oliveri*, 803 F.2d at 1273.  The focus of the court under either exercise is "the purpose rather

than the effect of the sanctioned attorney's activities." *Enmon v. Prospect Capital Corp.*, 675

F.3d 138, 145 (2d Cir. 2012). *See also Rankin v. City of Niagara Falls*, 293 F.R.D. 375, 383

(W.D.N.Y. 2013), *aff'd*, 569 F. App'x 25 (2d Cir. 2014).  The Second Circuit has observed:

> [T]he only meaningful difference between an award made under
> [Section] 1927 and one made pursuant to the court's inherent
> power is . . . that awards under [Section] 1927 are made only
> against attorneys . . . authorized to practice before the courts while
> an award made under the court's inherent power may be made
> against an attorney, a party, or both.

*Oliveri*, 803 F.2d at 1273.  Sanctions imposed under either the Court's inherent authority or

under Section 1927 may include an award of attorneys' fees. *Id.*  Further, appropriate sanctions

pursuant to the Court's inherent sanctions power may "include a fine payable to the Clerk of the

Court," *Xu v. UMI Sushi, Inc.*, 2016 WL 3523736, *4 (S.D.N.Y. 2016), in order to acknowledge

"[d]ue regard for the need to vindicate the public interest in the sound administration of justice,"

*Miltope Corp. v. Hartford Cas. Ins. Co.*, 163 F.R.D. 191, 195 (S.D.N.Y. 1995); *see also Cognex*

*Corp. v. Microscan Sys., Inc.*, 990 F. Supp. 2d 408, 421 (S.D.N.Y. 2013) (imposing a fine payable to Clerk of the Court in order "to provide an adequate deterrent to such conduct in the future").  The purpose of such fines is not only to punish bad faith conduct, but also to serve as a deterrent to others who might otherwise be tempted to engage in such behavior.  *Miltope Corp. v. Hartford Cas. Ins. Co.*, 163 F.R.D. at 194.

Under Rule 11 of the Federal Rules of Civil Procedure, sanctions may be imposed on an attorney for, among other things, "misrepresenting facts."  *Muhammad v. Walmart Stores East, L.P.*, 732 F.3d 104, 108 (2d Cir. 2013).  If sanctions are sought pursuant to a motion filed by opposing counsel, counsel may be sanctioned for conduct that was "objectively unreasonable."  *Id.*  If, on the other hand, a court is considering issuing sanctions *sua sponte* under Rule 11, they may be imposed "only upon a finding of subjective bad faith."  *Id.*  Under Rule 11(c)(3), sanctions are appropriate against an attorney who has made a false statement to the court and has "done so in bad faith."  *SEC v. Smith*, 710 F.3d at 97.  *See also Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 51 (2d Cir. 2008) (*sua sponte* sanctions may be imposed for "making false, misleading, improper, or frivolous representations to the court"), *cert. denied*, 555 U.S. 1102 (2009).  Filing a misleading motion for the purpose of influencing a court's decision on a motion constitutes bad faith.  *Housatonic Habitat for Humanity, Inc. v. Gen. Real Estate Holdings, LCC*, 2015 WL 3581242, *3-5 (D. Conn. 2015) ("the mere fact that [a party] might have a proper basis for taking [a] position does not make it any less improper to file a misleading motion, rather than a forthcoming motion, in pursuit of that position"); *Kleehammer v. Monroe Cty.*, 2013 WL 1182968, *12 (W.D.N.Y. 2013) (imposing sanctions *sua sponte* where the attorney "knew the representations were false and she submitted them with a motive to mislead the [c]ourt, so as to gain an advantage in the litigation by avoiding summary judgment").  In

making an assessment of bad faith, a court should be mindful that "Rule 11 neither penalizes overstatement nor authorizes an overly literal reading of each factual statement." *Kiobel v. Millson*, 592 F.3d at 83 (internal quotation omitted).

Where, as in this case, Rule 11 sanctions are not sought by motion of an opposing party but are being considered by the Court *sua sponte*, the scope of applicable sanctions is circumscribed. Specifically, sanctions may include "nonmonetary directives" and "an order to pay a penalty into court," but may not include "an order directing payment . . . of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4). The rule further proscribes the imposition of any monetary sanction by the court:

> on its own [initiative], unless it issued the show-cause order under
> Rule 11(c)(3) before voluntary dismissal or settlement of the
> claims made by or against the party that is, or whose attorneys are,
> to be sanctioned.

Fed. R. Civ. P. 11(c)(5)(B).[24] The Advisory Committee Notes make clear that the purpose behind the proscription is to ensure that "[p]arties settling a case . . . not be subsequently faced with an unexpected order from the court leading to monetary sanctions that might have affected their willingness to settle or voluntarily dismiss a case." Fed. R. Civ. P. 11(c) advisory committee's note to 1993 amendment.

In this case, a monetary sanctions award against counsel certainly would not offend the purpose of the Rule 11(c)(5)(B) proscription. There is no dispute that the sanctions motion was filed before the defendants were dismissed from the action, that the motion was directed originally at their conduct as well as their clients', and that they knew the motion would be pursued as to them following their clients' dismissal. They explicitly agreed in the Stipulation

---

[24] Pursuant to Rule 11(c)(3), this Court issued a show cause order to the Fisher Parties to put them on notice that the Court was considering Rule 11 sanctions and to provide them an opportunity to respond. (Docket ## 574, 580).

of Dismissal to the Court's continuing jurisdiction over the motion, as well as its jurisdiction

over "any additional motion(s) relating to or arising therefrom," to consider imposing any

sanctions in the Court's "discretion, including attorneys' fees and costs."  (Docket # 558).  The

Fisher Parties may not now fairly complain that the possibility that they could be sanctioned for

representations made in the course of opposing the sanctions motion – representations that were

made before the remaining defendants were dismissed from the action – was "unexpected."  *See*

*also Bell v. Vacuforce, LLC*, 908 F.3d 1075, 1081 (7th Cir. 2018) ("[w]e see no obvious reason

why Rule 11 should be interpreted to allow attorneys to file frivolous and abusive pleadings after

a judgment without the threat of court-initiated monetary sanctions").  That said, in view of the

language of Rule 11(c)(5)(B) and the complex issues it raises in the context of this case, the

Court will refrain from evaluating counsel's conduct under Rule 11 and assess it instead under

the Court's inherent authority and Section 1927.

> **B.**     **Analysis**

As this Court's consistent observations since the submission of the Osipoff

Declaration underscore, the Court has been very troubled by fundamental inconsistencies it

perceives between the factual allegations in the Metzger Declaration, on the one hand, and the

factual assertions in the Osipoff Declaration and her later testimony at the evidentiary hearing,

on the other.  The Metzger Declaration was submitted for the purpose of supporting the Fisher

Parties' contention that sanctions against them were not warranted.  Significantly, the

Declaration largely recounts events that occurred before Metzger became Ignite's General

Counsel and thus is not based on his "firsthand" knowledge; as the Declaration itself and his

subsequent testimony make clear, his factual assertions are based upon conversations with others

at the company, review of documents, and communications with Osipoff and Gershengorn.  The

hearing testimony establishes that Gershengorn and Osipoff asked him to submit a Declaration

and provided him with some of the information that he relied upon in making his assertions, and

that Fisher Phillips attorneys, including Osipoff, drafted the Declaration which he reviewed,

made some changes to, and ultimately signed.  Osipoff testified under oath that she reviewed it

before it was submitted in opposition to plaintiffs' motion.  Further, Gershengorn submitted it to

this Court by letter dated December 19, 2017.

      The factual assertions in Metzger's Declaration concerning the Fisher Parties'

involvement in the conduct for which plaintiffs seek sanctions are clear and direct.  They consist

of the following:

> The errors on the July 2015 Class Notice List were solely the fault
> of Ignite.  The repeated failure of Ignite to produce an accurate
> class Notice List was solely the fault of Ignite.  Ignite fully
> intended to comply with the Court's [Notice Order.]  However,
> Ignite made a number of unintended mistakes in the preparation of
> the class Notice List which unfortunately resulted in the production
> of inaccurate class Notice Lists.
>
>      \*   \*   \*
>
> Whether or not the Court ordered Ms. Osipoff to testify [at the
> June 6, 2016 hearing,] Ignite ultimately did not believe it was
> appropriate for Ms. Osipoff to testify about the efforts to correct
> the July 2015 Class Notice List – and Ms. Osipoff had no
> knowledge about the creation of the July 2015 Class Notice List.
>
>      \*   \*   \*
>
> The class Notice List was an issue solely undertaken by Ignite.

(Docket # 546-1 at Ex. A at ¶¶ 20-22).

      The purpose for which those assertions were submitted is equally clear and direct:

to persuade the Court that the Fisher Parties should not be sanctioned because they were not

involved in the preparation of the first two lists; they had no knowledge about the preparation of

the list; and, the errors on the list were solely the fault of Ignite and not them.  (Docket # 546).

At the hearing, Metzger even went so far as to acknowledge that the Fisher Parties would likely

have been relieved as counsel had he believed that they were responsible for the errors.

Indeed, the Metzger Declaration describes the process of preparation to

production of the July 2015 list by omitting any mention of Osipoff's work:

> Ignite then endeavored to correct the [March 2015] Notice List as
> quickly as possible, a Task undertaken by General Counsel Martin
> personally.  Though Ignite's counsel was aware that General
> Counsel Martin was spearheading the effort to correct the Notice
> List, unbeknownst to its counsel, General Counsel Martin did so
> individually, without assistance from anyone else at Ignite.
>
> Ignite provided its counsel with what Ignite believed to be a
> corrected class list of 32,962 putative class members (the "July
> 2015 Class Notice List"), which Ignite's counsel then provided to
> Plaintiffs' counsel on July 17, 2015.

(Docket # 546-1 at Ex. A at ¶¶ 11-12).  The reasonable inference from those paragraphs –

whether read alone or in the context of the rest of the Declaration – is that General Counsel

Martin prepared the list, turned it over to Osipoff, who produced it to plaintiffs' counsel on

behalf of her clients.  Indeed, the reasonableness of that inference is underscored by Metzger's

hearing testimony that he understood that "whatever list Martin came up with would then be

provided to plaintiffs' counsel" without any involvement by Osipoff or other attorneys in the

"creation or production" of the list.  (Docket # 575 at 32, 38-39).  As the record now shows,

however, Osipoff and her team received the list from Martin on July 4, 2015, worked with it for

forty-four hours over two weeks after receiving it, ran data programs and queries to verify its

accuracy, discovered errors, made changes, reviewed a second version, checked it, made changes

to it, *and only then* produced it to plaintiffs' counsel.

Moreover, as demonstrated in significant detail above, the Fisher Parties' opposition memorandum is replete with references to Metzger's Declaration.  Unquestionably, it is the factual linchpin of their legal opposition to sanctions – that no factual basis exists to sanction them because they were uninvolved in the preparation of the second class list and indeed had no knowledge about it but "only had knowledge of efforts to create a new[,] [third] list from scratch."  (Docket # 546 at 19).  In their memorandum, which Osipoff testified she was involved in drafting and reviewing, they repeat virtually verbatim the assertion in the Metzger Declaration that Martin corrected the list without assistance from anyone at Ignite, provided the Fisher Parties with a corrected list (the "July 2015 Class List"), which the Fisher Parties "then provided to [p]laintiffs' counsel on July 17, 2015."  (*Id.* at 4-5).  They even define the list that Martin gave Osipoff as the "July 2015 Class List."  (*Id.*).  They again omit mention of any of the forty-four hours of work done by Osipoff between receipt of the list from Martin (on July 4) and production of the list to plaintiffs' counsel (on July 17).[25]

If there were any doubt about the reasonable meaning and import of Metzger's Declaration, this Court's observations to counsel during the June 6, 2018 oral argument on the motion put those to rest.  The Court clearly articulated its understanding from the Metzger Declaration.  Citing the Metzger Declaration itself, the Court informed counsel that it reasonably inferred that the Fisher Parties had not been involved with the July 2015 class list and questioned whether that evident lack of involvement following the substantial error in the first list violated

---

[25]  Any suggestion that considerations of attorney-client privilege informed or excused counsel's representations is belied by the record and legally unsound.  First, the submission of Osipoff's earlier Declaration in May 2016 reflects counsel's apparent understanding that assertions regarding the steps taken to prepare the list, as opposed to the content of communications with Ignite about those steps, do not invade or waive the privilege.  So too does her submission two years later of her second Declaration describing what she did and whom she spoke to about the second class list, but not disclosing the content of the communications.  In any event, privilege considerations can never excuse concealing from the Court *the fact* that counsel had involvement in the process, particularly where the very issue before the Court is whether counsel's conduct warrants sanctions.

counsel's duty of diligence.  In response to that concern – the possibility that sanctions could be imposed because the Metzger Declaration succeeded in proving its point so well – Osipoff submitted her Declaration.

The facts that were revealed for the first time in Osipoff's Declaration and subsequently reaffirmed and elaborated upon in her testimony demonstrate that many of the core assertions in Metzger's Declaration and in the Memorandum of Law which relies upon it are simply inaccurate.  The assertion that no one at Fisher Phillips was involved in the preparation of the July list is false.  Osipoff's Declaration and testimony unequivocally demonstrate that she conferred with and discussed questions put to her by Martin during the period that Martin was compiling the list – a level of involvement that Osipoff herself characterized in her Declaration as "oversight and support to Ms. Martin on various issues that arose during the preparation" of the list.  (Docket # 560 at ¶¶ 6, 10 ("Ogletree logged approximately forty-four (44) hours for time spent overseeing the creation of the July 17, 2015 Class List and vetting the accuracy of that list")).  Osipoff received, reviewed, ran queries to verify, and directed changes to the list Martin gave her on July 4; she received a second version of the list from Martin on July 14 reflecting the changes that she and Martin had made; she repeated the process for this second version – ran queries and made changes; she produced to plaintiffs' counsel the final list on July 17, 2015.

Any notion that the nature and degree of Osipoff's work on the list can be dismissed as something other than involvement in the preparation or creation of the list is preposterous.  The July class list that she produced on behalf of her clients differed from the list she had received two weeks earlier from General Counsel Martin.  Whether those differences resulted from work she characterized as "vetting" is immaterial.  The work that Osipoff

performed, however characterized, changed the list that she had received into the final one that was produced.

The Fisher Parties' assertion that Osipoff had no knowledge about the creation of the list is belied by the record and offends common sense. The record plainly demonstrates that Osipoff had knowledge about how the list was prepared. Even under her own definition – the contention that "vetting" (meaning review for accuracy and modification to correct mistakes discovered) somehow does not constitute involvement in the process – Osipoff clearly had knowledge of the compilation, creation, and preparation of the list. As her testimony affirms, during Martin's compilation process, Osipoff communicated with Martin to address questions about the list that Martin raised. To contend that those communications do not amount to knowledge is simply absurd.

This Court's careful review of the record and assessment of the evidence leads to the conclusion that the representations made in Metzger's Declaration and in the Fisher Parties' memorandum of law submitted in opposition to the sanctions motion were knowing misrepresentations designed to mislead the Court in evaluating the conduct at issue in the sanctions motion, for which Osipoff and Gershengorn bear responsibility and should be sanctioned. Metzger's Declaration was solicited by Gershengorn and Osipoff, drafted by the Fisher Phillips attorneys, including Osipoff, and first submitted to the Court by Gershengorn (prior to counsel's entry of a notice of appearance for the Fisher Parties). (*See* Docket # 517). Metzger's testimony reveals that he learned the factual assertions in his Declaration from others, including Osipoff and Gershengorn. Although the record does not establish that he knew those assertions were false, it clearly and convincingly demonstrates that Osipoff and Gershengorn knew the assertions in the Declaration about their lack of involvement with and knowledge about

the preparation of the July 2015 class list were untrue.  Because their knowledge of the falsity of

those assertions derived from their own actions during the period April through July 2015,

primarily July 4 through July 17, there is no doubt that they knew Metzger's Declaration

contained misrepresentations at the time it was signed, when Gershengorn first submitted it to

this Court on December 19, 2017, and when it was resubmitted on their behalf in March 2018

and again in May 2018.

Notwithstanding that neither Osipoff nor Gershengorn signed the Metzger

Declaration or the memorandum of law that relies so heavily upon it, they are responsible for

those misrepresentations.  As stated above, they solicited the Declaration, Osipoff was involved

in drafting it and the memorandum which relied upon it, and Gershengorn first submitted it to the

Court.  Moreover, they advocated those representations by relying upon them – sometimes

exclusively – to advance the arguments made in their opposition brief that the errors in the July

2015 list were solely the fault of Ignite and that no basis existed therefore to sanction them.

Gershengorn and Osipoff appeared with their attorney at oral argument and listened to their

counsel proffer Metzger's Declaration as an accurate recitation of their non-involvement and as

justification for denial of plaintiffs' motion.  When the Court articulated that it understood the

Metzger Declaration to state that the Fisher Parties had had no involvement, they did not correct

the Court's understanding of the facts.

On this record, I find that Osipoff and Gershengorn not only knew the Metzger

Declaration contained false statements, but knowingly participated in presenting it to the Court

and advocating it for an improper purpose: to attempt to deflect the Court's attention from their

conduct, to persuade the Court that their client was wholly responsible for the problems with the

July 2015 class list – which persisted from its production in July 2015 until the new list was

produced over a year later, and to convince the Court that they had engaged in no conduct that even warranted examination, let alone sanctions.[26]  Facts pertaining to their degree of involvement in and knowledge about the July 2015 class list were relevant and material to all the bases on which plaintiffs sought sanctions: failure to timely comply with the Notice Order; failure to produce a witness for the June 6, 2016 hearing; and, representations to the Court about the accuracy of the lists.  That this Court ultimately determined after a careful and searching evaluation of all the record evidence that the Fisher Parties should not be sanctioned for non-compliance with the Notice Order or the May 17, 2016 Order[27] does not moot the question of sanctions for misrepresentations about their conduct.  As this opinion explicitly recognizes, those other sanctions questions were close determinations and their outcomes hardly free from doubt.

Moreover, if the Fisher Parties had convinced the Court based upon the Metzger Declaration that they had had no involvement with the July 2015 list, the Court conceivably could have denied the motion without further hearings.  Considering that the Fisher Parties were no longer being paid by their client, terminating the motion without further proceedings would also have avoided the expenditure of additional financial resources to litigate the motion.

For these reasons, I find that Gershengorn and Osipoff made misrepresentations to the Court in subjective bad faith for the improper purpose of attempting to influence the Court's decision on the sanctions motion in their favor.  *See Monroe v. Geo Grp., Inc.*, 2017 WL

---

[26]  Indeed, in his December 19, 2017 letter submitting the Metzger Declaration, Gershengorn even went so far as to suggest that the Declaration "calls into question whether [p]laintiffs should be permitted to proceed with the [sanctions] motion consistent with . . . their professional responsibilities."  (Docket # 581).

[27]  Although the Court does not find that the Fisher Parties should be sanctioned for non-compliance with the May 17, 2016 Order, as discussed above, I do find that Gershengorn and Osipoff should bear the costs of their unreasonable delay in informing the Court and opposing counsel that a witness would not testify at the June 6, 2016 hearing, necessitating plaintiffs' counsel to prepare for and attend a hearing that did not occur.

3973942, *8 (S.D.N.Y. 2017) ("[m]aking a false statement with intent to mislead a court certainly evinces subjective bad faith") (internal quotations and brackets omitted).  Had they simply described their conduct accurately, the Court would have had a proper basis to evaluate the sanctions motion and, as this decision now reveals, to find that they had adequately discharged their obligations with respect to the two Orders central to the motion.  That irony is not lost on the Court, but neither does it excuse the seriousness of the attorney misconduct or render their misrepresentations immaterial as a matter of law.  "[A] concealment or misrepresentation is material if it had a natural tendency to influence, or was capable of influencing, the decision of the decisionmaking body to which it was addressed." *Kungys v. United States*, 485 U.S. 759, 770 (1988) (internal quotation omitted).  The fact that Gershengorn and Osipoff chose to submit and rely upon knowingly false statements about their conduct and their knowledge led to further protracted proceedings, including an evidentiary hearing with two witnesses, the Court's subsequent issuance of an Order to Show Cause, review of lengthy post-hearing submissions that raised various arguments for the first time, and the preparation of a report and recommendation made more difficult by the conflict between the Metzger Declaration and the Osipoff Declaration and testimony.

The Court is mindful that the imposition of sanctions against attorneys is a serious matter with serious consequences, which must be approached with restraint.  Even with those considerations in mind, the Court cannot disregard the conduct before it or the justification for sanctions.  Accordingly, the Court finds that sanctions should be awarded against Gershengorn and Osipoff under Section 1927 and the Court's inherent authority.  The record before the Court demonstrates no basis upon which Kaufman should be sanctioned and indeed he is not even mentioned in plaintiffs' post-hearing submission (beyond a footnote observing that plaintiffs

72

seek sanctions against him).   (*See* Docket # 576 at 2 n.1).   Thus, I recommend that no sanctions be imposed on him.

   As to Gershengorn and Osipoff, I recommend to the District Court that each be ordered to pay $3,000 to the Clerk of the Court and to reimburse plaintiffs' counsel for their reasonable attorneys' fees and costs in making this motion.   Specifically, Gershengorn and Osipoff should be ordered to reimburse those fees and costs associated with the filing and briefing of the original motion (excluding the filings providing the further specificity ordered by the Court that should have been included in their original filings and excluding the costs of mediation), and the renewal of their motion after mediation, including briefing, oral argument, the evidentiary hearing, and post-hearing submissions.   Additionally, they should be ordered to reimburse those fees and costs incurred from May 17 through June 6, 2016, to prepare for and attend the court-ordered evidentiary hearing.   Plaintiffs' counsel shall submit an affidavit attesting to those fees and costs with supporting documentation by no later than **April 30, 2019**. Gershengorn and Osipoff may respond by no later than **May 31, 2019**.

   This Court finds that none of the other representations challenged by plaintiffs' counsel regarding the accuracy of the lists warrants sanctions against any of the attorneys who represented the defendants.   I have reviewed the statements I understand to give rise to the sanctions motion; none of the statements about the accuracy of the list purport to be guarantees by counsel, but rather reflections of counsel's belief at the time the statements were made that the lists were accurate.   The record does not include facts to demonstrate that counsel made such statements knowing or believing they were false.

   The Court further finds that none of the other sanctions sought by plaintiffs are warranted, and I recommend that they be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, it is recommended that the District Court grant in part and deny in part plaintiffs' renewed motion for sanctions **(Docket # 544)**.


　　　　　　　　　　　　　　　　　　　_s/Marian W. Payson_
　　　　　　　　　　　　　　　　　　　MARIAN W. PAYSON
　　　　　　　　　　　　　　　　　　United States Magistrate Judge

Dated:　Rochester, New York
　　　　　March 29, 2019

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

      **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

      **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b), 6(a) and 6(e) and Local Rule 72.

      The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

      <u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u> *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

      The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." <u>**Failure to comply with the provisions of Rule 72(b), or with the similar provisions of Rule 72(a) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**</u>

      Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**IT IS SO ORDERED.**

                                 *s/Marian W. Payson*
                                  MARIAN W. PAYSON
                           United States Magistrate Judge

Dated: Rochester, New York
       March 29, 2019